## IN THE UNITDED STATES DISTRICT COURT
## FOR THE SOUTHERN DISCTRICT OF NEW YORK

| | |
|---|---|
| In re<br><br>KIRWAN OFFICES S.à R.L.,<br><br>    Debtor. | Bankruptcy Case No. 16-22321 (RDD)<br><br>On Appeal from the U.S. Bankruptcy Court for the Southern District of New York<br><br>Case No. 1:17-cv-04339-CS<br><br>Case No. 1:17-cv-04340-UA |

## APPENDIX TO APPELLANT'S BRIEF IN SUPPORT OF APPEAL FROM BANKRUPTCY COURT ORDER CONFIRMING DEBTOR'S PLAN OF REORGANIZATION

**STEPHEN P. LYNCH**
Pro se
Ul. Letnikovskaya #2, Str 3,
P.O. Box #9, Moscow, 115114, Russia
0079295911002

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: _7-13-17_

**TABLE OF CONTENTS**

Relevant entries in the bankruptcy docket.........................................1-1104, 1118-1163

Orders from which the combined appeal is taken...........................811-851, 1001-1002

Notices of appeal.....................................................................1074-1076

Transcripts .............................................................652-682, 875-921, 1003-1073

**Fill in this information to identify the case:**

United States Bankruptcy Court  for the:

Southern _____ District of   New York _____
(State)

Case number (If known): _____   Chapter  11

☐ Check if this is an
amended filing

Official Form 205

# Involuntary Petition Against a Non-Individual

12/15

Use this form to begin a bankruptcy case against a non-individual you allege to be a debtor subject to an involuntary case. If you want to begin a case against an individual, use the *Involuntary Petition Against an Individual* (Official Form 105). Be as complete and accurate as possible. If more space is needed, attach any additional sheets to this form. On the top of any additional pages, write debtor's name and case number (if known).

## Part 1:   Identify the Chapter of the Bankruptcy Code Under Which Petition Is Filed

1. **Chapter of the Bankruptcy Code**

*Check one:*

☐ Chapter 7

☒ Chapter 11

## Part 2:   Identify the Debtor

2. **Debtor's name**

Kirwan Offices S.à r.l.

3. **Other names you know the debtor has used in the last 8 years**

Include any assumed names, trade names, or *doing business as* names.

N/A

4. **Debtor's federal Employer Identification Number (EIN)**

☒ Unknown

EIN __ __ – __ __ __ __ __ __ __

5. **Debtor's address**

**Principal place of business**

11/13 ____ Boulevard de la Foire _____
Number     Street

L-1528, Luxembourg

_____ _____ _____
City              State   ZIP Code

_____
County

**Mailing address, if different**

_____ _____
Number     Street

_____
P.O. Box

_____ _____ _____
City              State   ZIP Code

**Location of principal assets, if different from principal place of business**

Retainers of $250,000
_____ _____
Number     Street

New York _____ NY _____
City              State   ZIP Code

1

Debtor   Kirwan Offices S.à r.l.                                    Case number (if known)_____
         Name

6. **Debtor's website** (URL)   N/A

7. **Type of debtor**
   ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
   ☐ Partnership (excluding  LLP)
   ☐ Other type of debtor. Specify: _____

8. **Type of debtor's business**
   *Check one:*
   ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
   ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
   ☐ Railroad (as defined in 11 U.S.C. § 101(44))
   ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
   ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
   ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
   ☒ None of the types of business listed.
   ☐ Unknown type of business.

9. **To the best of your knowledge, are any bankruptcy cases pending by or against any partner or affiliate of this debtor?**
   ☒ No
   ☐ Yes. Debtor _____   Relationship _____
        District _____ Date filed _____   Case number, if known_____
                                          MM / DD / YYYY

        Debtor _____   Relationship _____
        District _____ Date filed _____   Case number, if known_____
                                          MM / DD / YYYY

**Part 3:   Report About the Case**

10. **Venue**
    *Check one:*
    ☒ Over the last 180 days before the filing of this bankruptcy, the debtor had a domicile, principal place of business, or principal assets in this district longer than in any other district.
    ☐ A bankruptcy case concerning debtor's affiliates, general partner, or partnership is pending in this district.

11. **Allegations**
    Each petitioner is eligible to file this petition under 11 U.S.C. § 303(b).
    The debtor may be the subject of an involuntary case under 11 U.S.C. § 303(a).

    *At least one box must be checked:*
    ☒ The debtor is generally not paying its debts as they become due, unless they are the subject of a bona fide dispute as to liability or amount.
    ☐ Within 120 days before the filing of this petition, a custodian, other than a trustee, receiver, or an agent appointed or authorized to take charge of less than substantially all of the property of the debtor for the purpose of enforcing a lien against such property, was appointed or took possession.

12. **Has there been a transfer of any claim against the debtor by or to any petitioner?**
    ☒ No
    ☐ Yes. Attach all documents that evidence the transfer and any statements required under Bankruptcy Rule 1003(a).

2

| Debtor | Kirwan Offices S.à r.l. | Case number (if known) _____ |
|---|---|---|
| | Name | |

**13. Each petitioner's claim**

| | Name of petitioner | Nature of petitioner's claim | Amount of the claim above the value of any lien |
|---|---|---|---|
| | Mascini Holdings Limited | unsecured loan | € 24,894,359.53 and $ 168,194,481.00 |
| | Lapidem Limited | unsecured loan | € 16,596,239.69 and $ 112,131,987.33 |
| | _____ | | $ _____ |
| | | Total of petitioners' claims | € 41,490,599.22 and $ 280,326,468.33 |

If more space is needed to list petitioners, attach additional sheets. Write the alleged debtor's name and the case number, if known, at the top of each sheet. Following the format of this form, set out the information required in Parts 3 and 4 of the form for each additional petitioning creditor, the petitioner's claim, the petitioner's representative, and the petitioner's attorney. Include the statement under penalty of perjury set out in Part 4 of the form, followed by each additional petitioner's (or representative's) signature, along with the signature of the petitioner's attorney.

| Part 4: | Request for Relief |
|---|---|

**WARNING** -- Bankruptcy fraud is a serious crime. Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both. 18 U.S.C. §§ 152, 1341, 1519, and 3571.

Petitioners request that an order for relief be entered against the debtor under the chapter of 11 U.S.C. specified in this petition. If a petitioning creditor is a corporation, attach the corporate ownership statement required by Bankruptcy Rule 1010(b). If any petitioner is a foreign representative appointed in a foreign proceeding, attach a certified copy of the order of the court granting recognition.

I have examined the information in this document and have a reasonable belief that the information is true and correct.

**Petitioners or Petitioners' Representative**          **Attorneys**

**Name and mailing address of petitioner**

Mascini Holdings Limited

2-4 Arch. Makarios III Avenue, Capital Center, 9th Floor
Number    Street

| Nicosia | Cyprus | 1065 |
|---|---|---|
| City | State | ZIP Code |

**Name and mailing address of petitioner's representative, if any**

Emile du Toit
Name

Dubai International Finance Center, Gate Village, Building 4, Level 4, Suite 402
Number    Street

| Dubai | UAE | |
|---|---|---|
| City | State | ZIP Code |

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  03/15/2016
MM / DD / YYYY

**✗** /s/ Emile du Toit
Signature of petitioner or representative, including representative's title

**Attorneys**

Jay M. Goffman
Printed name

Skadden, Arps, Slate, Meagher & Flom LLP
Firm name, if any

4 Times Square
Number    Street

| New York | NY | 10036 |
|---|---|---|
| City | State | ZIP Code |

Contact phone  212-735-3000    Email  jay.goffman@skadden.com

Bar number  1911239

State  NY

**✗** /s/ Jay M. Goffman
Signature of attorney

Date signed  03/15/2016
MM / DD / YYYY

| Debtor | Kirwan Offices S.à.r.l. | Case number (if known) |
|--------|-------------------------|------------------------|
| | Name | |

**Name and mailing address of petitioner**

Lapidem Limited, c/o Intertrust Corporate Services (Cayman) Limited
Name

190 Elgin Avenue, George Town
Number   Street

Grand Cayman                    Cayman Islands   KY1-9005
City                            State            ZIP Code

**Name and mailing address of petitioner's representative, if any**

Jeffrey Johnson
Name

300 Park Avenue, 16th Floor
Number   Street

New York                        NY          10022
City                            State       ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   03/15/2016
              MM / DD / YYYY

✘ /s/ Jeffrey Johnson
Signature of petitioner or representative, including representative's title

Jay M. Goffman
Printed name

Skadden, Arps, Slate, Meagher & Flom LLP
Firm name, if any

4 Times Square
Number   Street

New York                        NY          10036
City                            State       ZIP Code

Contact phone   212-735-3000    Email   jay.goffman@skadden.com

Bar number      1911239

State           NY

✘ /s/ Jay M. Goffman
Signature of attorney

Date signed     03/15/2016
                MM / DD / YYYY

**Name and mailing address of petitioner**

Name

Number   Street

City                            State       ZIP Code

**Name and mailing address of petitioner's representative, if any**

Name

Number   Street

City                            State       ZIP Code

I declare under penalty of perjury that the foregoing is true and correct.

Executed on
              MM / DD / YYYY

✘
Signature of petitioner or representative, including representative's title

Printed name

Firm name, if any

Number   Street

City                            State       ZIP Code

Contact phone           Email

Bar number

State

✘
Signature of attorney

Date signed
                MM / DD / YYYY

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| **In re** : | **Chapter 11** |
| **KIRWAN OFFICES S.À R.L.,** : | **Case No. 16-[_____] (RDD)** |
| **Debtor.** : | |

---

**CORPORATE OWNERSHIP STATEMENT OF**
**MASCINI HOLDINGS LIMITED**

In accordance with Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which incorporates the disclosure required under Rule 7007.1 of the Bankruptcy Rules, Mascini Holdings Limited (the "Petitioning Creditor"), hereby states that Araza Holdings Ltd. and Jervis Properties Inc. each own more than 10% of the outstanding shares of the Petitioning Creditor.

In accordance with 28 U.S.C. § 1746, the undersigned hereby declares under penalty of perjury under the laws of the United States that they have reviewed the foregoing and that it is true and correct to the best of their information and belief.

Dated: March 15, 2016

MASCINI HOLDINGS LIMITED

By:     _/s/ Emile du Toit_
Name: Emile du Toit
Title:  Authorized Signatory

5

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KIRWAN OFFICES S.À R.L., | : | Case No. 16-[_____] (RDD) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

**CORPORATE OWNERSHIP STATEMENT OF**
**LAPIDEM LIMITED**

In accordance with Rule 1010(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), which incorporates the disclosure required under Rule 7007.1 of the Bankruptcy Rules, Lapidem Limited (the "Petitioning Creditor"), hereby states that VR Global Partners L.P. and HBK Master Fund L.P. each own more than 10% of the outstanding shares of the Petitioning Creditor.

In accordance with 28 U.S.C. § 1746, the undersigned hereby declares under penalty of perjury under the laws of the United States that they have reviewed the foregoing and that it is true and correct to the best of their information and belief.

Dated:  March 15, 2016

                              LAPIDEM LIMITED

                              By:   */s/ Jeffrey Johnson*
                              Name: Jeffrey Johnson
                              Title:  Authorized Signatory

**Hearing Date: May 10, 2016 at 10:00 A.M**
**Objection Deadline:  May 3, 2016 at 10:00 A.M**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X

In re:                                                      Chapter 11
                                                            Case No. 16-22321 (RDD)
KIRWAN OFFICES S.A.R.L.

                        Debtor.

----------------------------------------------------------X

## <u>NOTICE OF MOTION</u>

**PLEASE TAKE NOTICE** that, upon the Declaration of Stephen P. Lynch dated April 6,

2016, the exhibits thereto, and the accompanying Memorandum of Law of even date, together

with the attached proposed Answer to the Involuntary Petition, Stephen Lynch ("Lynch"), the

Class C shareholder of the putative Debtor - Debtor-in-Possession, Kirwan Offices S.A.R.L., a

Luxembourg company ("Kirwan"), individually and on behalf of Kirwan, will move this Court

before the Honorable Robert D. Drain, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Southern District of New York, 300 Quarropas Street, White Plains, New

York 10601 on May 10, 2016 at 10:00 A.M., or as soon thereafter as counsel may be heard,  for

entry of an order: (1) dismissing the case upon the grounds of *forum non conveniens* in favor of

arbitration in London, as required under the Shareholders Agreement dated  August 30, 1987 (the

"SHA"); (2) pursuant to Rules 1018 and 7024 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules") and Fed. R. Civ. P. 24 incorporated therein, together with Bankruptcy Rule

7012 and Fed. R. Civ. P. 12, granting Lynch, individually and on behalf of Kirwan, leave to

7

intervene in this action, for purposes of contesting the involuntary petition filed by and on behalf of Kirwan's Class A and Class B shareholders (collectively, the "Financing Shareholders"), Mascini Holdings Limited, ("Mascini"), a Cypriot company and Lapidem Limited ("Lapidem"), a Cayman Islands company, on the grounds that the filing violated the controlling SHA and upon such leave, dismissing the involuntary petition: (A) upon the grounds that Kirwan does not qualify as a debtor under Section 109 of Title 11 of the United States Code (the "Bankruptcy Code") and that the actions taken for purposes of filing this case were void ab initio in violation of the SHA; and (B) alternatively, should this Court find that Kirwan meets the eligibility requirements under Bankruptcy Code § 109, staying these proceedings to allow for an LCIA determination as to whether the loans for the Financing Shareholder's claims are in fact due, as well as whether the filing violates the SHA, and upon that determination dismissing the petition; (3) should this Court nevertheless find that an order for relief may be entered, abstaining from hearing the case pursuant to Bankruptcy Code § 305(a)(1); (4) alternatively, dismissing the case pursuant to Bankruptcy Code § 1112(b) for cause based on the totality of the circumstances and on the grounds that it was not filed in good faith; and (5) pursuant to Federal Arbitration Act, 9 U.S.C. § 3, for a stay of the bankruptcy case pending arbitration in the LCIA, and  a hearing will be held at that date and time to consider the relief requested in the motion

**PLEASE TAKE FURTHER NOTICE**, that opposition to the Motion, if any, must be (i) in writing, (ii) electronically filed with the Clerk of the Bankruptcy Court, (iii) mailed to the Chambers of the Honorable Robert D. Drain, United States Bankruptcy Judge, United States Bankruptcy Court, Southern District of New York, 300 Quarropas Street, White Plains, New York 10601, (iv) mailed to the Office of the United States Trustee, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014, and (iv) served upon the undersigned counsel, so as to be actually received no later than May 3, 2016 at 10:00 a.m.

Dated: New York, New York
April 6, 2016

DANIEL J. ROTHSTEIN, P.C.

By:/s/ Daniel J. Rothstein_____
Daniel J. Rothstein
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 207-8700

-and-

WHITE & WOLNERMAN, PLLC
Randolph E. White, Esq.
David Y. Wolnerman, Esq.
950 Third Avenue, 11th Floor
New York, New York 10022
(212) 308-0667

*Co-counsel for Stephen P. Lynch*

Daniel J. Rothstein, P.C.
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 207-8700

White & Wolnerman PLLC
950 Third Avenue, 11th Floor
New York, New York 10022
(212) 308-0667

*Attorneys for Stephen P. Lynch*
*Individually and on behalf of the putative debtor*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
--------------------------------------------------------X

In re:                                                          Chapter 11
                                                                Case No. 16-22321 (RDD)
KIRWAN OFFICES S.A.R.L.

                                    Debtor.
--------------------------------------------------------X

### PROPOSED ANSWER OF STEPHEN P. LYNCH, INDIVIDUALLY AND ON BEHALF OF PUTATIVE DEBTOR TO INVOLUNTARY PETITION

Stephen P. Lynch, individually and derivatively on behalf of the putative debtor/debtor in possession Kirwan Offices S.A.R.L. ("Respondent"), by his attorneys, Daniel J. Rothstein, P.C. and White & Wolnerman, PLLC, (in addition to the motion to dismiss and related relief, filed earlier this same date) files this Answer to the allegations contained in the alleged Involuntary Petition filed in the above-captioned case by Mascini Holdings Limited and Lapidem Limited (together, the "Petition Creditors"), and alleges as follows:

1.      Respondent denies that the Petitioner Creditors are eligible to file the alleged Involuntary Petition in this case pursuant to 11 U.S.C. § 303(b). To the extent the Petitioning Creditors allege to have any claims against Kirwan Offices S.a.r.l., those claims are contingent as to liability and/or the subject of a bona fide dispute as to liability or amount.

2.      The Petitioning Creditors have made no allegations with respect to their assertion that Kirwan Offices S.a.r.l. is generally not paying its debts as they become due, and Respondent denies same.

3.      Respondent denies that Kirwan Offices S.a.r.l. is a person against which an order for relief may be entered under title 11 of the United States Code.

4.      Respondent denies that venue in the Southern District of New York is proper.

5.      Respondent denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 12 of the alleged Involuntary Petition.

## AFFIRMATIVE DEFENSES AND CLAIMS FOR RELIEF

Without assuming any burden of proof or persuasion that properly lies with the Petitioning Creditors, Respondent asserts the following defenses and claims in response to the alleged Involuntary Petition:

## FIRST AFFIRMATIVE DEFENSE

6.      The Financing Shareholders' loans are in the nature of paid-in capital and cannot be recovered from the Respondent unless and until there is a "Return" (as that term is defined in the Shareholders Agreement (the "SHA")) binding the parties.

7.      Any claims by the Petitioning Creditors are in addition subject to and must be resolved by the London Court of International Arbitration (LCIA), which has exclusive jurisdiction over the same and must so decide the claims by the application of English law.

8.      As a consequence of the foregoing the Petitioning Creditors' claims are subject to a bona fide dispute as to liability and amount.

### SECOND AFFIRMATIVE DEFENSE

9.      The Petitioning Creditors are insiders who lack standing to file under Bankruptcy Code § 303.

### THIRD AFFIRMATIVE DEFENSE

10.      Respondent is ineligible to be a Debtor pursuant to 11 U.S.C. § 109.

11.      The attempts to create bankruptcy eligibility, including the apparent creation of "Retainer" accounts, were unauthorized, do not constitute funds belonging to Respondent and are void *ab initio*.

### FOURTH AFFIRMATIVE DEFENSE

15.      The Respondent is able to pay its obligations as they come due and any unpaid "claims" were in reality created by the *ultra vires* acts of the Petitioning Creditors in order to fabricate bankruptcy eligibility where none exists.

### FIFTH AFFIRMATIVE DEFENSE

16. This Court should dismiss the alleged Involuntary Petition pursuant to 11 U.S.C. § 305.

### SIXTH AFFIRMATIVE DEFENSE

17. This Court has no subject matter jurisdiction to order the relief sought in the alleged Involuntary Petition.

### FIRST CLAIM FOR RELIEF

18.      Pursuant to 11 U.S.C. §303(i) the Court may award costs or reasonable attorneys' fees if the alleged Involuntary Petition is dismissed.

19.      Respondent requests that it be awarded its reasonable attorneys' fees following the hearing and determination of the alleged Involuntary Petition.

## SECOND CLAIM FOR RELIEF

20.     Pursuant to 11 U.S.C. § 303(i), the Court may award actual and punitive damages if it is determined that the Petitioning Creditors filed the case in bad faith.

21.     The Petitioning Creditors filed the alleged Involuntary Petition in a bad faith attempt to obtain relief from a court with no jurisdiction over the Respondent, a foreign entity with no nexus to the United States.

22.     The Petitioning Creditors manufactured jurisdiction in the United States on the eve of an involuntary filing and colluded with equity holders holding contingent claims to commence such an involuntary proceeding in violation of the putative debtor's operative documents and governing foreign law to further the interests of a subset of equity holders and to the detriment of other equity holders.

23.     As a consequence of the foregoing, Respondent requests that it be awarded actual and punitive damages, following the hearing and determination of the alleged Involuntary Petition.

WHEREFORE, the Respondent, Stephen Lynch, individually and derivatively on behalf of the Respondent, respectfully requests entry of a judgment: (i) dismissing the alleged Involuntary Petition with prejudice and costs; (ii) its reasonable attorney's fees incurred in contesting the alleged Involuntary Petition; (iii) its actual damages and an award of punitive damages on account of the bad faith nature of the alleged Involuntary Petition; and (iv) any and all such further relief as the Court deems just and proper.

Dated: New York, New York
      April 6, 2016

DANIEL J. ROTHSTEIN, P.C.

By:_____

Daniel J. Rothstein
747 Third Avenue, 32nd Floor
New York, NY 10017
(212) 207-8700

*-and-*

WHITE & WOLNERMAN, PLLC
Randolph E. White, Esq.
David Y. Wolnerman, Esq.
950 Third Avenue, 11th Floor
New York, New York 10022
(212) 308-0667

*Co-counsel for Stephen P. Lynch*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------X
In re:                                                      Chapter 11
                                                            Case No. 16-22321 (RDD)
KIRWAN OFFICES S.A.R.L.

                                        Debtor.
------------------------------------------------------------X

### DECLARATION OF STEPHEN LYNCH

Stephen Lynch declares the following under penalty of perjury:

1.      I am a United States citizen.  I have an undergraduate degree from Boston University and a graduate degree from the University of Pennsylvania.

2.      My career has been focused on Russia since being posted here as a Peace Corps Volunteer from 1992-1994.  Since 2001 I have lived full time in Moscow.

3.      I submit this Declaration in support of my motion, on my own behalf and derivatively on behalf of the Debtor, for dismissal of this case and related forms of relief.

4.      I am a minority shareholder with special rights in the Debtor.

5.      I bring this motion because the petitioners, the majority shareholders of the Debtor, pretending to be creditors, are foisting on this Court a two-party shareholders' dispute, with no connection to the United States and involving no legitimate bankruptcy.

**Exhibits**

6.      As Exhibit A to this Declaration, I attach a true copy of a four-page e-mail chain, which includes (on page 1) an e-mail to me dated 07/03/15 from Richard Deitz, who *de facto* controls the majority shareholders.  In that e-mail, he warned me not to take certain actions on behalf of our joint company, the Debtor:

> "Should you start any such process, you can expect to be sued without mercy by Kirwan and its shareholders.  You will find no corner in this world where you will not be besieged by litigation which will last until you are fully and irretrievably bankrupt.  I hope you get the message here.  This is not a threat, but rather a promise."

15

7.      Exhibit B is a true copy of the Shareholders Agreement of the Debtor, dated August 30, 2007.

8.      Exhibit C is a true copy of (i) a loan agreement dated August 30, 2007 between the Debtor and the majority shareholders, (ii) a September 6, 2007 amendment to that agreement, and (iii) a second loan agreement dated August 30, 2007 between the Debtor and the majority shareholders.

9.      Exhibit D is a true copy of the July 13, 2015 Final Award in LCIA arbitration No. 142774, which I brought against the Debtor, the majority shareholders, and a company controlled by Mr. Deitz.

**The parties**

10.     The Debtor, Kirwan Offices S.a.r.l ("Kirwan"), is a Luxembourg company.

11.     Kirwan's primary asset is a Russian company with a claim of ownership to the shares of Yukos Finance BV ("YF"), a Netherlands company, which was the largest foreign unit of Yukos Oil, the former major Russian oil company that is now defunct. The assets of Yukos Finance BV are worth circa one billion US dollars.

12.     The petitioners ("Petitioners") – Mascini Holdings Limited ("MHL"), a Cyprus company, and Lapidem Limited ("LL"), a Cayman Islands company – are the majority shareholders of the Debtor.

13.     Since 2013, MHL and LL have been under common control of VR entities, including VR Global Partners' LP ("VRGP") and VR Capital Group, Ltd. ("VRCG" and together with VRGP – "VR"), whose chief executive is Richard Deitz. Mr. Deitz is directly involved in all aspects of our shareholders' dispute.

14.     This involuntary bankruptcy case arises from my dispute with the Petitioners under the Shareholders' Agreement of August 30, 2007 ("SHA") to which the Petitioners, Debtor, VRGP and myself are parties. The involuntary bankruptcy petition ("Petition") is a

bad-faith attempt by the Petitioners to avoid our chosen London arbitration forum, because they have <u>three times failed</u> at arbitration or under the threat of arbitration to circumvent my minority rights.

15.     In this attempt the Petitioners chose this Court, where our shareholders' dispute has no real jurisdiction, as they hope the Court will liquidate the Debtor and thus achieve their goal of removing my rights.

16.     The petitioners also do not have any standing to bring their Petition to this Court as creditors because the capital contributions they made to the Debtor were truly their equity contributions and were disguised as loans solely for the purpose to reduce the burden of Luxembourg capital duty of 1% on their contributions.

**The origin of the parties' joint venture to acquire Yukos Finance**

17.     In April 2007, in cooperation with Deutsche Bank, I won an auction for lot #4 of the bankruptcy of Yukos Oil.  This success was notable as it had been the market's perception that the Yukos Oil bankruptcy auctions were controlled and choreographed by the Kremlin, with no outsiders allowed.

18.     My success in lot 4 disproved that the auctions were closed, as I knew no one in the Kremlin and had no special resources.  After the April success, in July and August 2007 I formulated a plan to participate in lot #19 for YF.

19.     To implement that plan I marketed it to and organized financial investors, choosing ultimately VR and Renaissance Capital ("RC"), a Moscow-based investment bank.

20.     On 14 August 2007, I acquired a Russian company, Promneftstroy ("PNS") from RN Trade, a subsidiary of Rosneft.  PNS was registered to participate in the auction and made a US$ 60,000,000 deposit as required by the auction rules.

21.     On 15 August 2007, PNS won the bankruptcy auction to acquire YF.

22.    On 20 August 2007, PNS signed a share purchase agreement with the Russian bankruptcy receiver for the purchase of the YF shares.

23.    To govern our joint venture, RC through MHL and VR through LL together with their "Guarantor" affiliates, respectively Renaissance Holdings Management Ltd ("RHML") and VRGP, the Debtor and I entered into the SHA. The SHA saw MHL & LL as the "Financing Shareholders" (as defined in the SHA, Clause 1.1), holding A and B share classes (ultimately they would hold 2,500,000 shares in total) while a single C share was issued to me for my contributions to the joint venture. The C share came with special rights and certain priorities in the joint venture as detailed and agreed in the SHA.

24.    On 30 August 2007, concurrent with signing the SHA and receiving the C share, I transferred the PNS shares to Kirwan. I did so on reliance on the SHA protections of my minority shareholder's rights which I discuss below. Without the SHA I would not have transferred PNS to Kirwan. In fact I refused to transfer PNS to Kirwan without a signed SHA that protected my minority shareholder's rights.

25.    On the same day Kirwan's Financing Shareholders provided PNS with the financing it needed (approximately $307 million) in order to close on its acquisition of YF from the Yukos bankruptcy receiver, which was required to take place by 31 August 2007.

**The parties' rights and obligations under the Kirwan Shareholders Agreement**

26.    In return for my contributions to the venture, including originating the investment concept and transferring PNS to Kirwan, the SHA guarantees me the right to receive 10% (ten percent) of any "Net Gain" (defined in SHA, Clause 1.1 and calculated under Schedule 4) when PNS would acquire quiet legal title to the shares of YF and transfer them to Kirwan. (SHA, Clause 12.5)

27.    In an arbitral award on 13 July 2015 regarding certain Kirwan shareholder disputes discussed below, the arbitrator expressed his view that my "entrepreneurial role"

was such as to justify . . . 10% of . . . the future net gain from the venture." (LCIA Final Award par. 82)

28.    The SHA protects my rights as a minority shareholder and gives me certain exclusive rights. For example, key corporate decisions require unanimous consent of all shareholders ("USRM"). Most broadly, unanimous shareholder consent is required for "[a]ny . . . corporate action the effect of which would be to alter the rights attaching to the C Share." (SHA, Schedule 3, Part 3)

29.    Of central importance for this case, unanimous shareholder consent is required for "[a]ny decisions which would result in the Company's liquidation, placing into receivership or administration of the Company." (SHA, Schedule 3, Part 3). The Financing Shareholders are violating this clause by trying to bankrupt Kirwan in this Court without my consent. For this reason the petition is involuntary despite there being no creditors except the majority shareholders whose loans are actually capital contributions. There are no third party creditors, in fact no real creditors at all.

30.    All the loans were in reality equity contributions by the Financing Shareholders. It was agreed between the SHA parties that the Financing Shareholders would fund 99% of the initially required capital and subsequent cash (capital) calls by way of loans to limit the impact of Luxembourg capital tax of 1%. At the same time the Financing Shareholders waived any remedies available to them for non-payment of the Loans and further agreed that they would not be paid any Return, including any amount of the loans by Kirwan or any other Group Company before prior satisfaction of my rights under clause 12 of the SHA.

31.    Furthermore, unanimous shareholder consent is required for "[p]ayment of any Return to the Financing Shareholders save where the rights of the C Shareholder in respect of that payment have first been satisfied in full as contemplated by Clause 12 of

this Agreement." (Id.) Under Clause 1.1 of the SHA, "Return" is defined very broadly,

including, for example, "a distribution made on the winding-up of the Company." In this

Court, the Financing Shareholders seek to violate these clauses by winding up Kirwan

without my consent and taking a Return for themselves and depriving me of a distribution.

32.     The SHA, corporate documents, and applicable law, including Russian law,

protect my minority rights in other governance issues of the joint venture, such as

amendments to the charter and bylaws of Kirwan, amendments to the charter of PNS, and

appointment and control of executive bodies of PNS and YF.

33.     The Kirwan shareholders agreed that all irreconcilable disputes arising under

the SHA between or among Parties, including Kirwan "shall be" submitted to arbitration in

the London Court of International Arbitration ("LCIA"). (SHA, Clause 25) Similarly the

loan agreements used to justify the bankruptcy provide for LCIA arbitration of disputes

between the Petitioners and the Debtor. Unfortunately, the Debtor being controlled by the

Petitioners, is not objecting to the maturity of the loans for a variety of reasons, and is not

taking this dispute to the LCIA where it should be properly adjudicated.

34.     In July 2015, at my request, the LCIA restrained Kirwan (as controlled by the

Financing Shareholders) from taking certain corporate actions that were related to the current

dispute and that violated my rights under the SHA. The LCIA awarded me 488,312.46

British sterling the Respondents received no cost award.[1]

35.     After the Final Award, before even paying the cost award, the Financing

Shareholders attempted to circumvent the award. They did this by attempting to grant from

Kirwan among other related resolutions, a limitless Power of Attorney ("POA") to Richard

---

[1] The reliance by "Creditors" on the LCIA Award in the 17 March 2016 Petition to Terminate
Exclusivity, to besmirch my actions or character, demonstrates the true intent of that
submission and the games they are playing (as does its timing). I have asked that the Final
Award in its entirety be submitted to this court under seal. The LCIA arbitration was clearly
won by me. The LCIA orders were exclusively in my favor as was the cost award.

Deitz (and Sina Toussi, VR's general counsel) to represent Kirwan and PNS in its litigation and related settlement discussions. The POA's sought authorities, through yet another new and creative tool, that which the LCIA had already restrained Kirwan under Deitz's control from doing. I objected and on the eve of my submitting a new request for relief to the LCIA, after first sending the Financing Shareholders a copy of the new request, the Petitioners and Kirwan "unilaterally" withdrew the POA and related resolutions.

36.     Having essentially lost twice in the LCIA in less than a year (actually three times as in late 2014 via an application for interim injunctive relief followed by a Consent Order I blocked the formation of a board of directors in breach of the SHA), the Financing Shareholders have now decided to try their luck in this foreign forum. As a deep pocketed hedge fund, they apparently hope that by outspending me, in an inconvenient jurisdiction, far from my home and counsel, my means for fighting back will be overwhelmed, and our joint venture will be liquidated with no return to me, while the remaining original Financing Shareholders will receive a return of nearly $140 million, and be freed from their contractual commitments to me.[2] I believe that their petition to this Court is unsupported by law, and I request that this Court give my motion careful attention.

**The parties committed to each other to persist in their joint venture.**

37.     The SHA set forth the shareholders' fundamental undertaking to each other in order to achieve the goal of acquiring YF: that they would "procure" that PNS "takes all actions, steps and proceedings legally available to it with a view to ensuring that it acquires legal registered title to the entire issued share capital of Yukos Finance B.V, as soon as reasonably practical following the payment of the Auction Price." (SHA Clause 5.3)

---

[2] In broad terms the investment basis of Kirwan is $340 million of which VR and its original partners financed 40% or $136 million. Jervis Properties Inc. – RC's partner in MHL – financed $54.4 million. The total cost of the investors who remained in this venture is $190.4 million. A settlement of $140,000,000 will get them 73.5% of their investment.

38.     In their 17 March 2016 Petition to Terminate Plan Exclusivity Periods, the
Financing Shareholders explicitly acknowledge that this has not been achieved (para. 2) and
in their proposed plan this would not occur.  It is inter alia to avoid this undertaking that VR,
MHL & LL have conspired to fake Kirwan's bankruptcy.  There are no third party creditors
or any legitimate creditor concerns at work here.

39.     With the exception of Akin Gump Strauss Hauer and Feld LLP, Mandel
Bhandari LLP and Amicorp, Kirwan does not have any agreements / engagement letters with
anyone else, including Clifford Chance LLP, Simmons & Simmons LLP and Houthoff
Buruma who represent PNS in the Netherlands. ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄  As to Akin Gump, they have US$150,000 on retainer.  After this is
applied towards their outstanding invoices they will be owed circa US$33,000.  An amount
far below what the Petitioners have spent on their counsel to file the petition and the
exclusivity periods motion and what I have to spend in connection with my motion.  Mandel
Bhandari are not being owed anything at the moment.  In any event Akin Gump's and
Mandel Bhandari's engagement and payment were carried out by Kirwan in breach of the
SHA.

40.     Furthermore, Mr. Deitz told Clifford Chance and Houthoff Buruma in a phone
conversation of a few weeks ago that this bankruptcy was an "organizational issue" and that
they need not worry about not being paid their legal fees.  This only further confirms my
belief that this bankruptcy is not a genuine bankruptcy but is a fraudulent one aimed to
dispose of my rights under the SHA and to "get rid of me" (as Mr. Deitz put it to Mr.
Godfrey).

41.     ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄
▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄



42.    The litigation was the very reason for the opportunity and was the reason why there were few bidders and why there was such a large surplus between the acquisition price and the actual value.



Notwithstanding these known risks, the deal we made in 2007 was that we would jointly combine our efforts including their expertise and financing to acquire and get title to YF. This is why I entered into the SHA with them as they provided me financing and promised to help me get title. Obtaining title has proven more difficult to accomplish than envisioned in 2007, and now they want an early exit where none was negotiated in the SHA. Their desire to exit this deal early, before we obtain title to YF, where no such exit is allowed without all the Parties consent, is the true motive behind the bankruptcy ploy and each of the previous attempts to get rid of me.



Page 9 of 34

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 26 of 88

43.   The expertise and sophistication of the Financing Shareholders cannot be understated.  Mr. Deitz in particular, is an expert on bankruptcy and distressed assets, and has intimately known the Yukos matters long before its bankruptcy and he has even appeared in this court in several instances.  In August 2007 Mr. Deitz had full knowledge of the risks and commitments they agreed to as a consequence of our agreement, and even more so in 2012 when he consolidated the majority shareholding of Kirwan, Mr. Deitz knew the circumstances and risks, including notably among others:

- The Dutch Litigation and the Claims (including the Glendale Claim)

- The Undertaking to get title to Yukos Finance (clause 5.3)

- The Undertaking by the Parties not to interfere with the steps of PNS to get quite title to Yukos Finance (clause 5.4)

- The Undertaking by the SHA Parties to procure that following the acquisition of the title to Yukos Finance PNS transfers the shares in Yukos Finance to Kirwan with the offset of the loans by Kirwan to PNS against the purchase price (clause 4.3.1)

- Kirwan and PNS entering into a share purchase agreement in respect of the Yukos Finance Shares on 30 September 2010 requiring that completion may only take place after the Dutch counsel gives an opinion that it would not violate any Dutch law or any effective order or ruling of the Dutch court and that such opinion can only be issued after an irrevocable order or ruling of the Dutch court on PNS's ownership of YF.

- Financing Shareholders waiver of all remedies (including the present bankruptcy petition) in relation to any non-payment or non-performance of Loans (clause 5.6)

- The prohibition against Third Party Agreements (Clause 18)

- The limitless Duration (Clause 23.1)

Page 10 of 34

- Confidentiality (Clause 24)

- Dispute resolution in the LCIA (clause 25)

- USRM (Schedule 3, Part 3) including inter alia: the sale or disposition of Yukos
  Finance B.V. (including any transfer of control); the incurring of any expense
  over $250,000 or in excess of $2,000,000 when aggregated with like expenditures
  (all the actions and payments resulting in Kirwan's fake insolvency are USRM
  but occurred without my participation or knowledge); the liquidation, placing into
  receivership or administration of the Company;

- The Consequences of me holding executive authority over the primary asset PNS
  and YF (Clause 7 and relevant law).

44.     Despite these commitments and agreements, the Financing Shareholders, now
both under the control of Mr. Deitz, seek to portray me as an incidental participant in our
venture and seek to vacate, via secret and unauthorized settlement talks and then a contrived
insolvency and fabricated bankruptcy of Kirwan, nearly all the commitments they made in
2007.

**Special Purpose Vehicles (SPV's) and nature of the corporate structure**

45.     Neither Kirwan nor the Financing Shareholders, nor their ultimate
beneficiaries, have any connection to this forum.  The corporate structure was carefully
designed and the respective jurisdictions chosen to minimize taxes and regulatory reporting.
They are each domiciled in tax havens, but now they seek to avail themselves of those same
legal structures that the SPV's were designed to and have been to this point utilized to avoid.

46.     Kirwan and the Financing Shareholders are off-the-shelf SPV's with no
activity prior to August 2007.  They were purchased by the financing shareholders
specifically for a one-off transaction.  None of these companies should have any operations
beyond the financial flow of funds required to operate Kirwan's only subsidiary PNS, where I

Page 11 of 34

am the sole executive authority.  The operations that have been made by Kirwan which resulted in its contrived insolvency, and suddenly presto jurisdiction in New York, are illegitimate, because inter alia they were done without any knowledge or authority from the required quorum of Kirwan's board or shareholders and were not in Kirwan's interests. There is no legitimate corporate action by Kirwan which results in the balance in its account being next to zero.

47.     In the case of Kirwan itself, the SHA parties and their advisors were directly involved in the acceptance of the decision to domicile the joint venture in Luxembourg and the related corporate and tax structuring.  In the case of MHL, I had been told by Renaissance that it was a company they were holding for just such a need, Cyprus being in 2007 the preferred offshore haven for Russia-based investors.

48.     I have less direct information as to the reasons why VR chose LL, except that the Cayman Islands is a well known tax haven, an offshore financial center as per the CIA Factbook, and all VR companies related to the Financing Shareholders (VR Capital Group, VRASL and VRGP) are based in the Cayman Islands.  It is also the same domicile of VR's guarantor under the SHA, VRGP.

49.     The creditors assert jurisdiction on the basis of $250,000 of retainers in New York.  I do not know what all these retainers are for (some is for Akin Gump), but I do know that Kirwan had no previous practice of paying retainers, and that Kirwan has not approved the paying of any retainer to New York or approved any related contract or engagement. Also Kirwan's only asset is PNS, a Russian company.  In reviewing the bank records of Kirwan I do know that the retainers could only have been made recently (January – February 2016) and thus I assume some of them are made only as a means to claim U.S. jurisdiction.

50.     In a case of incredible irony, some of the retainers used to justify Kirwan's jurisdiction and a large portion of the unauthorized payments from Kirwan that resulted in its

contrived insolvency are for the benefit of the Petitioners and VR employees' (Deitz and

Johnson) to finance their personal legal efforts.  On 8 December 2015 Mr. Deitz stated, in his

Declaration to this Court, in Case No. 1:15-mc-00325-P1:

> I am a resident of London and have permanently resided here since October 2013.  I
> have not resided in the United States since 1994.  While I am based in London, the
> nature of my work takes me all over the world.  Consequently, I am occasionally in
> New York, as well as in Buenos Aires, Dubai, and a number of other cities for
> business.  By no means do I "regularly" transact business in New York ... Since
> 2010, I have visited New York City approximately 15 times for business. In general,
> my visits have lasted one working week or less.  I am not a resident of New York, and
> I do not file New York State income tax returns.  In addition to visiting New York for
> business, I occasionally travel to New York for family or personal reasons ... VR
> Capital is incorporated in and has its registered address in the Cayman Islands. Other
> than Jeffrey Johnson, none of its directors are based in the United States, ***and it has
> no employees or other presence in the United States*** (emphasis added).  VR Capital
> indirectly owns VR Advisory Services Ltd ("VRASL") another Cayman entity.[4]
> Pursuant to applicable regulations, VRASL is registered with the U.S. Securities and
> Exchange Commission as a Non-Resident Investment Advisor.  VR Capital does not
> have an office in New York City."

51.     The closest connection to the SDNY is me and that is only because I was born

in New York.  However I have not been a resident of the United States in nearly two decades,

and for tax reasons I visit the United States for less than 35 days per year (that limitation

alone would make participating in US proceedings particularly onerous on me).  I am not

required to and do not file a NY State tax return, I own no real estate or property in the

United States and I have no U.S. bank account nor do I conduct business in the United States.

52.     The reason why I am personally holding the C share is to avail myself of U.S.

capital gain tax treatment of my future Net Gain if any from Kirwan.

**My role, contribution, and management and other rights**

53.     The timing and scale of my contributions involved in our joint venture were

extensively addressed at the LCIA, where I brought an action against MHL, LL and VR

Global Partners in September 2014.

---

[4] VRASL is the general partner of VR Global Partners L.P. (VRGP), which together with VR
Capital owns the majority of shares in the Financing Shareholders.

54.    On 13 July 2015 the arbitrator issued a Final Award, in which he concluded that my "entrepreneurial role was nevertheless such as to justify...10% of...the future net gain from the venture." -Paragraph 82, LCIA Final Award. The cost award was in the amount of 490,000 British pounds in my favor.

55.    The arbitrator's primary finding was that I hold the right to appoint the general director of PNS and that the general director is the sole executive authority of PNS. All of the value of Kirwan is represented in its ownership of PNS.

56.    I negotiated the exclusive right to appoint the sole executive authority of the core asset company (PNS) as I wanted insurance of my other rights.

57.    The Financing Shareholders portray my appointment right as general director as "ceremonial," as if a company had ceremony. In fact, in a Russian company, the general director is the only person that can act for the company. Although I contributed PNS to the joint venture, so that it is now a subsidiary of Kirwan, I negotiated to keep my right to appoint the PNS general director in order to protect my rights in the SHA.

58.    The power to appoint the general director of PNS is my key non-economic right as it works as it was designed, to prevent subversion of the SHA, allowing me to proceed to LCIA should Kirwan or the Financing Shareholders decide any matter which they are not allowed to under the SHA or take any other action which violates the SHA and thus would not be in the interest of PNS.

59.    By 2007, I had sufficient business experience in Russia to know that the general director of a Russian company is the only executive able to act for or represent a company. A shareholder can limit the authority of the general director by reserving for itself the power to approve certain of the general director's actions on behalf of the company. What the shareholder cannot do is extinguish the general director's independent and exclusive authority to act unilaterally on behalf of the company so long as the general

Page 14 of 34

director acts in the interest of the company and where required on the basis of prior approval of the shareholder.

60.    It is exactly because of my unavoidable statutory roles that Mr. Deitz wants now to effectuate a settlement of PNS's litigation through the bankruptcy court and not through the corporate governance procedures and relevant law agreed on in the SHA.  The bankruptcy petition has been invented to remove the protections I was given in 2007 and successfully defended in 2014 and 2015.

61.    Mr. Deitz can make no claims that I have not fulfilled my duties as general director.  As C Shareholder I owe no duty to the Debtor or the Petitioners.  And far from being uninvolved in PNS's matters, I am far more involved than Mr. Deitz.  From the hundreds of PNS meetings or conference calls that have occurred over nearly the last decade it can be counted on one or two hands, the number I have missed.[5]  Likewise it is me who is the primary attendee at the many court hearings and procedures in the Netherlands and elsewhere.  I have attended perhaps as many as 40 or 50 compared to the handful Mr. Deitz has deigned to show up for.  Indeed it was me who appeared in this very court on PNS's behalf in December 2007.

**Threats and intimidation by the Financing Shareholders**

62.    Concurrent with corporate actions and informal usurpation of my executive authorities by the Financing Shareholders, their de facto head Richard Deitz has repeatedly threatened me and seeks to intimidate me.

63.    As one example on 7 March 2015 a series of emails were exchanged between myself and Mr. Deitz.  My initial concern was the repeatedly delayed payment of funds to

---

[5] Except the many that Mr. Deitz has conducted himself in secret from me and outside the normal corporate governance procedures of PNS.

lawyers representing PNS in the Netherlands.[6]  I had suggested to Mr. Deitz that I could

source additional financing.   My suggestion received the following reply from Mr. Deitz:

> "Should you start any such process you should expect to be sued without mercy by
> Kirwan and its shareholder.  You will find no corner of this world where you will not
> be besieged by litigation which will last until you are fully and irretrievably bankrupt.
> I hope you get the message here.  This is not a threat, but rather a promise."

This threat was by no means a singular event nor the most sinister.

**Further attempts to usurp Kirwan and PNS executive authority**

64.     Between the closing of the LCIA hearings and issuance of its Final Award on

12 July 2015, I agreed with the Financing Shareholders on a new charter for PNS.  In

practice, as always this was a phone call between Mr. Deitz and myself.  No other Kirwan

director has played any role in the joint venture except as administrators.  The board meetings

(which are held on average once every two years) are discussions between me and Mr. Deitz

with no substantive views from the other directors.

65.     The new charter restated limits on the general director that had been agreed in

2007.  While I agree and consent to these limits, they require a cumbersome approval regime,

where the board must make a decision for many of the corporate actions I need to take as

executive (all the action before and after those decisions are mine to take).  As the primary

example, issuing instructions to counsel must be decided by the board before I as general

director issue the instructions.  This is required often, because the main activity of PNS is

litigation to gain title to the YF shares.

---

[6] It's noteworthy that in that case, from only six months ago, the overdue legal bills of many
hundreds of thousands of euros had not been paid in over a year and the lawyers due
compensation were making repeated entreaties to me.  They had not been paid because Mr.
Deitz was insisting that the already due (and discounted) invoices be sharply discounted.
And now in this case Mr. Deitz engineers an insolvency on the basis of a $150,000 retainer
payment to Akin Gump when none of their invoices (itself for services to Mr. Deitz
personally and his employee Jeffrey Johnson) were outstanding and the remaining balance of
February and March invoice was only approx. $24,000 in circumstances when Akin had
made no inquiry for payment.

66.     On 9 August 2015 I wrote to Mr. Deitz and other members of the Board advising them of the consequences of the new charter in particular the required corporate approval procedure to be followed before the general director could instruct counsel. Mr. Deitz replied that, "all decisions with respect to litigation matters were in the exclusive competence and purview of Kirwan," and that the latter had, "delegated *__management__* of the legal issues to VR Capital." which meant, he clarified, Richard Deitz and Sina Toussi.[7]

67.     This was the beginning of an exchange of correspondence between myself and Mr. Deitz.   My position was that as a consequence of the LCIA Award and as a matter of Russian law and the PNS Charter, no one but the General Director of PNS can instruct PNS' counsel.  Management cannot be delegated to Kirwan by anyone but the PNS general director.  Absent such delegation by the general director, Kirwan cannot delegate management authority as they do not have management authority to begin with.  Under the PNS Charter, instructions from the General Director of PNS to its counsel requires approval by Kirwan, as the sole participant in PNS, by way of written resolution signed by the Financing Shareholders.  Kirwan cannot approve or sign such a resolution without convening a meeting of its Board or without having all of its Directors, including me, consent to a circular written resolution.  This is the procedure we are required to follow as a consequence of the terms and restrictions in the Charter as demanded by the Financing Shareholders.

68.     On 1 September 2015, without my involvement resolutions of both Kirwan and PNS were passed purporting in essence to grant Messrs. Deitz and Toussi Power of Attorney with unlimited power to represent and legally bind Kirwan for any and all purposes related to initiating, prosecuting and settling (or entering into any settlement negotiations) with respect to any current and future legal proceedings affecting Kirwan and/or any of its

---

[7] Of the many thousands of emails that Mr. Deitz and I have exchanged this one is memorable.  It demonstrated to me that even after losing at the LCIA, Mr. Deitz does not want to recognize the management of PNS is exclusively vested in me or my nominee.

subsidiaries, i.e. PNS, (including but not limited to the litigation in the Netherlands related to Yukos Finance, i.e. the Yukos Finance Proceedings or Dutch Litigation) with the right to execute and file any and all necessary documents and to instruct counsel.

69.     The resolutions also said that without the approval of Kirwan, the General Director of PNS did not have any independent right, power or authority, and that his role was strictly limited to carrying out the instructions of Kirwan and its authorized representatives (i.e. Mr. Deitz and Mr. Toussi).  And that any and all discussions with any party regarding settlement of any litigation involving PNS were reserved for the exclusive competence of Kirwan as the sole participant of PNS, that without the approval of Kirwan the General Director of PNS did not have any independent right, power or authority to conduct any discussions with any party regarding settlement of any litigation involving PNS and that his role in relation to any such action was strictly limited to carrying out the instructions of Kirwan and its authorized representatives (i.e. Messrs. Deitz and Toussi).

70.     The Kirwan Resolution, Power of Attorney and the PNS Resolution sought to achieve through an invented and illegitimate backdoor exactly what the Respondents (i.e. Deitz) had already tried to do but were prevented from doing by the LCIA Consent Order in the first instance and then the LCIA Award:  conferring on Kirwan the power to act on behalf of PNS.

71.     I did not accept the Kirwan Resolution, the Power of Attorney or the PNS Resolution as I felt they were all in breach of the SHA, By-Laws of Kirwan, PNS Charter, LCIA Award and relevant law.  On 8 September 2015 I sent a notice of dispute under the SHA to Kirwan, the Financing Shareholders, and Kirwan.

72.     For nearly two months I worked to resolve the dispute amicably.  My communications with VR (who controlled all the potential respondents in the dispute) gave me the impression that they were simply dragging their feet and had no genuine intention to

cancel and withdraw the 1 September 2015 corporate actions of Kirwan. This left me no

choice but to write a request for arbitration to the LCIA. On 3 November 2016 in a final

good faith effort I sent copies of the request to the intended respondents, instead of first to the

LCIA, giving Deitz/VR the last chance to amicably settle the dispute.

73.     Immediately following the receipt of my request for arbitration, VR's Mr.

Toussi contacted me and told me that they would organize the unilateral withdrawal of the

resolutions and the Power of Attorney. By 6 November 2016 I had received signed

confirmation of these actions being completed.

74.     What I did not know was that Mr. Deitz continued to informally represent

Kirwan and PNS as if he had an unlimited power of attorney.   This is now shown in the

Financing Shareholders' 17 March 2016 Motion to Terminate Exclusivity.

75.     The majority shareholders, since being consolidated in 2013 under VR

Capital, have worked relentlessly and coercively to negate my minority rights, in particular

my right to appoint the general director of PNS. They have done this outside of the agreed

corporate governance procedures and in some cases in violation of applicable law.

76.     Repeatedly I have been forced to defend my corporate rights. In 2014 I

applied to the LCIA and the English Commercial Court to stop VR and the Financing

Shareholders from creating a board at PNS in violation of the SHA. Only after I filed my

claim and via a Consent Order did they abandon that attempt.

77.     Then in 2015, as I have already attested, I was forced to fully arbitrate against

the same parties. I obtained a Final Award on 13 July 2015 prohibiting them from creating a

second sole executive authority at PNS that would have cloned the general director position,

making it redundant.

78.     Later in 2015 I forced the VR controlled entities to withdraw resolutions of

Kirwan and PNS that I considered illegitimate and which purported to grant unlimited power

of attorney to Mr. Deitz and VR's corporate counsel and to emasculate, in yet a new way, my sole executive authority as PNS's general director.

79.     The above corporate actions had the benefit of at least being transparent. Where he failed in these efforts Mr. Deitz simply usurped informally the executive authorities of PNS, and arrogated the authority to act for Kirwan and PNS. This culminated in the events leading up to the conspired and contrived insolvency and fake bankruptcy of Kirwan, where the Financing Shareholders ignored every shred of corporate governance at Kirwan. Not a single shareholder or board meeting was held or resolution passed to give even the appearance of normal business in the fabrication of Kirwan's bankruptcy.

80.     Before and concurrent with that, including before and after having his illegitimate 'unlimited power of attorney' revoked, Mr. Deitz (or Mr. Toussi) had:

- Without any knowledge or authority from PNS engaged U.S. counsel, issued instructions to that U.S. counsel to file motions and petitions in U.S. SDNY and even appeared in several instances in U.S. district court as a representative of PNS. I discovered this only by chance on PACER. To this day, to the best of my knowledge, neither the Court nor the respondent in that matter have any knowledge that the 'representatives' of PNS that appeared in those proceedings were corporate imposters.



- Without any knowledge or authority from PNS entered into a cooperation agreement between PNS and a former member of the Yukos team, in which PNS inter alia agreed to compensate the individual certain costs. Mr. Deitz represented PNS in those unauthorized negotiations, misrepresenting his authority to do so. I found out about it only when Yukos brought it to my attention with accusations of corruption against PNS (although PNS had no knowledge of the affairs).

- At least twice without any knowledge or authority from either PNS or Kirwan or me as general director or C shareholder entered into settlement talks and agreed to terms of a settlement with our Yukos opponents.

Page 20 of 34

81.     The first set of settlement talks were from November 2014 to July or August 2015. I had some signals that settlement talks were ongoing without my consent or involvement and I had sought from the LCIA in the first arbitration declaratory relief prohibiting those discussions as not permitted under Clause 18 of the SHA, namely as Conflicts and Third Party Agreement(s). At least not permitted without all Parties' consent.

82.     A commercial settlement certainly could make sense for all parties, although I had in the past made it clear to Mr. Deitz that I would have to be compensated for any C Shareholder rights that I would need to waive in order for a settlement to be implemented. Given what I contributed to our joint venture on day one, not to mention nearly a decade of work and many hundreds of thousands of dollars in expenses for which the Financing Shareholders refuse to compensate me and that I would be foregoing the opportunity to earn many tens of millions of dollars should we get title to YF, and what I consider the settlement value of YF (far in excess of what Mr. Deitz has negotiated), my expectations are indeed substantial. However those expectations are for now only academic. The Financing Shareholders (i.e. Mr. Deitz) have never acknowledged that my C shareholder rights have any value in a settlement.

83.     In the arbitration the arbitrator did not grant me the declaratory relief I sought to prohibit Third Party Agreement discussions as he was not convinced that such talks had taken place. I was unable to provide sufficient evidence. Then shortly after the LCIA hearings closed, through emails from Yukos to me and our Dutch counsel and from the deposition of Mr. Wolf in New York, it was revealed that in fact Mr. Deitz had already negotiated settlement terms even before the LCIA hearing. This despite that during the hearing he had testified and his counsel had said that there were no settlement discussions. Rather then being as they said in the hearing, "a long, long, long, way away," the settlement terms were already agreed!

84.     In that settlement negotiated by Mr. Deitz without PNS's knowledge or involvement, PNS would settle for $162 million (although the emails that were exposed after the LCIA hearing refer to the beneficiary as VR), and potentially get another $245 million if PNS won its appeal of the 31 October 2007 decision (PNS would forego its right to appeal if it lost that decision). I had no involvement in those discussions nor in Mr. Deitz's subsequent rejection of those terms, "on PNS's behalf." Mr. Deitz withheld from me the draft settlement agreement he had been provided by Yukos and he told me I was not entitled to information about the settlement negotiations.

85.     The second set of settlement talks were in late 2015 and in the first quarter of 2016. These talks too were held exclusively by Mr. Deitz on behalf of PNS & Kirwan despite only weeks early having been explicitly prevented from having a power of attorney to do exactly that—represent PNS & Kirwan in settlement discussions. Again Mr. Deitz kept all of these discussion secret from me and he repeatedly lied or did not respond to me when I asked him if there were any ongoing settlement discussions.

86.     In November I had a meeting with David Godfrey, an adversary of PNS in the Dutch "public order" litigation.[8] When he suggested we discuss a settlement I excused myself and I called Mr. Deitz to ascertain his current thoughts. On the phone Mr. Deitz and I could not agree on even basic terms, so I told him I was leaving the meeting and I simply told Mr. Godfrey that I did not have all shareholders consent to negotiate a settlement.

---

As to the former I told Mr. Godfrey that I knew nothing about such things and I simply did not comment on the latter as I knew of it bu⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛ Mr. Godfrey. Mr. Godfrey told me that Yukos would retaliate for these actions⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛including the 1782 proceedings against Deitz and Johnson in SDNY and he did not tell me but shortly thereafter the English claim was filed seeking personal liability from myself and Mr. Deitz.

87.     In the evening of 16 December 2015 I had a telephone conversation with a representative of Yukos, Eric Wolf, and he asked me whether PNS had a settlement offer to make. As Mr. Deitz, essentially the only other decision maker, and I had not discussed a settlement I told Mr. Wolf that we were committed to our litigation but if anything changed I would call him. On 17 December 2015 by email I informed Kirwan of my conversation with Mr. Wolf.

88.     On 18 December 2015 Mr. Godfrey sent an email to me and Mr. Deitz advising us that the Foundation Board of Stichting YI would be prepared to consider entering into a settlement involving a payment of $60 million. On 21 December 2015 Mr. Deitz sent an email to me saying that the Foundation Board's proposal should be considered by the Board of Kirwan and that without a decision by the Board I should not to reply to Godfrey's proposal on behalf of PNS.

89.     I replied to Mr. Deitz and reminded him that a settlement that would result in PNS giving up on obtaining legal registered title to Yukos Finance shares was a departure from the SHA and would require all of the SHA Parties' approval, likewise a settlement that results in the sale or disposition of an interest in Yukos Finance by PNS or Kirwan was a USRM that required all of the Shareholders consent. For these reasons, as my email explained, a meeting of Kirwan's Board was not the proper venue for consideration of the settlement matter and that a proper meeting of Kirwan's Shareholders should be convened.

90.     Since no settlement terms had been proposed other than a low ball number, I also wrote Mr. Deitz that it would be premature for the shareholders to consider the settlement terms.  Not for the first time I asked Mr. Deitz for a copy of the draft settlement agreement he had received from Mr. Godfrey during the last settlement talks.

91.     Mr. Deitz did not reply to my email of 21 December 2015 and he did not send me the oft requested draft settlement agreement from earlier in 2015.  In any event I had no

intention of replying to the Godfrey "offer" as it was not in PNS's best interest to even

acknowledge such a low ball offer.   I knew nothing more about any of this until I read the

subsequent events in the 17 March 2016 Petition ("the ambush").

92.     Meanwhile though on 30 January 2016 Mr. Wolf sent an email to me saying

that it was time for us to talk. That very same day I spoke with Mr. Wolf.  On the call he said:

> "So listen, I thought we should talk because I understand that you and Deitz … are
> deadlocked and … I also understand that … both … you would like to settle. The
> only way I see out of this deadlock, and correct me if I'm wrong, is … if Yukos
> settles with you separately and with him separately, because I do not see you guys
> coming to any solution at all.  With open mind I just wanted to ask you sort of what is
> your number … not for the overall settlement, but for you."

93.     Given the sensitivity of the situation I wanted time to think and so I said

nothing and told Mr. Wolf I would call him in a few days. I also wanted to confer with my

legal counsel to assess what I could or could not say (considering the SHA and any other of

my obligations) in response to such an inquiry.  And I wanted to confer with Mr. Deitz as

notwithstanding our differences surely we will get a better settlement deal if we coordinate

(as we are required to), any actions that could result in a settlement.  And I wanted clarity as

in order for there to be a deadlock there needs to be a proposal—I knew of none, before

Wolf's call there had been no communications from Yukos since Godfrey's email and there

had been no board or shareholder meeting of Kirwan, formal or informal.  I wrote Mr. Deitz

right away, to alert him of my phone call with Mr. Wolf and to arrange to speak with him.

We spoke on 1 February 2016.  In that conversation:

> I told Mr. Deitz of my conversation with Mr. Wolf and what he had said to me
> about settlement talks and about me and Mr. Deitz being in a deadlock. I asked Mr.
> Deitz what he knew about any of this.
>
> Mr. Deitz said that he knew nothing about it, especially about the alleged deadlock,
> and that he had not talked to Mr. Wolf for quite awhile.
>
> To my direct question whether or not there have been settlement talks recently Mr.
> Deitz replied that there had been no serious settlement talks and that "these guys",
> i.e. Messrs. Wolf and Godfrey and other representatives of GML, knew Mr. Deitz's
> [settlement] number.  This indicated to me that in violation of our SHA Mr. Deitz

Page 24 of 34

was negotiating independently, as how else could they know his number, something I did not even know.

Mr. Deitz told me that he and Mr. Godfrey had not agreed on a [settlement] number.

I asked Mr. Deitz whether or not he was speaking with Mr. Godfrey in reply to which he asked in an irritated voice what it was that I wanted to know. I told him that I wanted to know if there was a settlement offer. Mr. Deitz said that there was not one.

I asked Mr. Deitz whether they, i.e. Mr. Godfrey or Mr. Wolf or GML, had come up with a [settlement] number and Mr. Deitz said, "no."

When I reminded Mr. Deitz of my assessment as "ridiculous" the settlement number of $60 million offered by Mr. Godfrey on behalf of Yukos, he agreed with my characterization. And when I asked Mr. Deitz whether he replied to that offer. Mr. Deitz said that he had not replied to Mr. Godfrey's offer.

I also told Mr. Deitz that Mr. Wolf proposed negotiating a settlement with each Shareholder separately and that without an additional agreement between the Shareholders this was not permitted. Mr. Deitz agreed that such negotiations fell under the Third Party Agreement restrictions in the SHA and were prohibited.

94.     Today we know that Mr. Deitz extensively lied in that phone conversation. In reviewing the transcript today alongside the 17 March Petition, and statements made to me by Mr. Godfrey or Mr. Wolf, I cannot find a single truthful answer in Mr. Deitz's statements that day.

95.     On 2 February 2016 I sent Mr. Deitz a follow-up email asking him to confirm that he had not had any settlement negotiations with GML and/or members of the foundations boards (whether directly or through intermediaries) since August 2015, that he had not responded to the $60 million offer of last December or made a counteroffer and that he had not told the other side that I was some kind of an obstacle to a settlement. In this email I also offered Mr. Deitz, if he was interested, in having separate settlement negotiations with the litigation adversaries (as a means to enhance the quantum sum they would be willing to pay), to discuss and agree on certain terms and then enter into a variation of the SHA, since in its current version the SHA prohibited separate settlement talks by the Shareholders. Mr. Deitz never replied to that email.

96.     On 4 February 2016 I sent yet another reply to Mr. Deitz's 21 December 2015 email regarding the $60 million offer from Mr. Godfrey. In this email I presumed, as Mr. Deitz had assured me, that he had not responded to Mr. Godfrey (or any Yukos party) and that there had been no settlement talks and that Mr. Deitz had made no representations on behalf of PNS. I asked Mr. Deitz to, as required by the SHA, give me a full and complete accounting of any contact of any kind whatsoever he had with Yukos, if my presumptions were incorrect. Mr. Deitz never replied to that email.

97.     Meanwhile on 3 February 2016 I had another phone conversation with Mr. Wolf during which, reading from a short text prepared by my personal counsel, I told Mr. Wolf that subject to the prior consent of other Shareholders in Kirwan and if negotiated and structured within the parameters of the SHA, that I would agree to a settlement in which I as C Shareholder received US$ 35 million. Mr. Wolf said that this was not going to happen. The entire conversation including pleasantries was less than two minutes.

98.     It is worth noting that at this time I did not know that Mr. Deitz had already communicated to Yukos that he would settle for $137.5 million. Although Mr. Wolf had told me he knew what Mr. Deitz's settlement number was, I did not know that number, and presumed it would be for a much, much higher figure. My desire to settle and the figure I articulated was in the context of what I think an overall settlement number should be and what rights and opportunity I am willing to give up in order to receive money today. I do not know why Mr. Deitz is willing to settle PNS's litigation for such a relatively small sum.

99.     Then out of the blue on 17 February 2016 Mr. Godfrey wrote me asking whether I was aware of the settlement offer currently being finalized by Dietz. I responded to Mr. Godfrey saying that I was not aware in any of my capacities of any settlement discussion or offer and I asked for the details. Mr. Godfrey wrote that the offer was for $140 million and he asked me whether I would support that. In my reply I asked Mr. Godfrey for more

information about the settlement offer: how it would be structured, what were the terms,
whether there was a term sheet, who were the parties and what was the status.  Godfrey
replied that it was only that number.  I replied again repeating my question about the parties
to the settlement discussions.  I also pointed out to Mr. Godfrey that I had not received any
offer to PNS and as a result was perplexed how Mr. Deitz could be finalising a settlement.

100.    Meanwhile on 19 February 2016 I wrote to Mr. Deitz asking him once again
whether or not he was in settlement talks with GML (or the Foundations).  In that email I
insisted on compliance with the SHA requiring that the Shareholders of Kirwan act together
in matters of settlement of the Yukos Finance Proceedings and other litigation related thereto.
Mr. Deitz never replied to that email.

101.    On 24 February 2016 I had a telephone conversation with Mr. Deitz during
which I twice asked him about settlement negotiations.  He refused to answer, my questions
were met by silence.  That same day I sent an email to him asking once again about the
settlement talks with GML, the Yukos Foundations, Godfrey, Misamore, etc. I asked Mr.
Deitz to let me know whether: he had received any settlement offer on behalf MHL or LL or
their Affiliates; or whether he had participated in any settlement negotiations with PNS
opponents or their representative (e.g. Eric Wolf) on behalf of MHL, LL or their Affiliates or
on behalf of PNS.

102.    This inquiry like the many previous emails and the questions in our phone
conversation was never replied to or answered.

103.    On 24 February 2016 Mr. Godfrey and I spoke by phone.  Mr. Godfrey
wanted to know my opinion on the $140 million settlement he said Mr. Deitz had negotiated
with Yukos on PNS's behalf.  Mr. Godfrey also said that he had met with Mr. Deitz and had
discussed a settlement with him and that Mr. Deitz had told him that I would not accept any
settlement (not true as provided I am compensated for my SHA rights, I will accept a

settlement) and that I, "had to be gotten rid of". Mr. Godfrey felt the need to clarify that "getting rid of" me did not mean killing me but rather getting rid of me in a corporate sense. Mr. Godfrey also said that as one means to getting rid of me Mr. Deitz had suggested selling the parent companies of PNS to Yukos.

104.    When I enquired with Mr. Godfrey about why he was telling me this information, he said that they needed to know if I supported the settlement or not as they did not want any "legal hangovers" from me and if there were to be any legal problems from me they needed to be Deitz's problem.

105.    After my conversation with Mr. Godfrey I was extremely worried that Mr. Deitz was actually planning a settlement without my involvement and that he was somehow doing an end-run of my rights under the SHA. On 4 March 2016 I sent a letter dated 3 March 2016 to MHL, LL, VRGP and Kirwan. In this letter I explained why a sale of PNS by Kirwan, of A and B Shares by the Financing Shareholders or of its shares in the Financing Shareholders by VRGP would be a breach of the SHA and demanded disclosure of information in relation to the settlement negotiations under clause 18.3 of the SHA and from Kirwan under clause 22 of the SHA. There was no reply to my letter.

106.    On the same day I also sent a letter to GML, its counsel and Mr. Wolf. In that letter I advised the addressees that a sale of parent companies of PNS to GML or its affiliates would be a breach of an agreement I had with certain parties (i.e. the SHA and parties to it). GML's counsel confirmed receipt of the letter.

**Kirwan's insolvency is contrived and the bankruptcy is fake.**

107.    From November 2015, after I forced the revocation of the illegitimate resolutions purporting to give unlimited POA, I received no substantive information of any activities of Kirwan. I was focused on the litigation matters of PNS and had no knowledge of any activities at Kirwan.

108.    There was the December email exchange with Mr. Deitz about the settlement offer, but that involved a settlement by PNS. In any event I had no further information, and neither Kirwan's board nor shareholders had any meeting on this or any other matter, formally or informally. In fact, as evidenced now by details in the 17 March Petition and partial corporate records I have since been able to obtain from the administrator,[9] VR was laying the groundwork and manipulating Kirwan to engineer the "insolvency event," and "bankruptcy," of the company.

109.    Under Mr. Deitz's directions, who once wrote to me in reference to VR, "l'etat c'est moi," the Financing Shareholders undertook a series of corporate actions and made related payments from Kirwan that resulted in Kirwan having no funds available to it,

████████████████████████████████████████████

████████████████████████████████████████████

██████ They did this on costs and expenses that were not in Kirwan's that were in whole or part not for Kirwan's benefit, not in Kirwan's interets and not approved by Kirwan.

110.    Not a single one of these corporate actions or payments adhered to the corporate governance requirements of Kirwan. There was not a single board meeting or board resolution or any of the required corporate procedures. The corporate actions and payments that resulted in the alleged insolvency and bankruptcy benefited VR employees, not Kirwan, were USRM's (but did not have the required unanimous consent), were for legal services provided to the Financing Shareholders and VRGP, not Kirwan, and/or were for services provided to PNS but without PNS's knowledge, authorization or actual benefit. The directors who organized these actions and made the payments are all employees of VR and in some cases directors of the very creditors whom now petition for the bankruptcy of Kirwan.

---

[9] The administrator in practice reports to the Financing Shareholders. In the past the administrator has told me that they could not share information with me as that would "break our confidentiality" obligations.

111.   They took these actions not in the best interest of Kirwan but to create a fake bankruptcy of Kirwan (and the forced sale of Kirwan's only asset, PNS, to circumvent the minority shareholder's rights). I found out about this when I was ambushed on 15 March 2015 with:

- An email from Jeffery Johnson the COO of a VR subsidiary with an attached letter from the Financing Shareholders, signed by Mr. Johnson and Mr. Du Toit (also an employee of VR). The letter declared an insolvency event at Kirwan on the basis of an unpaid Akin Gump invoice from the previous month.

- An email from Skadden Arps ("Skadden") advising me that the Financing Shareholders had filed an involuntary bankruptcy petition against Kirwan.

- Letters from Kirwan and the Financing Shareholders responding to my 4 March 2015 letters.

112.   Stunningly, in light of the subsequent 17 March, 2015 Petition to Terminate Exclusivity, in which it is disclosed that there were settlement discussions resulting in an agreed settlement number with the opponents in Dutch litigation, the letters from Kirwan and the Financing Shareholders provide no information on these discussions.

113.   Corporate actions and payments that were made against Kirwan's interests and without any corporate governance procedures include:

a)   Payments to Akin Gump ██████████████████ This was for services provided to Messrs. Deitz and Johnson (even though the engagement was signed on behalf of Kirwan by Mr. Du Toit, Kirwan has no need for legal advice in New York and in any event Mr. Du Toit obtained no approval for the engagement or subsequent payments). It is an unpaid invoice under this unauthorized engagement for services not provided to Kirwan that Mr. Johnson himself uses to declare an insolvency event at Kirwan.

b)   Payments to Bailey Glasser ████████████████ As I have already attested the engagement of Bailey Glasser to represent PNS lacked any authorization by PNS. These payments to Bailey Glasser likewise were not properly authorized by Kirwan.

c)   Payments to Decherts LLP ████████████████ This was for counsel received by Kirwan, the Financing Shareholders, and VRGP in the LCIA proceedings. Kirwan was responsible for only one quarter of this amount and should not have paid for the benefit of the Financing Shareholders and VRGP.

d)   A payment ████████████ to Mandel Bhandari LLP Trust Client Account. I do not know what this is for but surmise it is related to the bankruptcy of Kirwan.

Page 30 of 34

e) A payment of ████████████ to Freiberger & Washienko. This was for legal services provided to Daniel Feldman the former Yukos executive that Mr. Godfrey says Mr. Deitz corrupted. As I have already attested, Mr. Deitz signed that agreement on behalf of PNS without authorization. Kirwan had no reason to pay this bill and the payment was never approved. I do not know the particulars of "our deal" with Mr. Feldman but presume there is one.

114.     Not a single one of the above payments or the corporate actions resulting in them conformed to any of the agreed and required corporate governance procedures of Kirwan. They each, violate multiple clauses in the SHA and in some cases relevant law. In any event it was done without me knowing about it. It was VR's left hand, helping VR's right hand, to create an illegitimate insolvency event and subsequent contrived bankruptcy. Neither the insolvency nor the bankruptcy could be achieved in any other way. VR operates as if the SHA doesn't even exist.

115.     There is no purpose here except to obtain a court forced settlement. Nothing makes this fact more obvious than the combined costs of our current SDNY litigation could easily finance PNS's remaining litigation in the Netherlands. We have prepared our briefs for the Public Order Appeal, the hearing is months away. I have already personally paid for the legal analysis and strategy needed to defend the Glendale claims.

**The settlement offer is insufficient, Deitz lacks authority to negotiate and is conflicted.**

116.     The financial terms Mr. Deitz has negotiated as 'settlement' of PNS's rights to YF are woefully insufficient. PNS has a strong court case to obtain title to YF and we have a detailed defense strategy (which I personally paid for and have yet to be reimbursed) to defend against the Glendale claims. In addition to the expected value of PNS claims (whether they have a 1% or 99% chance of success) there is also Yukos's time value of money to consider.

117.     In 2015 Mr. Deitz negotiated a settlement with Yukos on behalf of PNS (albeit without authority from or knowledge of PNS or C Shareholder) for as much as $407mln.

Then he, again on behalf of PNS with no authority or foreknowledge, revoked "PNS's agreement."

118. Now Mr. Deitz has negotiated a $137.5mn settlement, albeit in secret and without any authorization from either Kirwan or PNS. This he negotiated after we received an adverse ruling in the Bridge Cases (which includes Glendale) but before the Russian Federation publicized new evidence that Yukos was illegally acquired during privatization and before I had obtained all the evidence necessary to defend against the Bridge Cases including Glendale ████████████████████████████████████████████ ████████████████████████████████████ .[10]

119. Perhaps this is simply because Mr. Deitz is tired. In the summer of 2015, in a rare candid moment told me that, "he was tired," of this project, "and the negativity." He told me that he had, "better things to do with his life," and that, according to him, "unlike you [i.e. me] this will not change my [i.e. his] life." It is my concern that these sentiments have corroded Mr. Deitz's thinking. My concern is heightened by MHL & LL's (i.e Mr. Deitz's) statements in this contrived bankruptcy that $137.5 million is the best PNS can get, while he fails to mention the influence on his decision-making, or even the very existence, of a claim for approximately 20 million British pounds by Yukos against him personally (and me) in the English Commercial Court. The settlement he has purportedly negotiated on PNS's behalf likely involves a waiver of this claim, at least against him personally. In those proceedings he has already been served, while I have not. Also due to the nature of his business (asset management), he has a large personal risk (reputational), beyond the direct financial sum sought from him. For these reason among others, particularly the low economic

---

[10] 

compensation negotiated for PNS's interest and value, I question his priorities in negotiations and his loyalties to PNS.

120.    The last annual report available for Yukos Finance B.V. is 2014 and its balance is $879,204,411.  This value comprises primarily the depository receipts in Yukos International UK B.V. ("YI").  The last annual report available for YI is likewise 2014 and while it's a more complicated balance sheet, in simple terms there is a great deal of money including nearly $554,137,506 in securities and $290,763,106 in in cash.  These are extraordinarily valuable companies and PNS is the only company with a legitimate claim to ownership.  This claim of ownership might be denied, in which case the assets will be for the benefit of nonexistent Yukos and eventually accrue, through subterfuge, to its former majority owners and management.  Or the Kirwan consortium might as we agreed to do, lay claim to these funds and successfully defend them.

121.    I do not know why the Financing Shareholders want out, but I can surmise that it is because serious challenges remain even after nine years and now the "they" is no longer a "they" but only a he: Mr. Deitz.  Mr. Deitz has consolidated the financial interest of the A shares and B shares, but has only 40% of the cost basis.  In his mind, this means that where the house dealt an ace he can get up and walk away from the blackjack table with his money back.  But the rules (the SHA) offered no such insurance.

122.    To achieve this goal VR has hatched a scheme which manipulates the U.S. federal court system to accomplish goals that cannot be accomplished contractually or through commercially reasonable means or through the LCIA, where Kirwan and its shareholders agreed to resolve their disputes.

123.    Under penalty of perjury, I confirm that my statements in this Declaration are true to the best of my knowledge.

Dated: April 6, 2016

Stephen Lynch

<u>30 August 2007</u>

MASCINI HOLDINGS LIMITED

and

VR GLOBAL PARTNERS, L.P.

and

LAPIDEM LIMITED

and

RENAISSANCE HOLDINGS MANAGEMENT LIMITED

and

STEPHEN P. LYNCH

and

KIRWAN OFFICES S.A.R.L.

---

SHAREHOLDERS AGREEMENT

---

Herbert Smith CIS LLP

# EXHIBIT B
49

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 52 of 88
16-22321-rdd   Doc 21-2   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit B
(Redacted per Order - Docket No. 20)   Pg 2 of 2

# REDACTED

**FULL DOCUMENT SEALED**

IN THE MATTER OF                               LCIA Arbitration No. 142774

THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN ARBITRATION

UNDER THE RULES OF THE LONDON COURT OF INTERNATIONAL
ARBITRATION


B E T W E E N:


Stephen Lynch

Claimant

– and –


Mascini Holdings Limited (1)

Lapidem Limited (2)

VR Global Partners LP (3)

Kirwan Offices S.A.R.L. (4)

Respondents


---

FINAL AWARD

---


EXHIBIT D

1

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 54 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 2 of 60

**Table of Contents**

A.   The Parties and their Representatives..................................................................... 3

B.   The background in brief, the Arbitration Agreement and the Choice of Governing Law 3

C.   The Tribunal ..................................................................................................... 5

D.   The Course of the Arbitration and the 4 February 2015 Agreement.................................. 5

E.   The Claimant's Claims .......................................................................................... 14

F.   Jurisdiction........................................................................................................ 17

G.   The Issues ......................................................................................................... 19

H.   The Terms of the SHA and of the original Charter of PNS ........................................... 28

I.   Discussion and Determination of the Issues............................................................... 34

J.   The Parties' Legal Costs and Expenses .................................................................... 53

K.   The Costs of the Arbitration .................................................................................. 56

L.   Dispositive Part of the Award ................................................................................ 57

## A. The Parties and their Representatives

1.   The Claimant is Stephen P. Lynch a U.S. citizen who has lived and worked in Moscow for many years. Mr Lynch describes himself as an entrepreneur.

2.   The Respondents are:

    (a)   First Respondent, a Cypriot company;

    (b)   Second Respondent, a Cayman company;

    (c)   Third Respondent, a Cayman partnership;

    (d)   Fourth Respondent, a Luxembourg company.

3.   The First and Second Respondents own all except one of the shares in the Fourth Respondent. That share is owned by the Claimant.

4.   The Claimant was originally represented by King & Wood Mallesons LLP, then by McGuire Woods London LLP and then by Nabarro LLP.  It was and is also represented by Sandakov & Partners LLP and Richard Perkoff, a barrister.

5.   The Respondents were all represented throughout by Dechert LLP.

## B. The background in brief, the Arbitration Agreement and the Choice of Governing Law

6.   In 2007, the assets of the oil company, Yukos, were being auctioned off and sold by a Russian bankruptcy trustee, in highly controversial and well publicised circumstances. The assets were sold in lots, and one of those lots, no.19, was Yukos Finance B.V. ("YF"), a Dutch company with certain valuable assets (and liabilities).

7.   On 14 August 2007, the Claimant's company, Monte-Valle LLC, acquired Promnestroy LLC ("PNS"), a Russian company.

8.   On 15 August 2007, PNS won the auction to purchase lot no.19.

9.   On 30 August 2007, the Claimant entered into a Shareholders Agreement ("the SHA") with the First to Fourth Respondents (and also Renaissance Holdings Management Limited, "RHML") relating to the affairs of the Fourth Respondent (a Luxembourg company) and PNS, which it had been agreed would be acquired by the Fourth Respondent. At that time, the Third Respondent owned or controlled the Second Respondent and RHML owned or controlled the First Respondent.

3

10.  As a result of the suite of transactions entered into at around that time:

    (a)  PNS duly acquired lot no.19, i.e. YF (as was expected, the validity of this acquisition has been disputed by third parties in the Netherlands);

    (b)  the Fourth Respondent became the owner of PNS;

    (c)  the First and Second Respondents became the owners of all shares except one in the Fourth Respondent, in a ratio of 60/40, divided into A shares and B shares;

    (d)  the Claimant became the owner of one C share in the Fourth Respondent;

    (e)  a revised charter of PNS was agreed and put into effect.

11.  The SHA was intended to regulate the affairs of the Fourth Respondent and, to a limited extent only, its sole asset, PNS, which had acquired lot no.19 (YF).

12.  From 2007 to 2010, a close associate of the Claimant was nominated by him, and elected, as General Director of PNS. From 2010 to the present time, the Claimant has been serving as the General Director of PNS.

13.  In about 2013, RHML disposed of the First Respondent to the Third Respondent or other companies substantially controlled by Mr Dietz. Since that time, the Third Respondent and Mr Richard Deitz, the moving force behind the VR Capital group, have exercised substantial control of both the First and Second Respondents, and hence of all of the A and B shares in the Fourth Respondent.

14.  Disputes have arisen between the Claimant and the Respondents, in particular in relation to the Claimant's role as General Director and as to proposed changes to the charter of PNS.

15.  The SHA contains an arbitration agreement at Article 25, which provides:

> *"15. Arbitration*
>
> *If any dispute, controversy or claim between the Parties arises out of or in connection with this Agreement including any question regarding its existence, breach, termination or invalidity ("Dispute") they shall use all reasonable endeavours to resolve the Dispute amicably. If the Parties are unable to resolve the Dispute, then the Dispute shall be referred to and finally resolved by arbitration under the LCIA Rules which Rules are deemed to be incorporated by reference into this Clause 25. The place of*

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 57 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 5 of 60

*arbitration shall be London, England and there shall be one (1) arbitrator, to be appointed by the LCIA Court. The language of the arbitration shall be English. Any arbitral award pursuant to this Clause shall be in writing and shall be final and binding on the parties. The award may include an award of costs, including all arbitration costs, reasonable attorney's fees and disbursements, to be made on the basis that the losing Part(y)(ies) shall pay the costs of the successful Part(y)(ies)".*

16.    The arbitration was commenced pursuant to this arbitration agreement.

17.    The SHA also provides in Article 30 that it is governed by and shall be construed in accordance with English law, and English law has been applied in its interpretation.

## C.   The Tribunal

18.    The sole arbitrator, who has conducted this arbitration pursuant to Article 25 of the SHA (set out above) and the LCIA 1998 Rules (which were those in force when it was commenced) is the undersigned, Graham Dunning QC, Barrister of Essex Court Chambers in London.

19.    On 5 February 2015, the parties were notified that the sole arbitrator had been appointed by the Court of the London Court of International Arbitration.

## D.   The Course of the Arbitration and the 4 February 2015 Agreement.

20.    The arbitration was commenced by a Request for Arbitration dated 3 September 2014. The Claimant sought expedited formation of a tribunal pursuant to Article 9 of the LCIA Rules. He requested (*inter alia*) interim injunctive relief in connection with possible changes of the charter of PNS put forward by the Respondents earlier in 2014 that were alleged to contravene the provisions of the SHA, which changes were to be voted on at a board meeting of the Fourth Respondent called for 22 September 2014.

21.    On 15 September 2014, the Claimant also applied for interim injunctive relief in the Commercial Court in London to restrain the Respondents from making any such changes.

22.    That resulted in a Consent Order under which both the Court proceedings and this arbitration were stayed on certain terms including that the proposed board resolution of 22 September 2014 would not be voted upon.

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 58 of 88
16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Order - Docket No. 20)    Pg 6 of 60

23.  For several months, there were discussions during which other proposed changes to the PNS charter were drafted and disputes over the PNS Charter and the role of the General Director of PNS continued whilst the arbitration was stayed.

24.  On 5 November 2014, the Board of the Fourth Respondent voted on and approved a revised charter of PNS, which has been referred to in the arbitration as "the Revised PNS Charter".

25.  The Revised PNS Charter was approved by the Fourth Respondent as the sole participant in PNS by Resolution No. 2014/1 on 10 December 2015.

26.  The Claimant, as General Director of PNS, refused to implement and to register the Revised PNS Charter, maintaining that it was in breach of Russian law and was contrary to his contractual rights under the SHA.

27.  Further changes to the PNS Charter were proposed to answer the criticism that the Revised PNS Charter did not comply with Russian law. A board meeting of the Fourth Respondent to vote on these was called for 11 February 2015.

28.  On 30 January 2015, faced with this upcoming Board meeting, the Claimant sought to revive the arbitration, serving an Amended Request for Arbitration, a request for injunctive relief and a further request for expedited formation of the tribunal.

29.  The Respondents initially objected but by an agreement in writing, dated 4 February 2015, the parties agreed to go forward with the arbitration on an expedited basis.

30.  At this point in time, there had been the following sets of proposed changes to the Charter of PNS:

(a)  Those that were approved in November and December 2015, which (as mentioned above) the parties have called "the Revised PNS Charter";

(b)  Those that were initially put forward for voting at the Board meeting called for 11 February 2105, which the parties have called "the 2015 Charter" – this was superseded by another version, namely;

(c)  An amended version of the latter, circulated on about 30 January 2015, which the parties have called "the Revised 2015 Charter". This version was agreed by the parties to be compliant with Russian law, and hence the only question in relation

6

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 59 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 7 of 60

to it was whether its terms infringed the SHA. The Claimant argued that it infringed the terms of in particular Clause 7.1 and the requirement for unanimous voting found in Schedule 3, part 3. Unlike the Revised PNS Charter, it has not yet been voted upon by the Board of the Fourth Respondent, nor has it been the subject of any resolution by the Fourth Respondent as the sole participant in PNS.

31.   The full terms of the 4 February 2015 Agreement and of the expressly limited basis on which the arbitration was agreed to be conducted are set out in full below.

> *Agreement between Stephen Lynch, Mascini Holdings Limited; Lapidem Limited; VR Global Partners LP; and Kirwan Offices S.A.R.L in relation to the conduct of LCIA Case No. 142774:*
>
> 1. *(a)   Subject to items (2) to (5) below, the Respondents will withdraw in its entirety the agenda item, as set out in Mr Deitz's email of 31 December 2014 timed at 7:06pm to* inter alia *discuss the implementation of the new charter of PNS as approved by the Kirwan Board on November 5, 2014, from the agenda for the Kirwan Board meeting scheduled for 11 February 2015. The Respondent will take no further action in relation to the Revised PNS Charter, the 2015 Charter or the Revised 2015 Charter at the 11 February 2015 Kirwan board meeting,*
>
>    *(b)   Undertakings by the Respondents. Until the rendering of the arbitral award the subject of the revised timetable for LCIA Case No 142774 at Annex A to this agreement:*
>
>    *(i)   The Respondents undertake to withdraw the agenda item for the Board Meeting scheduled for 11 February 2015 to discuss and/or vote on the approval and/or implementation of any new PNS Charter (including the Revised PNS Charter, the 2015 Charter and the Revised 2015 Charter) and they further undertake not to table any agenda items for any Board Meetings in the future of any of the iterations of the revised Charter (the Revised PNS Charter, the 2015 Charter and the Revised 2015 Charter or otherwise).*
>
>    *(ii)   The Respondents undertake to make no changes to the PNS Charter approved by the resolution of the sole member of PNS dated 29 March 2010 ("Current Charter") without obtaining the prior written approval of Mr Lynch, such approval not to be unreasonably withheld.*

7

(iii) *Subject to the terms of the Current Charter, the SHA and applicable law, as well as Mr Lynch properly discharging his responsibilities as the General Director of PNS in accordance with the Current Charter, the SHA and applicable law, and the terms of this Proposal, the Respondents agree to maintain Mr Lynch in office of the General Director of PNS and not to alter the terms of Mr Lynch's appointment as General Director of PNS.*

(iv) *The Respondents undertake not to cause or procure the implementation of or take any steps whatever to further implement act upon or give effect to the Revised PNS Charter.*

2. *The Parties agree to submit the Kirwan SHA Dispute to LCIA arbitration pursuant to Clause 25 of the SHA, on the following basis:*

(a) *<u>The scope of the LCIA arbitration is limited to the Kirwan SHA Dispute, which means for the avoidance of doubt the issues of (i) whether the Revised 2015 Charter and/or the Revised PNS Charter breaches the SHA and (ii) whether the Respondents are by their conduct in breach of Clause 18 of the SHA (unless otherwise agreed by the Parties). The Parties further record that no issues of Russian law arise in relation to the Revised 2015 Charter, which the Claimant agrees is compliant with Russian law. Insofar as the Revised PNS Charter is concerned, it is agreed that Russian law issues can be raised before the LCIA solely insofar as non-compliance with Russian law of the Revised PNS Charter is relied upon by the Claimant as amounting in itself to a breach of the SHA;</u>*

(emphasis supplied)

(b) *The Parties agree to the procedural timetable in Annex A, and agree to take all steps to ensure the adoption and implementation of Annex A; and*

(c) *The Parties agree on the nomination of Graham Dunning QC as the sole arbitrator (whose preliminary availability to act as sole arbitrator on the timetable at Annex A has been confirmed by Mr. Dunning's clerk) provided that Mr Dunning signs a statement of independence.*

3. *Until the rendering of the arbitral award the subject of the revised timetable for LCIA Case No 142774 at Annex A to this agreement:*

(a) *The parties shall instruct PNS counsel to act on instructions from Mr Lynch only if such instructions are confirmed to PNS counsel by either Mr Deitz· or Mr Toussi (on behalf of Kirwan), and to act on instructions from Mr Deitz or Mr Toussi (on behalf of Kirwan) only*

8

16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Case 1:17-cv-04339-CM    Document 23    Filed 07/03/17    Page 61 of 88
Order    Document 23

*if such instructions are confirmed to PNS counsel by Mr Lynch. Such confirmation of instructions not to be unreasonably withheld.*

(b) *The Claimant undertakes that he will not sign or otherwise commit on behalf of PNS to any matter without prior approval from Kirwan, other than routine housekeeping matters (tax filings, etc.).*

(c) *The parties mutually undertake to each other to strictly comply with their ongoing obligations under Clause 18 of the SHA with respect to any Third Party Agreement.*

4. *The Claimant (and any Affiliate of the Claimant and any general director of PNS recommended by the Claimant pursuant to Clause 7.1.2 of the SHA): (a) waives any right to object to or otherwise challenge the compliance of the Revised 2015 Charter with Russian law; and (b) subject only to the matters the subject of the Kirwan SHA Dispute, waives any other right to object to the validity or legality of the Revised 2015 Charter.*

5. *In the event the Claimant's claim in the LCIA arbitration fails (such that the approval of the Revised 2015 Charter by the Kirwan Board is not precluded by the SHA), the Claimant as general director (and any general director of PNS recommended by the Claimant pursuant to Clause 7.1.2 of the SHA) is immediately (following appropriate resolutions and any other matters necessary to effect registration) required to register the Revised 2015 Charter with the Federal Tax Office of the Russian Federation without any delay whatsoever and undertakes to take all steps necessary to effect such registration without any further objection. For the avoidance of doubt, such obligation is irrespective of any rights Claimant might have to challenge the arbitral award under the English Arbitration Act 1996.*

6. *The Respondents will agree to the stay being lifted on the basis that (a) the Claimant prepares the necessary application and paperwork for review and agreement by Respondents, and (b) for the purposes of Article 29 of the LCIA Rules and Section 63(1) of the English Arbitration Act 1996 the costs of the Claimant's arbitration claim with the Commercial Court under 2014 Folio 1112 are to be determined by the arbitrator in LCIA Case No. 142774.*

*Signed for and on behalf of Stephen Lynch: McGuire Woods London LLP.*

*Signed for and on behalf of Mascini Holdings Limited; Lapidem Limited; VR Global Partners LP; and Kirwan Offices S.A.R.L. Dechert LLP. 4 February 2015*

9

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 62 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 10 of 60

*Annex A: Procedural Timetable*

| | |
|---|---|
| *20 February 2015* | *Claimant's Statement of Case (in compliance with paragraph 2(a) of this agreement), together with any documents, witness statements and expert reports on which Claimant intends to rely.* |
| *20 March 2015* | *Respondents' Counter-Memorial, together with any documents, witness statements and expert reports on which Respondents intend to rely.* |
| *3 April 2015* | *Claimant's Reply, together with any documents, witness statements and expert reports on which Claimant intends to rely.* |
| *17 April 2015* | *Respondents' Rejoinder, together with any documents, witness statements and expert reports on which Respondents intend to rely.* |
| *24 April 2015* | *Parties to indicate which witnesses and experts they require to attend the Oral Hearing.* |
| *Week of 8 June 2015* | *Oral Hearing in London. (The Respondents do not anticipate that more than 3 hearing days will be required).* |
| *Within 10 days of close of Oral Hearing* | *Parties to exchange submissions on costs.* |
| *No later than 60 days following close of Oral Hearing.* | *Tribunal to transmit Final Award to Parties.* |

32. In compliance with the timetable annexed to the 4 February 2015 Agreement, on 20 February 2015 the Claimant served his Statement of Case, outlining the claims that he was then seeking to pursue in this arbitration.

33. On 20 March 2015, the Respondents served their Counter-Memorial, which also included jurisdictional objections: see below.

34. On 17 April 2015, the Claimant served his Reply.

35. On 8 May 2015, the Respondents served their Rejoinder.

36. The above pleadings were accompanied by exhibits, witness statements and experts' reports on Russian law.

37. On 27 April 2015, the Third Respondent made an application for claims against it to be dismissed. This was essentially on the basis that there were no claims in the Statement

of Case made against the Third Respondent. On the same day, the Claimant applied to amend his Statement of Case to include specific claims against the Third Respondent.

38.    I was asked to rule on these two applications. The Respondents argued that I should not permit the "new claims" and that in any event the amendments or some of them raised issues falling outside the scope of the arbitration as agreed under the 4 February 2015 Agreement.

39.    On 30 April 2015, after receiving written submissions from the parties, I indicated as follows:

1.    *I consider that I do have power to allow the proposed amendments, provided that they fall within the scope of the reference under the 4th February agreement. Whilst there is a dispute as to whether the proposed amendments are "new" claims or not, I consider that I do not need to decide this because the power to allow amendments is not restricted to merely modifying existing claims, defences, counterclaims and replies. In my view, an LCIA tribunal has power to allow amendments which do raise arguably "new" claims, counterclaims, defences and replies, provided they fall within the scope of the reference and/or the arbitration agreement.*

2.    *I do not propose to determine at this stage whether the proposed amendments do or do not fall outside the scope of the 4th February agreement. I consider that the most appropriate time to decide that will be after the June hearing.*

3.    *I am currently not persuaded that the proposed amendments raise matters which cannot be fairly addressed by the Respondents before and at the June hearing, with any suitable modifications to the procedural timetable. I presume that the Claimants will accommodate any reasonable request to modify the timetable.*

4.    *I am prepared to hear further argument on all these aspects at the procedural hearing fixed for Monday, 18th May 2015, alternatively the parties may make further written submissions if they wish to do so.*

5.    *Therefore, the parties should proceed for the time being on the basis that the amendments may be allowed, but the question of the scope of the reference and hence whether the proposed amendments are finally allowed will be determined as part of the award published following the June hearing.*

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 64 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 12 of 60

40. On 18 May 2015, a procedural hearing was held by telephone at which directions for the evidential hearing were discussed and (following some further exchanges) agreed. In the event, the parties made no further submissions about the two applications that had been made at the end of April.

41. It was agreed that the hearing would take place at the IDRC in Fleet Street London and commence on Tuesday 9 June 2015, and run for 3 days with a possible overrun onto Friday 12 June 2015. The parties also agreed a timetable for the hearing (subsequently amended slightly on 4 June 2015) under which there would be oral opening and closing speeches and, in between those, I would hear oral evidence (principally in cross examination) of Mr Lynch, the Claimant, and Mr Reid, Mr Jennings and Mr Deitz (called by the Respondents), followed by the respective Russian law experts, Mr Dyakin and Mr Bevzenko.

42. On 20 May 2015, the Respondents served Supplemental Submissions on the Claims against the Third Respondent.

43. On 4 June 2015, the Respondents' solicitors wrote raising various new issues with regard to what has been called the Current Charter of PNS (i.e. that version of the PNS Charter which was brought into force in 2010 in place of the original charter agreed in August 2007, and to which the parties had referred in the 4 February 2015 Agreement, as set out above). They argued for the first time that it was not validly approved by the Fourth Respondent: see below.

44. A further procedural hearing was held on 8 June 2015. There were discussions as to what should be done about these new issues, as it was agreed that they could not be addressed and determined at the June evidential hearing. Eventually, after further mention of this subject at the evidential hearing, the parties made a detailed letter agreement on this topic, the terms of which I set out below:

> *Stephen Lynch ("Claimant") v. Mascini Holdings Limited; Lapidem Limited; VR Global Partners, L.P.; and Kirwan Offices S.A.R.L. (together, the "Respondents") (LCIA Arbitration Case No. 142774) (the "Arbitration")*
>
> *We write further to the parties' discussions with the Tribunal, Mr. Dunning QC as the sole arbitrator, concerning the basis on which Mr. Dunning should proceed at the oral hearing scheduled for 9-12 June 2015 in London*

16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Case 1:17-cv-04339-CM    Document 13    Filed 08/13/17    Page 65 of 88
Order) Docket No. 26)    Pg 13 of 60

*(the "Hearing") having regard to the new issue that has been raised concerning the validity or otherwise of the PNS Charter dated 29 March 2010 (referred to by the parties in the Arbitration as the "Current Charter").*

*In view of the fact that both parties agree that the Hearing can and should proceed, we propose that the parties write jointly to Mr. Dunning to ask him to proceed with the Hearing and to make the Award within 60 days of the close of the Hearing in accordance with the parties' procedural agreement dated 4 February 2015 as amended (the "4 February Agreement") (the "Award") on the following basis:*

1. *The validity of the Current Charter and the circumstances in which it was promulgated, approved and/or registered are in dispute between the parties;*

2. *The parties agree that the validity of the Current Charter cannot be argued or determined within the procedural timetable of the Arbitration, in particular in accordance with the procedural timetable provided by the 4 February Agreement including the Hearing;*

3. *Notwithstanding (1) and (2) the parties agree, for the purposes of the Hearing and Award only and in order to allow the Hearing to proceed and for the Tribunal to render its Award in accordance with the 4 February Agreement, that:*

   a. *The Tribunal is to assume, for the purposes of the Hearing and the Award only, that the Current Charter is valid and not promulgated, approved and/or registered in breach of the Kirwan SHA, Kirwan By Laws and/or any other legal instrument or any law;*

   b. *However, in making its Final Award the Tribunal is not to make any findings as to the validity of the Current Charter or whether the Current Charter was promulgated, approved and/or registered in breach of the Kirwan SHA, Kirwan By-Laws and/or any other legal instrument or any law;*

   c. *This agreement is for the Hearing and the Award only and is without prejudice to any party's right without limitation to challenge in any forum or in any way whatsoever the validity of the Current Charter and/or claim that the circumstances in which the Current Charter was promulgated, approved and/or registered are in breach of the Kirwan SHA, Kirwan's By-Laws, English law, Luxembourg law, Russian law, or are without limitation in any other way unlawful or contrary to any agreement or instrument; and*

   d. *The parties agree that if arbitration proceedings pursuant to Clause 25 of the Kirwan SHA are commenced in relation to the*

13

> *promulgation, approval and or registration of the Current Charter,
> then Mr. Graham Dunning QC is to be appointed sole arbitrator,
> provided that if he is unable for whatever reason to act as sole
> arbitrator then the parties will agree on another person to be
> appointed sole arbitrator within 30 days of the Request for
> Arbitration or if they cannot agree within the said term such
> arbitrator shall be appointed by the LCIA in accordance with the
> LCIA Arbitration Rules.*

> 4. *For the avoidance of doubt, the parties agree that, if any assumption as
> to the Current Charter in 3(a) above is subsequently overturned, they
> are free to argue that findings made by the Tribunal in the Award in
> reliance on or arising out of or connected to any such assumption in
> 3(a) above are of no effect.*

45. In the meantime, on 5 June 2015, the Claimant had served a set of written submissions entitled "Submissions in Relation to the Amended Statement of Case", responding to the Respondents' Supplemental Submissions of 20 May 2015.

46. The evidential hearing took place, as planned, at the IDRC from 9 to 12 June 2015. The evidence was completed within the third day and oral closing submissions were then made on the fourth day, 12 June. After the hearing, I was provided with submissions and accompanying schedules etc., and reply submissions, on costs.

47. In the final event, I did not have to rule on the issues raised by the proposed amendments to the Statement of Case and on the submissions on them because I was informed at the last day of the evidential hearing that the Claimant was no longer seeking permission to amend his Statement of Case as set out in the draft amendments which had been the subject of his application of 27 April 2015.

48. Instead, on the final day of the hearing, I was handed a document containing amendments to the relief claimed in the Statement of Case, which I set out in Section E below, and which were in a form that was not objected to by the Respondents.

## E. The Claimant's Claims

49. In its Statement of Case, the Claimant argued that the purpose of the SHA was to regulate the relations between the parties to it in relation to the Fourth Respondent and in relation to the latter's primary subsidiary, PNS, including the provision of certain rights and protection for the Claimant as the holder of only one share of the issued shares in the Fourth Respondent. It also argued that the recently consolidated and

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 67 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 15 of 60

controlling mind behind the First to Third Respondents is Richard Deitz and that it was his ultimate and stated intention first to marginalise and then exclude the Claimant from the running of the Fourth Respondent and PNS, in breach of the Claimant's rights under the SHA, with a view to being able to reduce to zero the Claimant's ability to earn the sums contemplated by Article 12 of the SHA. The Claimant set forth its claims at considerable length.

50. In the final event, the Claimant sought the following relief (what follows below is the amended version of that relief, which was handed to me on the last day of the evidential hearing and lettered as set out below):

(a) "A declaration that the provisions of the Revised PNS Charter which purport to create an additional sole executive body in PNS and to confer upon the Fourth Respondent (Kirwan Officers S.a.r.l) the power to act on behalf of PNS [namely Articles 4.1.12, 9.5.4, 10.7 and 10.8] breach the Shareholders agreement dated 30 August 2007."

(b) "A declaration that the provisions of the Revised 2015 Charter which purport to create an additional sole executive body in PNS and to confer upon the Fourth Respondent (Kirwan Officers S.a.r.l) the power to act on behalf of the PNS [namely, Articles 4.1.12, 9.5.14 and 11.1 to 11.3] breach the Shareholders Agreement dated 30 August 2007."

(c) "A declaration that the inclusion in the Revised PNS Charter of the provisions set out in Annex 2 paragraph 3.2 of the Statement of Case breaches the Shareholders Agreement dated 30 August 2007."

(d) "A declaration that the inclusion in the Revised 2015 Charter of the provisions set out in Annex 2 paragraph 3.2 of the Statement of Case breaches the shareholders Agreement dated 30 August 2007."

(e) "A declaration that the approval of the Revised PNS Charter and of the Revised 2015 charter by the Fourth Respondent are Unanimous Shareholder Reserved Matters requiring Unanimous Required Shareholder Consents."

(f) "An order restraining the First, Second and Fourth Respondents and each of them whether by themselves their servants, agents or howsoever from causing or

procuring the implementation of or taking any steps whatever to further
implement act upon or give effect to the Sole Participant's Resolution and/or the
Revised PNS Charter."

(g)　"An order restraining the Fourth Respondent whether by itself its servants or
agents howsoever otherwise from submitting or seeking to submit the Revised
PNS Charter to the government authority that carries out state registration of legal
entities in the Russian Federation.".

(h)　"An order restraining the First, Second and Fourth Respondents and each of them
whether by themselves their servants or agents or howsoever otherwise from
approving or seeking to approve the Revised 2015 Charter."

(i)　"An order restraining the Fourth Respondent whether by itself its servants or
agents or howsoever from seeking to appoint as General Director of PNS any
person not recommended by the Claimant in accordance with Article 7.1.2 of
the SHA.".

(j)　"An order restraining the First, Second and Fourth Respondents and each of them
whether by themselves their servants, agents, Affiliates or howsoever otherwise
from entering into any Third Party Agreement or soliciting, encouraging or
entering into any discussions with any person other than the other Shareholders in
relation to a possible Third Party Agreement, save as contemplated by the
Shareholders Agreement."

(k)　"Damages in lieu of or in addition to any relief claimed above."

(l)　"Such further or other relief as may be required."

(m)　"Costs."

51.　As mentioned above, on 27 April 2015 the Claimant had sought to amend its Statement
of Case to add some new allegations and to seek to make certain further claims for
relief but, in the event, these amendments were not pursued by the Claimant, and I shall
say no more about them.

16

Case 1:17-cv-04339-CM    Document 13    Filed 07/13/17    Page 69 of 88
16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Order - Docket No. 20)    Pg 17 of 60

## F.  Jurisdiction

52.  By its Memorial dated 27 March 2015, the Respondents responded to the claims and also raised jurisdictional objections to the matters pleaded in the Statement of Case.

53.  The Respondents argued three jurisdictional objections at that stage, namely:

(a)  First, it was argued that there is no dispute involving the Third Respondent for the purpose of the arbitration clause and "therefore" the Third Respondent is not a proper party to the arbitration. It was argued that, whilst the Third Respondent is a party to the SHA, its only role in the transactions contemplated by the SHA was as a covenantor of certain, limited obligations of the Second Respondent (under Clause 20); it is not a shareholder in the Fourth Respondent (and hence cannot itself vote on the disputed matters and is not a party to the restrictions contained in clause 18), nor does it have management or appointment rights under the SHA (and hence it has not caused, through any appointed director of the Fourth Respondent, any vote or resolution with regard to the Revised PNS Charter or the Revised 2015 Charter). The Respondents argued that, as the Third Respondent was not properly a party to any dispute with the Claimant, for these reasons, the claims for relief against it should be withdrawn and, if not withdrawn, should be dismissed by the Tribunal. However, the Third Respondent is a party to the SHA, has sided with the other Respondents and has participated in the arbitration and been represented throughout and made the same submissions as the other Respondents. In my view, there is jurisdiction to award the declaratory relief as against it, as set out in the final form of relief claimed that was handed to me on the final day of evidential hearing. In that final form, no injunctive relief was sought as against the Third Respondent. In the circumstances, it was my understanding that the jurisdictional objection fell away.

(b)  Second, it was argued that the Tribunal lacks jurisdiction over the "servants", "agents" and "Affiliates" of the Respondents. It was said that the injunctive relief sought is directed in part against such servants, agents and Affiliates and should accordingly be declined. In my view, this is a misunderstanding of the relief sought. That relief is sought against the Respondents, who are parties to this arbitration, and it is directed to stopping them doing certain things either directly or by procuring others to do such things. It goes without saying that I do not have

jurisdiction over non-parties to the arbitration agreement and cannot make an award with direct legal effect as against them. The form of relief that I have ordered makes this clear.

(c) Third, it was argued that the Tribunal lacks jurisdiction to determine the validity of the Revised PNS Charter and the Revised 2015 Charter as a matter of Russian law. I am mindful of the express terms of the 4 February 2015 Agreement. However, once again, there may be a misunderstanding here. I do have jurisdiction to decide disputes falling within the arbitration agreement (and in particular the 4 February 2015 Agreement) - and hence certain issues relating to the validity of the Charter of PNS - not least because the PNS Charter as amended from time to time is referred to and to some extent incorporated into the SHA. Of course, I am not sitting as a Russian Companies Court, and any decision I were to make on these issues would not be binding for all purposes and in particular would not be binding on persons who are not party to the arbitration agreement. In any event, this may not matter because I was told at the hearing that the Respondents' third jurisdiction objection fell away in light of the amendment to the relief sought in paragraph 58(a) of the Statement of Case, as set out above. Moreover, I have held that there is no implied term, contrary to the Claimant's contention.

54. The Respondents also objected promptly to what it claimed were new claims, falling outside the jurisdiction of the Tribunal, made in the Amended Statement of Case served on 27 April 2015. However, as mentioned above, these amendments were not proceeded with and I do not need to say anything about them in this regard.

55. As set out above, the scope of this arbitration as agreed in the 4 February 2015 Agreement is limited to two basic issues, namely:

(a) Whether the Revised 2015 Charter and/or the Revised PNS Charter breaches the SHA; and

(b) Whether the Respondents are by their conduct in breach of Clause 18 of the SHA (unless otherwise agreed by the parties).

56. In my view, all of the heads of relief sought in the original Statement of Case and in the final form of relief sought by the Claimant do arise out of these issues.

18

## G.   The Issues

57.   As just mentioned, the two basic issues are (i) whether the Revised 2015 Charter and/or
the Revised PNS Charter breaches the SHA and (ii) whether the Respondents are by
their conduct in breach of Clause 18 of the SHA (unless otherwise agreed by
the Parties).

58.   It was and is agreed that no issues of Russian law arise in relation to the Revised 2015
Charter, which the Claimant agreed was compliant with Russian law. As far as the
Revised PNS Charter is concerned, it was agreed in the 4 February 2015 Agreement
that Russian law issues could be raised solely insofar as non-compliance with Russian
law of the Revised PNS Charter was to be relied upon by the Claimant as amounting in
itself to a breach of the SHA.

59.   Despite the apparent simplicity of the foregoing, both parties' pleadings and written
evidence were lengthy, ranged over a wide field and, as set out above, until a late stage,
there was a dispute as to whether certain claims went outside the agreement scope of
the arbitration.

60.   At the procedural hearing, I therefore asked the parties to prepare an agreed (if
possible) list of issues. This was provided to me in agreed form on 3 June 2015.

61.   It is a long list, which I set out in full below.

> *Issue No.1:   On its true construction, does Clause 7.1.1 of the Kirwan*
> *Shareholders Agreement executed on 30 August 2007 (the "Kirwan*
> *SHA") prevent the creation of an additional sole executive body for PNS*
> *by Kirwan in addition to the General Director?*
>
> *1.   The Revised PNS Charter and the Revised 2015 Charter seek to create*
> *an additional sole executive body at PNS with executive powers.*[1]
>
> *2.   Does the plain meaning of the words of Clause 7.1.1 of the Kirwan SHA*
> *prevent the creation of an additional sole executive body for PNS by*
> *Kirwan in addition to the General Director?*
>
> > *a.   What relevance, if any, is the absence of any reference to executive*
> > *powers as opposed to decisions in Clause 7.1.1?*

---

[1] The parties also recorded as follows at this point: "Mr Dyakin and Mr Bevzenko agree that only a sole
executive body may act on behalf of a Russian LLC and bind it to a transaction (Bevzenko 2nd report para.
5.4.2). Mr Bevzenko admits that Kirwan is intended to be the second executive body of PNS (2nd report
paragraph 5.6) and that "the founder could only have been meaning (sic) to grant to the sole participant Kirwan
the power to act as an additional sole executive body for the company PNS" (2nd report paragraph 5.4.3)."

19

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 72 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 20 of 60

    b.   *Does it support the Respondents' case that Clause 7.1.1 does not prevent the appointment of an additional sole executive body for PNS?*

    c.   *Does it support the Respondent's case that Clause 7.1.1 does not expressly provide that the General Director shall have exclusive executive powers at PNS?*

    d.   *What relevance are the words "in accordance with the Charter" in Clause 7.1.1?*

    e.   *What relevance is it that the Revised PNS Charter and Revised 2015 Charter grant Kirwan, as opposed to any other party, powers as additional sole executive body?*

3.   *Other terms of the Kirwan SHA:*

    a.   *On the true construction of Clause 7.1.3 do the Financing Shareholders have the power to amend the Charter of PNS to limit or alter the powers of its General Director as they see fit?   Is reading Clause 7.1.1 to prevent the creation of an additional sole executive body for PNS by Kirwan in addition to the General Director inconsistent with or contradict (sic) Clause 7.1.3 of the Kirwan SHA?*

    b.   *On the true construction of Clause 7.1.2 must the General Director of Kirwan always be a person recommended by the C Shareholder (the Claimant)?   If not, is reading Clause 7.1.1 to prevent the creation of an additional sole executive body for PNS by Kirwan in addition to the General Director inconsistent with or contradict Clause 7.1.2 of the Kirwan SHA?*

    c.   *Is Clause 7.2 inconsistent with the Claimant's case that Clause 7.1.1 prevents the creation of an additional sole executive body in PNS?*

    d.   *Does clause 7.1.4 support the Claimant's case that he was afforded both appointment rights and control rights in relation to PNS and that these were not temporary or transitory?*

4.   *Background to the SHA:*

    a.   *To what extent are the genesis of the investment and the Auction, the investment agreement, the history of the negotiations of the Kirwan SHA, the terms of the 2007 PNS Charter, and Russian law at the time the Kirwan SHA was executed, relevant and admissible as part of the "background knowledge" which would reasonably*

be available to the audience to whom the Kirwan SHA was
addressed?

b.  The Genesis of the Investment and the Auction:

  i.   The bringing together of the "consortium" members

  ii.  The genesis of the investment thesis, being participation in
       the Auction and the tri-partite "peace agreement" between
       Yukos Finance B.V. ("Yukos Finance") (as controlled by
       PNS), Rosneft and GML/Moravel

  iii. The agreement with Rosneft concerning the settlement of
       Yukos Finance's claims against Rosneft

  iv.  The purchase of the whole share capital of PNS by Monte-
       Valle from Rosneft's subsidiary

  v.   The agreement with GML/Moravel concerning the settlement
       of claims between Yukos Finance and GML/Moravel

  vi.  The successful bidding for the shares in Yukos Finance on 15
       August 2007

  vii. Was the Claimant's part significant or was he merely a front
       man?

c.  Investment Agreement dated 15 August 2007:

  i.   Was an investment agreement negotiated between the
       Claimant, Mr. Deitz and Mascini prior to the Auction?

  ii.  Was Monte-Valle and/the Claimant at financial risk when it
       purchased PNS on 14 August 2007?

  iii. Did Mr. Lynch sign the Investment Agreement on 15 August
       2007?

  iv.  Was a complete, agreed and binding investment agreement
       entered into between Mr. Lynch, Mr Deitz and Mascini on 15
       August 2007?

  v.   Was a signed, agreed and binding investment agreement
       entered into by the Claimant (or Monte-Valle) dated 20
       August 2007?

  vi.  Was a complete, agreed and binding investment agreement
       entered into by the Claimant (or Monte-Valle) at any time
       between 15 August 2007 and 30 August 2007?

21

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 74 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 22 of 60

       vii. *Does the investment agreement (signed or unsigned) have any relevance to the interpretation of the Kirwan SHA?*

d.  *Drafting history of the Kirwan SHA:*

      i. *Did the Claimant negotiate the removal of the right of the A Shareholder to remove the General Director of PNS?  Was the right of the A Shareholder to remove the General Director of PNS unnecessary because of the provisions of the 2007 PNS Charter and the decision making powers given therein to the sole participant in General Meeting?*

      ii. *Did the Claimant negotiate the removal of the A Shareholder's right to create Management Committee as a corporate organ of PNS?  Was a Management Committee unnecessary because of the provisions of the 2007 PNS Charter and the decision making powers given therein?*

      iii. *If so, is it admissible or relevant to the construction of Clause 7.1.1 that the parties to the SHA excluded the right of the A Shareholder to remove the General Director of PNS and/or the possibility of a Management Committee being appointed as a governing body of PNS as a result of negotiations?*

e.  *Terms of the 2007 PNS Charter dated 31 August 2007:*

      i. *Would it be inconsistent with or contradict the terms of the 2007 PNS Charter (e.g., Articles 12.3.5, 12.3.20, 12.3.24, 12.3.25, 12.3.27, 12.3.29, and 13.7), which terms were negotiated in parallel to the Kirwan SHA, to read Clause 7.1.1 to prevent the creation of an additional sole executive body for PNS by Kirwan in addition to the General Director?*

f.  *Russian law at the time Clause 7.1.1 of the Kirwan SHA was executed on 30 August 2007:*

      i. *In 2007 was it the case that only a sole executive body could act on behalf of a Russian LLC without a power of attorney?*

      ii. *In 2007 and after the 2014 amendments was it the case that neither a general meeting of participants of an LLC nor any of the participants jointly or severally could act on behalf of an LLC without a power of attorney?*

      iii. *Did the parties to the Kirwan SHA intend to limit the types of decisions that could be taken by Kirwan and the General*

*Director in accordance with Clause 7.1.1 by reference to Russian law as at 30 August 2007?*

iv. *Is it relevant that neither the Kirwan SHA or 2007 PNS Charter provides that the powers of the PNS General Director and/or Kirwan in respect of PNS are to be limited by, subject to or otherwise stabilised by reference to the laws of the Russian Federation as at the date of the Kirwan SHA?*

v. *Would limiting the types of decisions that could be taken by Kirwan and the General Director in accordance with Clause 7.1.1 by reference to Russian law as at 30 August 2007 be inconsistent with the terms of the Kirwan SHA (e.g., Clause 1.4 and definition of "Charter" in Clause 1.1) and/or the 2007 PNS Charter (e.g., Articles 12.3.5, 12.3.20, 12.3.24, 12.3.25, 12.3.27, 12.3.29, and 13.7) and/or the Current Charter (e.g., Articles 9.2.2, 9.2.3 and 9.2.12).*

vi. *Are the Claimant's claimed "paramount control rights" inconsistent with or contrary to Russian law? Does the General Director have an obligation to act in the best interests of PNS? Is the General Director of PNS obliged to carry out all instructions of the sole participant (Kirwan) resolved upon in general meeting irrespective of whether or not they conform with his duty under Article 53.1 of the Russian Civil Code to act reasonably and with good faith in the interests of PNS not Kirwan as its sole participant?*

vii. *Can the general participants of a Russian LLC compel the General Director to carry out their instructions resolved upon in general meeting or must they dismiss him?*

viii. *Was the Claimant entitled to refuse to register the Revised PNS Charter on the grounds that it did not comply with Russian law and so he could not make the required declaration that it did so comply which would expose him personally to the risk of administrative penalties?*

5. *If on its true construction Clause 7.1.1 prevents the creation of an additional sole executive body for PNS by Kirwan in addition to the General Director, can Clause 7.1.1 only be varied by the written agreement of all the parties to the SHA in accordance with Clause 28.6?*

**Issue No.2: Other alleged breaches of the SHA**

23

6. *Would the breach of Clause 7.1.1 alleged by the Claimant also breach Clauses 5.1, 5.2, 6.1, 9.1 and 28.2?*

7. *Do the proposed alterations of the powers of the General Director of PNS contained in the Revised 2014 Charter and the Revised 2015 Charter and set out in Annex 2 to the Statement of Case at paragraph 3.2 breach the respective provisions of the SHA set out therein?*

### *Issue No.3: Unanimous Reserved Shareholder Matters*

8. *In the alternative to the Claimant's case on Clause 7.1.1 above, is the purported alteration of the decision making process provided for in Clause 7.1.1 by the introduction of Kirwan as an additional sole executive body in PNS a "corporate action" the effect of which would be to alter the rights attaching to the C Share which requires Unanimous Required Shareholder Consent under USRM3 in Part 3 of Schedule 3 to the SHA?*

9. *In particular:*

   a. *Are changes to the charter of PNS included in the list of Unanimous Shareholder Reserved Matters in Part 3 of Schedule 3 to the SHA?*

   b. *What relevance is USRM4, which provides that any changes to Kirwan's By-Laws the effect of which would be to alter the rights attaching to the C Share?*

   c. *Are the "corporate actions" in USRM3 limited to a narrow list of classic corporate actions ("issue of shares, debentures, warrants, options or any capital reorganisation") by an issuer in relation to issuance of securities in relation to its own share capital or debt structure (and reorganisation of the same)?*

   d. *Are "corporate actions" limited to those at Kirwan or do they extend to resolutions of the board of Kirwan which effect changes to the charter of PNS?*

   e. *Is the Claimant's alleged right to prevent the introduction of an additional sole executive body in PNS under Clause 7.1.1 a right "attaching to a C Share"?  In particular, can the powers of the General Director create a right "attaching to the C Share" in light of the Clause 7.1.2 of the Kirwan SHA?*

   f. *Is the only "right attaching to a C Share" the right for those shares to remain un-cancelled unless and until the monies owed to the Claimant were properly paid?*

24

    g.   *Consequently, is the resolution of the board of Kirwan of 5th November 2014 to require Kirwan as general participant in PNS to implement the Revised PNS Charter a "corporate action" and would the passing of a similar resolution to implement the Revised 2015 Charter likewise be a "corporate action" requiring Unanimous Required Shareholder Consent under USRM3?*

10.  *To what extent, if at all, are the proposed alterations of the powers of the General Director of PNS set out in Annex 2 to the Statement of Case at paragraph 3.2 likewise matters which require Unanimous Required Shareholder Consent under USRM3?*

### *Issue No.4: Have Mascini and/or Lapidem breached Clause 18.2 of the Kirwan SHA*

11.  *On the true construction of Clause 18.2, does Clause 18.2 prevent Mascini and Lapidem as Shareholders from entering into any discussions with any persons apart from other Shareholders in relation to a possible settlement by PNS and/or Kirwan of the Dutch Yukos Litigation?*

12.  *Were the actions of Mr Deitz set out in paragraphs 21 and 22 of the Statement of Case carried out on behalf of Lapidem and Mascini?*

13.  *If so, did those actions constitute a breach of Clause 18.2?*

14.  *Was:*

    a.   *Kirwan an Affiliate of Mascini?*

    b.   *PNS an Affiliate of Mascini?*

    c.   *Kirwan an Affiliate of Lapidem?*

    d.   *PNS an Affiliate of Lapidem?*

15.  *If the actions of Mr Deitz set out in paragraphs 21 and 22 of the Statement of Case were carried out on behalf of Kirwan and PNS were Mascini and Lapidem in breach of Clause 18.2 in that they failed to procure that their Affiliates did not solicit, encourage or enter into any discussions with any persons apart from other Shareholders in relation to a possible Third Party Agreement?*

16.  *What, if any authority did Mr Deitz have to act on behalf of PNS to enter into discussions of the kind set out in paragraphs 21 and 22 of the Statement of Case? If Mr. Deitz did not have such authority, is that relevant to the Claimant's Clause 18.2 case?*

### Issue No.5:  Does the Kirwan SHA contain an implied term that the PNS Charter must comply with Russian Law?

17. Is there an implied term of the Kirwan SHA that the PNS Charter must comply with Russian Law?

18. Is the implication of such a term in any event prevented by Clause 27.1 of the Kirwan SHA?

19. The parties agree that the Revised 2015 Charter is valid as a matter of Russian Law.

20. As regards the Revised PNS Charter, did this breach the alleged implied term because Kirwan was invalidly appointed as an additional sole executive body in PNS under the Revised PNS Charter:

   a. because it was not identified properly as a second sole executive body in addition to the General Director; and/or

   b. because no provisions on the procedure for appointment or the term of the appointment were included in the Revised PNS Charter; and/or

   c. because the Revised PNS Charter did not specify whether the additional sole executive body could act separately and independently of the General Director or only jointly with him; and/or

   d. because it did not specify the "competence" (powers) of the additional sole executive body: or

   e. to the extent that it did so,  it defined the powers to enter into any transactions as being "subject to the prior approval of the General Participants Meeting" which was an exorbitant limitation on the powers of the additional sole executive body and contrary to Russian law?

### Issue No.6: The new claims against VRGP in the Claimant's Amended Statement of Case

21. Are the new claims against VRGP outside the scope of the terms of reference of this arbitration as prescribed by the 4 February Agreement?

22. Did PNS acquire legal title to Yukos Finance by way of the transfer of shares from Mr Rebgun acting as Yukos bankruptcy receiver pursuant to the Deed of Transfer dated 10 September 2007?

23. *Did the judgment of the Amsterdam District Court on 31 October 2007 dispossess PNS of title or did it mean that since the Yukos bankruptcy was held to have violated principles of Dutch public law and could not be recognised in the Netherlands Mr Rebgun had no right or title to the shares in Yukos Finance (a Dutch company) and consequently could not give legal title to the shares to PNS?*

24. *Do the steps taken by Mr. Deitz as set out in paragraphs 21 and 22 of the Statement of Case constitute breaches by VRGP of Clauses 5.3 and 5.4 of the Kirwan SHA as well as of Clause 18.2?*

25. *Do Clauses 5.3 and 5.4 of the Kirwan SHA oblige VRGP and the other Parties to procure that the Dutch Yukos Litigation continues?*

26. *Has VRGP breached Clause 6.1 of the SHA? In particular:*

    a. *On the true construction of Clause 6.1 does VRGP's obligation extend to using its best endeavours to ensure that the management of the Group is conducted in accordance with Clauses 6 and 7 of the Kirwan SHA?; or*

    b. *On the true construction of Clause 6.1 is VRGP's obligation to use its best endeavours limited to its obligations as a party to the Kirwan SHA, namely the obligations of VRGP under Clause 20?*

    c. *Was VRGP in a position to procure that Mascini and Lapidem prevent a breach of Clause 7.1?*

27. *Has VRGP breached Clause 9.1 of the Kirwan SHA? In particular:*

    a. *On its true construction does Clause 9.1 require VRGP to procure that no action or decision shall be taken by any Shareholder which breaches the Unanimous Shareholder Reserved Mechanism? or*

    b. *Does VRGP have no such obligations because it has no rights or obligations in respect of Reserved Matters because it is not a Shareholder in Kirwan?*

***Issue No.7: Relief sought by the Claimant***

28. *What, if any, relief is the Claimant entitled to?*

29. *Jurisdiction Ratione Personae: Does any of the relief sought by the Claimant involve the granting of relief against persons who are not parties to this arbitration and in relation to whom the Tribunal lacks jurisdiction?*

**H. The Terms of the SHA and of the original Charter of PNS**

62.   I set out below the principal terms of the SHA on which the arguments turned.

I have of course taken account of all its terms to which I was referred by the parties, even those not set out below.

*1.1 Definitions:*

*"**Affiliate**" means any person that, directly or indirectly, through one or more intermediaries, Controls (jointly or otherwise), or is Controlled by or is under common Control with a Shareholder.*

*"**Charter**" means the charter of Promneftstroy in the form appended hereto as amended from time to time.*

*"**Net Gain**" shall have the meaning given in Clause 12.1 and shall be calculated in accordance with the principles set out in Schedule 4*

*"**Reserved Matters**" means the Unanimous Shareholder Reserved Matters, the Special Majority Shareholder Reserved Matters and the Majority Shareholder Reserved Matters.*

*"**Third Party Agreement**" means any contract or arrangement with any person, other than another Party (i) for the acquisition or sale of shares in the Yukos Subsidiaries or (ii) the acquisition of any part of the assets or undertaking of Yukos Subsidiaries or (iii) in relation to the settlement of any Claim or (iv) which would reasonably affect the ability or willingness of the parties to proceed with the transactions contemplated by this Agreement in the ordinary course or (v) in relation to any other matters relating to any claims whatsoever against any of the Yukos Subsidiaries.*

*"**Unanimous Required Shareholder Consent**" shall have the meaning given to it in Clause 8.2.1.*

*"**Unanimous Shareholder Reserved Matters**" means those matters set out in Part 3 of Schedule 3.*

*.....*

*5. Undertakings:*

*5.1   The Shareholders agree that:*

*5.1.1   Their respective rights in the Company shall be regulated by this Agreement and subject to Clause 28.2, the By-laws.*

16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Case 1:17-cv-04339-CM    Document 21    Filed 07/13/17    Page 81 of 88
Order)    Docket No. 20)    Pg 29 of 50

5.2    *The Shareholders and the Company agree to be bound by and comply with the provisions of this Agreement which relate to them and that all provisions of the By-laws will be enforceable between themselves in whatever capacity.*

5.3    *The Parties shall procure that Promneftstroy, subject to being put in funds pursuant to Clauses 4.2.1 and 10, takes all actions, steps and proceedings legally available to it with a view to ensuring that it acquires legal registered title to the entire issued share capital of Yukos Finance BV as soon as reasonably practicable following the payment of the Auction Price and that all actions set out in the Yukos Finance BV Restructuring Document are taken in accordance with the timetable set out in that document (provided that such document has been initialled by all Shareholders).*

5.4    *Each of the Parties acknowledges and agrees and undertakes that it will not, and will procure that its Affiliates will not, take any actions that will interfere with the actions, steps and proceedings contemplated by Clause 5.3.*

…….

## 6. The Board and Management Structure

6.1    *Supervision: The Parties will use their respective best endeavours to ensure that the management of the Group is conducted at all times in accordance with the provisions of this Clause 6, Clause 7 and the By-laws.*

…..

## 7. Management of Subsidiaries

7.1    *Promneftstroy*

7.1.1    *All decisions in respect of Promneftstroy will be taken by the company and the Promneftstroy General Director in accordance with the Charter.*

7.1.2    *The identity of the Promneftstroy General Director shall be determined on the recommendation of the C Shareholder, save that following cancellation of the C Share as contemplated in Clause 3, the identity of the Promneftstroy General Director shall be determined on the recommendation of the A Shareholder.*

29

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 82 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 30 of 60

7.1.3   *The financing shareholders and the Company shall procure that the powers of the Promneftstroy General Director are limited as st out in the Charter.*

7.1.4   *In any case where (i) Promneftstroy ceases to be owned by the Company, (ii) the reorganisation referred to in Clause 4.3.1 (or similar reorganisation) takes place or (iii) there is any other restructuring such that the Company (but not Promneftstroy) continues to hold Yukos Finance BV or any Yukos Subsidiary, then the C Shareholder shall have materially equivalent appointment and control rights (taking into account the existing powers of the General Director in Promneftstroy) in Yukos Finance BV (or where, mutatis mutandis, one of the circumstances in sub-clause (i), (ii), or (iii) applies to Yukos Finance BV, such other Yukos Subsidiary as may be the parent company (or where no such parent, the largest) of the Yukos Subsidiaries which remain Group Companies), for as long as the C Share remains in existence in accordance with the terms of this Agreement.*

7.2   *Management of the Yukos Subsidiaries: To the fullest extent permitted by applicable law all decisions otherwise to be taken by the boards of directors of any Group Company will be taken by the Board, subject to those matters which are Reserved Matters which will be taken by the Shareholders in accordance with Clause 9.*

......

8.2   *Shareholder consent thresholds*

8.2.1   *For the purposes of this Agreement, the consent in relation to a Unanimous Shareholder Reserved Matter (**"Unanimous Required Shareholder Consent"**) shall require:*

(i)   *the prior written consent of, or on behalf of, each Shareholder, or*

(ii)   *the affirmative vote of all Shareholders entitled to attend and vote at a general meeting of the Company.*

......

9. *Reserved Matters*

9.1   *The Parties agree that (except as necessary to give effect to any provision of this Agreement) no action or decision shall be taken (whether by the Shareholders, the Board, the Promneftstroy General*

Director, the Promnefstroy Management Committee, the Company, any other member of the Group or any of the directors, officers or managers of the Group) or resolution passed:

9.1.1   Relating to any Unanimous Shareholder Reserved Matters without Unanimous Required Shareholder Consent;

9.1.2   Relating to any Special Majority Shareholder reserved Matter without the Special Majority Required Shareholder Consent.

9.1.3   Relating to any Majority Shareholder Reserved Matters without Majority Required Shareholder Consent.

.....

## 12. C Shareholders Earn Out

12.1     Prior to the payment of any Return, the Financing shareholders shall calculate the Net Gain (if any) and shall procure that such calculation is notified in writing to the C Shareholder ...

12.4     The Net Gain shall be calculated in accordance with the principles set out in Schedule 4

.....

## 18. Conflicts

18.1   Each of the Shareholders hereby represents and warrants (in respect of itself and its Affiliates) that:

18.1.1   Neither it nor any Affiliate has entered into a Third Party Agreement and it is not negotiating, or continuing any discussions or proposing to negotiate or enter into discussions in relation to any Third Party Agreement, and

18.1.2   To the extent that it has been negotiating or continuing discussions with any person other than a Party in relation to a Third Party Agreement the names of the person with whom it has been negotiating have been disclosed and those negotiations have been terminated.

18.2   Each of the Shareholders undertakes to each of the other Shareholders that, during the terms of this Agreement and save as contemplated by this Agreement, it shall not, and it shall not encourage or enter into any discussions with any person other than the other Shareholders in relation to a possible Third Party Agreement.

31

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 84 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 32 of 60

.....

20. *VRGP Covenant*

.....

20.2 *Without prejudice to the rights of the MHL and SL against LL, VRGP shall be a primary obligor and shall be deemed a principal debtor in respect of its obligations under this Agreement and not a surety.*

... ...

20.5 *VRGP agrees to indemnify MHL and SL on demand against all losses, claims, costs, charges and expenses which it may incur as a result of any default by LL in performing any Obligation or by VRGP in performing its obligations under this Agreement*

... ...

28. *General*

.....

28.2 *Conflict with the By-laws: In the event of any ambiguity or discrepancy between the provisions of this Agreement and the By-laws, it is intended that the provisions of this Agreement shall prevail between the Shareholders and accordingly the Shareholders shall exercise all voting and other rights and powers available to them so as to give effect to the provision of this Agreement and shall further if necessary procure any required amendment to the By-laws.*

... ...

28.6 *Variations: No variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the parties.*

.....

*Part 3 Unanimous Shareholder Reserved Matters*

*Save where any such matter has been specifically agreed in the Yukos Finance BV Restructuring Document.*

- *Expenditure by the Financing Shareholders or any Group Company over and above that reasonably required to meet Operational Expenses.*

- *Payment of any Return to the Financing Shareholders save where the rights of the C Shareholder in respect of that payment have first*

32

16-22321-rdd  Doc 21-4  Filed 05/27/16  Entered 05/27/16 14:31:55  Exhibit D (per
Order - Docket No. 20)  Pg 33 of 60
Case 1:17-cv-04339-LM  Document 23  Filed 07/13/17  Page 85 of 88

been satisfied in full as contemplated by Clause 12 of
this Agreement.

○ Any issue of shares, debentures, warrants, options or any capital
reorganisation or other corporate action the effect of which would
be to alter the rights attaching to the C Share.

○ Incurring of any Operational Expenses by the Financing
Shareholders or any Group Company either (a) in excess of
US$250,000 in respect of each individual item of expenditure or (b)
in excess of US$2,000,000 when aggregated with all other items of
like expenditure or where such expenditure is paid to the same or
related parties.

○ The sale of (sic) disposition of Yukos Finance BV (including any
transfer of control).

… … …

○ Any related party transaction entered into, other than on arms'
length commercial terms and reasonably necessary for the relevant
Yukos Subsidiary, by a Yukos Subsidiary with any of the
Shareholders or its Affiliates.

63. Although the definition of Charter in the SHA says that it means *"the charter of [PNS]
in the form appended hereto as amended from time to time"*, there was no such formal
appendage to the SHA.

64. However, the terms of the original Charter of PNS were being discussed in parallel with
the terms of the SHA and were agreed as part of the suite of transactions on 31 August
2007, i.e. the day after the SHA was signed. In my view, it is of no significance that the
original charter was not actually appended to the SHA and was in a draft at this time
which was executed the following day. In my view, the SHA is to be construed by
reference to the Charter executed on 31 August 2007, just as much as if the document
had been formally appended.

65. I have been provided with excerpts of the original Charter of PNS translated into
English. In my view, they are instructive.

66. As required at a minimum by Russian law at the time, PNS had two management
"bodies"; its sole participant, the Fourth Claimant, and its General Director. It is
notable that numerous matters including all important decisions on financial matters

and settlements were exclusively reserved to the Fourth Respondent as the sole member of PNS (under the provisions of Article 12.3). The role of the General Director, apart from day to day management and relatively minor decisions, was essentially limited to the carrying into effect of decisions within the exclusive power of the Fourth Respondent (see Articles 13.2, 13.3 and 13.6).

67. The original Charter of PNS did not give the General Director power to block transactions, such as the settlement of major litigation relating to the assets of PNS, with which he disagreed. The exclusive power to decide in relation to such matters rested with the sole member, the Fourth Respondent, and the General Director was obliged to carry its decisions into effect.

68. However, as set out above, the definition of "Charter" includes the charter *"as amended from time to time"*. Throughout much of this hearing, the parties proceeded on the basis that the PNS Charter had been amended in 2010; the version brought into effect at that time was called "the Current Charter". As mentioned, at a very late stage, just before the evidential hearing, issues arose as to whether this was done validly.

69. These issues were eventually covered by the Letter Agreement set out above. Accordingly, I need say nothing about it except that I do note, however, that so far as concerns PNS, Article 12.3.3 of the previous charter, i.e. the 2007 charter, provides that the *"making of changes or additions to the Company's charter"* is a matter reserved to *"the exclusive competence of the General Meeting of the Company members"*, i.e. the Fourth Respondent as sole participant.

I. **Discussion and Determination of the Issues**

70. I have decided to structure this section of the award in accordance with the agreed list of issues.

*Issue No.1: On its true construction, does Clause 7.1.1 of the Kirwan Shareholders Agreement executed on 30 August 2007 (the "Kirwan SHA") prevent the creation of an additional sole executive body for PNS by Kirwan in addition to the General Director?*

71. This issue arises because, as the parties agreed, both the Revised PNS Charter and the Revised 2015 Charter purport to create an additional sole executive body at PNS in addition to the General Director of PNS. The question is: does that breach the terms of the SHA?

34

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 87 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 35 of 60

72.   In my view, it does and accordingly the answer to this broad question is "Yes". The parties to the SHA agreed that there would be only one sole executive body of PNS, namely the General Director.

73.   Clause 7.1.1 states expressly that *"all decisions in respect of [PNS] will be taken by [the Fourth Respondent] and the [PNS] General Director in accordance with the Charter"*. This was consistent with the original charter of PNS signed on 31 August 2007 under which (as discussed in the previous section above) there were two management bodies of PNS, the general meeting of the shareholders, i.e. the Fourth Respondent, and the General Director (Article 11); the former's role and powers were set out in Article 12 and the latter's in Article 13. Clause 7.1.2 of the SHA gave the Claimant, as the C shareholder in the Fourth Respondent, the contractual right to have his nominee appointed as the General Director, until his share was cancelled. Clause 7.1.4 provided for the Claimant to be granted *"similar appointment and control rights"* in YF (or in its subsidiaries) in certain circumstances contemplated by the SHA. This wording is an objective indication that the parties regarded Clauses 7.1.1 and 7.1.2 as giving the Claimant "appointment and control rights". A further indication can be found in Schedule 5 to the SHA which provided that as soon as reasonably practicable on the Subscription Day "relevant meetings of [PNS] will be held to give effect to the appointment contemplated by this Agreement and to approve the adoption of the Charter". In my view, these appointment and control rights, such as they are (which so far as control is concerned depends on the terms of the Charter in force at the relevant time), would be undermined by the creation of a second sole executive body in addition to the General Director. Clause 7.1 as a whole is directed towards a different decision-making structure for PNS than that which shall "otherwise" apply for the group companies; it is carved out from clause 7.2, which in all other cases allocates decision-making to the Board of the Fourth Respondent alone.

74.   Accordingly, I have formed the clear conclusion it would be inconsistent with both the express provisions and the scheme of Clause 7.1, as set out above, for an additional sole executive body to be created in addition to the General Director. In order for this position under the SHA to be amended, it would require the agreement in writing of all the parties to the SHA. This is because clause 28.6 of the SHA states "no variation of this Agreement shall be effective unless in writing and signed by or on behalf of each of the parties".

Case 1:17-cv-04339-CM   Document 13   Filed 07/13/17   Page 88 of 88
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 36 of 60

75.   I have considered all the questions inserted by the parties under this Issue No.1 in the agreed list of issues, as well as all their other written and oral arguments, but do not find it necessary to express detailed reasons on each and every one of these arguments and questions in order to decide the overall issue, as set out above. However, I shall briefly indicate my views.

76.   As to the questions raised in paragraph 2:

(a)   I did not think that the absence of any reference to executive powers as opposed to decisions in Clause 7.1.1 is of any great relevance to what I have to decide. I am not deciding what are the respective powers of the two "bodies" of PNS (i.e. the sole participant and the General Director), only that the SHA requires that there be such two bodies and none others. Nor am I deciding that the SHA gives the Claimant what have been called "paramount control rights". The respective powers of, and the relationship between, the two bodies are nowhere addressed out in the SHA. They must therefore be as laid down in the Charter of PNS, as in force at any given time (and subject to any valid amendments thereto). No provision of the SHA expressly deals with the right of any of the parties or of the Fourth Respondent to amend or alter the Charter of PNS.

(b)   In my view, it does not support the Respondents' case that Clause 7.1.1 does not expressly prevent the appointment of an additional sole executive body for PNS. Indeed, it might have been surprising if it had done so because the parties were agreed that, as at 2007, it was not possible under Russian law for a LLC to have more than one sole executive body; this became possible only by reason of changes introduced into Russian Federation law with effect from 1 September 2014.

(c)   In my view, it does not support the Respondents' case that Clause 7.1.1 does not expressly provide that the General Director shall have exclusive executive powers at PNS. This is because in my view Clause 7.1.1 is directed towards what decision-making bodies PNS shall have. Thus, it is not directed to the powers of the General Director but leaves that subject to be covered by the Charter, as validly amended from time to time, and by the requirements of Russian law.