Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 1 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 37 of 60

(d)   In my view, the relevance of the words "in accordance with the Charter" in Clause 7.1.1 is to indicate that the decision-making bodies of PNS as set out in its Charter shall be the Fourth Respondent as its sole participant and the General Director, and that they shall act in accordance with the Charter as (validly) amended from time to time. As already mentioned, I think that it is instructive to compare Clause 7.1 with clause 7.2; the latter likewise addresses *who* shall take decisions "otherwise" (i.e. other than as dealt with in clause 7.1), viz. decisions on behalf of the subsidiaries of the Fourth Respondent other than PNS, namely the Board of the Fourth Respondent.

(e)   I do not think that it is any real significance that the Revised PNS Charter and Revised 2015 Charter grant the Fourth Respondent, as opposed to any other party, powers as an additional sole executive body. In my view, it is the creation of this additional body as a body entitled to act on behalf of PNS which infringes the SHA, not the identity of the person who is granted its powers.

77.   As to the questions raised in paragraph 3, I did not consider that Clause 7.1.3 assisted me to any great extent in construing clauses 7.1.1 and 7.1.2. It is couched in terms of an obligation and neither party really explained why this was so to my satisfaction. It is consistent with the First and Second Respondents each being obliged to limit the powers of the General Director, rather than for example the First Respondent oppressing the Second Respondent by siding with the Claimant and in that context seeking to increase the powers of the General Director. Subject to the requirements of the SHA and of Russian law, the sole participant in PNS (i.e. the Fourth Respondent, which is controlled by the First and Second Respondents as shareholders of all the shares except one) does have the power to amend the Charter of PNS to limit or alter the powers of the General Director as it sees fit. I do not consider that reading Clause 7.1.1 to prevent the creation by the Fourth Respondent of an additional sole executive body for PNS in addition to the General Director is inconsistent with or contradicts Clause 7.1.3 of the SHA.

78.   In my view, on the true construction of Clause 7.1.2 the General Director of PNS must always be a person recommended, i.e. nominated, by the C Shareholder (the Claimant). The other parties to the SHA are obliged to procure that this be the case, e.g. to vote or resolve in the case of the Fourth Respondent or to procure that the Fourth Respondent

be instructed to vote or resolve so as to respect this right in the case of the other Respondents. The Board of the Fourth Respondent cannot appoint as the General Director of PNS someone not recommended by the Claimant. It has to be borne in mind that the SHA was agreed at a time when there were three, not two, shareholding blocks. In my view, it is reasonable to assume that the First and Second Respondents and those behind them were content to allow the Claimant to have this right in part because he (or his nominee) could play a role in holding the ring between them.

79. In my view, this construction of Clause 7.1.2 supports and reinforces the view that I have formed on Issue No.1. It creates what may be termed an "appointment right". Certainly, in my view, Clause 7.2 is not inconsistent with Clause 7.1 preventing the creation of an additional sole executive body in PNS.

80. As I have stated above, Clause 7.1.4 does support the Claimant's case that he was afforded certain "appointment and control rights" in relation to PNS and that these were not temporary or transitory, albeit that they were subject in the case of control rights to the terms of the Charter and any valid changes thereto which might affect the relative powers of the sole participant and the General Director in the management of PNS. It is notable that Clause 7.4 refers to "(taking into account the existing powers of the General Director of [PNS])". This would make little sense if the General Director's role and powers could be side-stepped simply by the creation of an additional sole executive body as contemplated by the revised charters that the Respondents seek to put into effect. These words also show that the phrase "materially equivalent appointment and control rights" refers back to clauses 7.1.1 and 7.1.2.

81. As to the background to the SHA, whilst I have taken this into account as part of the factual matrix in which the SHA was made, in line with the guidance set out in *Rainy Sky SA v Kookmin Bank SA* [2011] 1 WLR 2900, para 21, I was not persuaded to consider this topic as being anywhere near as important as the parties evidently did, judging from the substantial efforts they put into submissions and evidence with regard to the background. Whilst the genesis of the investment and the auction, the Investment Agreement (which is referred to in the recitals of the SHA), the terms of the 2007 PNS Charter and Russian law at the time the SHA was executed, are all relevant and admissible as part of the "background knowledge" which would reasonably be

16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Case 1:17-cv-04338-CM    Document 18-1    Filed 07/03/17    Page 3 of 71
Order - Docket No: 20)    Pg 39 of 66

available to the audience to whom the SHA was addressed, I did not consider that any of them unequivocally supported either sides' case on the construction of clause 7.1.

82.   I did not consider that it is necessary for me to make any finding on whether the Investment Agreement was ever a fully binding agreement on all intended parties, and if so when and on what terms. It is a fact, however, that the Claimant signed at least one version of the Investment Agreement and so he must have been happy at that point with most, if not all, of its terms, including that he was to have *"standard minority protections"* as per clause 4.1. But the Investment Agreement said nothing about the management bodies of PNS or of the respective roles of the Fourth Respondent or the future General Director of PNS. I formed the view that the Claimant had possibly over-stated his part, and the financial risks he took, in bringing the August 2007 transactions to a successful conclusion but, on the other hand, his entrepreneurial role was nevertheless such as to justify being awarded a US$1.25 million management fee payable immediately and a 10% share of the future net gain from the venture. Ultimately, I did not consider that the Investment Agreement (signed or unsigned) had any real relevance to the interpretation of clause 7.1 of the SHA.

83.   As to the negotiation of the SHA itself, and the evidence of the drafts through which it went before being finally agreed and executed on 30 August 2007, I consider these matters are inadmissible as to the construction of the SHA under English law. I have therefore placed no weight on this evidence.

84.   As to the terms of the 2007 PNS Charter dated 31 August 2007, I do not consider that the terms of the 2007 PNS Charter (e.g., Articles 12.3.5, 12.3.20, 12.3.24, 12.3.25, 12.3.27, 12.3.29, and 13.7), which terms were apparently negotiated in parallel to the SHA, mean that Clause 7.1.1 should not be read to prevent the creation of an additional sole executive body for PNS in addition to the General Director.

85.   As to the questions of Russian law set out in the list of issues, save as mentioned above, I do not consider that I need to resolve these issues in order to decide the proper construction of the SHA. Further, some of them might be considered to trespass outside the scope of the arbitration as set out in the 4 February 2015 Agreement.

86.   I record, however, that in general I found the evidence of Mr Bevzenko to be more convincing and authoritative than that of Mr Dyakin and the Russian law evidence

39

persuaded me that: (1) in 2007 only a sole executive body (or a management company appointed in its place if permitted by the charter and then resolved upon) could act on behalf of a Russian LLC and bind it to a transaction without a power of attorney; (2) the minimum governing or management bodies of an LLC were its participants and its sole executive body; (3) as from 1 September 2014, an LLC could (but need not) have two or more sole executive bodies, who could be empowered to act on its behalf either jointly or separately; and (4) at all times, neither a general meeting of participants of an LLC nor any of its participants jointly or severally could act as such on behalf of an LLC without holding a power of attorney.

87. Further, the Russian law experts agreed that a General Director of an LLC is obliged under Russian law to act reasonably and in good faith in the interests of the company of which he or she or it is the General Director (see e.g. Article 53(3) of the Amended Civil Code of the Russian Federation). What this Russian law duty means in practice in any given situation will be a fact-specific issue, and I was not required to resolve any such issue.

88. The parties to the SHA appear to have envisaged that the Charter of PNS could and would be amended from time to time. There was nothing specifically agreed in the SHA which prescribed or proscribed what the Charter should or should not provide in relation to the management of PNS by its two bodies, the sole participant (the Fourth Respondent) and the General Director, or as to their respective and relative powers.

*Issue No.2: Other alleged breaches of the SHA*

89. I shall first address the question: Would the breach of Clause 7.1.1 alleged by the Claimant also breach Clauses 5.1, 5.2, 6.1, 9.1 and 28.2?

90. As regards Clause 5.1, in my view the answer to this question is "No." Clause 5.1 is not concerned with the corporate governance or decision-making of PNS; it is concerned with various matters relating only to the Fourth Respondent.

91. As regards Clause 5.2, this states that the Shareholders and the Company (i.e. the Claimant, the First, Second and Fourth Respondents) agree to be bound by and comply with the provisions of the SHA which relate to them. In my view, whilst it may be considered as merely stating the obvious effect of the SHA, clause 5.2 does require the

40

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 5 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 41 of 60

First, Second and Fourth Respondents to ensure compliance with Clause 7.1 and in this respect it was breached.

92.   As regards Clause 6.1, this contains an agreement by all parties to the SHA to use their respective best endeavours to ensure that the management of the group is conducted at all times in accordance with the provisions of Clauses 6 and 7. In my view, this clearly covers ensuring compliance with Clauses 7.1.1 and 7.1.2 and it imposes an obligation on all the Respondents to use their respective best endeavours to ensure compliance with these clauses, which likewise has been breached.

93.   As regards Clause 9.1, I do not consider that 9.1 was breached in this instance. That issue is covered below under Issue No.3.

94.   As regards Clause 28.2, this is concerned with conflicts between the SHA and the By-Laws of the Fourth Respondent. It is not concerned with the corporate governance or decision-making of PNS. I do not consider that it was breached.

95.   I now turn to the second question under this head, namely: do the proposed alterations of the powers of the General Director of PNS contained in the Revised 2014 Charter and the Revised 2015 Charter and set out in Annex 2 to the Statement of Case at paragraph 3.2 breach the respective provisions of the SHA set out therein? I shall address the proposed alterations using the lettering set out in paragraph 3.2 itself.

96.   (a) Article 4.1.12 of the Revised PNS Charter, read in conjunction with Article 10.7, to which it refers (or Article 11 in the case of the Revised 2015 Charter), infringes Clause 7.1 for the reasons that I have already given and because its effect (if valid under Russian law) is to make the Fourth Respondent, or allow the Fourth Respondent to specified as, an additional sole executive body of PNS. That is also a breach of Clauses 5.2 and 6.1 but it is not a breach of Clauses 5.1, 8.2.1, 9.1, 28.2 and USRM3 of the SHA.

97.   (b) Article 7 of both the Revised PNS Charter and the Revised 2015 Charter are said to eliminate the pre-emption right of PNS under Article 6.7 of the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and was not developed orally before me. I do not consider

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 6 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 42 of 60

that these clauses cover the contents of the charter of PNS or preclude the change complained of.

98.  (c) Article 9.5.11 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

99.  (d) Article 9.5.12 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

100.  (e) Article 9.5.13 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

101.  (f) Article 9.5.14 (of both the Revised PNS Charter and the Revised 2015 Charter) gives a power to appoint other persons to act on behalf of PNS under Article 53 of the Amended Civil Code of the Russian Federation. That infringes Clause 7.1 for the reasons that I have already given and because its effect (if valid under Russian law) is to allow the appointment of another person to act as an additional sole executive body of PNS. That is also a breach of Clauses 5.2 and 6.1 but it is not a breach of Clauses 5.1, 8.2.1, 9.1, 28.2 and USRM3 of the SHA.

102.  (g) Article 9.5.16 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and

not developed orally before me. I do not consider that these clauses cover the contents
of the charter of PNS or preclude the change complained of.

103.    (h) Article 9.5.18 is objected to on the basis that it changes the scope of powers of the
PNS General Director under the Current (2010) Charter. It is argued that this breaches
Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument,
which was not dealt with in any detail in the Claimant's written reply submissions and
not developed orally before me. I do not consider that these clauses cover the contents
of the charter of PNS or preclude the change complained of.

104.    (i) Article 9.5.19 is objected to on the basis that it changes the scope of powers of the
PNS General Director under the Current (2010) Charter. It is argued that this breaches
Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument,
which was not dealt with in any detail in the Claimant's written reply submissions and
not developed orally before me. I do not consider that these clauses cover the contents
of the charter of PNS or preclude the change complained of.

105.    (j) Article 9.5.22 is objected to on the basis that it changes the scope of powers of the
PNS General Director under the Current (2010) Charter. It is argued that this breaches
Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument,
which was not dealt with in any detail in the Claimant's written reply submissions and
not developed orally before me. I do not consider that these clauses cover the contents
of the charter of PNS or preclude the change complained of.

106.    (k) Article 9.5.23 is objected to on the basis that it changes the scope of powers of the
PNS General Director under the Current (2010) Charter. It is argued that this breaches
Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument,
which was not dealt with in any detail in the Claimant's written reply submissions and
not developed orally before me. I do not consider that these clauses cover the contents
of the charter of PNS or preclude the change complained of.

107.    (l) Article 9.5.26 is objected to on the basis that it changes the scope of powers of the
PNS General Director under the Current (2010) Charter. It is argued that this breaches
Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument,
which was not dealt with in any detail in the Claimant's written reply submissions and

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 8 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 44 of 60

not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

108. (m) Article 9.5.27 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

109. (n) Article 10.4.1 and 10.4.2 is objected to on the basis that it changes the scope of powers of the PNS General Director under the Current (2010) Charter. It is argued that this breaches Clauses 5.1, 5.2, 6.1, 8.2.1, 9.1, 28.2 and USRM3 of the SHA. I reject this argument, which was not dealt with in any detail in the Claimant's written reply submissions and not developed orally before me. I do not consider that these clauses cover the contents of the charter of PNS or preclude the change complained of.

110. (o) Articles 10.7 and 10.8 of the Revised PNS Charter and Articles 11.1 and 11.2 and 11.3 of the Revised 2015 Charter are complained of on the basis that they purport to appoint the Fourth Respondent as an additional sole executive body of PNS. That infringes Clause 7.1 for the reasons that I have already given and because its effect (if valid under Russian law) is to allow the appointment of another person to act as an additional sole executive body of PNS. That is also a breach of Clauses 5.2 and 6.1 but it is not a breach of Clauses 5.1, 8.2.1, 9.1, 28.2 and USRM3 of the SHA.

### *Issue No.3: Unanimous Reserved Shareholder Matters*

*In the alternative to the Claimant's case on Clause 7.1.1 above, is the purported alteration of the decision making process provided for in Clause 7.1.1 by the introduction of Kirwan as an additional sole executive body in PNS a "corporate action" the effect of which would be to alter the rights attaching to the C Share which requires Unanimous Required Shareholder Consent under USRM3 in Part 3 of Schedule 3 to the SHA?*

111. This is an alternative case, and I have ruled in favour of the Claimant on his primary case.

112. I was not persuaded that the introduction of Kirwan as an additional sole executive body in PNS was a "corporate action" in the sense required in the third bullet point Part 3 of Schedule 3 or that the effect of it would be to alter the rights "attaching to the

16-22321-rdd Doc 21-4 Filed 05/27/16 Entered 05/27/16 14:31:55 Exhibit D (per
Case 1:17-cv-04339-CM Document 26-1 Filed 06/13/17 Page 9 of 71
Order - Docket No. 26) Pg 45 of 60

C Share" so as to require Unanimous Required Shareholder Consent. I bear in mind the
Claimant's submissions on the *eiusdem generis* rule but in my view "corporate action"
does not cover the management structure at PNS and refers to actions related to the
Fourth Respondent. Further, the phrase "rights attaching to the C Share" refers to the
Claimant's rights qua shareholder in the Fourth Respondent. The Claimant's rights
under Clause 7.1 of the SHA are rights created by the SHA and are not rights "attaching
to his C Share". In this regard, I noted that whereas the decision-making referred to in
Clause 7.2 of the SHA is expressed to be subject to Clause 9 and to the reserved matters
there specified, Clause 7.1 is not expressly made subject to Clause 9.

113. As to the particular sub-questions, I do not think that changes to the charter of PNS are
included in the list of Unanimous Shareholder Reserved Matters in Part 3 of Schedule 3
to the SHA. Changes to the By-Laws of the Fourth Respondent were specifically
included (at the fourth bullet point, USRM4) but changes to the Charter of PNS were
not. I do not consider that USRM4 assists the Claimant. As already indicated above, in
my view "corporate actions" in USRM3 are limited to a list of classic corporate actions
("issue of shares, debentures, warrants, options or any capital reorganisation"), and the
like, by an issuer in relation to the issuance of securities in relation to its own share
capital or debt structure (and reorganisation of the same). Thus, "corporate actions" are
limited to those at the Fourth Respondent and do not extend to resolutions of the board
of the Fourth Respondent the sole purpose of which to effect changes to the charter of
PNS.

114. I do not consider that the Claimant's right to prevent the introduction of an additional
sole executive body in PNS under Clause 7.1.1 is a right "attaching to a C Share"
within the meaning of URSM3. I do not need to decide whether his only "right
attaching to a C Share" is the right for those shares to remain un-cancelled unless and
until the monies owed to him are properly paid. I have had no evidence of shareholder
rights under Luxembourg law, and I do not consider that a decision on this question is
necessary for the issues that I have been asked to decide.

115. Consequently, the resolution of the board of the Fourth Respondent of 5 November
2014 to require it as general participant in PNS to implement the Revised PNS Charter
is not a "corporate action" and the passing of a similar resolution to implement the

Revised 2015 Charter would likewise not be a "corporate action" requiring Unanimous Required Shareholder Consent under USRM3.

116. For the same reasons, the proposed alterations of the powers of the General Director of PNS set out in Annex 2 to the Statement of Case at paragraph 3.2 are not matters which require Unanimous Required Shareholder Consent under USRM3.

### Issue No.4: Have Mascini and/or Lapidem breached Clause 18.2 of the Kirwan SHA

117. Clause 18.2 of the SHA contains a broad undertaking by each of the First Respondent, the Second Respondent and the Claimant that, during the terms of the SHA and *"save as contemplated by the [SHA]"*, they shall not, and shall procure that none of their Affiliates shall not, enter into any Third Party Agreement or solicit, encourage or enter into any discussions with any person other than the other shareholders in the Fourth Respondent in relation to a possible Third Party Agreement.

118. Clause 18 was carried over from Clause 5 of the Investment Agreement, with one sub-clause (5.4) deleted and otherwise minimal changes, apart from changing "Parties" to "Shareholders". As a result of that change, it did not contain any undertaking at all by the Fourth Respondent, as it was not a "Shareholder" as defined in the SHA. Nor did it contain any undertaking at all by Mr Dietz, as he was neither a Shareholder nor a party to the SHA (although he had been a party to the Investment Agreement).

119. Clause 18.2 appears to be aimed at preventing agreements that would frustrate the joint venture memorialised in the SHA, which is to make a profit for the Fourth Respondent either through success in the Dutch litigation or through settlement. It is not designed to prevent the negotiation of deals on behalf of the Fourth Respondent or its subsidiary, PNS.

120. The Claimant contends that the actions of Mr Deitz in conducting discussions as alleged in paragraphs 21 and 22 of the Statement of Case were not discussions *"as contemplated by the SHA"* and instead constitute an infringement of Clause 18.2 by the First and Second Defendants.

121. The alleged discussions, without the consent of the Claimant, were:

(a)   Discussions at Claridges Hotel in London in December 2013 with David Godfrey of Yukos International UK BV and Marc Fleishman of Stickting

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 11 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 20)   Pg 47 of 60

Administratiekantoor Yukos International (a trust under Yukos) regarding a possible settlement relating to Yukos;

(b)  A meeting with Rashid Sharipov, the first vice-president of Rosneft on 24 February 2014, attended by the Claimant, at which Mr Deitz articulated terms (contrary to the wishes of the Claimant) that would be acceptable to him for the settlement of the Dutch litigation in which PNS was involved.

(c)  Settlement negotiations of Mr Deitz in September 2014 with Mr Godfrey in which an alleged settlement offer was made by Mr Godfrey.

(d)  In late 2014 on unknown dates Mr Ditez had meetings twice with Mr Daniel Feldman, a director of Yukos International (a Yukos subsidiary).

122.  Having heard and considered the evidence of Mr Deitz and the Claimant on these matters, and considered the few contemporaneous documents relating to them, I hold that it was not proved to my satisfaction that, in taking part in these discussions, Mr Deitz was acting on behalf of the First and Second Respondents. He was and is a director of the Fourth Respondent, and he had the consent of the majority of the Board. In my view, the most logical interpretation is that he was exploring possible settlement on behalf of the Fourth Respondent, alternatively that he was acting on his own behalf as someone able to control, indirectly, the decisions and actions of the Fourth Respondent. I was also not persuaded that he was conducting discussions with a view to making an agreement solely with the First or Second Respondent or which would not be, or result in, a bona fide settlement on behalf of the Fourth Respondent and hence bring about the flow of funds ultimately to the Fourth Respondent so that, if there was a Net Gain within the meaning of the SHA the Claimant would receive his 10% share.

123.  In short, it was not proved to my satisfaction that Mr Deitz was acting for the First and Second Respondents nor that the discussions complained of fell outside the saving in clause 18.2 of the SHA, namely *"save as contemplated by this Agreement"*. The SHA contemplates that the Fourth Respondent will seek to make a profit from its investment in PNS and that this profit will come to the Fourth Respondent and be distributed to the shareholders in the Fourth Respondent in accordance with the terms of the SHA. I was not persuaded that the discussions in which Mr Dietz participated were for any other purpose than this.

16-22321-rdd   Doc 31-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order - Docket No. 26)   Pg 48 of 66
Case 1:17-cv-04339-CLM   Document 13-1   Filed 07/13/17   Page 12 of 71

124. As to the question of construction, namely on the true construction of Clause 18.2,
whether Clause 18.2 prevents the First and Second Respondents as Shareholders from
entering into any discussions with any persons apart from other Shareholders in relation
to a possible settlement by PNS and/or the Fourth Respondent of the Dutch Yukos
Litigation, I do not consider that I need to answer this in view of the foregoing.
However, I am inclined to think that Clause 18.2 does not prevent the First and Second
Respondents from conducting exploratory talks towards a bona fide settlement to be
made on behalf of the Fourth Respondent and which would result in a flow of funds to
the Fourth Respondent without any diversion of funds or value.

125. As to the role of Mr Deitz in the discussions complained of, as I have already indicated,
I was not persuaded that he was acting on behalf of the First and Second Respondents,
as opposed to acting on his own behalf, or as a director of the Fourth Respondent, with
a view to possibly achieving a bona fide settlement and a realisation of value on behalf
of the Fourth Respondent, as contemplated by the SHA. In view of this, the other
questions posed under this issue do not appear to arise for decision.

126. In the circumstances, on the evidence presented, I was not persuaded that there has
been a breach of Clause 18.2 by either the First Claimant or the Second Claimant and I
decline to order any relief.

### *Issue No.5: Does the Kirwan SHA contain an implied term that the PNS Charter must comply with Russian Law?*

127. During the course of the hearing the Claimant moved away from advocating a term that
the charter "*must comply with Russian law*" and revised the implied term for which he
contended. The final version was as follows: "*It was an implied term of the Kirwan
SHA that Kirwan should not introduce amendments to the Charter of PNS which are
not in compliance with Russian law*".

128. I am not persuaded that such a term should be implied into the SHA. The debate
between the Russian law experts in this case as to whether the Revised PNS Charter
does or does not comply with Russian law illustrates one of the reasons why I think
such a term could be problematic. Neither expert contended that the charter was
positively illegal. The issue was whether it was sufficiently clear and properly
expressed so as "comply" with Russian law in the sense of achieving its objective of

16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Order)M Deckel Nen 209-1 Pg 11eb 0813/17   Page 13 of 71
Case 1:17-cv-04329-CM   Document 209-1   Filed 06/13/17   Page 13 of 71

constituting the Fourth Respondent as an additional sole executive body of PNS, with one expert arguing that there was compliance in this sense and other that there was not.

129. Another feature which struck me is that the role of PNS was intended to be relatively short-lived. It was contemplated that YF would be transferred to the Fourth Respondent (or possibly a subsidiary) under clause 4.3.1 of the SHA. Under Clause 7.1.4, the Claimant was then to have materially equivalent appointment and control rights in whichever company came to hold YF. That could have been a Luxembourg company (the Fourth Respondent) or possibly a corporation formed under some other legal system. However, the Claimant did not contend that, in addition to the term of potentially short-lived consequence as regards the charter of PNS, an equivalent implied term should be applied to the By-Laws of the Fourth Respondent or to corporate constitution of whichever subsidiary came into the picture as an alternative.

130. The Claimant did not cite any precedent of a similar case in which such a term has been implied into a shareholders' agreement subject to English law to the effect that any changes to the corporate rules of the company in question (governed by a different law) are subject to an implied term of "compliance". The Claimant relied instead on general principles and in particular the re-statement of those principles by Lord Hoffmann in *A-G of Belize v Belize Telecom Ltd* [2009] UKPC 10. In that case, however, Lord Hoffmann said at paragraph 17: *"The question of implication arises when the instrument does not expressly provide for what is to happen when some event occurs. The most usual inference is that nothing is to happen. If the parties had intended something to happen, the parties would have said so."*

131. In the present case, this dictum applies with special force. Here, save as expressly agreed in clauses 7.1.1, 7.1.2 and 7.1.3 (discussed above), the parties have said nothing in the SHA about how or when the charter of PNS, a Russian company, is to be amended or what it must provide. They did not need to do so because there are (or would be) provisions covering this in (a) the 2007 Charter, which they agreed and signed on 31 August 2007 (and any subsequent validly revised version thereof) and (b) Russian law (as amended from time to time). There is therefore no "gap" which needs to be covered by an implied term in order to fulfil the parties' presumed intentions. The reasonable inference, in my view, is that the parties intended the processes contemplated by the terms of the charter and of Russian law to govern the contents of

16-22321-rdd Doc 24349-39 Filed 05/27/16 Entered 05/27/16 14:31:55 Exhibit D (per
Order - Docket No. 20) Pg 50 of 60
Case 1:17-cv-04339-CM Document 1-1 Filed 07/13/17 Page 14 of 71

any revised charter and its compliance with Russian law. They did not intend to impose any contractual obligation on the Fourth Respondent in regard to compliance with Russian law and did not need to do so.

132. Accordingly, I decide that no term as contended for the Claimant as regards compliance with Russian law is to be implied into the SHA, although I would not have held that the implication of such a term was prevented by Clause 27.1 of the SHA. In view of this decision, I do not need to go on and resolve the dispute between the experts on Russian law as to whether there was a breach of the alleged implied term in that the Fourth Respondent was invalidly appointed as an additional sole executive body of PNS under the Revised PNS Charter.

### *Issue No.6: The new claims against VRGP in the Claimant's Amended Statement of Case*

133. I do not need to resolve any of these issues because, as mentioned already, the Claimant informed me during the hearing that he no longer sought permission to amend the Statement of Case to introduce these claims. The Respondents had maintained that these claims fell outside the scope of the arbitration under the 4 February 2015 Agreement but in the circumstances I am not required to determine that issue.

### *Issue No.7: Relief sought by the Claimant*

134. The Claimant has won on Issue No.1 and for that reason is entitled to the declaratory relief claimed at paragraphs 58(a) and (b) of the Statement of Case (as amended on the final day of the hearing).

135. As to the relief claimed in paragraphs 58(c) and (d), in light of my conclusions on Issue No.2, the Claimant is entitled to declarations that (i) the inclusion of the following Articles in the Revised PNS Charter breaches the SHA, namely 4.1.12, 9.5.14, 10.7 and 10.8, and (ii) the inclusion of the following Articles in the Revised 2015 Charter breaches the SHA, namely 4.1.12, 9.5.14 and 11.1 to 11.3.

136. In light of my conclusions on Issue No.3, I decline to order the relief claimed in paragraph 58(e).

137. As the Claimant has won on Issue No.1, the question arises whether he should be granted the injunctive relief claimed in paragraphs 58(f), (g) and (h). As to these heads of relief, the Respondent raised several further arguments, which I shall now address.

16-22321-d Doc 24339-3 Filed 05/27/16 Entered 05/27/16 14:31:55 Exhibit D (per
Case 1:17-cv-04339-CM Document 13-1 Filed 07/13/17 Page 15 of 71
Order - Docket No. 20) Pg 51 of 60

138. The Respondents argued, as regards sub-paragraph (f) that: (i) the First, Second and Fourth Respondents do not have to do anything further to implement the Sole Participant's Resolution and the Revised PNS Charter and therefore there was no need for any injunctive relief, as the "ship had already sailed"; (ii) damages are an adequate remedy, and (iii) the application was premature and there was no evidence that the Respondents intended to disregard the declaratory relief. I reject the argument that damages are an adequate remedy; it seems self-evident to me that damages are, or are likely to be, an inadequate remedy.

139. During the hearing I inquired whether the Respondents would be prepared formally to undertake to act in accordance with any declarations that I made on the requested relief. After the hearing, on 17 June 2015, the Respondents indicated they declined to provide any such undertaking(s). I am therefore required to decide whether in my view this injunctive relief sought in (f) is necessary at this stage and would serve a useful purpose. On balance, I have decided that it would not.

140. As regards sub-paragraph (g), the Respondents argued that any action that the Fourth Respondent might take to submit the Revised PNS Charter for registration would be taken in its capacity as sole participant in PNS and not as a party to the SHA. I reject this as a ground for not ordering injunctive relief. The Fourth Respondent is a single legal person which, if it took the steps that the Claimant seeks to restrain, would be taking steps to further its breach of Clause 7.1. The Fourth Respondent also made similar arguments as those in relation to paragraph (f) and submitted that there was no evidence that it was going to do what is sought to be restrained by this head of relief. However, the Fourth Respondent did decline to give any undertaking, as mentioned above. On balance, I consider that there is a sufficient risk that the Fourth Respondent may submit or seek to submit the Revised PNS Charter for registration notwithstanding that it contravenes the SHA, as I have held, and accordingly I have decided to order this head of relief.

141. As regards sub-paragraph (h), the Respondents submitted that neither of the First or Second Respondents would have any role in approving the Revised 2015 Charter as it would be voted on by the Board of the Fourth Respondent. I accept this argument and decline this head of relief as against these Respondents. As regards the Fourth Respondent, it was argued that the Tribunal does not have jurisdiction to restrain the

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 16 of 71
16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:53   Exhibit D (per
Order - Docket No. 20)   Pg 52 of 60

Fourth Respondent in its capacity as the sole participant in PNS from approving the Revised 2015 Charter. I do not think that this is valid ground for declining the relief sought for the same reason as already set out above. It was also argued on behalf of the Fourth Respondent that damages would be an adequate remedy and that the application was premature, without evidence to show that what was sought to be restrained was likely to happen. I reject the argument that damages are an adequate remedy, for the same reason as already set out above. As to risk of the event happening, I bear in mind the evidence of the background to these disputes and that the Fourth Respondent was not willing to provide any undertaking, and on balance I have decided to grant this head of relief against the Fourth Respondent only.

142. In my view, for the reasons given in relation to Issue No.1 above, the Claimant would be entitled to the relief sought in paragraph 58(i), if I was persuaded that there was an imminent risk of the Fourth Respondent not complying with Clause 7.1.2 of the SHA. The Respondents argued that there was no basis for the injunctive relief sought. The Claimant argued that there was sufficient evidence of threats made by Mr Dietz for me to infer that the Fourth Respondent may seek to appoint a person other than one recommended or nominated by the Claimant, in breach of Clause 7.1.2. Although that evidence related to matters which took place some time ago before this phase of the arbitration process, bearing in mind that the Respondents were not willing to provide an undertaking, ultimately I was persuaded that there was a sufficient risk for me to make an order against the Fourth Respondent as requested.

143. In light of my conclusion on Issue No.4, I decline to order the relief claimed in paragraph 58(j). I would also have declined to order the relief sought on the basis that it is too vague. The final two lines contain the words, "save as contemplated by the Shareholders Agreement". As this arbitration has demonstrated, different views are capable of being taken as to precisely what is contemplated by the Shareholders Agreement, and therefore this formulation is too uncertain to be included in any injunctive relief.

144. No claim for damages was presented to me and accordingly I decline to award the relief claimed in paragraph 58(k).

145. I was informed by the Claimant that no "further or other relief" was claimed, apart from that addressed above, and accordingly I decline to order the relief claimed in paragraph 58(l).

146. As to costs, claimed in paragraph 58(m), I address these in Sections J and K below.

147. As to whether any of the relief sought involves the granting of relief against persons who are not parties to this arbitration and in relation to whom the Tribunal lacks jurisdiction, I understand that in the final event this objection was no longer maintained to the formulation of the relief that was presented to me on the final day of the hearing. For the avoidance of doubt, however, I do make clear that no person other than the parties to this arbitration is bound by this Award to comply with the orders that are contained in this Award.

## J.   The Parties' Legal Costs and Expenses

148. On 22 June 2015, I received the parties' first round of submissions on costs and costs schedules. Both parties claimed costs.

149. The Claimant acknowledged that it was liable for costs in connection with its ultimately abandoned application to amend its Statement of Case to include claims against the Third Respondent, which should be set off against costs awarded to it. Apart from that, it argued that the Tribunal would need to assess the relative success and failure of the parties' in light of the findings in the Award. It argued that, if there was a split decision on the key issues, the Tribunal should pay special regard to which side won on the interpretation of Clause 7.1.1 because the parties' disagreement on this was the catalyst for the commencement of the arbitration and a great deal of time was spent on this issue and matters connected to it. It argued that if the Claimant won on this issue then costs should follow the event, subject to any appropriate reduction for issues lost which should be determined on a broad brush % basis. It suggested a deduction of no more than 25% if it lost on the issues on which broadly speaking it has in fact lost in this Award.

150. The total costs and expenses claimed by the Claimant were £961,558.95, (although this included £41,750 paid as fees and deposits to the LCIA, which are addressed separately in Section K below). Of this sum, more than £98,000 related to the expert evidence of Mr Dyakin, which was largely attributable to the implied term issue on which the

16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Case 1:17-cv-04339-GM - Document 23-1   Filed 07/03/17   Page 18 of 71
Order - Document 20)1   Filed 07603/17

Claimant lost and which I therefore propose to disallow. Apart from that, the items of costs claimed by the Claimant in his costs schedule strike me as reasonable and I therefore start from the total figure before making some broad brush discounts. The Claimant was both client and appeared as a witness and in my view out of the sum of £17,319 claimed in respect of his travel, accommodation and related expenses a figure of £10,000 was not unreasonable.

151. The Respondents' costs were US$1,999,752.77 (although again this included sums paid to the LCIA addressed in Section K below), which is indicative that the overall level of the Claimant's costs was not unreasonable given what was at stake between the parties. Further, the legal charge out rates and number of hours worked on the two sides were broadly similar. I did not detect that the Claimant's changes of legal teams and counsel caused its costs to have been unreasonably increased; as I have said, his costs were broadly in line with the Respondents' (and they kept the same legal team throughout).

152. The Respondents contended for the general principle that costs should follow the event and asked for costs in their favour on the indemnity basis. They argued that the arbitration should never have been commenced; they were seeking to do no more than make lawful and reasonable changes to the corporate governance structure of PNS, consistent with the SHA. As is apparent from elsewhere in this Award, I have rejected that argument to a substantial extent. They also argued that the arbitration was commenced, or revived, prematurely but I do not accept that argument. I consider that it was not unreasonable for the Claimant to bring at least the majority of these disputes to be resolved in arbitration at the time when he did.

153. The Respondents also argued that the Claimant's conduct in the arbitration had been unreasonable and forced the Respondents to incur additional expenditure unnecessarily, for example by broadening the scope of the factual inquiry and for a "kitchen sink" approach to claims, which shifted around until the very end of the hearing. They argued for 50% of their costs for this reason (and also on account of issues on which they have prevailed). I have some sympathy with this argument and have taken it into account to a limited extent, although not to the extent requested by the Respondents, in the broad brush discount that I propose to make to the Claimant's recovery. I bear in mind that this litigation has been very hard fought by the Respondents as well, with lengthy written submissions in particular, and they too have left few stones unturned, as is

Case 1:17-cv-04339-CM   Document 13-1   Filed 07/13/17   Page 19 of 71
16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:59    Exhibit D (per
Order - Docket No. 20)    Pg 55 of 60

evidenced by their costs schedule. Both sides adduced overly long witness statements. I reject the argument that the Respondents would be entitled to any of their costs on an indemnity basis.

154.  More importantly, I take into account that, whilst the Claimant has succeeded on Clause 7.1, and has been successful in obtaining substantial relief, the Respondents have succeeded and the Claimant has correspondingly failed, on a number of other issues and heads of relief, and that, if an issue based costs order were to have been made, some costs in relation to these issues would likely have been ordered to be paid by the Claimant to the Respondents (and no costs in relation to them would have been awarded to the Claimant). For example, the costs of the Respondents' Russian law expert were US$22,464.34. The Respondents additionally argued for broad brush figures in respect of issues on which, as it turns out, they have succeeded, namely 15% of their costs in relation to the implied term issue, a further 15% of their costs in relation to the abandoned application to amend the Statement of Case, a further 10% of their costs in relation to the USRM3 claim, and a further 10% of their costs in relation to the Clause 18.2 issue. All these points have force, although the figures are very broad brush and seem rather high, and I have taken them into account but I have not done so on the basis that the Claimant was unreasonable to have raised these issues in the first place.

155.  By Clause 6 of the 4 February 2015 Agreement, the parties agreed that costs associated with the Commercial Court proceedings in September 2014 would be addressed in this Award. The Claimant's schedule of costs did not separately identify costs in connection with these Court proceedings (although supporting invoices did refer to work in that connection and in their reply submissions the Claimant asked that the Respondents be ordered to pay the costs of the Court proceedings). The Respondents' schedule, however, identified separate counsel's fees of just over $39,000 in connection with the Court proceedings. Fees of Dechert LLP were also claimed in this regard.

156.  The Respondents argued that the Claimant should be ordered to pay their costs associated with the Commercial Court proceedings because the charter that would have been put in place but for the consent order in September 2014 would have provided for a board of directors and not an additional sole executive body. They argued that this proposal would not have breached clause 7.1.1 of the SHA.  Although I was not

16-22321-rdd Doc 24-19 Filed 05/27/16 Entered 05/27/16 14:31:55 Exhibit D (per
Order - Docket No. 20)   Pg 56 of 60
Case 1:17-cv-04339-CM Document 13-1 Filed 07/13/17 Page 20 of 71

required to determine this issue, I am not convinced that the Respondents are correct about this. In any event, I consider that their costs should lie where they fell, as they relate to a separate issue that I was not required to decide in the arbitration and which was not on the agreed list of issues provided to me. At the time, the parties sensibly agreed by Consent Order to stay the proceedings while they attempted to see if matters could be worked out; both sides incurred costs in connection with the Commercial Court proceedings and which resulted in this stay. Accordingly, I have therefore not taken these costs of the Respondents into account in deciding the sum that should be awarded to the Claimant and I have disallowed a part of the Claimant's costs as relating to this work.

157.   Most important of all, I bear in mind the guiding principle that costs should follow the event. The Claimant has achieved a fair measure of success, and in my view he should have a meaningful award of costs to reflect that success. On the other hand, as I have already indicated, he has lost on a number of issues and heads of relief and is susceptible of some criticism, for example in raising the new claims against the Third Respondent and then dropping them, and I am also disallowing the costs of his Russian law expert evidence.

158.   Taking into account the outcome of this Award and everything else in a broad brush way as I have been invited to do by both parties, for the reasons set out above, I propose to make no order for costs in favour of the Respondents and to order that the Respondents shall pay the Claimant a fixed sum in relation to his costs and expenses set out in his schedule of costs.

159.   The sum that I have decided upon is £450,000, which is to be paid within 28 days of the date of the Award. Interest shall be paid thereafter on that sum at the rate of 2.5% per annum compounded quarterly until the sum is paid in full to the Claimant.

## K.   The Costs of the Arbitration

160.   These are the costs of the arbitration (other than the legal or other costs incurred by the parties themselves) as determined by the LCIA Court, pursuant to Article 28.1 of the applicable LCIA Rules, which are as follows:

| | |
|---|---|
| Registration fee: | £1,750.00 |
| LCIA's administrative charges: | £11,142.78 |
| Sole arbitrator's fees: | £58,500.00 |

16-22321-rdd   Doc 21-4   Filed 05/27/16   Entered 05/27/16 14:31:55   Exhibit D (per
Case 1:17-cv-04338-GM   Document 13-1   Filed 07/13/17   Page 21 of 71
Order - Docket No. 20)   Pg 57 of 665

Total costs of the arbitration:          £71,392.78

These costs are subject to VAT, in the amount of £3,482.14.

161. I have decided that the Respondents should bear the whole of the costs of the arbitration. These costs are relatively modest compared to the sums which the parties have expended on their legal costs and expenses. I have already made substantial discounts in their favour to the costs recoverable by the Claimant. The Claimant had to commence and pursue this arbitration in order to obtain the relief that he has been successful in obtaining. In the circumstances, I consider that the appropriate order is that the Respondents shall bear the whole costs of the arbitration.

162. The Claimant has lodged a registration fee and deposits amounting to £41,750, including interest accrued.  The Respondents have lodged deposits amounting to £40,041.12, including interest accrued. Total funds lodged by the parties amount, therefore, to £81,832.24, which has been applied to the costs of the arbitration, including VAT, as above (£74,874.92). There remains, therefore, on the LCIA's account, a balance of funds of £6,957.32, which is to be returned to the parties by the LCIA in equal shares (£3,478.66 each side).

163. Accordingly, in view of my decision that the Respondents shall bear the whole costs of the arbitration, I order that the Respondents shall within 28 days of this Award pay £38,312.46 to the Claimant in respect of the costs of the arbitration, being the amount that the Claimant has paid towards the costs (£41,791.12), less the surplus funds that will be returned to the Claimant by the LCIA (£3,478.66).

164. Interest shall be paid thereafter on that sum at the rate of 2.5% per annum compounded quarterly until it is paid in full to the Claimant.

## L.  Dispositive Part of the Award

165. Accordingly, for reasons given above, and having carefully considered all of the parties' submissions and evidence, I finally award and adjudge as follows:

    (1) I have jurisdiction in relation to the matters which form the subject matter of this Award.

    (2) It is declared that:

16-22321-rdd    Doc 21-4    Filed 05/27/16    Entered 05/27/16 14:31:55    Exhibit D (per
Case 1:17-cv-04339-CM    Document 20-1    Filed 07/03/17    Page 22 of 71
Order - Docket No. 20)

(a)   the provisions of the Revised PNS Charter which purport to create an additional sole executive body in PNS and to confer upon the Fourth Respondent the power to act on behalf of PNS, namely Articles 4.1.12, 9.5.4, 10.7 and 10.8, breach the Shareholders Agreement dated 30 August 2007;

(b)   the provisions of the Revised 2015 Charter which purport to create an additional sole executive body in PNS and to confer upon the Fourth Respondent the power to act on behalf of the PNS, namely, Articles 4.1.12, 9.5.14 and 11.1 to 11.3, breach the Shareholders Agreement dated 30 August 2007;

(c)   the inclusion of the following Articles in the Revised PNS Charter breaches the SHA, namely 4.1.12, 9.5.14, 10.7 and 10.8; and

(d)   the inclusion of the following Articles in the Revised 2015 Charter breaches the SHA, namely 4.1.12, 9.5.14 and 11.1 to 11.3.

(3)  It is ordered that the Fourth Respondent is restrained from committing the following acts and from procuring that its servants or agents commit the same, namely:

(a)   submitting or seeking to submit the Revised PNS Charter to the government authority that carries out the state registration of legal entities in the Russian Federation;

(b)   approving or seeking to approve the Revised 2015 Charter; and

(c)   appointing as General Director of PNS any person not recommended by the Claimant in accordance with Article 7.1.2 of the SHA.

(4)  The Respondents shall pay the Claimant £450,000 in respect of his legal costs and expenses within 28 days of the date of this Award.

(5)  The Respondents shall pay the Claimant £38,312.46 in respect of the costs of the arbitration within 28 days of this Award.

(6)  In the event that the Respondents fail to pay the Claimant the sums referred to in (4) and (5) above within 28 days of this Award, they shall also pay interest

thereafter on those sums at the rate of 2.5% per annum compounded quarterly until those sums are paid in full to the Claimant.

(7)  Save as set out above, the parties' claims advanced before me are dismissed.


This Final Award was made in London, being the place and seat of the arbitration.


_____

Graham Dunning QC                                    Dated: 13 July 2015

IN THE MATTER OF

THE ARBITRATION ACT 1996

AND IN THE MATTER OF AN
ARBITRATION

UNDER THE RULES OF THE LONDON
COURT OF INTERNATIONAL
ARBITRATION

LCIA Arbitration No. 142774

B E T W E E N :

Stephen Lynch

Claimant

– and –

Mascini Holdings Limited (1)

Lapidem Limited (2)

VR Global Partners LP (3)

Kirwan Offices S.A.R.L. (4)

Respondents

FINAL AWARD

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                          :
In re:                       :    Chapter 11
                          :
KIRWAN S.A.R.L.          :    Case No. 16-22321 (RDD)
                          :
                          :    (Involuntary Petition Pending)
          Alleged Debtor.     :
                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## STIPULATION REGARDING CONDUCT OF
## HEARING SCHEDULED FOR JUNE 17, 2016

      Mascini Holdings Limited and Lapidem Ltd. ("Petitioners") and Stephen Lynch ("Lynch" and together with Petitioners, the "Parties") hereby submit this stipulation regarding the June 17, 2016 hearing on the motion filed by Lynch for intervention, dismissal, abstention or stay and all related filings made by the Parties in connection therewith.

      1.     Issues.  The issues to be addressed at the hearing shall be limited to (i) whether Lynch should be allowed to intervene on Kirwan's behalf to contest the involuntary petition; (ii) whether this Court should dismiss this case for *forum non conveniens* and/or should abstain from hearing this case pursuant to § 305 of the Bankruptcy Code; (iii) whether the above-captioned alleged debtor is eligible to be a debtor pursuant to § 109 of the Bankruptcy Code; (iv) whether the alleged debtor can properly be the subject of an involuntary petition under the parties' pre-petition agreements; and (v) whether the petition must be dismissed or stayed in favour of arbitration of certain shareholder issues.

      2.     Testimony.  The evidence to be considered at the June 17, 2016 hearing shall be limited to the expert declarations submitted by the parties on English and Luxembourg law, which include, in the case of Petitioners, the initial and reply declarations of Martin Pascoe and

Paul Mousel and, in the case of Lynch, the declarations of Ming-Yee Shiu and Jean Brucher.

The parties waive cross-examination of the experts, but shall make such experts available either

in person or via telephonic means in order to enable the Court to question any such expert.  The

parties may rely on the fact declarations filed in this case, but solely (i) to explain their respective

positions, and not for additional evidentiary support, (ii) to reference facts asserted in each

declaration that appear undisputed or to illustrate matters that the parties contend are disputed but

bear on the issues at the hearing; and/or and (iii) to argue the existence of a dispute that a party

contends is relevant to an issue before the Court.  These fact declarations include the declarations

of Mr. Stephen Lynch and Mr. Richard Deitz.

3.    Exhibits.  Attached hereto is a list of all exhibits that the parties agree may be

admitted into evidence at the June 17, 2016 hearing and utilized for all purposes.

4.    Argument.  Consistent with the Courts' statement at the June 7, 2016 status

conference, the parties' presentations shall be limited to oral argument on the issues identified in

paragraph 1, in whatever order each party deems appropriate, and discussion, as necessary, of the

testimony and exhibits referenced in paragraphs 2 and 3 above.  Mr. Lynch, as moving party,

shall present first.

5.    Confidentiality.  In order to be consistent with the parties' joint agreements to

redact/seal certain exhibits filed in this matter, the parties will undertake their best efforts to

avoid disclosure of such information, which pertains to certain trial strategy and related

information concerning the ongoing litigation against non-debtor third-parties to obtain clean

title to the shares of Yukos Finance.  The parties reserve the right to request that the Court

exclude non-parties from attending one or more portions of the hearing, including representatives

of the non-debtor parties in the Yukos Finance litigation.

6.      <u>Reservations</u>.  The parties reserve all rights to assert or dispute that any issue identified in paragraph 1 above or in the parties' submissions, including whether this case should be dismissed pursuant to § 1112 of the Bankruptcy Code, involves matters of fact that should be addressed by the Court at a later time.

Dated:   New York, New York
         June 15, 2016

                                SKADDEN, ARPS, SLATE, MEAGHER
                                  & FLOM LLP

                        By:     /s/ Jay M. Goffman
                                Jay M. Goffman
                                Mark A. McDermott
                                Jonathan Frank
                                Suzanne D.T. Lovett
                                Four Times Square
                                New York, New York 10036

                                Counsel for Mascini Holdings and Lapidem Ltd.,
                                Petitioning Creditors

                                WHITE & WOLNERMAN, PLLC

                        By:     /s/ Randolph E. White
                                Randolph E. White, Esq.
                                David Y. Wolnerman, Esq.
                                950 Third Avenue, 11th Floor
                                New York, New York 10022
                                (212) 308-0667

                                        -and-

                                Law Office of Daniel J. Rothstein, P.C.
                                747 Third Avenue, 32nd Floor
                                New York, NY 10017
                                (212) 207-8700

                                Co-counsel for Stephen P. Lynch

3

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
In re:                                                       Chapter 11
                                                             Case No. 16-22321 (RDD)
KIRWAN OFFICES S.A.R.L.

                                    Debtor.
-----------------------------------------------------------------X


## DECLARATION OF STEPHEN LYNCH

      Stephen Lynch declares the following under penalty of perjury:

      1.      This declaration is submitted in support of the Motion as a supplement to my declaration to this Court of 6 April 2016 and in reply to the Objection and Memorandum ("Objection") of the Petitioning Creditors, Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini", together with Lapidem – the "Financing Shareholders") ("Objection") and the Declaration of Mr. Deitz of 3 May 2016.

      2.      In this declaration I will provide additional information and evidence regarding the background in which the Shareholders Agreement ("SHA") between Lapidem, its parent VR Global Partners LP ("VR Global"),[1] Mascini, its parent Renaissance Holdings Management Limited ("Renaissance Holdings"), Kirwan Offices S.a.r.l. ("Kirwan") and myself was negotiated and our on-going Dispute(s),[2] showing that contrary to the Objection and Mr. Deitz's declaration:

          (a)      this is a two-party Dispute between the shareholders of Kirwan;

          (b)      the Financing Shareholders' capital contributions to Kirwan were disguised as loans solely for tax purposes;

---

[1] VR Capital Group is the indirect 100% owner of of the general partner of VR Global Partners. They and the Financing Shareholders are all controlled by Richard Deitz.

[2] The SHA defines "Dispute" as "any dispute, controversy or claim between the Parties" arising out of or in connection with the SHA and provides for resolution of Dispute(s) by arbitration under the Rules of the London Court of International Arbitration.

(c)      the Financing Shareholders' waiver makes the Loans unenforceable;

(d)      the Financing Shareholders' payments to Kirwan in 2013-2015 were capital contributions only rebranded and documented as loans in "January or March 2016";

(e)      it has always been agreed that loans would not be repaid until Kirwan obtained registered title to Yukos Finance shares and distributed its assets;

(f)      there was no genuine insolvency event and there are no unpaid creditors of Kirwan;

(g)      the Financing Shareholders paid retainers out of Kirwan's funds to Akin Gump and Mandel Bhandari under agreements not binding on Kirwan;

(h)      Kirwan does not owe any money to Akin Gump;

(i)      there is no agreed settlement between PNS and its Dutch litigation adversaries (Godfrey, Misamore and others, collectively the "Yukos Finance Foundation").

3.      The following facts demonstrate that the involuntary bankruptcy commenced on behalf of Kirwan as conceived by Richard Deitz, the mastermind behind the Financing Shareholders, does not belong in this Court and represents nothing more than Mr. Deitz's latest attempt of many to disenfranchise my bargained for and agreed C Shareholder rights. Through this bankruptcy, Mr. Deitz seeks to negate the provisions of the SHA and thereby "resolve" the Dispute between me and the Financing Shareholders as to whether or not my C Shareholder consent is required for the settlement of the litigation involving PNS outside of our agreed dispute resolution forum – the London Court of International Arbitration ("LCIA").  In blunt terms he wants to steal my C Shareholder rights.

## I.    THE AGREED INVESTMENT STRUCTURE

4.    In order to understand why the Financing Shareholders' loans to Kirwan are not due for repayment as Mr. Deitz faintly argues in his declaration ¶¶ 58-60, it is important to understand the investment structure the parties to the SHA agreed to in August 2007.

### A.    PNS Holding Company domiciled in Luxembourg for tax reasons

5.    Originally it was intended that PNS would be acquired through a Cypriot company.  The Financing Shareholders would contribute the equity and I would contribute PNS's shares.  This is shown in the first draft of the SHA then called "Subscription and Joint Venture Agreement" of 20 August 2007 (Exhibit 1).[3]  As per the 20 August 2007 draft the Financing Shareholders would contribute the necessary funds by way of contributions to the Cypriot company's share capital (see clauses 2.1, 10.1 and 10.2 of the 20 August 2007 draft).

6.    On 21 and 22 August, after considering ████████████ the Financing Shareholders decided to go with a Luxembourg company as the holding company for PNS instead of Cyprus (see ¶¶ 108-110 of Deitz Witness Statement in LCIA Arbitration No. 142774 at Exhibit 2 and Mr. Deitz's email of 21 August 2007 at Exhibit 3).  On 22 August 2007 Herbert Smith, counsel for Mascini's parent Renaissance Capital, circulated their initial thoughts on the Dutch tax issues (Exhibit 4).  As follows from the Herbert Smith email,

7.    I had no objection to the change of domicile of the holding company for PNS, as it would economically benefit our joint venture and thus my share of any Net Gain (as defined in the SHA), and it would not change my own personal tax liability.

---

[3] Exhibit 1 is an extract of the draft agreement.

**B.** <u>**Structured loans avoided Luxembourg duty on share capital**</u>

8.      Using a Luxembourg company to hold the Yukos Finance shares had one

disadvantage. The Luxembourg company had to pay a capital duty of 1% in relation to its

capital.  The initial contribution of $250 million by the Financing Shareholders to the share

capital of a Luxembourg company would have resulted in capital duty liability of $2.5

million.  Moreover, since the Financing Shareholders expected to contribute more money for

operational expenses (as defined in the SHA and discussed below), there would be additional

tax on future capital contributions.

9.      The Luxembourg capital duty problem was highlighted in Herbert Smith's

email of 22 August 2007 and again in the Luxembourg counsel memorandum (which Mr.

Deitz referred to in his comments to the SHA draft of 22 August 2007, see below).  On 24

August 2007 Herbert Smith circulated the "transaction structure paper" ("Structure Paper")

summarizing ███████████████████ and describing the new joint-venture structure

based on this advice (Exhibit 5).

10.     Section 2 of the Structure Paper titled ███████████ provided that the

Luxembourg Company (the holding company for PNS) would be funded by the Financing

Shareholders in the agreed proportions (i.e. 60:40) and that <u>in order to limit the impact of</u>

<u>Luxembourg capital tax,</u> it was proposed to fund the Luxembourg Company with 85%

interest bearing debt, 14% interest free debt, 1% equity.

11.     Section 5 of the Structure Paper titled '███████████" provided that the

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████  The Structure Paper evidences that the joint venture Parties

(as defined in the SHA) always intended the loans to be waived, and that several days before

adding clause 5.6 to the SHA, by which the Financing Shareholders waived any remedy in

relation to non-payment and non-performance of the Loans by Kirwan, they considered whether or not such a waiver would incur tax liability on behalf of Kirwan.

12.     Section 6, Subsection (iii) of the Structure Paper titled ',' explained that the Luxembourg capital duty was

It further stated that this

In other words, instead of $2.5 million Kirwan would have to pay only $25,000 if it used this ".'

13.     Subsequent to the above-referenced                     and discussions with Luxembourg counsel, Mr. Deitz wrote in his comments to clause 2.1 of the SHA draft of 22 August 2007 which still provided for equity contributions: "we believe this funding should be in form of loans; I believe that [Renaissance Capital, Mascini's parent] agree this structure needs to be refined based on recent memo received from Lux counsel" (Exhibit 6).

14.     To summarize, the Parties chose Luxembourg and a "highly leveraged financing structure,"                     They always planned and agreed that the loan remedies were waived, and so while the Financing Shareholders agreed to procure that Kirwan complied with the loans, the loans were and are unenforceable against Kirwan.

15.     Five days after the Financing Shareholders provided the Loans to Kirwan, the interest-bearing Loans were amended to become interest-free loans and **all further loans funding Cash Call Notices were interest free** as well.  This represents further evidence that the funds advanced by the Financing Shareholders to Kirwan in the form of loans never meant to be true debt.

16.    To underscore the obvious, the "loans" earned no interest, there were no interest payments, the "loans" were more than 99% of the capital structure and as I will show their repayment was entirely dependent upon gaining title to Yukos Finance (implied profit).

### C.  SHA Clause 5.6 renders the loans unenforceable against Kirwan

17.    The Financing Shareholders waived remedies in respect of non-payment and non-performance of the Loans by Kirwan <u>and not</u> the Loans themselves.



20.    ⬛⬛⬛⬛⬛⬛⬛⬛⬛ Kirwan's Board and Shareholders (as defined in the SHA) approved Kirwan's financial statements.  Such approval, however, should not be taken as a variation of the SHA terms by which remedies in respect of the Loans were waived.[4]

21.    Clause 5.6 was negotiated when the Financing Shareholders were controlled by different parties.  Mascini was controlled by Renaissance Holdings and its parent Renaissance Capital.  Lapidem was controlled by VR Global and its affiliate VR Capital Group.  Now Deitz controls both Financing Shareholders through VR Global and VR Capital.

---

[4] The SHA has a Variation clause (28.6) requiring any variation of the SHA to be in writing and signed.

Thus, clause 5.6 of the SHA protected not only me against the Financing Shareholders demanding repayment of the Loans, but also the Financing Shareholders against each other (i.e. either of them demanding early repayment of the Loans).

22.     Mr. Deitz like me would not have accepted a situation where Mascini (then controlled by the Renaissance group) could demand repayment of the A Shareholder Loans (as defined in the SHA) by Kirwan at any time and enforce such repayment 365 days thereafter.  Nor would Mascini have allowed Lapidem to do so.  For this reason among others, the waiver provision in clause 5.6 of the SHA is quite sensible, indeed was required and is far from "absurd" (as Mr. Pascoe rather bluntly suggested in his declaration obviously giving no consideration to the background in which the SHA was entered into).

23.     Clause 5.6 of the SHA was a collateral term that overrode clause 5 of the Loans:  Kirwan entered into the Loans relying on a binding promise of the Financing Shareholders in the SHA not to enforce the Loans for non-payment or other non-performance against it.  Relying on the same promise, I agreed to transfer PNS to Kirwan.

**D. The Financing Shareholders recognized and agreed that Kirwan would not repay the loans until the title to Yukos Finance shares was obtained if ever.**

24.     According to ███████████ of the Structure Paper, Kirwan (LuxCo) was not ████████████████████████████████████████ ████████████████████████████████████████ ███████████████████████████ This structuring was repeated in clause 4.3.1 of the SHA (see also ¶ 110 of Deitz Witness Statement at Exhibit 2).

25.     Regardless of clause 5 in the loan agreements, the Financing Shareholders provided funds to Kirwan on the common understanding of Kirwan and its shareholders that Kirwan would not repay those loans until after the acquisition of title to the Yukos Finance

shares and distribution of its assets. The same conclusion follows from the definition of the "Return" and clauses 11.3, 11.4 and 12.1 of the SHA.



28.     The consideration for the Yukos Finance shares ███████████ was to be set off against the liability of PNS to Kirwan under the loan agreements for the same amount.

29. ███ The SHA does not provide for any specific time limit either in its duration (clause 23) or ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████

30.    ██████████████████████████████████████████████, and the SHA parties are not allowed to abandon the goal of acquiring the PNS shares, which they undertook in clauses 5.3, 5.4 and 4.3.1 of the SHA.

31.    ████████████████████████████ was negotiated between Renaissance Capital, VR Capital and myself and approved by a circular resolution of

Kirwan's board of managers, including Deitz and myself (Exhibit 8).[5]  By agreeing to the

terms of the ██████████████████████████  the Financing Shareholders

not only varied the Repayment Date provisions in the loan agreements executed before 30

September 2010 consistent with the completion provisions in the ████████████

██████████  but also provided further funds to Kirwan on the common

understanding of Kirwan and its shareholders that ████████████████████

██████████████████████████████████████

████████  Exactly as we intended in our original agreement.

### E.  Kirwan's 2012-2015 annual accounts blocked by the Financing Shareholders

32.     In accordance with Luxembourg law,[6] managers of a Luxembourg S.à r.l. (i.e.

Kirwan) must submit annual accounts and a management report to the general meeting of

shareholders within six months of the end of the financial year.  Since 2012 the Financing

Shareholders have blocked the preparation of Kirwan's Annual Accounts.  Despite my

repeated requests, no accounts for 2012-2015 have been submitted to Kirwan's shareholders

by its board of managers controlled by VR Capital, and no coherent explanation of this delay

has been provided to me.

33.     From 2007 to 2011 (before Mr. Deitz consolidated control of the Financing

Shareholders), Kirwan's Annual Accounts were prepared and submitted to the shareholders

for approval.  As those financial results showed a significant loss (the cumulative loss of

Kirwan for 2007-2011 was $22.36 million), the shareholders of Kirwan also had to decide

whether to have the company continue with its activity or to put it in liquidation as per article

100 of the Luxembourg Company Law of 10 August 1915 (as amended).  In 2011 and 2013,

---

[5] The shareholders of Kirwan also approved it as evidenced by a 28 September 2010 email from Rob Reid of
Renaissance to myself and VR. See Exhibit 9.

[6] The amended law of 19 December 2002 on the register of commerce and companies and the accounting and
annual accounts of undertakings and Company Law of 10 August 1915 (as amended).

when the shareholders approved Kirwan's accounts for 2007-2011, they decided that Kirwan

would continue its activities despite the loss (see Minutes of the general meeting of

shareholders held on 21 May 2013[7] approving Kirwan's accounts for 2011 at Exhibit 10).[8]

34.    There was never an issue that Kirwan was insolvent.  On the contrary, the

Financing Shareholders continued to provide funds to Kirwan.  Ignoring the fact that the last

purported cash call did not come directly from the Financing Shareholders, a total of ▮▮▮▮

▮▮▮▮ was provided to Kirwan in 2012-2015.

35.    In a rare meeting of the board of managers of Kirwan on 11 February 2015,

Mr. du Toit said that the reason for the delay in preparing the accounts was: "just us wanting

to re-look and re-think the structure, the financing structure", that it had "nothing to do with

Kirwan", that "Kirwan auditors [were] waiting for loan confirmation documents from the

[F]inancing [S]hareholders" and that this was "the only holdup".  See Exhibit 11.[9]

36.    As we now know from Mr. du Toit's 13 May 2016 email (discussed further

below and attached as Exhibit 12), such "loan confirmation documents" were not created by

the Financing Shareholders until "January or March 2016," when they were created through

backdating and use of signature images and in some cases pre-date Mr. du Toit's appointment

as director.

---

[7] Mr. Deitz omits to include these minutes in Exhibit 5 to his declaration and includes only a copy of my proxy
to the employees of Kirwan's domiciliation agent (Amicorp) instead, although he included all minutes of
Kirwan shareholder's meetings approving previous accounts.

[8] The decision to put Kirwan into liquidation is a Unanimous Shareholder Reserved Matter (an SHA defined
term) that requires a Unanimous Required Shareholder Consent (also an SHA defined term).  In short it cannot
be done without my consent.

[9] The transcript excerpt evidences not just the matter at hand, but is an example of the conduct of the board and
company toward me.

II.   **FURTHER FUNDING OF KIRWAN BY THE FINANCING SHAREHOLDERS**

A.   <u>**Kirwan does not owe the ▓▓▓▓▓ provided in 2013-2015.**</u>

37.   The statements made by Mr. du Toit at the 11 February 2015 board meeting and in his email of 13 May 2016 show that the Financing Shareholders provided funds to Kirwan in 2013-2015 without documenting them in any respect.  They only decided to treat such funds as loans and seek repayment thereof at some point in 2016, having decided to stage Kirwan's insolvency and bankruptcy.

38.   As Mr. du Toit admits in an email of 13 May 2016 (Exhibit 12), Kirwan's board did not issue a single Cash Call Notice to the Financing Shareholders in 2013-2015.

39.   The Financing Shareholders provided ▓▓▓▓▓ to Kirwan during this period.  And nearly another ▓▓▓▓ was provided by VR Group and its affiliates or investors VR Capital, HBK Fund LP ("HBK") and Jervis Properties Inc. ("Jervis").

40.   When the Financing Shareholders provided this money to Kirwan, they did not document these transactions.  The bank transfers contained the following descriptions: "for legal and admin fees payment", "for legal fees payment", "for legal invoices payment", "payment outstanding legal invoices".  Only a few payments referred to capital calls and cash calls, but even then they were made in the absence of any Cash Call Notices as required by clause 10.1 of the SHA and any loan agreements.

41.   The purported 2013-2015 loan agreements were actually fabricated in "January or March 2016":

(a)   they refer to Cash Call Notices that have never existed and the Board never met and never resolved to issue such notices;

(b)   the loan agreements did not exist at the time of the transfers;

(c)     several of the loans were signed by Mr. Du Toit as director of Kirwan, but have a signing date prior to Mr. Du Toit's appointment as a director of Kirwan;[10]

(d)     on 11 February 2015 according to Mr. du Toit he was re-thinking the financing structure and was not providing Kirwan's auditors any documents of the transfers from the Financing Shareholders to Kirwan (see ¶ 35 above);

(e)     on 8 November 2015, in reply to my request to provide "corporate records documenting the moneys advanced to Kirwan" as well as "corporate material/documents evidencing cash calls from Kirwan and evidencing how Kirwan entered into any loans and/or issued cash call notices," Mr. du Toit sent me what he referred to as "a summary of all the capital calls from Kirwan to the underlying shareholders", and all the loans are listed there as capital calls, not loans (Exhibit 13);

(f)     the loan agreements were created using digital images of signatures of the signatories.  A signature page was thus created for loans with Lapidem and another signature page was created for loans with Mascini, then the Lapidem signature page was pasted to Lapidem loans while the Mascini signature page was pasted to Mascini loans.

(g)     ▇▇▇▇▇▇ came from VR Global, VR Capital, HBK and Jervis and not from the Financing Shareholders, and at the time of these transfers there were no "loan agreement(s)" for this money.

42.     While fabricating the loans for the purpose of Kirwan's alleged insolvency, Lapidem intentionally omitted to create a loan agreement for a total of ▇▇▇▇▇ provided to Kirwan on 25 March and 4 April 2015, and Mascini omitted to create a loan agreement for ▇▇▇▇▇ it provided to Kirwan on 4 April 2015 for payment of outstanding (legal) invoices.

---

[10] Emile du Toit was appointed director of Kirwan on 21 November 2013.  Six of the purported loan agreements pre-date his appointment yet carry his signature on behalf of the "Borrower", Kirwan.

There is a simple explanation for this. If the Financing Shareholders wanted to pretend that the payment of ▬▬▬ was covered by a Cash Call Notice under clause 10.1 of the SHA, as they did with respect to the rest of the payments from them and from VR Global, VR Capital, HBK and Jervis, then the total putative Cash Call Notice would have been for ▬▬▬ and Mascini would have been responsible to provide ▬▬▬ to Kirwan (less ▬▬▬ that it actually paid), which at the time Mascini simply did not provide.

43.    Leaving Mascini liable to Kirwan for $74,720 (which together with the retainer would have been enough to pay all of Akin Gump's invoices) went against the Financing Shareholders' contrived insolvency plan. Instead they chose to simply ignore these amounts and not to document them as loans, even though they were no different than all the other amounts provided to Kirwan in 2013-2015.

44.    As for ▬▬▬ which came from VR Global, VR CapitalG, HBK and Jervis, Kirwan does not owe the Financing Shareholders this money. When this money came to Kirwan, no loan agreement existed between Kirwan and the Financing Shareholders in respect of these funds, nor was there any Cash Call Notice served by the Board on the Financing Shareholders. VR Global, VR Capital, HBK and Jervis provided these funds as a capital contribution to Kirwan pursuant to two emails of Mr. du Toit as the CFO of VR Capital dated 14 August 2015. The emails are attached here as Exhibit 14. There is no mention in those emails of any loan funding or loan agreement. These are capital contributions (until they were remade into "loans" in 2016).

45.    That the Financing Shareholders waived all remedies in relation to non-payment or non-performance of the Loans by Kirwan (SHA clause 5.6) and that the loans funding Cash Call Notices are not due to them either also explains why in all the years after the 31 October 2007 judgment, the Financing Shareholders never demanded repayment of the loans under clause 5 of the loan agreements, even though on a stand-alone basis (i.e. without

the SHA), they could have done so. Indeed when Renaissance Capital wanted to exit our venture, they didn't demand the loans' repayment. They sold their interest in Mascini to VR Global/VR Capital for "virtually zero" (see ¶ 186 of Deitz Witness Statement at Exhibit 2).

### III. SHAREHOLDERS' AGREEMENT ON INCURRING OF EXPENSES BY KIRWAN

### A. Operational Expenses

46.     Originally it was agreed that ███████ of the Loans would be reserved on account of Operational Expenses (clause 2.3 of the SHA).

47.     Operational Expenses is a defined term in the SHA, and it provides a closed list of categories of Operational Expenses. One of the categories is all costs and expenses incurred by Kirwan or PNS in connection with asserting legal title to the shares in Yukos Finance. The SHA also requires that Operational Expenses be reasonably incurred and properly documented.

48.     Beyond any doubt it was agreed in the SHA and is not disputed by the Financing Shareholders that expenses which fell outside the scope of Operational Expenses ("over and above reasonably required to meet Operational Expenses") or above a certain threshold ($250,000 in respect of each individual item of expenditure or in excess of US$2,000,000 when aggregated with all other items of like expenditure) had to be approved by all Shareholders.

49.     In his email to my counsel Mr. Moore of Herbert Smith (counsel for Mascini) wrote in relation to ████████████████████████████████ ████████████████████████████████████████ ███████████████ (Exhibit 15).

50.     It was also agreed that the board of managers of Kirwan could serve Cash Call Notices on the Financing Shareholders to fund Operational Expenses (clause 10.1 of the SHA). The SHA does not provide for serving a Cash Call Notice on the Financing

Shareholders in relation to non-Operational Expenses.  Such expenses are a Unanimous

Shareholder Reserved Matter.  Accordingly if all shareholders authorize Kirwan to incur non-

Operational Expenses (expenses over and above reasonably required to meet Operational

Expenses), they need to decide how such expenses will be funded and whether funds

provided in response to Cash Call Notices can be used for the same purpose.

  51. The SHA further requires that all Shareholders, whether directly or through

their appointees to the board of managers of Kirwan, would be aware of any Company

expenses before they were incurred:

    (a) the SHA parties are required to comply with clause 6 of the SHA and

Kirwan By-Laws;

    (b) Kirwan By-Laws provide that Kirwan acts through its board of

managers (article 8.8) (Exhibit 16);

    (c) Kirwan's board of managers can make decisions either in meetings

called by 20 business days notice or by way of circular resolutions signed by all

managers (clause 6.3 of the SHA and articles 8.6, 8.7 and 8.10 of the By-Laws);

  52. As per the terms of the SHA, Kirwan could not incur any expense without a

shareholders meeting (or written resolution) or a board meeting (or circular resolution).

  53. In violation of Kirwan's SHA and By-Laws, I was not informed of or given

any information (until after the involuntary bankruptcy petition) about the very expenses

which are now alleged to have created an insolvency event for Kirwan and are being used as

grounds for the bankruptcy petition by the Financing Shareholders.  These unauthorized

expenses include amongst others:  an Akin Gump ("Akin") engagement and a so-called

Settlement, Cooperation and Retainer Agreement.

  54. As a final note on Operational Expenses, it is striking to note that the

fabricated loan agreements themselves refer to their purpose as "expenses" not Operational

Expenses - an acknowledgement that the expenses for which those loan proceeds were used were not Operational Expenses.

**B.** **Engagement of Akin Gump**

55.     The Akin engagement (and related invoices) is central to this contrived bankruptcy. I addressed this in detail in my first declaration, and I have discovered additional evidence showing that the engagement is invalid and was for services provided to Mr. Deitz and his employees (i.e. not for services to Kirwan). On 5 May 2016 I wrote Akin and asked them to refund the money they received from Kirwan (Exhibit 17). Here I rebut in full Mr. Deitz's explanation of this engagement and related expenses in ¶¶ 42-45 of his declaration.

56.     Akin's engagement by Kirwan required the unanimous consent of all its shareholders, including myself, because it was not an Operational Expense as defined by the SHA. Even if it was an Operational Expense, which it was not, unanimous consent was still required, because the invoices paid were in excess of ▇▇▇▇▇▇ in respect of an individual expenditure (Akin's legal fees for the representation and not their individual (monthly) invoices). It was also in excess of ▇▇▇▇▇▇ when aggregated with all other items of like expenditure (legal services) – all such payments require, as per the SHA, the consent of all three shareholders. In breach of the SHA, no unanimous shareholder consent was obtained before Akin's engagement or before the payments to Akin in dissipation of Kirwan's funds.

57.     In addition, an Operational Expense had to be properly documented as the definition of Operational Expenses provides. This means authorized by Kirwan, recorded in the minutes of its board meeting or by circular resolution and signed by a joint signature of its A and B managers. This has not been done and is another reason that Akin's engagement was not an Operational Expense.

58.     Akin's engagement by Kirwan should have also been approved by the board of managers of Kirwan (of which I am a member) and should have been signed by an A and a

B manager of Kirwan, as required by article 8.11 of the Kirwan By-Laws, and not as the case is by Mr. Du Toit alone. The effect of Art 8.11 of Kirwan's By-Laws is a matter of public record in the Luxembourg Commercial registry which is accessed via www.rcsl.lu. Art. 8.11 of the By-Laws provides that Kirwan will only be validly bound by the joint signature of one (1) class A manager and one (1) class B manager (including by way of representation). None of this was done. There is no board resolution approving Akin's engagement and no joint signature on the engagement letter.

59.     The engagement Akin entered into with Kirwan had only one signature. Kirwan was not validly engaged pursuant to article 8.11 of its By-laws as recorded in the Commercial Register of Luxembourg. The consequence of this is that Akin has charged Kirwan for representation of Messrs. Deitz and Johnson individually and their company VR Capital pursuant to an invalid engagement, and Kirwan owes no money to Akin.

C.     **Settlement, Cooperation and Engagement Agreement**

60.     The Settlement, Cooperation and Retainer Agreement ("Feldman Agreement") is between Mr. Feldman, on the one hand, and VR Global, VR Capital (collectively "VR") and Kirwan, on the other. Under the Feldman Agreement VR and Kirwan promised jointly and severally to Feldman to reimburse him for legal fees up ████████ in connection with the claim against him by certain Yukos entities, Mr. Godfrey and others. The complaint against Feldman is in Exhibit 18 and the Feldman Agreement is in Exhibit 19. Pursuant to the Feldman Agreement, Kirwan paid Mandel Bhandari LLP, the law firm representing Mr. Feldman, a total ████████████████████████████.

61.     In no way are the expenses arising from the Feldman Agreement an Operational Expense (expense which relates to assertion of legal title by PNS to the shares in Yukos Finance). This clearly follows from the complaint against Feldman. The entry into the Feldman Agreement by Kirwan required unanimous consent of its shareholders (as an

expense over and above reasonably required to meet Operational Expenses and because it

exceeded the threshold ███████████████████████

      62.     The Feldman Agreement was also not an Operational Expense because it was

not properly documented (no board of managers or circular resolution approving this expense

and no joint signature of A and B managers on the Feldman Agreement).

      63.     In addition the Feldman Agreement should have been approved by Kirwan's

board of managers (with my participation in a board meeting) and signed by an A and B

manager of Kirwan and not by Mr. du Toit alone.  For the same reason that Akin's

engagement does not constitute a binding obligation of Kirwan, the Feldman Agreement does

not constitute an obligation either.

      64.     On 9 May 2016 I wrote all the parties to the Feldman Agreement and Mandel

Bhandari, telling them that the agreement was not binding on Kirwan for the reasons set out

above. I requested that Mandel Bhandari refund monies paid to them and advised them not to

incur additional charges on Kirwan's account.  Mr. Deitz and his counsel argue after-the-fact

that this agreement is in the interest of Kirwan, but neither Kirwan's board or shareholders

have ever considered this matter, and no such decision has ever been made.

      65.     Mr. Deitz writes in his declaration ¶ 41 that the Feldman Agreement "was

executed by Kirwan as part of the Petitioners' efforts in prosecuting the litigation".  This is an

astonishing admission that the Feldman Agreement was not Kirwan's legitimate expense.

The litigation involves PNS and not the Petitioners or Kirwan and it is for PNS (and not the

Petitioners) to decide through its properly authorized bodies how to prosecute litigation to

which it is a party.  Even if Kirwan wanted for some reason to execute the Feldman

Agreement, proper corporate procedures must be followed as provided for in the SHA.  None

of this happened, there is not a shred of Kirwan authority behind the Feldman Agreement.

IV.    NO GENUINE INSOLVENCY OF KIRWAN

A.    There are no real creditors of Kirwan

66.    Besides the Financing Shareholders, the only alleged creditor of Kirwan is
Akin. As I have already described Akin is not a creditor of Kirwan, to the contrary they owe
Kirwan money.

67.    For some reason the 17 March 2016 Motion of Petitioning Creditors to
Terminate Exclusivity Periods was served on Clifford Chance, Houthuff Buruma and
Simmons and Simmons.[11] These law firms are PNS's Dutch legal counsel.

68.    All three of these law firms have PNS as their client. None of them have any
agreement or relationship with Kirwan other than receiving payments from Kirwan on PNS's
behalf. They have no contractual relationship with Kirwan and no basis to be a creditor of
Kirwan. I have checked twice with these law firms (a second time since my first
declaration). None of them intend to participate in the bankruptcy and upon my inquiry they
all confirmed: they have no relationship with Kirwan and no direct interest in the bankruptcy.

69.    Mr. Deitz in ¶ 48 of his declaration states that consistent with the 2007
agreement, all fees incurred in connection with the Yukos Finance litigation would be paid by
Kirwan. However, he provides no evidence of this agreement. Kirwan's role is to fund PNS
so that the latter can pay its expenses. That in fact Kirwan has made these payments directly
does not change the party responsible for the debt. PNS not Kirwan. The Dutch law firms
have no valid claims against Kirwan.

B.    Scheming, deceit, subterfuge: the Akin retainer and invoices

70.    As I have already attested, the Akin engagement, and payments made for the
related retainer and services provided (to VR Capital), are central to orchestrating this

---

[11] At the time of this declaration it makes absolutely no sense for these parties to be copied by Petitioning
Creditors. I suspect that in the near or medium term should this bankruptcy proceed, we will find what role Mr.
Deitz has cast them for in his show.

bankruptcy and contriving its jurisdiction in New York. To do this, the Financing

Shareholders plotted to make sure that there was a retainer, that it was maintained when it

could have been used to avert the fake insolvency event, and that invoices appeared overdue

when they were not.

71.    The Akin Engagement Letter (Exhibit 20) reads: "Attached to this letter is our

Statement of Firm Policies (the "Statement") that will apply to our representation of you".

The Statement (attached to Exhibit 20) forms part of the Engagement Letter itself. The

Statement provides that unless otherwise agreed, the retainer will be applied to statements

rendered in connection with the representation. There was no 'otherwise agreed' term

between Akin and Kirwan, and accordingly Akin could and should have applied the retainer

to its statements. Had it done so, its January 2016 invoice for ████████ would have been

completely paid, and its February invoice would have had an unpaid balance of only

████████ Alternatively, Kirwan could have paid Akin's January 2016 invoice as up until 9

March 2016 it had sufficient funds in its account to pay this invoice.

72.    Instead of applying the retainer to the unpaid invoices, Akin asked permission

to do so from VR Capital's Mr. Toussi, who has no relationship to or authority for Kirwan

whatsoever. This was a concerted scheme by VR Capital (acting for the Financing

Shareholders) to create an impression that there were overdue invoices to Akin in the amount

of ████████ for January and February 2016 and not for only ████████

73.    Moreover, the February invoice, dated 7 March 2016, was not due until 18

March 2016. As per the Engagement Letter, payment is due within 10 days of receipt of an

invoice. Assuming that Kirwan received this invoice on 7 March 2016 (which it did not), its

payment did not fall due until 17 March 2016. Thus when the Petitioners determined that

Kirwan was insolvent and filed the bankruptcy petition, the remaining balance of Akin

February's invoice had not fallen due and Kirwan **was not insolvent**.

74.    To increase the debt to Akin, the Financing Shareholders or VR Capital (not Kirwan) asked Akin to issue an interim March invoice despite the fact that Akin's standard practice until then and as per the Engagement Letter was to bill monthly. The March interim invoice is for ███████ It is dated 14 March 2016 (I must underscore the obvious—one day before the involuntary petition) and did not fall due until 24 March 2016 (assuming it was received on 14 March 2016). As Mr. Pees advised me on 6 April 2016, the unbilled work in progress was ███████ Putting aside the non-binding effect of the Engagement Letter for Kirwan, Kirwan's overall debt to Akin, including the unbilled work in progress, less the retainer is ██████ I maintain however that Kirwan does not owe Akin any money at all. On the contrary Akin owes Kirwan ███████ of funds that were dissipated from its account by Mr. Deitz or Mr. Senbanjo (a lawyer at VR) in concert with Mr. Matthijs Bogers (an A director at Kirwan) or Mr. Stephane Hepineuze (an employee of Kirwan's Luxembourg administrator) for service to VR and its employees' benefit, all on the basis of an invalid engagement agreement, which Akin should have known was not validly entered into.

75.    It bears repeating that but for the concerted machinations with the retainer, there was no outstanding debt to Akin on 15 March 2016, when the Petitioners declared an insolvency event and filed the involuntary petition against Kirwan.

76.    Moreover, Akin invoices list Kirwan's registered office address in Luxembourg, but these invoices were never sent there. Mr. Pees has said, he sent these invoices by email to Emile du Toit @vr-capital.com, not to Kirwan. Perhaps this is not surprising, although still invalid delivery, as Akin represented VR Capital and two of its officers/directors – Mr. Johnson and Mr. Deitz – not Kirwan. In any event Kirwan never received the invoices and so they were not due, let alone overdue.

77.    A final important point is that Akin could only request a retainer in an amount which was appropriate with respect to the required representation. Prior to the Involuntary

Petition, since a hearing on 4 February 2016, there were limited developments in this case with the exception of a few letters that the parties filed with the court (see Godfrey et al v. Johnson et al 1:15-mc-00325-P1 on Pacer). There is not nor could there be any justification for another retainer of ▮▮▮▮▮ as Mr. Pees suggests in his letter of 29 April 2016, which is Exhibit 4 to Mr. Deitz's declaration, and as Mr. Deitz argues in his declaration at ¶ 53. March work including unpaid work in progress was ▮▮ and there was no work in April. In any event their entire engagement is illegitimate and no retainer is required at all.

**C.    It is not the first time Kirwan has no funds in its bank account.**

78.    Between 29 January and 29 May 2013, the balance in Kirwan's bank accounts was: EUR –273.37 in Luxembourg International Bank, USD $44.89 and EUR 337.47 in Laiki Bank. This is at the time when VR Global and VR Capital acquired Renaissance Capital's interest in Mascini. At that time outstanding invoices also existed – Kirwan owed Amicorp $17,355, which it paid on 5 June 2013, after the Financing Shareholders provided funds to it as a "capital call" on 30 May 2013. The Financing Shareholders did not consider this an insolvency event then, even though the situation is no different than it was on 15 March 2016. Indeed in line with its sole purpose as a funding vehicle, Kirwan has not in practice ever maintained any significant cash balance (on a relative basis).

**D.    Kirwan creditworthiness has never been properly considered.**

79.    It is alleged that Kirwan cannot fund ongoing expenses and has no access to further capital contributions absent further cash injections from the Financing Shareholders (¶ 2 of the Objection and ¶ 51-57 Deitz Declaration). This is false or at least has not been considered by Kirwan much less proven.

80.    Kirwan, as has been noted by me, has had no shareholders or board meeting at which any of this was discussed or found to be the case. It is Mr. Deitz who has made this

determination for Kirwan, but not Kirwan itself through its governing bodies acting in accordance with the SHA and its By-Laws.

81.    At both the Kirwan and PNS, levels I am confident that there are multiple sources of funding. Indeed, I am from time to time approached by third parties interested in providing financing, but I have never pursued these inquiries as I never thought, and still do not think, that the Financing Shareholders are truly serious about not contributing the funds necessary to keep PNS' litigation active (relatively small amounts compared to what has been invested to-date).[12]

82.    The Financing Shareholders in ¶ 10 of the Objection portray limited and dire options for Kirwan. Among the three options according to the Financing Shareholders, they could 'walk away' with a complete loss of value to all creditors. This will not happen, as in that scenario I would undertake to pay in full any creditor of Kirwan (with the exception of the Financing Shareholders, who are not creditors), including creditors of Kirwan's only subsidiary (PNS), in return for the shares of Kirwan.

83.    It is true that I cannot compel the Financing Shareholders to fund further Cash Call Notices. If this is their decided course, it is in their interest to advise the board, and it is the board's responsibility to seek new financing. I am confident this can be done and will assist in this matter, and I have several ideas for potential financing.

84.    It is bad faith by the Financing Shareholders to on the one hand aggressively prevent me from raising third-party financing,[13] while on the other hand state that they are unwilling to provide additional financing and try to bankrupt Kirwan for their own benefit.

---

[12] Except of course via a settlement in which they get their money back but get rid of Lynch and his pesky rights.

[13] Mr. Deitz in his declaration does not disavow his threats as exemplified by Exhibit 1 of my first declaration.

V.   THE LCIA AWARD

85.   The Financing Shareholders' references and arguments in relation to the LCIA Final Award (¶ 23 of the Objection and ¶¶ 29, 30 and 32 of Mr. Deitz's declaration) are misconceived.

86.   Contrary to Mr. Deitz's allegations, the Tribunal did not make any findings in ¶¶ 66 and 67 of the Final Award.  "Discussion and Determination of the Issues", starts from ¶ 70.  ¶¶ 66 and 67 of the Final Award belong to the chapter headed "The Terms of the SHA and of the original Charter of PNS".  In any event ¶¶ 66 and 67, even if properly characterized by Mr. Deitz which they are not,[14] are no longer relevant as PNS has a new charter as of 1 July 2015 and the terms of this charter are different than the terms of the 2007 PNS charter.

87.   The Petitioners fail to mention the LCIA Tribunal's finding at ¶ 86 of the Final Award.  The Russian law evidence persuaded the Tribunal that:

(a)   only a sole executive body (or a management company appointed in its place if permitted by the charter and then resolved upon) could act on behalf of a Russian LLC and bind it to a transaction without a power of attorney; and

(b)   neither a general meeting of participants of an LLC nor any of its participants jointly or severally could act as such on behalf of an LLC without holding a power of attorney.

88.   In line with the above findings of the LCIA Tribunal and the arbitrator's orders to the Respondents (¶ 165 of the LCIA Award) not to inter alia create a second sole executive authority and not to appoint any person not nominated by me as general director, I sent an email to Kirwan's directors on 10 August 2015 (Exhibit 21).  The email advised them

---

[14] These paragraphs refer to the exclusive power of the participant (Kirwan) to decide certain corporate matters. Corporate management and acts are still the exclusive power of the general director see ¶ 86 of the LCIA Award and ¶ 87 here.

of the consequences of the LCIA Award on the management of PNS and the division of

authority at PNS and who has the right to represent PNS.  Specifically only the general

director can represent PNS in the management of its litigation or the settlement of the same.

### VI.  FIDUCIARY DUTY

89.    In their Motion to terminate the plan exclusivity period and in their Objection,

the Financing Shareholders expend a great deal of effort to accuse me of breach of my

fiduciary duties (¶¶ 6, 34, 38, 50, 54 of the Motion and ¶¶ 8, 11, 12, 19-24, 60 and 85 of the

Objection).  Petitioners' arguments in this regard are preposterous.  They do not state which

law governs my supposed fiduciary duties, and they do not state how my opposition to their

plans to abandon the investment and settle the litigation over my objection breaches any

specific fiduciary duties.  Not only do they fail to point to a single fact in support of such

alleged breach, they purposely conflate my duties as the general director of PNS with my

duties as a director of Kirwan (and my rights as C-Shareholder) in an attempt to confuse and

mislead this Court (the Motion speaks of my duties as the general director of PNS whereas

the Objection refers to my duties as a director of Kirwan).  Neither mention my rights as C

Shareholder.

90.    As the general director of PNS, I have to act in the interests of PNS reasonably

and in good faith (see ¶ 87 of the Final Award: "Further, the Russian law experts agreed that

a general director of an LLC is obliged under Russian law to act reasonably and in good faith

in the interests of the company of which he or she or it is the general director (see e.g. Article

53(3) of the Amended Civil Code of the Russian Federation")).

91.    In any event I simply did not have any ability to act as either general director

or C director, because Mr. Deitz in breach of the SHA excluded my participation in

settlement negotiations and conducted these negotiations in secret from me.[15]  I also have not received on behalf of PNS any settlement offer to be able to present to the board of managers of Kirwan for approval as PNS's charter requires.  Having not received an offer, it would be impossible for me as general director to frustrate the same (see footnote 13 again).

92.     Second, the PNS charter does not allow me to accept a settlement on behalf of PNS without Kirwan's approval.  And Kirwan must follow proper corporate procedures as per the SHA and its By-Laws before it can give me that approval.  But it can only do so once there is a concrete offer that I can present to Kirwan.  This has not happened yet.

93.     Third, as PNS general director I only have to present a settlement offer to Kirwan for approval if I want to, acting reasonably and in good faith.  Given the existing ███████████████████████████████████████████████████████, I cannot, acting reasonably and in good faith, accept a settlement on behalf of PNS that would result in breach of this agreement.[16]

**VII.     THE CONTRIBUTIONS AND RIGHTS OF THE RESPECTIVE SHAREHOLDERS**

94.     The majority shareholders and their counsel repeatedly use fractional absurdism to discuss my shareholding (0.00056%) and their "majority creditor" position (which is actually 0% as their loans were equity and cannot be repaid until we finish the project).  They also diminish my role in our joint venture and argue that my only right is to 10% of the Net Gain if any.

95.     The fraction that my C share represents in Kirwan's share capital is unimportant, and it is wrong to consider it as one share out of 2,500,001 shares of Kirwan.

---

[15] The letters I have sent referred to in ¶¶ 25 and 33 in Mr. Deitz's declaration I sent as C Shareholder. Those letters and their contents were fully within my rights as C Shareholder.
[16] ██████████████████████████████████████ would require consent of the parties to the agreement and unanimity among Kirwan's shareholders as provided in the SHA.

Kirwan has different classes of shares.  A and B classes of shares have similar rights.  The C

Share is a totally different class and I own that entire class and the special rights accorded it.

96.     On 30 August 2007 I signed a side letter in the form included in Exhibit 20.

according to which any distributions that Kirwan pays me in connection with my C Share are

absorbed by the Net Gain.  Thus it does not matter whether the fraction that my share

represents is 0.00056% or more or less, I am entitled to 10% of the Net Gain.

97.     As to my contributions to our joint-venture, the Financing Shareholders'

opposition papers are peppered with quips calling my role "minor", "limited", and the like.

However, the Financing Shareholders do not acknowledge any role that I played, and they do

not explain how I acquired such extraordinary minority shareholder rights.

98.     I refute the general assertions diminishing my role and affirm the following:

(a)     I originated the investment thesis and approached first Renaissance

Capital, then VR Capital.  Of the three of us, I was the only one with successful

Yukos auction experience, and it was my plan that worked best.  I got my C share and

the associated rights not because VR Capital is a charity fund (it is not), but because I

contributed value in exchange for that share and the C Shareholder rights.

(b)     On 14 August 2007, the day I bought PNS from Rosneft, the Parties

had not yet signed the SHA,[17] that only happened on 30 August 2007.[18]

---

[17] Mr. Deitz made much in the LCIA hearing of an Investment Agreement signed prior to the SHA.  Even that
agreement was only signed after the auction on 15 August 2015 and was in any event not binding as Mr. Deitz
made changes to it concurrent with his signing but after my signing.

[18] Mr. Deitz the ultimate beneficiary behind Lapidem disclosed this to the Financial Times on 19 August 2007
(four days after the auction of Yukos Finance and five days after I had bought PNS) where he said, "Monte
Valle [Stephen Lynch], having acquired Promneftstroi [PNS], is in discussion with certain parties about
providing capital to it to fulfill its obligations and we are one of the parties involved.  See Exhibit 23.

(c)     My role in our joint venture is substantial, I am a C director and C Shareholder. I control the management of PNS and I have spent thousands and thousands of hours on Kirwan/PNS business.

(d)     I have incurred hundreds of thousands of dollars in unreimbursed expenses. This includes paying for the legal analysis underlying PNS's defense against the "bridge cases" (Glendale). The Financing Shareholders have consistently rebuffed my requests for compensation and for now I have stopped asking.[19]

99.     In 2007 I was very concerned by the reputation of the groups behind the Financing Shareholders (Renaissance Capital and VR Global/VR Capital). I spent a lot of time with my lawyers considering how to protect myself once I gave up the shares of PNS. The resulting SHA does a reasonably good job of that and it inter alia requires that we obtain title to the Yukos Finance shares and that no party interfere with that goal.

100.     Mr. Deitz wants to renege on that deal. He wants to exit before we get title to Yukos Finance. He wants to implement a plan that absent a bankruptcy would require my consent vote in at least six of the nine matters reserved for unanimous shareholder approval, and that cannot be implemented without my signature in three or four capacities (exactly how many will be determined by the structure of the settlement). He wants to do all of this without paying me a dime, while his company will receive at least $137.5 million (and probably much more).

**VIII.    THE DUTCH LITIGATION**

**A. The PNS LITIGATION**

101.     Obtaining title to Yukos Finance has been far more difficult than we envisioned. To say however that the litigation ████████████████████████ ████████████████████████████████████ (see ¶¶ 33-47, 53-63, 147-151 of Deitz

---

[19] The exception being the costs awarded to me by the LCIA arbitrator.

Witness Statement at Exhibit 2).



104.    The 2007 decision was not irrevocable and we have spent a great deal of time

and Kirwan has spent ████████████ of dollars to protect PNS' position and prepare the

appeal which will be shortly heard and ruled on later this year or early in 2017.  The money

for this litigation was provided by Lapidem and Mascini, because this was what our

agreement called for.  This is why they are called Financing Shareholders.

105.    As addressed in my first declaration, we have always stood a strong shot at

overturning the 31 October 2007 judgment.  This position was significantly strengthened in

2014, when the European Court for Human Rights ("ECHR") found that Yukos Oil had

engaged in "massive tax evasion," and that there was "no evidence of political motivation" in

the tax case and bankruptcy against Yukos Oil.

106.    Then just recently on 20 April 2016 (long after Mr. Deitz's unauthorized

alleged agreement to settle on the cheap with PNS' opponents for only $137.5 million), the

Hague District Court quashed on jurisdictional grounds the award of the Energy Charter

Treaty ("ECT") arbitration tribunal requiring the Russian Federation to pay former majority

shareholders of Yukos Oil $50 billion.

107.    The ECT arbitration tribunal had found the opposite of the ECHR, namely in

short that the Russian Federation's tax claims against Yukos Oil were unfounded and

politically motivated (which if true would be contrary to Dutch Public Order).  With the

quashing of the ECT arbitral award, all that remains standing as European adjudication of the Yukos affair is Europe's highest court's decision (the ECHR). Given the Hague court's quashing of the ECT, and given the findings of the ECHR, I am advised that it is now unlikely that Dutch courts will continue to invoke Dutch public policy in order to deny PNS its rights to its property: title to the Yukos Finance shares.

108.    It may take years for this matter to be adjudicated, but once PNS is in control of Yukos Finance (perhaps very soon), we will have a substantially changed litigation environment.

109.    As surprised and suspicious as I was by the low settlement value Mr. Deitz purportedly negotiated, it is stunning that he and his counsel submitted their Objection to this Court without even mentioning the quashing of the ECT award. This development substantially enhances PNS's negotiation position, and any settlement reached before this event should be disavowed (and can be as without my signature it is non-binding).[20]

110.    It is also stated in the Deitz declaration and by their counsel that I am 'hopelessly out of the money,' and I am 'seeking to pull a rabbit out of the hat'. No rabbit is needed and we have no way to know if I am in or out of the money, until we get title to Yukos Finance, as we agreed to do.   We do know that Yukos Finance currently has a value in excess of $800 million.

111.    In any event **there is no settlement agreement**. On 31May 2016 I talked with Mr. Godfrey a board member of the Yukos Finance Foundation and one of the plaintiffs in the main proceedings against PNS. He told me that there was no term sheet, that there was

---

[20] I don't believe that Mr. Deitz has any intention of settling the litigation for $137.5 million. The alleged settlement is just a tool in the scheme to get rid of me ███████████████████████████████

see ¶ 111.

no signed agreement, and that neither he nor the Yukos Finance Foundation (the actual opposing parties to PNS) had negotiated a settlement with Mr. Deitz. He told me that Mr. Deitz had negotiated a settlement number with Mr. Wolf (who is not a board member and does not represent the Yukos Finance Foundation or any party to the litigation), but no other terms had been agreed and that it would be up to himself (Godfrey) and the Foundation's lawyers to negotiate the remaining terms and an actual agreement with PNS (which means with me as PNS's executive authority). Mr. Godfrey said they were not interested in any settlement agreement on which Mr. Deitz and myself were not agreed. He did say the number discussed was acceptable to the them (no surprise there, if it's $137.5 million it's a great deal for them).

112.    That there is no settlement agreement should not be surprising. How could there be, there has been no corporate discussion. No one has proposed to the shareholders the terms and conditions of a settlement and their respective compensation.

113.    Repeatedly I have made it clear that a settlement would be welcome. However, any settlement must be achieved with shareholder unanimity, and if I need to waive any of my rights for the settlement, then I need to be paid for such waiver. Until then, as C Shareholder I have every right to demand the SHA Parties' compliance with my agreed rights.

114.    Another reason I find the settlement number suspicious is that it does not appear to consider possibilities other than a total win or a total loss. For example, there are scenarios whereby PNS will have unjust enrichment claims against the beneficiaries of Yukos. PNS after all paid $307 million to the estate of Yukos Oil. There are many different potential outcomes, but Mr. Deitz wants to get out cheap now because even at a cheap settlement he gets most of his money back (or more) and he can invest it in other areas he finds more promising in spite of the commitments he and his companies made to me.

  
### B. Various other litigation that Deitz refers to in his declaration

115.    At ¶ 22 of his declaration Mr. Deitz refers to a number of proceedings that according to him "the Petitioners have also funded". It is preposterous that Mr. Deitz even mentions some of these cases:

(a)    The case mentioned at ¶ 22(c) did not involve either Kirwan or PNS as a party, but involved HBK. The irony of this case is that the inaccuracy of HBK's officer's [Ben Heller] statements in his email communications with the representative of his co-shareholder in Lapidem, Mr. Deitz, obtained by PNS adversaries in these discovery proceedings, are used against PNS and me personally in a damages case for hundreds of millions of dollars, brought by Yukos International UK BV, the appeal of which is still pending. Kirwan and PNS however cannot and should not be responsible for mistakes made by Mr. Deitz and his partners, which subsequently became discoverable. Lapidem was paying for the mistake of its own shareholders, Mascini had no role in the fiasco.

(b)    The filing of an application on behalf of PNS by Bailey Glasser seeking an order for discovery in aid of the foreign proceeding (¶ 22(e) of Deitz's declaration) was not authorized by me as the PNS general director. Instructions to do this came from Mr. Deitz, who attended the hearing and deposition as a putative PNS representative while he was not authorized to do so, never having held any power of attorney from PNS (see ¶ 86 of the Final Award). The deposition of Mr. Wolf resulted in retaliatory actions – inter alia applications for discovery against Mr. Deitz, Johnson and VR Capital. It was absolutely unnecessary, foolish and reckless to spend money on Mr. Wolf's deposition, which (the spending) was done without my approval as C Shareholder.

    (c)      With reference to ¶ 22(f) of Mr. Deitz's declaration, I wish to note that Mr. Godfrey et al sought discovery against Mr. Johnson as the CFO of VR Capital (and not as a director of Lapidem), Mr. Deitz as a representative of VR Global and the control person of VR Advisory Services Ltd., the general partner of VRGP, and against VR Capital.  Representation of the respondents in these proceedings by Akin should have been paid for by Lapidem or VR Capital, but not by Kirwan, as I demonstrate at ¶¶ 55-59.

    (d)      The High Court claim (¶ 22(g) of Mr. Deitz's declaration) is against ex-Renaissance owners and managers, viz.: Jennings and Reid, Mr. Deitz and me personally.  It does not involve PNS.  Neither PNS nor Kirwan are parties to these proceedings and should not foot Mr. Deitz's and others' legal bills without it being so agreed according to the corporate governance procedures.

    (e)      The statement at ¶ 22(h) is false in its characterization of the applicants as "PNS' adversaries".  The applicants are adversaries of Feldman and those who ███████████████████████████████ he was privy to as an officer of certain Yukos companies.  PNS has never authorized and has nothing to do with this ████ and I as the C Shareholder would have never approved of this action and Kirwan spending money on it, including the Feldman Agreement and payments to Mandel Bhandari, which I discuss at ¶¶ 60-65.

    (f)      The most astonishing paragraph is ¶ 22(i).  Bailey Glasser LLP purported to represent PNS in the discovery against Mr. Wolf, and it also represented Feldman prior to his representation by Mandel Bhandari.  Before the unauthorized and non-binding Feldman Agreement, there was another similar agreement between Feldman, VR and PNS.  Mr. Deitz signed this agreement on behalf of PNS without having been authorized to do so.  This agreement provided for representation of

Feldman by Bailey Glasser.  In connection with the above unauthorized acts by Bailey Glasser on behalf of PNS, I sought information and documents from them, which they have refused to provide to me.  As PNS general director and the only constituent authorized to act on its behalf, I sent them a number of requests in the period between 25 September 2015 and 18 March 2016, all in substance ignored.

116.    The above cases have nothing to do with PNS, they are creations of Mr. Deitz himself, the result of reckless and aggressive behavior and illegitimate acts in contravention of Kirwan's governing documents (and in some cases of relevant law), and it is simply wrong and misleading to give credit to the Financing Shareholders for funding these cases.

117.    In Mr. Deitz's declaration (¶ 31) and Petitioners' counsel's Objection, much is made of allegedly unauthorized changes to PNS's 2007 Charter allegedly by me.  This matter was discussed at the 2015 LCIA arbitration, but it was not a matter for the tribunal to consider. There has never been any process of discovery or any determination of facts.  No one has ever filed any claims against me in relation to this matter, although the Financing Shareholders did, after the LCIA Award, take action (through Kirwan) against PNS on this matter in Russian district court.  However that claim was withdrawn in its entirety after the first hearing.[21]  In any event it is completely irrelevant to this matter, and I do not address it except to fully reject the Financing Shareholders' insinuations.

IX.    CONCLUSION

118.    The Financing Shareholders have done great damage to PNS's interests.  In their counsel's submissions and Mr. Deitz's declaration ███████████████████████ ████████  They do this because Mr. Deitz is ready to sell cheap (settle cheap), get some money now which almost covers, or does that and more, VR's investment, and then put that

---

[21] This was another case of the relentless bullying by Deitz and another case of me incurring expenses on behalf of PNS as I funded that defense, for which I have not been reimbursed.

money to work in other VR endeavors, which earn on average 24.6% per annum according to

Mr. Deitz's declaration. This is in VR Capital's interest, not mine as C Shareholder and I do

not agree to sell our project cheap. We agreed to ▮▮▮▮▮▮▮▮▮▮ and I want to

continue that joint undertaking (or settle with compensation to me for any rights of mine that

I would need to waive and for lost opportunity).

119.    Since 2013 VR has relentlessly sought to evade my SHA rights. First, as I

already described in my first declaration, they tried through various means (a board, a second

sole executive authority, powers of attorney) to circumvent my executive authority at PNS.

Any of these actions, if legitimate, would have allowed Kirwan to act for (bind, commit,

represent) PNS and negotiate a settlement.  The Financing Shareholders admit this in their

cash call notice to their shareholders.[22]  These attempts all failed.

120.    It is because of their failure to do an end-run around my blocking positions in

the SHA that they have now contrived this bankruptcy. They do so in a jurisdiction far from

our base of business (both PNS and I are in Moscow) and our agreed Dispute resolution

forum in London.

121.    In the Objection ¶ 35 it is stated that I "cannot credibly suggest that this court

is inconvenient."  In fact Akin Gump on behalf of inter alia Mr. Deitz and VR Capital

extensively argues exactly this assertion in the U.S. SDNY matter 15-cv-4964 unfolding

concurrent to this bankruptcy attempt.  They submit point after point to disassociate Mr.

Deitz and VR Capital from the SDNY and ironically even submit in those proceedings the

last page of his 3 May 2016 declaration in this bankruptcy matter, signed in London, as

evidence of his lack of connection to SDNY (Exhibit 27).

---

[22] Emails from Emile du Toit dated 14 August 2015 (Exhibit 14).

122.    What is true for Mr. Deitz is even more so for me.  It is only through great expense and effort nearly beyond my means that I can be represented in New York against this deep-pocketed and abusive Cayman Islands hedge fund.

123.    This summer I have limited ability to exit Russia as I am awaiting new travel documents (related to renewal of my Russian residency).  And I have no plans to travel to the U.S. this year.

124.    The fake bankruptcy is the latest manifestation of Mr. Deitz's aggressive bullying and verbal abuse and often repeated attempts and threats to 'crush' me or the like. He is doing this because he wants to override my minority rights and sell or dispose of Kirwan's indirect interest in Yukos Finance on terms he alone will negotiate and he alone will agree to.  And he wants to do this without compensating me for my rights in the SHA nor for nearly a decade of work and unpaid expenses.

125.    Mr. Deitz is trying through this court to whitewash and legitimize years of minority abuse.  He even hopes in this bankruptcy action for a 'get out of jail free card', by seeking, according to his counsel (Objection ¶ 30), "appropriate orders and injunctions barring Mr. Lynch and all other persons from pursuing any litigation ... on account of any matter connected to the litigation and, or Kirwan."  This is because he and his companies have conducted serial contractual violations and perhaps worse, causing me material damage.

126.    For the foregoing reasons it is respectfully requested that this Court grant this Motion in its entirety and award me such other and further relief as this Court deems equitable and proper.

Dated: June 6, 2016, Moscow, Russia

_____

Stephen Lynch

# REDACTED

FULL DOCUMENT SUBJECT TO SEAL MOTION

-----Original Message-----
From: "Richard Deitz" <rdeitz@vr-capital.com>

Date: Tue, 21 Aug 2007 12:19:44
To:<slynch@monte-valle.com>,"Robert Reid" <rreid@rencap.com>
Subject: RE: Promneftstroy. FAS.

Guys-
I think we need to think about this issue carefully.  From my perspective, I do not think we want YF ending up being owned by PNS for the long-term (if it were possible to assign the SPA agreement, it would be better if that could be done in fact).  On the structuring, I think we are headed slightly in the wrong direction with the Cyprus holdco--this is something that would be useful only if PNS owned YF, which we do not want at all for tax purposes.  I was advised that the law firm of Loyens & Luff in Luxembourg is very good at tax structuring issues.  I am expecting today to receive a contact there, but perhaps RC or Baker & Botts already have a good contact.  I would recommend that we talk to them.

On the FAS issue, I think the issue is whether or not PNS would have any restrictions to transfer its interests in YF to a third party (presumptively, a new Lux holdco).

RD

# EXHIBIT 3

**Subject:** Surplus - structure paper

**Date:** Friday, 24 August 2007 at 11:44:19 AM British Summer Time

**From:** MOORE, NICHOLAS (LC01) <Nicholas.Moore@herbertsmith.com>

**To:** Reid, Robert <RReid@rencap.com>, slynch@monte-valle.com <slynch@monte-valle.com>, Steve.Wardlaw@bakerbotts.com <Steve.Wardlaw@bakerbotts.com>, rdeitz@vr-capital.com <rdeitz@vr-capital.com>

**CC:** Wootton, Steven <SWootton@rencap.com>, Batulin, Nikolay <NBatulin@rencap.com>, WITTERING, ROBIN <Robin.Wittering@herbertsmith.com>, Copeland, Michael <Michael.Copeland@herbertsmith.com>, Foresman, Bob <BForesman@rencap.com>

Please find transaction structure paper attached.

Kind regards

Nick Moore
Partner
Herbert Smith CIS LLP
DDL: +7 (495) 783 67 70
FAX: +7 (495) 363 65 01
www.herbertsmith.com

This message is confidential and may be covered by legal professional privilege. If you have received this message in error please delete it and notify the sender immediately; you should not retain the message or disclose its contents to anyone. If you require assistance please contact our main switchboard on +7 495 363 6500.

Herbert Smith CIS LLP is a Limited Liability Partnership registered in England and Wales with registered number OC311205. We use the word partner to refer to a member of Herbert Smith LLP, or an employee or consultant with equivalent standing and qualifications. Herbert Smith LLP may monitor e-mail communications in accordance with applicable law and regulations.

Herbert Smith LLP, Gleiss Lutz and Stibbe are three independent firms which have a formal alliance. Further information is available from www.herbertsmith.com.

This e-mail has been scanned for viruses by MessageLabs.
For further information visit http://www.messagelabs.com

# EXHIBIT 5

# REDACTED

## FULL DOCUMENT SUBJECT TO SEAL MOTION

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | : **Chapter 11** |
| | : |
| KIRWAN OFFICES S.À R.L., | : **Case No. 16-22321 (RDD)** |
| | : |
| Debtor. | : |
| | : |
| | : |

**ORDER (I) FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE AND
(II) DENYING, IN PART, STEPHEN P. LYNCH'S MOTION FOR INTERVENTION
AND DISMISSAL, ABSTENTION OR STAY**

This matter having come before the Court on the Motion for Intervention and Dismissal, Abstention or Stay [Dkt. No. 8] (the "Motion"); and upon consideration of the Involuntary Petition (the "Petition") against Kirwan Offices S.à r.l. (the "Debtor") filed on March 15, 2016 and all other papers filed in support of and in opposition to the Petition and the Motion; and the Court finding that it has jurisdiction over the Petition and Motion pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b), that venue is proper in this district under 28 U.S.C. §§ 1408 and 1409, and that the Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B) that the Court may decide; and upon the record of the hearing held by the Court on the Motion on June 17, 2016 and all of the proceedings herein; and after due deliberation thereon; and good cause appearing therefor for the reasons stated by the Court at the hearing, which constitute the Court's findings of fact and conclusions of law,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1. The Petition is granted and an order for relief under chapter 11 of the Bankruptcy Code (title 11 of the United States Code) is granted with respect to the Debtor.

2.      The Motion is denied with prejudice with respect to the request to intervene to answer the Petition on behalf of the Debtor.

3.      The Motion is denied with prejudice with respect to the request to dismiss this case under the doctrine of *forum non conveniens*.

4.      The Motion is denied with prejudice with respect to the request for abstention under section 305 of the Bankruptcy Code pursuant to the doctrine of *forum non conveniens* or in favor of arbitration; all other issues raised by Stephen Lynch under section 305 of the Bankruptcy Court are expressly preserved for a future hearing, pending further order of the Court.

5.      The Motion is denied with respect to the request to stay these proceedings pending arbitration.

6.      The hearing with respect to the request to dismiss pursuant to section 1112 of the Bankruptcy Code and on related section 305 abstention/dismissal grounds is adjourned pending further order of the Court except insofar as the Motion is denied herein.

7.      This Court shall retain jurisdiction to hear and to determine all matters arising from the interpretation and/or implementation of this Order.


Dated:  White Plains, New York
        July 5, 2016

                        /s/ Robert D. Drain_____
                        ROBERT D. DRAIN
                        UNITED STATES BANKRUPTCY JUDGE

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| KIRWAN OFFICES S.à R.L., | Case No. 16-22321(RDD) |
| Debtor. | |

### STIPULATION OF FACTS ON MOTION TO DISMISS OR ABSTAIN

Lapidem Ltd. ("**Lapidem**"), Mascini Holdings Limited ("**Mascini**") and Stephen

P. Lynch ("**Lynch**," and together with Lapidem and Mascini, the "**Parties**") stipulate

that the facts set forth below are undisputed.  This Stipulation may be used only for the

hearing on Lynch's motion for dismissal, abstention or stay [ECF No. 7].  Nothing in

this Stipulation or Stipulation Exhibits shall be taken as an admission of any fact for any

other purpose.

All documents attached to this Stipulation as Exhibits are true and correct copies

of the originals.  The Parties waive all objections to authenticity of such Exhibits.  The

Parties preserve all objections to admissibility based on relevance or materiality of facts

recited in this Stipulation and to the Exhibits to the Stipulation.  With respect to any

statements of fact contained in the Exhibits, the Parties are free to assert or contest their

accuracy and credibility.

<u>Ownership in and Assets of Kirwan and PNS</u>

1.    The debtor, Kirwan Offices S.à R.L. ("**Kirwan**"), is an entity formed under

the laws of Luxembourg by a corporate services provider in February 2007 as a shelf

1

company.  When incorporated, Kirwan had no assets other than its share capital equal to $17,072.

2.      Since August 30, 2007, Kirwan has had three shareholders.  Mascini holds all of the outstanding Class A shares of Kirwan (1.5 million shares).  Lapidem (together with Mascini, the "**Petitioners**") holds all of the outstanding Class B shares of Kirwan (1 million shares).

3.      Lynch is Kirwan's third shareholder.  He holds a single Class C share, the entire share class.  Lynch, a U.S. citizen, currently resides in Moscow, Russia.  Lynch is a class C director (manager) of Kirwan and the general director of PNS (as defined below).  He is also a director of Yukos Finance (as defined below), appointed by the Russian bankruptcy receiver of Yukos Oil (see ¶¶ 31 & 41 below).

4.      Through intermediate companies, Lapidem and Mascini are currently majority-owned and effectively controlled by VR Global Partners, LP ("**VRGP**"), an investment fund domiciled in the Cayman Islands and VR Capital Group Ltd. ("**VRCG**" and together with its subsidiaries, "**VR Capital**"), a Cayman Islands asset management company founded in 1999 by Richard Deitz with headquarters outside the United States and the investment manager of VRGP.

5.      Deitz, a U.S. citizen, is the President of VR Capital and currently resides in London, England.  Deitz has not resided in the United States since 1994.  Deitz travels extensively on a global basis for business, including occasional visits to New York, but he does not "regularly" transact business in New York.  Deitz is a Class B director of Kirwan.