6.       VRCG does not have an office in New York City.  Jeffrey Johnson, a director of VRCG, is based in the United States.  VRCG itself has no employees or other presence in the United States.  VRCG indirectly owns VR Advisory Services Ltd ("**VRASL**") another Cayman entity, which also does not have an office or employees in the United States.  VRASL is the general partner of VRGP.  VRASL acts as an investment advisor and has a sub-advisor, VR Advisory Services (USA) LLC ("**VRASL USA**"), which is based in the U.S.  VRCG's website identifies certain of its affiliates along with those affiliates' locations. That website is hosted on servers in the United Kingdom.

7.       Kirwan is an investment vehicle for a consortium of parties that participated in the Yukos Finance auction. Kirwan never had and never was intended to have trading operations or employees or to generate income other than from its indirect investment in Yukos Finance B.V.  Kirwan's only assets as of the date of the filing of the petition in this case ("**Petition Date**") are its participatory (membership) interest in a wholly-owned Russian subsidiary, OOO Promneftstroy ("**PNS**"); minimal cash in bank accounts; retainers placed with U.S. lawyers; and loans to PNS.  The consortium intended Kirwan to hold, obtain and then distribute value from Yukos Finance B.V. and its subsidiaries to its shareholders.

8.       Kirwan's organizational document is its articles, dated October 18, 2007, and referred to in the SHA (as defined below) as the "By-Laws" (the "**Kirwan Charter**") (Stipulation Exhibit 8/1).  Although it has changed over time, Kirwan's board of directors currently consists of Class A director Emile du Toit, who is also CFO of VR

Capital; Class B directors Olaitan Senbanjo, who is also Deputy General Counsel of

VRASL, and Deitz; and Class C director Lynch.

9.      PNS participated in the auction of Yukos Finance B.V. ("**Yukos Finance**").

As a result of its successful bid at the auction described below, PNS has a claim to all of

the shares in Yukos Finance (which claim is disputed) and is the party to the Yukos

Finance Litigation described and defined below.  Other than asserting title to Yukos

Finance shares PNS does not do anything to generate revenue.

10.     Yukos Finance's current net asset value is believed to be $800 million.

**Acquisition of Yukos Finance**

11.     On March 6, 2006, certain creditors of Yukos Oil Company ("**Yukos Oil**")

filed an involuntary bankruptcy application against it in Moscow, where Yukos Oil was

located.

12.     On March 28, 2006, the Russian bankruptcy court placed Yukos Oil under

supervision, and Yukos Oil's creditors endeavored to liquidate the company.  In July,

2007, the Russian court-appointed bankruptcy receiver noticed an auction for 100% of

the shares in Yukos Finance, a Netherlands company and Yukos Oil's largest foreign

subsidiary, for August 15, 2007.

13.



4



14.

15.



6



18.

19.

20.

7

21.     On August 15, 2007, PNS won the auction for 100% of the shares of Yukos

Finance.  The winning bid was approximately $309 million.

22.



23.     On August 20, 2007, PNS entered into an agreement with the Russian

bankruptcy receiver to purchase the Yukos Finance shares, the Yukos Finance Share

Purchase Agreement ("**Yukos Finance SPA**") (Stipulation Exhibit 23/1).

24.

25.     On August 30, 2007, Lynch, Mascini, VRGP, Lapidem, Renaissance

Holdings Management Limited (a Renaissance Capital entity) and Kirwan executed a

Shareholders Agreement (the "**SHA**") (Stipulation Exhibit 25/1).  Concurrent to the

8

negotiation and execution of the SHA, the parties amended PNS's charter (the "2007 PNS Charter") (Stipulation Exhibits 25/2 and 25/3).

26.    On August 31, 2007, Lapidem and Mascini provided $250 million to Kirwan. Of these funds Kirwan provided about $247.5 million to PNS, and PNS made the final payment (having already paid $60 million by way of the deposit) for the Yukos Finance shares to the Russian bankruptcy receiver. As of that date, the consortium members believed that the Dutch courts would recognize their purchase.

27.    ███████████████████████████████████████████ ███████████████████████████ Lynch or his affiliate was entitled to receive a fee of $1,250,000 upon closing of the consortium's purchase of Yukos Finance. In September 2007, Kirwan paid $1,250,000 to Gigalogic Holdings Limited, a Cypriot company nominated by Lynch.

28.    On September 3, 2010, Kirwan and PNS entered into an agreement regarding the engagement and payment of legal costs and expenses of four law firms (Simmons & Simmons, Akin Gump Strauss Hauer & Feld LLP ("Akin Gump"), Mullin Hoard & Brown LLP and Houthoff Buruma) in relation to claims of Kirwan and its subsidiaries (the "PNS/Kirwan Legal Advisors Agreement") (Stipulation Exhibit 28/1).

29.    Also on this date, Kirwan and VRGP entered into an agreement regarding the engagement and payment of legal costs and expenses of Clifford Chance in relation to claims of Kirwan and its subsidiaries (Stipulation Exhibit 29/1) (the "Kirwan/VRGP Clifford Chance Agreement").

9

30.     Also on this date, Kirwan and VRCG entered into an agreement regarding the engagement and payment of legal costs and expenses of Akin Gump in relation to claims of Kirwan and its subsidiaries (Stipulation Exhibit 30/1) (the "**Kirwan/VRCG Akin Gump Agreement**").

31.     On September 10, 2007 the Russian bankruptcy receiver nominated Lynch and Robert Reid (an employee of Renaissance Capital) as directors of Yukos Finance (Stipulation Exhibit 31/1) and then transferred the shares in Yukos Finance to PNS by a deed of transfer dated September 10, 2007 (Stipulation Exhibit 31/2).

32.     On September 19, 2007, Halebay Holdings Limited ("**Halebay**") agreed to loan funds to PNS to repay the Rosneft loan to PNS of circa $60 million that had been used to pay the auction deposit. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████ On March 30, 2011, Mascini and Lapidem provided funding to Kirwan (who in turn provided the funds to PNS) for the purpose of repaying in full the Halebay loan.

33.     ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████

34.     On September 30, 2010, the SHA parties entered into an addendum to the SHA ("**SHA Addendum**") (Stipulation Exhibit 34/1)████████████████████

████████████████████████████████████████████████████

10

██████████ Kirwan's board of managers, including Deitz and Lynch, signed the

Kirwan board resolutions approving the SHA Addendum ██████████████████

████████████████

35.    Lapidem and Mascini provided all of the funding for PNS's acquisition of

Yukos Finance, including the repayment of the loan in relation to the $60 million

deposit for the participation in the Yukos Finance auction:

  a. On August 30, 2007, Lapidem and Mascini paid $2,482,929 for the

newly issued class A and class B shares.

  b. On August 30, 2007 Lapidem and Mascini entered into Loans (as

defined in the SHA) with Kirwan and provided Kirwan with $247,500,000,

(Stipulation Exhibits 35/1 and 35/2).  On September 5, 2007 the interest-bearing

loan agreement was amended to become an interest-free loan agreement

(Stipulation Exhibit 35/1).

  c. On or about March 30, 2011 Kirwan served Loan Cash Call Notices

(as defined in the SHA Addendum) on Mascini and Lapidem (Stipulation

Exhibits 35/3 and 35/4), and on March 30, 2011 Mascini entered into a loan

agreement with Kirwan and provided ██████████ to Kirwan (Stipulation

Exhibit 35/5) and Lapidem entered into a loan agreement with Kirwan and

provided ██████████ to Kirwan (Stipulation Exhibit 35/6).  These funds were

provided by Mascini and Lapidem for the purpose of repaying the Halebay loan.

11

    d.    The total of the foregoing amounts in U.S. dollars is over $300 million.[1]

36.    Lapidem and Mascini have provided additional funds to Kirwan in the approximate total amount of ███████████████████████████████ ███████████████████████████████████ bringing the total amount of funds provided to approximately $345 million.[2]  Documentation relating to the provision of these additional funds is Stipulation Exhibit 36/1.  Other than for the Halebay facility, the additional funds were provided without a formal board or shareholder meeting being held or approval sought by way of written resolutions. Generally, Lynch was not notified by Lapidem, Mascini or VR Capital when Lapidem or Mascini provided additional funds to Kirwan nor was his consent as a director sought, though Kirwan's activities and its legal bills and the need to fund them were topics of consortium emails and calls on which Lynch participated (Stipulation Exhibit 36/2).

37.    The amounts provided to Kirwan by Lapidem and Mascini described in the preceding two paragraphs have not been repaid. ██████████████████████ ███████████████████████████ Lynch acknowledges that he cannot compel Mascini and Lapidem to fund further Cash Call Notices (as defined in the SHA) from Kirwan.

---

[1] Nothing in this Stipulation shall be deemed an agreement or admission by any of the parties as to the characterization of the amounts that Lapidem and Mascini have provided to Kirwan.

[2] The parties do not stipulate to the actual amount advanced but agree on this amount as an approximation only for purposes of this Stipulation.

12

38.     In February 2013, Renaissance Capital sold its interest in Mascini to VR
Capital for a nominal cash consideration and VR Capital's assumption of Renaissance
Capital's funding obligations towards Mascini, making VR Capital the majority
shareholder of Mascini.  In March 2013, VR Capital sold a portion of its acquired
interests in Mascini to Jervis Properties Inc. ("**Jervis**"), an existing shareholder and
original co-investor in Mascini with Renaissance Capital in 2007.  Jervis remains an
investor in Mascini to this day.

39.     Before VR Capital's acquisition of a controlling stake in Mascini,
documents evidencing the provision of funds to Kirwan by Lapidem and Mascini were
made substantially contemporaneously with such provision.  After VR Capital's
acquisition of a controlling stake in Mascini in 2013, VR Capital personnel replaced
Renaissance Capital personnel in managing the financial operations of Kirwan.  When
money was required for additional funding, funding requests for Kirwan were sent by
email directly to each of Mascini or Lapidem's individual investors, rather than to
Mascini and Lapidem, by VR Capital personnel.  Upon receipt of funds from their
respective shareholders, Mascini and Lapidem then provided the funds to Kirwan
when, and in such amounts, as required.  Lynch was not notified of these transactions
by Lapidem, Mascini or VR Capital and nor was his consent as a director sought.
Formal agreements memorializing this post-acquisition funding were created in 2016.

40.     Lynch was not required to and has not provided any funding, advances or
other credit directly to Kirwan.  In August 2014, Lynch presented certain requests for
reimbursement of purported expenses to the Kirwan board of directors of $92,506.76

13

(Stipulation Exhibit 40/1).  The list of expenses is Stipulation Exhibit 40/2.  The Board

of Kirwan considered the issue in a meeting on September 22, 2014 and voted not to

approve Lynch's request.  Two directors expressed the view at the Board meeting that

there was no proof of the expenses and they were not presented in a timely manner,

which Lynch disputed.

## Yukos Finance Litigation in the Netherlands

### The October 31, 2007 Ruling

41.    On October 31, 2007, the Amsterdam District Court ruled in favor of the

former international legal counsel and Chief Financial Officer at Yukos Oil, Godfrey,

and Misamore, in a lawsuit contending that the Yukos Oil Russian bankruptcy receiver

lacked the authority to remove them as directors (the "**October 31, 2007 Ruling**").  This

decision called PNS's purchase of Yukos Finance into question, as it found that on the

basis of Dutch public order the effects of Yukos Oil's bankruptcy, including the powers

of the bankruptcy receiver, could not be recognized in the Netherlands.  Following this

decision, Godfrey and Misamore were reinstated in the corporate registry of Yukos

Finance as its directors, from which they previously had been removed in favor of the

receiver's appointees.  Following a motion by PNS and Yukos Finance (as represented

by Reid and Lynch), the Amsterdam District Court also ordered that a note be placed in

the registry stating that the directorships of Yukos Finance were disputed, in that Reid

and Lynch also claimed to be the directors in lieu of Godfrey and Misamore.

42.    Following the October 31, 2007 Ruling, the Yukos Foundation board

(whose members included Godfrey, Misamore and a representative of GML) did not

14

230

sign the settlement agreement. The Yukos Foundation is a Dutch law trust (known as a stichting) controlled by the former Yukos Oil management which controls Yukos Finance's subsidiary, Yukos International UK B.V. ("**Yukos International**"), into which subsidiary (and subsidiaries thereof) the former Yukos Oil management had transferred Yukos Finance's assets in a restructuring in 2005. A settlement agreement was being negotiated among the Kirwan consortium, GML and Rosneft in the weeks following the Yukos Finance auction in accordance with the discussions prior to the auction, but a settlement ultimately was not concluded. As a result of the October 31, 2007 Ruling, the Kirwan consortium was drawn into what has become years of litigation over the ownership of Yukos Finance.

43.    Yukos Finance (as represented by Reid and Lynch) and PNS joined as interested parties in the Russian bankruptcy receiver's appeal of the October 31, 2007 Ruling. Costs and expenses of the intervening parties were, and continue to be, paid solely by Kirwan on behalf of PNS. In 2010, the Amsterdam Court of Appeals ruled against PNS on this appeal. The Court of Appeals held, on the basis of territoriality, that no actions of a Russian bankruptcy receiver could be recognized in the Netherlands, and therefore PNS had never validly purchased Yukos Finance. The Amsterdam Court of Appeals made no finding on the District Court's October 31, 2007 Ruling on Dutch public order.

44.    PNS appealed the Amsterdam Court of Appeals' decision to the Dutch Supreme Court. In September 2013, the Dutch Supreme Court reversed the Court of Appeals' decision, finding that private international law provided no bar to the

15

231

Case 1:17-cv-04339-CM   Document 13-2   Filed 07/12/17   Page 14 of 77

recognition of the acts of a Russian receiver in the Netherlands.  The matter was
remanded to the Court of Appeals so alternate grounds advanced by Messrs. Godfrey
and Misamore could be considered.  The appeal of the October 31, 2007 Ruling is
scheduled to be heard on November 28, 2016. The Court of Appeals has not scheduled a
date for issuance of a decision.  All parties to the case have an automatic right of appeal
of the Court of Appeals' decision to the Dutch Supreme Court.

*Glendale Litigation*

45.    On August 10 and 14, 2007, Yukos Capital S.A.R.L. ("**Yukos Capital**"), a
subsidiary of Yukos Finance, and Glendale Group Ltd. ("**Glendale**") respectively filed
conservatory attachments over the shares of Yukos Finance in an amount of
approximately $3 billion (the "**Glendale Litigation**").  The attachments were based on
loans allegedly made by Yukos Capital to Yukos Oil and promissory notes allegedly
issued by Yukos Oil and subsequently endorsed to Glendale prior to its bankruptcy that
were not recognized in the Russian bankruptcy.  Yukos Capital and Glendale are
controlled by Godfrey and Misamore.  The asserted value of the Glendale Litigation
exceeds the value of Yukos Finance's assets.  The Kirwan consortium learned of the
existence of these actions only after PNS had prevailed at the Yukos Finance auction.

46.    In 2008, Yukos Capital and Glendale sought to convert the attachments of
Yukos Finance shares to "executory status" and require a court-ordered auction of the
Yukos Finance shares, with all proceeds going to satisfy the $3 billion Yukos Capital
and Glendale claims.

16

47.     In January 2009, PNS filed a motion to join the Glendale Litigation as an interested party.  PNS filed defenses on procedural grounds which were rejected in 2012 by the Amsterdam District Court.  In early 2013, PNS appealed the Amsterdam District Court's decisions, which appeals were rejected by the Court of Appeals in 2014.  PNS appealed the Court of Appeals' decisions to the Dutch Supreme Court, which appeal was rejected on November 13, 2015.  PNS sought reconsideration, which also was rejected.

48.     The Glendale Litigation is currently proceeding on the merits before the Amsterdam District Court. ██████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

*Freezing Order Litigation*

49.     PNS's litigation adversaries also brought an action in the Dutch courts through Yukos Finance's subsidiary, Yukos International, claiming damages (in the amount of up to $333 million) against PNS, Rosneft and Lynch for the harm allegedly suffered by Yukos International as a result of a freezing order over Yukos International assets which was subsequently vacated, as discussed below (the "**Freezing Order Liability Litigation**," and together with the October 31, 2007 Ruling and the Glendale Litigation, the "**Yukos Finance Litigation**").

50.     The freezing order in question was obtained by PNS and Rosneft in March 2008 and restrained Yukos International and its directors (Godfrey and Misamore) from distributing funds from Yukos International's bank account until the issue of ownership

17

of the Yukos Finance shares (and therefore the ownership of Yukos International) was resolved. In 2011, the Dutch Supreme Court concluded that because of the October 31, 2007 Ruling, the freezing order should not have been granted. The Supreme Court therefore overturned the District and Appeals Courts' decisions granting the injunctive relief.

51. Yukos International subsequently sued PNS, Rosneft, and Lynch for the damage it allegedly incurred complying with the freezing order. On February 11, 2015, the District Court of Amsterdam held that PNS was liable in principle for damages but rejected the amount sought ($333 million) by Yukos International. Instead, the court held that the amount of compensation to be awarded to Yukos International shall be determined in damage assessment proceedings. All claims against Lynch were rejected. PNS has appealed the District Court's decision and Yukos International cross-appealed in regards to the dismissal of Lynch's liability. The case is now with the Court of Appeals.

*Other Litigation*

52. In 2007, Akin Gump represented VR Capital, Renaissance Capital, Deitz, Lynch and Robert Foresman (of Renaissance Capital) in section 1782 discovery proceedings brought by Godfrey & Misamore in the Southern District of New York (the **"2007 Section 1782 Proceedings"**). The *ex parte* petition, document requests and memorandum of law are Stipulation Exhibits 52/1, 52/2 and 52/3 respectively. Judge Rakoff quashed Godfrey & Misamore's subpoenas in a decision dated November 30, 2007 (Stipulation Exhibit 52/4). Lynch was aware of Akin Gump's representation of

18

him and other respondents in these proceedings and has never objected to Kirwan's
payment of the defense of the 2007 Section 1782 Proceedings.

     53.     On October 5, 2015, Godfrey and others filed an *ex parte* petition in the
Southern District of New York seeking discovery from Jeffrey Johnson, Deitz, and
VRCG (the "**2015 Section 1782 Proceedings**"). The petition, document requests and
memorandum of law are Stipulation Exhibits 53/1, 53/2 and 53/3 respectively. Akin
Gump represents Deitz, Jeffrey Johnson (a director and COO of VRCG), and VRCG in
the 2015 Section 1782 Proceedings. Lynch was not informed by Lapidem, Mascini,
VRCG, Deitz or Johnson of, and did not approve, the 2015 Akin Gump engagement
letter.

     54.     [REDACTED]

55.    At present, PNS does not have control of Yukos Finance or its assets.
Instead, PNS's litigation adversaries have control of Yukos Finance's assets and are
believed to be using those assets to fund the ongoing litigation with PNS.

**Kirwan's Financial Statements**

56.    On March 25, 2011, a general meeting of the shareholders of Kirwan was
held.  At that meeting, Mascini, Lapidem, and Lynch (acting through their proxies)
voted their shares unanimously to approve the annual accounts for the accounting
years ended December 21, 2007, December 31, 2008, and December 31, 2009 and for
Kirwan to continue its activity despite its losses (Stipulation Exhibit 56/1).

57.    On November 14, 2011, a general meeting of the shareholders of Kirwan
was held.  At that meeting, Mascini, Lapidem, and Lynch (acting through their proxies)
voted their shares unanimously to approve the annual accounts for the accounting year
ended December 31, 2010 and for Kirwan to continue its activity despite its losses
(Stipulation Exhibit 57/1).

58.    On May 21, 2013, a general meeting of the shareholders of Kirwan was
held.  At that meeting, Mascini, Lapidem, and Lynch (acting through their proxies)
voted their shares unanimously to approve the annual accounts for the accounting year
ended December 31, 2011 and for Kirwan to continue its activity despite its losses
(Stipulation Exhibit 58/1).

59.    All of the Kirwan annual accounts referred to above record the funds
provided to Kirwan by Lapidem and Mascini as loans.

20

60.     Despite Lynch's request in April 2014, Kirwan's board has not prepared annual accounts for any year after 2011.  A transcript of a portion of the Board meeting of February 11, 2015 relating to the preparation of accounts is Stipulation Exhibit 60/1. Board meetings were not recorded or transcribed and Lynch did not inform any of the board members that the meeting was being recorded.

**Professional Representation**

*Houthoff Buruma*

61.     Houthoff Buruma ("Houthoff") represents PNS and Yukos Finance (as represented by Lynch and Reid) in the Dutch Yukos Finance Litigation.  Houthoff also represents PNS and Lynch in the Freezing Order Liability Litigation.  Houthoff has been issuing its invoices in PNS's name for all of these representations.  ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮

Kirwan has paid Houthoff Buruma's invoices directly from funds provided exclusively by Lapidem and Mascini.  At present, over ▮▮▮ is owed to Houthoff Buruma in connection with its efforts on behalf of PNS.

*Clifford Chance*

62.     Clifford Chance also represents PNS, Lynch and Yukos Finance (as represented by Lynch and Reid) in the Dutch Yukos Finance Litigation and Deitz in the U.K. Proceedings.  ▮▮▮▮

▮▮▮▮▮▮

▮▮▮

21

63.     On March 11, 2016, Clifford Chance issued an invoice for services rendered in the amount of €178,383.44 (Stipulation Exhibit 63/1).  On March 14, 2016, Kirwan part-paid this invoice in the amount of €27,700.  At present, over ████████ is owed to Clifford Chance in connection with its efforts on behalf of PNS.

*Akin Gump*

64.     Emile du Toit, a director of Kirwan, executed an engagement letter dated October 13, 2015 with Akin Gump (Stipulation Exhibit 64/1) in connection with the Section 1782 Proceedings commenced by Godfrey.  Mr. du Toit alone signed the engagement letter on behalf of Kirwan.  There is no Kirwan board or shareholder resolution approving the Akin engagement, and there was no Kirwan board or shareholder meeting to consider the Akin engagement.

65.     In a letter dated January 12, 2016 directed to Emile du Toit of Kirwan, Akin Gump requested a retainer of $150,000 (Stipulation Exhibit 65/1).  On January 19, 2016, $150,000 was wired to Akin Gump by Kirwan in response to the request for a retainer.[3]

66.     Akin Gump issued an invoice to Kirwan for services rendered dated November 4, 2015 in the amount of $90,037.30.

67.     Akin Gump issued an invoice to Kirwan for services rendered dated November 24, 2015 in the amount of ████████ and reflecting a total balance of

---

[3] *See* extract from Kirwan USD bank account with Banque Internationale à Luxembourg (Stipulation Exhibit 65/2).

22

███████ This invoice (including the prior balance of ███████ due under the November 4 invoice) was paid by Kirwan on December 30, 2015.[4]

68.   Akin Gump issued an invoice to Kirwan for services rendered dated January 12, 2016 in the amount of ███████ This invoice (along with the retainer of $150,000) was paid by Kirwan on January 19, 2016.[5]

69.   Akin Gump issued an invoice to Kirwan for services rendered dated February 11, 2016 in the amount of $100,683.77 (Stipulation Exhibit 69/1).  This invoice has not been paid.

70.   Akin Gump issued an invoice to Kirwan for services rendered dated March 7, 2016 in the amount of $61,093.49 and reflecting a total balance of $161,777.26 (Stipulation Exhibit 70/1).  This invoice has not been paid.

71.   On March 12, 2016, Sina Toussi, an employee of VRASL USA, requested that Akin Gump issue an invoice for all unbilled amounts.  Akin Gump issued an invoice to Kirwan for services rendered dated March 14, 2016 in the amount of $12,753 and reflecting a total balance of $174,530.26 (Stipulation Exhibit 71/1).  This invoice has not been paid.

72.   Kirwan has not disputed the Akin Gump invoices.  Nor has it passed a resolution approving the invoices.

73.   Akin Gump has not applied its retainer against any of the invoices it issued to Kirwan.

---

[4] *See* extract from Kirwan USD bank account with Banque Internationale à Luxembourg (Stipulation Exhibit 67/1).
[5] *See* extract from Kirwan USD bank account with Banque Internationale à Luxembourg (Stipulation Exhibit 65/2).

74.    On April 25, 2016, Lynch sent a letter to Robert Pees of Akin Gump (Stipulation Exhibit 74/1). Akin Gump responded to Lynch in a letter dated April 29, 2016 (Stipulation Exhibit 74/2). On May 5, 2016 Lynch sent another letter to Robert Pees of Akin Gump (Stipulation Exhibit 74/3) in reply to his April 29, 2016 letter.

75.    Before the Petition Date, invoices for the representation of Johnson, Deitz and VR Capital in connection with the 2015 Section 1782 Proceedings were not provided to Lynch by Lapidem, Mascini or VR Capital.

*Mandel Bhandari*

76.    On November 6, 2015, du Toit executed a Settlement, Cooperation, and Retainer Agreement, dated November 6, 2015, with Daniel Feldman, a former director and officer of companies controlled by the Yukos Foundation which purports to represent the former Yukos Oil shareholders in the Yukos Finance Litigation (Stipulation Exhibit 76/1). Du Toit alone signed the agreement on behalf of Kirwan. There is no Kirwan board or shareholder resolution approving the Agreement, and there was no Kirwan board or shareholder meeting to consider the Agreement. Lynch was not informed by Lapidem, Mascini or VR Capital of, and did not and does not approve, the Agreement.

77.    Pursuant to the terms of the Settlement, Cooperation, and Retainer Agreement, on November 13, $100,000 was wired to Mandel Bhandari LLP ("**Mandel Bhandari**") from Kirwan as a retainer. Mandel Bhandari issued an invoice in the amount of ███████ on January 15, 2016 for services rendered. This invoice was paid by Kirwan on February 12, 2016. This invoice was not provided to Lynch before the

24

Petition Date. Kirwan has not disputed the Mandel Bhandari invoice. Nor has it passed a resolution approving the invoice or the retainer payment.[6]

*Amicorp*

78.    Kirwan's corporate services provider, Amicorp Luxembourg S.A. ("**Amicorp**"), currently has outstanding invoices totaling approximately €25,000.[7] These invoices have not been provided to Lynch by Lapidem, Mascini or VR Capital.

**Kirwan Finances**

79.    On March 14, 2016, Kirwan had the following opening balances in its bank accounts:

a.    -€527.76 in its EUR account with the Bank of Cyprus (Stipulation Exhibit 79/1);

b.    RUB 1,119.74 in its RUB account with the Bank of Cyprus (Stipulation Exhibit 79/2);

c.    $20.83 in its USD account with the Bank of Cyprus (Stipulation Exhibit 79/3);

d.    €0.00 in its EUR account with Banque Internationale à Luxembourg ("**BIL**") (Stipulation Exhibit 79/4); and

e.    $31,286.60 in its USD account with BIL (Stipulation Exhibit 79/5).

80.    As noted above, on the same date Kirwan paid €27,700 to Clifford Chance in part payment of its invoice dated March 11, 2016 in the amount of €178,383.44. The

---

[6] Nothing in this Stipulation is a waiver by Lynch of any objection to the validity of the engagement of Akin Gump or Mandel Bhandari by Kirwan.
[7] Stipulation Exhibits 78/1 and 78/2.

payment was made out of Kirwan's USD bank account with BIL. Including bank fees and other charges, this payment reduced Kirwan's balance in this bank account by $31,060.89, resulting in a new balance of $225.71.[8]

81.    The new balance of Kirwan's USD account with BIL combined with the balances in its other bank accounts identified above resulted in a negative net balance (converted into USD) of -$325.70 on March 14, 2016.

82.    As also noted above, and also on March 14, 2016, Akin Gump issued an invoice to Kirwan for services rendered in the amount of $12,753 and reflecting a total balance of $174,530.26. As of the Petition Date, Akin Gump held and currently still holds a retainer from Kirwan in the amount of $150,000.

83.    As of March 14, 2016, Kirwan had insufficient funds to pay either the €150,683.44 still outstanding under the Clifford Chance invoice dated March 11, 2016 or the $174,530.26 outstanding under the Akin Gump invoices of February 11, March 7 and March 14, 2016.

84.    Lapidem and Mascini did not demand repayment of any of their advances to Kirwan before March 15, 2016. On that date, Lapidem and Mascini formally declared an insolvency event and demanded repayment of the funds they had provided to Kirwan (Stipulation Exhibit 84/1). Later that same day, Mascini and Lapidem filed the petition commencing this case.

---

[8] See extract from Kirwan USD bank account with Banque Internationale à Luxembourg (Stipulation Exhibit 79/5).

85.    Prior to March 15, 2016, Lapidem and Mascini had stopped funding Kirwan.  As at March 15, 2016, Lapidem and Mascini refused to grant Kirwan additional time in which to repay the funds provided to it by them.  Kirwan has never sought or considered financing from any source other than Lapidem and Mascini.  As of and before the Petition Date, Kirwan had no credit available from alternative sources.

86.    In the course of the 2015 arbitration proceedings described below, on March 17, 2015, Lapidem, Mascini, VRGP and Kirwan's counsel, Dechert LLP ("**Dechert**"), wrote to Lynch's counsel at the time, McGuireWoods LLP ("**McGuireWoods**"), regarding payment of PNS's legal fees and alternative sources of funding for PNS and Kirwan (Stipulation Exhibit 86/1).  McGuireWoods responded to Dechert on March 20, 2015 (Stipulation Exhibit 86/2).

87.    On April 20, 2016, Lynch's Luxembourg counsel, Jean Brucher, sent a letter to Kirwan requesting information and documents relating to Kirwan's insolvency (Stipulation Exhibit 87/1).

**Disputes among Lapidem, Mascini, and Lynch**

88.    Since 2010, Lynch has been the PNS General Director and before that, an associate of his was the PNS General Director.

89.    On September 3, 2014, Lynch began an arbitration at the London Court of International Arbitration (the "LCIA"), seeking injunctive relief on the ground that changes to the corporate governance structure of PNS proposed by the Kirwan Class A and Class B directors would violate the SHA and an action in the Commercial Court in London for interim injunctive relief.

27

90.     In September 2014, amendments to the Russian LLC law and the Russian
Civil Code authorized an LLC's charter to empower several persons, acting jointly or
independently, to act for the LLC and authorized LLC participants to provide in the
LLC's charter for a second sole executive body, which may act independently of the
initial sole executive body.

91.     In October 2014, Kirwan's Class A and Class B directors proposed
amendments to the PNS charter, to be voted on at a Kirwan board meeting November 5,
2014, to create a second sole executive authority, but did not discuss these amendments
with Lynch.

92.     The parties entered into a Consent Order, dated September 18, 2014,
under which both the arbitration and the action were stayed on certain terms, including
that the proposed board resolution approving the proposed amendments to the PNS
charter would not be voted on (Stipulation Exhibit 92/1 (under seal)).

93.     After unsuccessful discussions between VR Capital and Lynch, Kirwan's
board approved a different revised PNS charter in November 2014, and Kirwan, as the
sole participant in PNS, approved the revised PNS charter in December 2014.

94.     Lynch refused to implement and register the revised PNS charter,
claiming it breached Russian law and the SHA, contending that management of PNS
cannot be delegated to anyone but the General Director of PNS.

95.     Kirwan's Class A and Class B directors then proposed further changes to
the revised PNS charter to address the Russian law issues Lynch identified and

28

proposed to approve such revised PNS charter at a February 11, 2015 Kirwan board meeting.

96.    On January 30, 2015, Lynch sought to revive the stayed arbitration, serving an Amended Request for Arbitration, including a request for an injunction and for the expedited formation of the tribunal.

97.    The respondents in the arbitration, Lapidem, Mascini, VRGP and Kirwan, agreed to expedited arbitration.

98.    On July 13, 2015, the arbitrator issued a Final Award (Stipulation Exhibit 98/1).  On August 13, 2015, the respondents filed a request for the correction of the Final Award with the LCIA.  Following submissions by both sides, on September 7, 2015, the arbitrator declined to accede to the application contained in the respondents' request for correction.

99.    In March 2010, Lynch amended the version of the PNS charter that was executed contemporaneously with the SHA in August 2007 (the **"2007 PNS Charter"**) without any authorization from Kirwan to do so.  Lynch sent an email dated June 9, 2010 to Deitz and Reid regarding the PNS Charter (Stipulation Exhibit 99/1).  Lynch did not otherwise inform Kirwan's board of directors, and did not obtain the Kirwan board of directors' approval, of the amendment.  The 2010 version of the PNS Charter is Stipulation Exhibits 99/2 and 99/3.  During the course of the merits hearing in the LCIA arbitration, Lynch attributed the amendment to a "back office error" at his company, Monte-Valle.  In July 2015, Kirwan amended the PNS charter (the **"2015 PNS Charter"**) (Stipulation Exhibit 99/4).  After the registration of the 2015 PNS Charter on

29

July 30, 2015, Lynch and Deitz exchanged a number of emails between themselves and other members of the board of directors of Kirwan and with Dutch counsel of PNS regarding Kirwan and PNS corporate governance issues, including the management of the Dutch Yukos Litigation (Stipulation Exhibits 99/5 and 99/6).

100.    On September 1, 2015, Kirwan's Class A and Class B directors adopted shareholder resolutions.  Lynch objected to these resolutions and negotiations ensued.

101.    On October 21, 2015, Sina Toussi sent an email to Lynch regarding the resolutions (Stipulation Exhibit 101/1).  Email correspondence ensued. Lynch sent a draft arbitration request dated November 2, 2015 to Lapidem, Mascini, Kirwan and VRGP.  On November 6, 2015, Lapidem, Mascini, and Kirwan withdrew the September 1, 2015 resolutions and the power of attorney (Stipulation Exhibits 101/2-101/13).

**Settlement Discussions**

102.    In late 2014 and early 2015, discussions involving a third-party intermediary to settle the Yukos Finance Litigation took place (Stipulation Exhibits 102/1 and 102/2).

103.    On June 26, 2015, Godfrey sent an email (Stipulation Exhibit 103/1) to Deitz containing proposed terms of settlement (Stipulation Exhibit 103/2) and a draft settlement agreement.  Lynch requested a copy of the draft settlement agreement, but Deitz declined to provide it.  Deitz participated in the discussions which culminated in the settlement proposal being received from Godfrey on June 26, 2015 without consulting or informing Lynch.

104.    Deitz rejected the June 26, 2015 settlement proposal by email to Godfrey dated July 1, 2015 (Stipulation Exhibit 104/1).  Godfrey replied to Deitz on July 2, 2015 (Stipulation Exhibit 104/1).  On July 3, 2015 Deitz replied to Godfrey (Stipulation Exhibit 104/1).  Godfrey replied on July 10, 2015 (Stipulation Exhibit 104/1).  On August 14, 2015, Lynch met with Eric Wolf ("**Wolf**"), a representative of GML, and expressed his opinion that a settlement of the Yukos Finance Litigation had to be approved by the Shareholders of Kirwan and that only the general director of PNS could validly represent PNS in settlement negotiations or bind it to a settlement.  On August 21, 2015, Lynch sent Deitz an email regarding his earlier discussion with Wolf, to which Deitz responded the same day (Stipulation Exhibit 104/2).

105.    On August 28, 2015, Lynch advised Deitz by email of a forthcoming meeting with Yukos representatives the following week (Stipulation Exhibit 105/1).  Deitz replied to Lynch's email on August 28 and 29 (Stipulation Exhibit 105/1).  On August 31, 2015, Lynch met with Wolf and then advised Deitz by telephone of the contents of his meeting with Wolf.

106.    In an October 30, 2015 email, Lynch informed Deitz that he had had a phone conversation with Godfrey in which they had agreed to touch base after the latest ruling in the Glendale Litigation in the Netherlands due in November (Stipulation Exhibit 106/1).

107.    On November 2, 2015, Lynch sent a letter to a number of Yukos Oil representatives and their lawyers regarding PNS's corporate authorities and directing

31

the recipients to discuss a settlement of litigation involving PNS only with its general

director Lynch (Stipulation Exhibit 107/1).

108.    On November 7 and 17, 2015 Lynch advised Deitz by email of a meeting

with Godfrey on November 24, 2015 and suggested that Lynch and Deitz have a

meeting beforehand (Stipulation Exhibits 108/1 & 108/2).  When Deitz attempted to

restrain Lynch from having such discussions, Lynch rejected Deitz's or VR Capital's

right to interfere in any way with the general director's right to represent PNS.

109.    On November 24, 2015, Lynch met with Godfrey in Singapore.  Lynch has

never provided a written record of the discussions.  Lynch called Deitz during the

meeting and advised him of the matters being discussed.  When Deitz and Lynch could

not agree on strategy, Lynch ended the meeting.  Later that day, Deitz asked Lynch via

email if he had had a second meeting with Godfrey (Stipulation Exhibit 109/1).  Lynch

responded on November 25, 2015 that he had not (Stipulation Exhibit 109/1).

110.    On December 16, 2015 Lynch had a telephone conversation with Wolf.

Lynch's description of the conversation in an email to the members of Kirwan's board

on December 17, 2015 is Stipulation Exhibit 110/1.

111.    On December 18, 2015, Godfrey made a new offer to Deitz to settle finally

and fully all litigation relating to Yukos Finance for $60 million.  Lynch was copied on

the email containing the settlement offer.

112.    On December 21, 2015, Deitz contacted Lynch about the settlement

proposal and suggested calling a Kirwan board of directors meeting (Stipulation Exhibit

112/1).  Lynch responded on the same date (Stipulation Exhibit 112/1).

32

113.   A second set of settlement talks occurred in late 2015 and in the first quarter of 2016. Deitz discussed settlement with Wolf, purportedly reaching an agreement on a settlement amount of $137.5 million.

114.   Deitz undertook the second settlement efforts and meeting with Godfrey without consulting or informing Lynch.

115.   In late 2015 and early 2016, Lynch and Deitz communicated by telephone and email about settlement talks (emails attached as Stipulation Exhibits 104/2, 105/1, 106/1, 108/1, 108/2, 109/1, 110/1, 112/1, 115/1-115/4).

116.   On January 30, 2016, Wolf contacted Lynch and asked Lynch what would be his settlement number if Yukos were to settle with Lynch and Deitz separately. On February 3, 2016, without consulting Deitz or the Kirwan board, Lynch replied to Wolf that subject to the prior consent of Kirwan's shareholders he would agree to a settlement in which he as C Shareholder received $35 million.

117.   On March 4, 2016, Lynch wrote to Mascini, Lapidem, Kirwan, and VRGP (Stipulation Exhibit 117/1). The same day, Lynch sent a separate letter to GML and Wolf (Stipulation Exhibit 117/2). Lynch's letter to GML and Wolf was sent without consulting Deitz or seeking authorization from Kirwan.

118.   On March 9 and 15, 2016, Lynch received emails from Mr. Olaitan Senbanjo, Class B Director of Kirwan and Deputy General Counsel of VR Advisory Services Ltd., the general partner of VRGP, with attachments, in response to Lynch's March 4, 2016 letter (the emails and attachments are Stipulation Exhibits 118/1 and 118/2).

33

**The Filing of the Involuntary Bankruptcy Petition**

119.    Petitioners filed this chapter 11 bankruptcy case to enable them to
implement a resolution of the dispute over the Yukos Finance shares.

**Kirwan Board Meetings and Decision-making**

120.    The board of directors of Kirwan has not met since June 30, 2015. Prior to
that, the board met and passed resolutions twice in 2015 and twice in 2014.  The board
passed circular resolutions four times in 2010 and once in 2007.  Some Kirwan decisions
were made by phone calls among some or all of the Kirwan directors without formal
board action.[9]

*(Signature page follows.)*

---

[9] Nothing in this Stipulation is a waiver by Lynch of his objection to the validity of any action taken
without board approval.

34

Dated:      New York, New York
            November 16, 2016

By: _____

JENNER & BLOCK LLP
Richard Levin
Stephen L. Ascher
919 3rd Avenue
New York, NY 10022
Telephone: (212) 891-1600
rlevin@jenner.com
sascher@jenner.com

*Attorneys for Stephen Lynch*

Dated:      New York, New York
            November 16, 2016

By: _____

SKADDEN, ARPS, SLATE, MEAGHER
& FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000
Jay.Goffman@skadden.com
Mark.Mcdermott@skadden.com
Suzanne.Lovett@skadden.com

*Attorneys for Petitioners*

35

251

# SHARE PURCHASE AGREEMENT

encumbered with the Admitted Dutch Creditors Attachments

Between

Mr E.K. Rebgun in his capacity as court appointed bankruptcy receiver of
**OAO Yukos Oil Company**

as Seller

and

**Limited Liability Company "Promneftstroy"**

as Purchaser

**Relating to**

the sale and purchase of the Shares together with the Rights pursuant to
the Auction

1

## Table of contents

| | | |
|---|---|---|
| 1. | Definitions | 5 |
| 2. | Sale. Purchase, Payment and Transfer | 13 |
| 3. | No Warranties by Seller | 14 |
| 4. | No assumption of Obligations | 15 |
| 5. | Up streaming of Dividends and the Attachments | 15 |
| 6. | Costs | 16 |
| 7. | Waiver of dissolution and annulment | 16 |
| 8. | Term and Termination | 16 |
| 9. | Third parties | 17 |
| 10. | Assignment | 17 |
| 11. | Exclusion | 17 |
| 12. | Partial Invalidity | 17 |
| 13. | Dutch Notary involvement | 18 |
| 14. | Indemnification | 18 |
| 15. | Language | 18 |
| 16. | Notices | 18 |
| 17. | Governing law and Jurisdiction | 19 |

2

**THIS AGREEMENT** is dated august 20, 2007 and made

<u>BETWEEN:</u>

1. **Mr E.K. REBGUN** in his capacity as court appointed bankruptcy receiver of **OAO YUKOS OIL COMPANY**, a company in the Receivership Proceedings, incorporated under the laws of the Russian Federation, having its registered office in Moscow, the Russian Federation, and

2. **Limited Liability Company "Promneftstroy"**, a company incorporated under the laws of the Russian Federation and having its registered office in Moscow and its office address at 19 Malaya Kaluzhskaya Street, Bldg. 1, Moscow, 117071, registered at the Unified State Register of Legal Entities of Moscow Interdistrict Inspectorate No. 46 of the Federal Tax Service under Main State Registration Number 5077746429701, represented by Mr VITALY ELISEEV, its General Director acting on the basis of the company's Charter.

<u>WHEREAS:</u>

(A)    On 28 March 2006 the Arbitrazh Court opened a bankruptcy case of Yukos. Subsequently, on 1 August 2006 the Arbitrazh Court declared Yukos' bankruptcy and opened Receivership Proceedings, whereby the powers of Yukos' management (in any event in relation to the matters subject of this Agreement) were terminated and the Receiver was appointed;

(B)    Yukos is registered as the legal title holder of the Shares. No depository receipts are issued;

(C)    On and after 26 April 2005 the Banks have made a conservatory attachment (*conservatoir beslag*) on the Shares to secure the Banks' Claim. This conservatory attachment on the Shares is by operation of applicable Dutch law converted into an executory attachment (*executorial beslag*) on 1 July 2005. Subsequently, on 15 July 2005 the Banks requested the Amsterdam Court to determine the terms and conditions and manner of an executory sale of the Shares pursuant to section 474g of the DCCP, which request is pending before the Amsterdam Court under court docket reference HA RK 05/568;

(D)    The Banks have subsequently sold and transferred the Banks' Claim and related claim rights to Rosneft;

(E)    On 20 April 2005 Moravel made a conservatory attachment (*conservatoir beslag*) on the Shares to secure the Moravel Claim, which by operation of Dutch law was converted into an executory attachment after Moravel obtained leave by the Amsterdam Court to enforce the Moravel Claim. Subsequently, pursuant to section 474g of the DCCP Moravel requested the Amsterdam Court to determine the terms and conditions and manner of an executory sale of the Shares, which request is pending before the Amsterdam Court under court docket reference HA RK 06/0018.

(F)    On 15 September 2005, a third (alleged) creditor of Yukos, YNG, made a conservatory attachment (*conservatoir beslag*) on the Shares to secure the YNG Claim. Subsequently, YNG merged into Rosneft and consequently Rosneft prosecutes the YNG claim before the Amsterdam Court (to the extent still necessary). A Dutch notarial deed of acknowledgement was executed on 8 May 2007 whereby Yukos acknowledged the YNG Claim up to an amount of sixty-two billion three hundred and fifty-nine million six hundred and four thousand nine hundred and five Rubles and ninety-two hundredths

3

(62,359,604,905.92) with interest amounting to twelve billion seven hundred and ninety-six million one hundred and sixty-nine thousand four hundred forty Rubles and forty-four hundredths (12,796,169,440.44) and by which notarial deed Rosneft to that extent has obtained an enforceable title which has enabled it to make an executory attachment on the Shares in May 2007.

(G)   Furthermore on or about 7 October 2005 YNG made a conservatory attachment on the Yukos International Shares and on the Depository Receipts to secure a claim for damages that would occur if and to the extent that the YNG Claim would remain unpaid;

(H)   On or after 19 April 2005 Yukos Finance transferred all of its transferable assets to Yukos International as a capital contribution in exchange for a share premium and simultaneously it transferred the Yukos International Shares to Stichting AK in exchange for the Depository Receipts; this transfer gave rise to a claim for damages by Rosneft (as successor to YNG) in relation to which claims Rosneft (YNG) made conservatory attachments on the Yukos International Shares and on the Depositary Receipts.

(I)   Litigation between the Former Management vis-à-vis the Receiver and the Management as regards the validity of the dismissal of the Former Management and consequently whether the Management actually became the legal representatives of Yukos Finance, is pending as of the Effective Date. It is argued by the Former Management that the Receivership Proceedings do not take effect in the Netherlands, or at least that the Receivership Proceedings should be denied any effect in the Netherlands.

(J)   Currently Yukos Finance is involved in litigation in the Netherlands in the following matters:

| Case | Parties | | Cause-list number and Court |
|---|---|---|---|
| 474g-proceedings | E.K. Rebgun | OAO Yukos Oil Company, Yukos Finance B.V., STAK Yukos International, Yukos Investment Ltd., OAO Rosneft, OAO Yuganskneftegaz | 05/568, 06/18 and 06/696 <br><br> Amsterdam Court |
| Ordinary proceeding (bodemprocedure) | E.K. Rebgun q.q., L.J Hogerbrugge S.S., Shmelkov | Former Management Yukos Finance B.V. | 06/3612 <br><br> Amsterdam Court |
| Appeal of Court decision of 21 September 2006 against NautaDutilh summary proceedings (kort geding) | E.K. Rebgun, Yukos Finance B.v | NautaDutilh N.V., Van Galen, Strik, Itallaner <br><br> and joined parties, Yukos Finance B.V., Yukos International UK B.V., Godfrey and Misamore | 07/168 <br><br> Court of Appeal in Amsterdam |
| Appeal of Court decision of 17 November 2006 <br><br> summary proceedings | Yukos Finance B.V. | TMF Management B.V <br><br> and joined parties, Former Management Yukos International UK, Yukos Finance B.V | 06/1928 <br><br> Court of Appeal in Amsterdam |
| Ordinary proceedings request pending for joining with proceedings 06/3612 | Yukos Finance B.V. (Hogerbrugge and Shmelkov) | Former Management Yukos Finance B.V. | 07/739 <br><br> Amsterdam Court |

4

255

It should be noted that on 24 May 2007 the Court of Appeal rendered a decision on an appeal in summary proceedings (*kort geding*) on the matter that is the subject of the ordinary proceeding 06/3612. The appellants (Former Management and Yukos Finance allegedly represented by Former Management) may file an appeal with the Supreme Court of the Netherlands (*Hoge Raad*).

(K)   It should be noted that the Former Management continues to act as if they represent Yukos Finance, notwithstanding the fact that they were dismissed by a shareholder's resolution made by Yukos on 11 August 2006 and that in doing so they in the above cases allege that they (or counsel instructed by them) represent Yukos Finance.

(L)   Yukos Finance may have an obligation to indemnify Management against all claims made against them in relation to their conduct of business after 1 August 2006 and in relation to the aforementioned litigation.

(M)   The Management have filed unaudited statutory accounts of Yukos Finance for the year ended 2005 without having been allowed access to information that would have enabled them to review Yukos Finance's accounts.

(N)   Having regard to the applicable Receivership Proceedings and the Attachments Yukos has put the Yukos Finance Shares and the Rights up for sale by means of the Auction.

(O)   The Purchaser has made the highest bid at the Auction and by doing so has bound itself to execute this Agreement.

(P)   The Seller and the Purchaser recognise that as a matter of Dutch law the rights of the Admitted Dutch Creditors are not affected by the Auction, this Agreement and any transaction arising therefrom.

**HAVE AGREED AS FOLLOWS:**

1.    **Definitions**

1.1   In this Agreement including the headings the capitalised terms shall have the meaning as set out in this section:

| | | |
|---|---|---|
| Admitted Claims | : | each and every claim indebted by Yukos to the claimant concerned, consisting of principal and, if applicable, Interest, for which an Attachment has been made or will be made on the Shares and which has been or will eventually be declared admissible or which claim has been or will eventually be recognized in the distribution of the Executory Sale Proceeds either by an agreement made and which gives entitlement under section 480 (2) DCCP or by force of a judicial settlement (*rangregeling*) as meant in section 481 and any section thereafter in the DCCP. |
| Admitted Creditor | : | any party who holds an Admitted Claim; |
| Admitted Dutch Creditors Attachments | : | the Rosneft Attachment, the Moravel Attachment and the YNG Attachment severally as well as |

5

| | | |
|---|---|---|
| | | jointly; |
| Agreement | : | this agreement including the recitals and the Annexes; |
| Amsterdam Court | : | the District Court (*Rechtbank*) at Amsterdam, the Netherlands; |
| Annex | : | any annex to this Agreement; |
| Arbitrazh Court | : | the Arbitrazh Court of the City of Moscow (Арбитражный суд г. Москвы) in Moscow, RF; |
| Articles | : | the articles of incorporation of Purchaser; |
| Attachment Proceeds | : | the Executory Sales Proceeds and all other monies that have been and will be or must be paid to the Bailiff pursuant to, due to or in connection with the Attachments; |
| Attachments | : | the Admitted Dutch Creditors Attachments and any subsequent conservatory or executory attachment made in the Netherlands on the Shares by an Admitted Creditor prior to the Executory Sale; |
| Auction | : | The open sale procedure to sell the Shares conducted in accordance with the RF Law "On Insolvency (bankruptcy)" and with the Auction Terms; |
| Auction Terms | : | The terms and conditions that apply to the Auction as they have been approved by Yukos' creditors' committee on July 13, 2007, and have been published in No. 151 (4414) of the newspaper *Rossiyskaya Gazeta* on July 14, 2007; |
| Bailiff | : | the bailiff (*gerechtsdeurwaarder*), Mr. G. Hoogkamer of Nijstad & Toonen Gerechtsdeurwaarders in Amsterdam, the Netherlands, who has made the attachment pursuant to which the Executory Sale Proceedings have commenced or will commence that will result in the Executory Sale of the Shares, or his successor or any other bailiff to whom the Attachments Proceeds must be paid pursuant to the DCCP or to the Court Order; |
| Bailiff's Fees | : | any fees and disbursements that will be charged by the Bailiff in connection with the Executory Sale Proceedings; |
| Banks | : | BNP Paribas S.A., Citibank N.A., Commerzbank AG, Calyon S.A., Deutsche Bank AG, ING Bank N.V., Société Générale S.A., KBC Bank N.V., |

6

| | | |
|---|---|---|
| | | Bank Of Tokyo-Mitsubishi UFJ (Holland) N.V., Hillside Apax Fund Limited, Thames River Traditional Funds PLC, VR Global Partners LP, Shepherd Investments International Limited and Stark Trading; |
| Banks' Claim | : | a claim made by the Banks vis-à-vis Yukos for payment of a principal amount of US$ 472,887,663.10 plus accruing Interest and costs which has been assigned to Rosneft; |
| Compensation | : | A fixed amount that is equal to the amount of the Security Deposit and that cannot be reduced; |
| Completion Date | : | The 10th working day after the date that the Seller sends the Payment Confirmation; |
| Court Order | : | a court order issued by a Dutch court whereby the sale and means of a sale of the Shares is ordered pursuant to the Executory Sale Proceedings which order has become final (in the absence of an appeal or following an appeal proceeding before a Court of Appeal (Gerechtshof) or cassation proceeding before the High Court of Justice (Hoge Raad der Nederlanden), |
| DCC | : | the Dutch Civil Code (Burgerlijk Wetboek) as in force at the date of this Agreement; |
| DCCP | : | the Dutch Code of Civil Procedure (Wetboek van Burgerlijke Rechtsvordering) as in force at the date of the Deed of Transfer; |
| Deed of Transfer | : | the notarial deed of transfer of the Shares pursuant to this Agreement in the form as attached to this Agreement as Annex 1; |
| Depository Receipts | : | any and all depository receipts (certificaten van aandelen) that have been issued by Stichting AK in exchange for the Yukos International Shares; |
| Dividends | | (i) all dividends, interest or other income (including, without limitation, any share premium called) paid or payable in respect of the Shares, (ii) all stocks shares, rights, securities or other assets accruing or offered at any time (by way of redemption, bonus, preference, option rights, or otherwise) in respect of the Shares, (iii) all dividends, interest or other income in respect of any asset referred to under (ii), and (iv) all proceeds in respect of the Shares on the dissolution or liquidation of Yukos Finance; |

7

258

| | | |
|---|---|---|
| Dutch Notary | : | the civil-law notary (*notaris*) in the Netherlands before whom the parties will execute the Deed of Transfer; |
| Effective Date | : | the date of this Agreement; |
| Executory Sale | : | the executory sale and transfer of the Shares as a consequence of the Court Order; |
| Executory Sale Proceedings | : | the proceedings pursuant to section 474g DCCP, pending before the Amsterdam Court on the Effective Date under court docket references HA RK 05-0568 and HA RK 06-0018; and any similar proceedings commenced by an Admitted Creditor prior to an Executory Sale; |
| Executory Sale Proceeds | : | the proceeds of the sale of the Shares pursuant to the Executory Sale Proceedings including the Dividends that have become payable pending the Attachments; |
| Former Management | : | Mr. D.A. Godfrey and Mr. B. K. Misamore, dismissed as directors of Yukos Finance pursuant to a resolution of the general meeting of shareholders of Yukos Finance of 11 August 2006; |
| Interest | : | the agreed and/or statutory interest due on outstanding amounts of debt(s) of Yukos to the claimant concerned and vice versa, up to the Effective Date; |
| Management | : | Mr. S.S. Shmelkov and Mr. L.J. Hogerbrugge in their capacity of directors of Yukos Finance, as appointed by a resolution of the meeting of shareholders of Yukos Finance on 14 August 2006 and 30 August 2006 respectively; |
| Moravel | : | Moravel Investments Limited, a company incorporated under the laws of Cyprus and having its office at Limassol, Cyprus; |
| Moravel Attachment | : | a conservatory attachment (*conservatoir beslag*) on the Shares which Moravel has made as from the twentieth day of April two thousand five to secure the Moravel Claim which conservatory attachment by operation of law is converted into an executory attachment (*executorial beslag*) on the Shares; subsequently, pursuant to section 474g of the DCCP Moravel requested the Court in Amsterdam to determine the terms and conditions and manner of an executory sale of the Shares, which request is pending before the Amsterdam Court under court docket reference HA RK |

8

| | | |
|---|---|---|
| | | 06/0018; |
| Moravel Claim | : | a claim made by Moravel vis-à-vis Yukos for payment of a principal amount of US$ 655,725,238.60 plus US$ 5,445,541.50 accrued interest as of 5 April 2005 plus accruing Interest and costs; |
| Party | : | the Seller and the Purchaser; |
| Payment Confirmation | : | a registered letter or a telefax (the receipt of which has been confirmed by the Seller) that the Seller will send to the Purchaser confirming that the Purchase Price has been paid and received in full; |
| Payment Date | : | The earlier of the date that the Seller sends the Payment Confirmation and the 14th calendar day after the Effective Date and if that date is not a working day, the first working day thereafter; |
| Purchase Price | : | The non-refundable aggregate amount of seven billion eight hundred thirty-eight million three hundred and sixty-one thousand (7,838,361,000.00) Russian Rubles that the Seller must pay as per the Auction Terms as is evidenced by the protocol of the results of the Auction; |
| Purchaser | : | The party who has made the highest bid for the purchase of the Shares as is evidenced by the protocol of the results of the Auction, being Limited Liability Company "Promneftstroy", a company incorporated under the laws of the Russian Federation and having its registered office in Moscow and its office address at 19 Malaya Kaluzhskaya Street, Bldg. 1, Moscow, 117071, registered at the Unified State Register of Legal Entities of Moscow Interdistrict Inspectorate No. 46 of the Federal Tax Service under Main State Registration Number 5077746429701; |
| Purchaser Costs | : | all existing or future costs, fees, taxes (including any taxes which are required to be withheld by or on behalf of Purchaser from payments made by or on behalf Purchaser) and disbursements incurred by or on behalf of the Purchaser resulting from (implementing) the Deed of Transfer and from holding and managing the Shares and all costs, fees, taxes and disbursements incurred in any litigation, including but not limited to the Executory Sale Proceedings, or other activities; |

9

| Receiver | : | Mr. E.K. Rebgun in his capacity as court appointed bankruptcy receiver (конкурсный управляющий) of Yukos, appointed by the Arbitrazh Court in Moscow on 1 August 2006; |
|---|---|---|
| Receivership Proceedings | : | the receivership proceedings (конкурсное производство) that have been opened by a decision of the Moscow Arbitrazh Court on 1 August 2006 as is evidenced by a judgment dated 4 August 2006 with case number A 40-11836/06-88-35, and extended by a ruling of the Moscow Arbitrazh Court on 7 August 2007 as is evidenced by a judgment dated 8 August 2007; |
| RF | : | the Russian Federation; |
| Rights | : | the Surplus and all rights in relation thereto, the rights to declare, demand and collect dividends that are not included in the Shares and all claim rights and litigation rights – including but not limited to the right to bring actions before the applicable forum and any and all rights of Seller vis-à-vis Stichting AK and Yukos International and its current and former directors and the Former Management which Seller under Dutch or any other applicable laws has and will have and may bring as a consequence of or in connection with the transfer of all of Yukos Finance's transferable assets to Yukos International as a capital contribution in exchange for a share premium and the simultaneous transfer of the Yukos International Shares to Stichting AK in exchange for the Depository Receipts in or around April 2005; |
| Rosneft | : | OAO Rosneft, a company incorporated under the laws of the RF, having its office in Moscow, RF; |
| Rosneft Attachment | : | a conservatory attachment (conservatoir beslag) on the Shares which the Banks have made as from the twenty-sixth day of April two thousand five to secure the Banks' Claim which conservatory attachment by operation of law is converted into an executory attachment (executorial beslag) on the Shares on the first day of July two thousand five; subsequently, pursuant to section 474g of the DCCP, the Banks requested the Amsterdam Court to determine the terms and conditions and manner of an executory sale of the Shares which request is pending before the Amsterdam Court under court docket reference HA RK 05/568; the Banks have subsequently sold and assigned their claim and claim rights to Rosneft and Rosneft now |

10

| | | |
|---|---|---|
| | | prosecutes the request filed by the Banks; |
| Security Deposit | : | The amount of one billion five hundred nineteen million six hundred seventy-two thousand and two hundred (1,519,672,200.00) Russian Rubles that the Purchaser has paid to the Seller prior to the Auction as per the Auction Terms and that shall serve (i) either as partial and irrevocable payment of the Purchase Price in the event that the Seller has received payment of the entire Purchase Price as per section 2.4 of this Agreement or (ii) as an irrevocable payment of the Compensation in case this Agreement is cancelled pursuant to section 8 of this Agreement; |
| Seller | : | the Receiver; |
| Set Off | : | the set off of mutual obligations to pay a debt and to enforce the payment of a claim; |
| Shares | : | any and all of the shares that have been issued and outstanding in the capital of Yukos Finance B.V., numbered 1 up to and including 242.399, each having a par value of one thousand euro (EUR 1,000) and the Dividends; |
| Stichting AK | : | Stichting Administratiekantoor Yukos International, a Dutch foundation (stichting) and legal entity (rechtspersoon), incorporated under the laws of the Netherlands and having its registered office in Amsterdam, the Netherlands, and its office address at Locatellikade 1, Parnassustoren, in (NL-1076 AZ) Amsterdam, registered at the Commercial Register of the Chamber of Commerce in Amsterdam under file number 34224823; |
| Subsidiary Dividends | : | (i) all dividends, interest or other income (including, without limitation, any share premium called) paid or payable in respect of the Yukos International Shares and the Depository Receipts or in respect of any other shares held in any and all subsidiary or other company directly or indirectly owned by Yukos Finance and/or by Yukos International (ii) all stocks, shares, rights, securities or other assets accruing or offered at any time (by way of redemption, bonus, preference option rights, or otherwise) in respect of the Yukos International Shares and the Depository Receipts or in respect of any other shares held in any and all subsidiary or other company directly or indirectly owned by Yukos Finance and/or Yukos International, (iii) all dividends, interest or other income in respect of |

11

262

| | | |
|---|---|---|
| | : | any asset referred to under (ii), and (iv) all proceeds in respect of the Yukos international Shares and/or the Depository Receipts on the dissolution or liquidation of Stichting AK and/or of Yukos International; |
| Surplus | : | The Attachment Proceeds that will remain after the payments on the Admitted Claims and the Bailiff's Fees on account of the Attachments. |
| YNG | : | (formerly prior to its merger with Rosneft) OAO Yugoskneftegaz, a company incorporated under the laws of RF and having its registered office in Nefteyugansk, RF; |
| YNG Attachment | : | a conservatory attachment (*conservatoir beslag*) on the Shares which YNG has made as from the fifteenth day of September two thousand five to secure the YNG Claim; subsequently, YNG merged into Rosneft and consequently Rosneft prosecutes the YNG claim before the Amsterdam Court; as well as an executory attachment (*executoriaal beslag*) which Rosneft as successor to YNG made on the Shares on May 2007 pursuant to a notarial deed of acknowledgement dated 8 May 2007 by which the YNG Claim was acknowledged by Yukos; |
| YNG Claim | : | a claim made by YNG vis-à-vis Yukos (as prosecuted by Rosneft after its merger with YNG) pending before the Amsterdam Court on the Effective Date under court docket reference HA RK 05/3611 and the same claim made by Rosneft as legal successor to YNG pursuant to a deed of acknowledgement made between Yukos and Rosneft in relation to the above claim which deed was executed before a Dutch notary and in which Yukos acknowledged this claim up to an amount of sixty-two billion three hundred and fifty-nine million six hundred and four thousand nine hundred and five Rubles and ninety-two hundredths (62,359,604,905.92) with interest amounting to twelve billion seven hundred and ninety-six million one hundred and sixty-nine thousand four hundred forty Rubles and forty-four hundredths (12,796,169,440.44); |
| Yukos | : | OAO Yukos Oil Company, a company incorporated under the laws of the RF, having its registered office in Moscow, RF; |
| Yukos Finance | : | Yukos Finance B.V., a limited liability company incorporated under the laws of the Netherlands |

| | | |
|---|---|---|
| | | and having its registered office in Amsterdam, the Netherlands, and its office address at Jan van Goyenkade 13 in (NL-1075 HP) Amsterdam, the Netherlands, registered at the Commercial Register of the Chamber of Commerce in Amsterdam under file number 34107730; |
| Yukos Finance Obligations | : | any obligation by Yukos Finance to pay its liabilities; |
| Yukos International | : | Yukos International UK B.V., a limited liability company incorporated under the laws of the Netherlands, having its registered office in Amsterdam, the Netherlands, and its office address at Jan van Goyenkade 13 in (NL-1075 HP) Amsterdam, registered at the Commercial Register of the Chamber of Commerce in Amsterdam under file number 34109466; |
| Yukos International Shares | : | The entire issued share capital of Yukos International; |
| Yukos Obligations | : | Any obligation by Yukos to pay the Admitted Claims or any other obligation. |

1.2 In this Agreement, clause headings are inserted for convenience purposes only. They shall not affect the construction of this Agreement. In this Agreement, a reference to a clause is a reference to a clause of the actual agreement (not including the Annexes)

1.3 Unless the context requires otherwise, words denoting the singular number shall include the plural and vice versa. References to the Parties shall also include references to their legal successors.

1.4 Unless indicated or evidently intended otherwise, references in the masculine form shall include the feminine and neutral form and vice versa.

1.5 In case of conflict between or inconsistency of the provisions of this actual agreement and the contents of the Schedules or Annexes, the provisions of the actual agreement shall prevail.

1.6 In case of conflict between Dutch and Russian legal concepts mentioned between brackets and/or in italics in this Agreement and the English translation thereof as used in this Agreement, the Dutch or Russian text, as the case may be, and its meaning thereof under Dutch or RF law, will prevail

2    Sale, Purchase, Payment and Transfer

2.1 The Seller sells the Shares together with the Rights to the Purchaser, who purchases the Shares together with the Rights subject to the terms and conditions of this Agreement

13

264

2.2 The Shares and the Rights shall be for the risk and account of Purchaser as of the Payment Date.

2.3 The Seller shall transfer the Shares as they are on the Completion Date to the Purchaser and subject to the Attachments.

2.4 As a consideration for the Shares and for the Rights the Purchaser shall pay the Purchase Price to the Seller as per the Auction Terms.

2.5 The Purchaser shall on the Payment Date irrevocably pay the entire Purchase Price denominated in Russian Rubles by means of wire transfer of the Purchase Price deducted solely by the amount of the Security Deposit to the following account (details of the account are provided below in Russian):

Получатель:         ОАО "НК ЮКОС"
ИНН/КПП             8604010486/997150001
Расчетный счет      40702810100000003814
В АБ «ГАЗПРОМБАНК» (ЗАО) г. Москва
Корр. Счет          30101810200000000823
БИК                 044525823.

2.6 The Seller shall as soon as it has irrevocably received the abovementioned payment send the Payment Confirmation to the Purchaser.

2.7 The Purchaser shall deliver to the Dutch Notary at least 72 hours prior to the Completion Date all documents that the Dutch Notary shall reasonably require to execute the Deed of Transfer, such as (but not necessarily limited to) documents evidencing the existence and identity of the Purchaser and its representatives, and the authority of the Purchaser and the powers of its representatives to enter into this Agreement and the Deed of Transfer supported by a legal opinion of a reputable RF law firm.

2.8 Subject to the full payment of the Purchase Price on the Completion Date the Seller shall transfer the Shares and the Rights to Purchaser and Purchaser will accept the same from Seller, by means of execution of the Deed of Transfer before the Dutch Notary.

2.9 The transfer of the Shares must be perfected by the notice of the transfer of the Shares that will be serviced by a Dutch bailiff to Yukos Finance pursuant to article 196b (3) in conjunction with article 196a (1) Book 2 DCC. The Parties shall instruct Yukos Finance to enter the transfer in the shareholders' register in such manner that it reflects that the transfer is made subject to the Admitted Dutch Creditors Attachments.

2.10 The Seller shall give notice of the transfer of the Shares and of the Rights to the Amsterdam Court and to the Bailiff in writing. A copy of the notice will be provided to the Purchaser.

2.11 The Seller will immediately prior to the transfer of the Shares adopt a shareholders' resolution as sole shareholder to discharge (kwijten) the Management of its liabilities in relation to the performance of its duties for the period starting 11 August 2006 and ending on the Completion Date. The Purchaser shall be bound by this discharge (kwijting) and shall not in any manner seek or procure the voidance of that resolution. Immediately after that discharge the Purchaser shall have the right to appoint its own management in Yukos Finance.

3. **No Warranties by Seller**

14

3.1     The Shares and the Rights are transferred "as is where is" (*voetstoots*) and the Seller with the consent of the Purchaser shall not make any representations and warranties to the Purchaser in relation to the Deed of Transfer, the Shares and the Rights, Yukos Finance or the Management.

3.2     The Purchaser acknowledges that the Shares and the Rights are sold pursuant to the Auction and that the Seller is not required to provide the Purchaser with any information beyond the scope of the Auction Terms. Purchaser waives any right to require that the Seller shall provide additional information in relation to the Shares, the Rights and Yukos Finance.

3.3     The Seller shall not be liable vis-à-vis the Purchaser for any losses and damages incurred by the Purchaser as a result of this Agreement or the execution of the Deed of Transfer.

4.      **No assumption of Obligations**

4.1     The Purchaser shall not pursuant to this Agreement or pursuant to the Deed of Transfer assume any of Yukos Obligations or Yukos Finance Obligations.

5.      **Upstreaming of Dividends and the Attachments**

5.1     The Shares are transferred subject to the Attachments and are encumbered with the Admitted Dutch Creditors Attachments.

5.2     For as long as the Attachments encumber the Shares and until the Shares are sold either (i) by means of the Executory Sale or (ii) by means of a private sale initiated by the Purchaser in the event that the Executory Sale Proceedings terminate without a Court Order.

        (A)     the Purchaser will ensure that Yukos Finance pay to the Bailiff all Dividends (if any) from all Subsidiary Dividends it is to receive from Stichting AK and/or to be received via the Stichting AK or on the basis of a court order from Yukos International or from any other subsidiary, reduced by any tax withheld, levied, assessed or charged (or to be withheld, levied, assessed or charged) in respect of such Dividends and Subsidiary Dividends, and by the Yukos Finance Obligations, and increased by any refund of taxes if and when received by Yukos Finance, and reduced by any (other) Yukos Finance Obligation, subject to and in compliance with applicable Dutch Company Law;

        (B)     the Purchaser shall adopt all the shareholder's resolutions in relation to the Shares to enable Yukos Finance to approve and to make the payments as contemplated in clause 5.2 (A) and shall not collect any Dividend for the duration of the Attachments to the detriment of the Admitted Creditors. If pending the Attachments the Purchaser shall receive a Dividend, the Purchaser shall pay forthwith such dividend to the Bailiff.

        (C)     the Purchaser shall comply with any order by the Amsterdam Court (or other competent Dutch court) in relation to the Attachments without prejudice to any of the Purchaser's rights to seek such orders or appeal such orders;

        (D)     for the duration of the Attachments the Purchaser shall not sell or encumber the Shares without stipulating from the counterparty to such a transaction that it shall fully observe the terms and conditions of this Agreement and shall not sell or transfer the Shares in a manner that would lessen the value or number of Shares.

15

5.3     The obligations of the Purchaser under this section 5 create a stipulation (*beding*) made by the Seller on its own behalf and on behalf and to the benefit of (*ten behoeve van*) the Admitted Creditors.

6.      Costs

6.1     The Purchaser shall pay all of the Purchaser Costs and shall pay the costs of the (execution of) the Deed of Transfer and the notice thereof to Yukos Finance and shall make any deposit as a security for the costs of the Deed of Transfer and the notice thereof upon the first request by the Seller or by the Dutch Notary.

6.2     Nothing in this Agreement or in the Deed of Transfer shall limit the right of Yukos Finance to pay the costs incurred by the Management in relation to this Agreement, the Deed of Transfer and in relation of the Executory Sales Proceedings and any other litigation in relation to the Shares, the Rights, the Management, the Former Management and the Receivership Proceedings, which costs are deemed included in the Yukos Finance Obligations.

7.      Waiver of dissolution and annulment

7.1     Each of the Parties shall in the Deed of Transfer waive its right to bring an action to dissolve this Agreement (*ontbinding*) or to annul this Agreement (*vernietiging*) as from the moment of execution, which waiver is irrevocably accepted by each of the Parties.

7.2     Each of the Parties hereby waives its right to set-off (*verrekenen*) any claim against another Party with an amount due under this Agreement to another Party, which waiver is irrevocably accepted by each of the Parties.

8.      Term and Termination

8.1     This Agreement shall be cancelled without any notice or action being required by either Party if the Seller has not received the Purchase Price in full on the Payment Date as stipulated in section 2.4 of this Agreement, save for the following:

        (A)     if this Agreement is cancelled pursuant to this section of the Agreement, the Purchaser shall pay without any right of deduction (*vermindering*) suspension (*opschorting of uitstel*) or set-off (*verrekening*) the Compensation to the Seller and the Seller shall at any time have the irrevocable and immediate right to collect the Compensation by means of set-off (*verrekening*) or otherwise from the Security Deposit;

        (B)     the Purchaser shall not seek a reduction or annulment of the Compensation;

        (C)     the Seller shall not be entitled to claim any other amount from the Purchaser in relation to the cancellation of this Agreement than the Compensation;

        (D)     this section 8.1 and the sections 16 and 17 will survive cancellation of the Agreement in case any dispute would arise between the Parties in relation to the cancellation itself.

8.2     This Agreement can not in whole or in part be terminated (*worden opgezegd of ontbonden*) by a Party unless by written agreement made by all the Parties.

8.3     It is the Parties' explicit desire and intent that transfer of the Shares that will be made in

16

the Deed of Transfer shall not be determined as an evasion (*onttrekking aan*) of the Shares from the Admitted Dutch Creditors Attachments. The Parties believe that the contemplated transfer of the Shares under this Agreement is not an evasion of the Shares, since (i) the Admitted Dutch Creditors Attachments as made by the Bailiff remain in full force and effect and (ii) the rights of the Admitted Dutch Creditors in relation to the Shares and the Attachments will be respected in full as stipulated in article 474e DCCP and (iii) the Shares will continue to be in the Netherlands in the place of the registered seat of Yukos Finance and (iv) Yukos Finance will upon notice of the transfer be instructed to enter the transfer in the shareholders' register such that it is subject to the Admitted Dutch Creditors Attachments and (v) the transfer of the Shares will be served by means of a notice thereof to Yukos Finance (by a bailiff), which notice will explicitly clarify the unaffected continuation of the Admitted Dutch Creditor Attachments, and (vi) a copy of this Agreement and of the Deed of Transfer and of this notice shall be submitted to the Amsterdam Court in the Executory Sales Proceedings and to the Bailiff, and (vii) the value or number of the Shares will not decrease as a result of this Agreement or of the Deed of Transfer.

8.4    If a Dutch competent court in a final decision in which the Purchaser is or may be a party would have determined that the transfer of the Shares must be regarded as an evasion of the Shares, then (i) the Shares will not be deemed to have been transferred under the Deed of Transfer, (ii) the Purchase Price will be deemed to have been given in full consideration for the sale and transfer of the Rights and (iii) the Purchaser shall not be entitled to any repayment of the Purchase Price or any part thereof or of any Purchaser Costs.

9.    **Third parties**

9.1    This Agreement shall only be binding upon and inure to the benefit of and be enforceable by the Parties and shall not in any manner prejudice the rights of the Admitted Creditors in relation to the Shares and the Attachments.

10.    **Assignment**

10.1    The rights and obligations of the Purchaser created hereby may not be assigned by the Purchaser to a third party until after the Completion Date; thereafter the Purchaser cannot assign these rights and obligations unless he has received a prior written confirmation by the assignee that the assignee will observe the terms and conditions of this Agreement as if the assignee were the Purchaser.

11.    **Exclusion**

11.1    The Parties acknowledge that the provisions of this Agreement and of the Deed of Transfer shall derogate to and exclude the applicability of the provisions of title 1 of book 7 of the DCC.

12.    **Partial Invalidity**

12.1    In the event that one or more clauses of this Agreement or of the Annexes are established to be non-binding, the other clauses of this Agreement and of the Annexes will continue to be effective. The Parties are obliged to replace the non-binding clauses with other clauses that are binding, in such a way that the new clauses differ as little as possible from the non-binding clauses, taking into account the object and the purpose of this Agreement.

17

13.    **Dutch Notary involvement**

13.1   With reference to the provisions of the Code of Conduct (*Verordening Beroeps- en Gedragsregels*) as determined by the general meeting of the Royal Notarial Association (*Koninklijke Notariële Beroepsorganisatie*), the Purchaser will through execution of the Deed of Transfer explicitly declare its consent to the fact that the Seller and Purchaser may be assisted by a Dutch Notary who is a member of the law firm that is involved in matters relating to Yukos, the Receivership Proceedings, Yukos Finance, Management, or any of its subsidiaries or relating to this Agreement and agrees to waive any and all potential conflicts arising therefrom.

13.2   The Dutch Notary shall not in any manner be liable for any delay in the execution of the Deed of Transfer unless resulting from gross negligence on his part.

14.    **Indemnification**

14.1   The Purchaser hereby irrevocably and unconditionally and severally undertakes to indemnify the Receiver and the lawyers (*advocaten*), civil- law notaries ((*kandidaat-)notarissen*) and/or tax advisers who advised the Seller in relation to this Agreement and to the Deed of Transfer against all costs, claims, expenses and liabilities in whatever manner incurred by or asserted against them as a result of the drafting and execution of this Agreement and the Deed of Transfer, except with respect to conduct that is deemed or held to be gross negligence or wilful misconduct by the Arbitrazh Court.

15.    **Language**

15.1   This Agreement is made and shall be executed in both an original in the English language and an original in the Russian language. In case any difference would be found in the meaning of words or based on a different interpretation of words and sentences in each language, the meaning of and the interpretation based on the English language original shall prevail, except for the terms in Russian or in Dutch used herein.

16.    **Notices**

       All announcements or notices to the Parties will be done in writing or by telecopy (but in case of a telecopy immediately confirmed in writing by the receiving Party) to the following address:

       (A)    To Seller

              Name                    : Bankruptcy Receiver of OAO Yukos Oil Company

              For the attention of    : Mr. E.K. Rebgun in his capacity as Bankruptcy Receiver of OAO Yukos Oil Company

              Address                 : 3 Zvenigorodskoye Shosse, Moscow, 123242

              Location                : 3 Zvenigorodskoye Shosse, Moscow, 123242

              Country                 : Russia

              Fax number              : (+7 495) 254-87-83

       (B)    To Purchaser

18

| | |
|---|---|
| Name | . Limited Liability Company "Promneftstroy" |
| for the attention of | . Mr. V.M. Eliseev in his capacity as General Director |
| Address | : 19 Malaya Kaluzhskaya Street, Bldg. 1, Moscow, 117071 |
| Location | : 19 Malaya Kaluzhskaya Street, Bldg. 1, Moscow, 117071 |
| Country | : Russia |
| Fax number | : (+7 495) 933-08-80 |

17. **Governing law and Jurisdiction**

17.1 This Agreement and the Deed of Transfer and all transactions contemplated herein shall be exclusively governed by laws of the Netherlands.

17.2 All disputes arising out of or in connection with this Agreement or further agreements resulting thereof, shall be settled exclusively by the Arbitrazh Court unless the Parties agree otherwise in writing.

17.3 An Admitted Creditor who has accepted the stipulation on its behalf under section 5.3 may opt to submit any action under this Agreement to either the Court mentioned under 17.2 or the Court in which jurisdiction the Purchaser has its registered seat.

In witness whereof this Agreement has been executed by the Parties hereto and entered into the day and year first above written.

For the Seller                                    For the Purchaser

19

270

# Shareholder's resolution

(appointment (*benoeming*) of directors (*bestuurders*))

### THE UNDERSIGNED:

**Open Joint Stock Company Yukos Oil Company** (the "Shareholder"), a legal entity established and existing under the laws of the Russian Federation, with its registered office and principal place of business located at 17 Dubininskaya St. Moscow 115054, Russian Federation, and duly represented by Mr. Eduard K. Rebgun, acting as court appointed insolvency officeholder in the bankruptcy of the Shareholder,

### WHEREAS:

1.  the Shareholder is the holder of the entire issued and outstanding capital of **Yukos Finance B.V.** (the "Company"), a private company with limited liability (*besloten vennootschap met beperkte aansprakelijkheid*), with its registered office in Amsterdam and its business office at Jan van Goyenkade 13, 1075 HP Amsterdam, the Netherlands, registered at the Commercial Register of the Chamber of Commerce and Industry in Amsterdam under file number 34107730;

2.  none of the shares in the issued share capital of the Company are encumbered with a right of usufruct or a right of pledge;

3.  no depository receipts for shares in the issued share capital of the Company have been issued with the co-operation of the Company;

4.  pursuant to the provisions of article 20 of the articles of association of the Company, resolutions can be validly adopted outside a meeting;

5.  by a Share Purchase Agreement dated 20 August 2007 (the "SPA") between Mr. Eduard K. Rebgun, acting as court appointed insolvency officeholder in the bankruptcy of the Shareholder as seller and Promneftstroy (the "Purchaser"), the seller has sold his entire shareholding in the Company to the Purchaser and has agreed to transfer the shares in the Company subject to the terms and conditions of the SPA;

6.  currently the Company has no acting directors and the Shareholder wants to appoint new directors; the Purchaser agrees to this resolution by the Shareholder whereby the Shareholder appoints the following individuals as the Company's directors prior to the transfer of the shares in the Company to the Purchaser. The Purchaser will sign this resolution to confirm his agreement;

7.  the appointed directors will sign this resolution to confirm their acceptance of the appointments;

### HEREBY RESOLVES:

1.  to appoint Mr. Stephen Patrick Lynch, residing in 1 Tamanskaya Ul/5, Moscow, Russian Federation, born in New York (NY), United States of America, on the twenty-third day of January nineteen hundred sixty-seven, holder of a passport of the United States of America with number 711471383 as Managing Director of the Company effective 10 September 2007 at 10 AM CET;

2.  to appoint Mr. Robert Reid residing in 22 Voznesensky Pereulok, Moscow, born in England on the twelfth day of November 1973, holder of a passport of the United Kingdom with number 761075889 as Managing Director of the Company effective

D014 SR app Lynch Reid Yukos Finance B V (10 september 2007) fin.doc

10 September 2007 at 10 AM CET;

3.    that both Mr. Lynch and Mr. Reid each individually shall be authorized to on behalf of the Company file the required entries of these appointments in the trade register (*Handelsregister*) of the Chamber of Commerce (*Kamer van Koophandel*);

4.    that having regard to section 2:256 of the Dutch Civil Code both Mr. Lynch and Mr. Reid shall be permitted to on behalf of the Company acknowledge the transfer of shares in the Company to the Purchaser as agreed in the SPA <u>provided that</u> the Attachments (as defined in the SPA) shall remain wholly unaffected thereby;

Signed in the place and on the date and time as mentioned below the signatures.

The Shareholder:            OAO Yukos Oil Company duly represented by E.K. Rebgun, acting in said capacity

The Purchaser:              Promneftstroy duly represented by Mr. Stephen Patrick Lynch as its attorney in fact

Stephen Patrick Lynch *pro se*

Mr. [Reid] *pro se*

Place:                      Amsterdam, the Netherlands

Date:                       10 September 2007

Time:                       11.15 hours AM CET (prior to the transfer of shares to the Purchaser pursuant to the SPA)



FINAL– 10 September 2007

2007JHE60007734HE A001

# Deed of transfer of the Shares subject to the Attachments and of the Rights

by

Mr E.K. Rebgun in his capacity of court appointed bankruptcy receiver of

## OAO Yukos Oil Company

as Seller

to

## Promneftstroy

as Purchaser

Relating to the shares in the capital of:

Yukos Finance  B.V.

with registered office in Amsterdam, the Netherlands

Simmons & Simmons

PO Box 79023  1070 NB   Zuidplein 100  1077 XV  Amsterdam

T +31 (0)20 890 99 00   F +31 (0)20 890 99 99



Simmons & Simmons                                                                                     -1-

# Deed of transfer of the Shares subject to the Attachments and the Rights

This tenth day of September two thousand seven, appeared before me, Jan-Mathijs Petrus Hermans, civil-law notary in Amsterdam, the Netherlands:——

(1) Mr. **Eduard Konstaninovich Regbun**, (the "Seller"), residing in 64 Leninisky Prospect, Apartment 383, Moscow 117296, Russian Federation, born in Moscow, Russian Federation, on the fifteenth day of March nineteen hundred forty-seven, holder of a valid passport of the Russian Federation with number 51N°1999053, in his capacity of court appointed bankruptcy receiver of OAO Yukos Oil Company, a company in the Receivership Proceedings (as defined below) incorporated under the laws of the Russian Federation, with its registered office and principal place of business located at 17 Dubininskaya St. Moscow 115054, Russian Federation, registered at the Unified State Register of Legal Entities of Moscow Interdistrict Inspectorate number 46 of the Federal Tax Service under Main State Registration Number 1028601259466; and ——

(2) Mr. Stephen Patrick Lynch, residing in Letnikovskaya Ulitsa 11/10, Building 12, Moscow, Russian Federation, and living at 438 Route 22, North Salem, New York (NY), 10560, United States of America, born in New York (NY), United States of America, on the twenty-third day of January nineteen hundred sixty-seven, holder of a passport of the United States of America with number 711471383, in his capacity of attorney-in-fact pursuant to a power of attorney in writing dated the fourth day of September two thousand seven, and as such representing: **Promneftstroy** (the "Purchaser"), a company incorporated under the laws of the Russian Federation, with its registered office and principal place of business located at 19 Malaya Kaluzhskaya Street, Building 1, Moscow, 117071, Russian Federation, registered at the Unified State Register of Legal Entities of Moscow Interdistrict Inspectorate number 46 of the Federal Tax Service under Main State Registration Number 5077746429701. ——



Simmons & Simmons                                                                -2-

Seller and Purchaser hereinafter also referred to as "<u>Party</u>" and/or "<u>Parties</u>".——
Said individuals, in their said capacity, declared:————————————
<u>WHEREAS</u> ————————————————————————————

(A)   On the twenty-eighth day of March two thousand six, the Arbitrazh
      Court (as defined below) opened a bankruptcy case of the Seller. ———

(B)   Subsequently, on the first day of August two thousand six the Arbitrazh
      Court opened Receivership Proceedings, whereby the powers of Sell-
      ers' management (in any event in relation to the matters subject of the
      Agreement (as defined below) and this deed were terminated and the
      Receiver (as defined below) was appointed.——————————

(C)   In accordance with the applicable Receivership Proceedings, the Re-
      ceiver (as defined below) as the Seller entered into the Agreement with
      the Purchaser, taking into full consideration the legal position of Ros-
      neft and Moravel (both as defined below) as regards to the Admitted
      Dutch Creditors Attachments (as defined below).——————————

(D)   To effect the obligation to transfer and accept the Shares as set forth in
      the Agreement, the Seller and the Purchaser wish to enter into and
      execute this deed.————————————————————

<u>IT IS HEREBY AGREED AS FOLLOWS</u>:——————————————

<u>Article 1</u> ————————————————————————————

**<u>Definitions</u>** ————————————————————————————

1.1   In this deed expressions shall have the meaning as indicated below: ——

      (A) "<u>Admitted Dutch Creditors Attachments</u>" means the Rosneft At-
      tachment, the Moravel Attachment and the YNG Attachment severally
      as well as jointly ————————————————————

      (B) "<u>Agreement</u>" means the Share Purchase Agreement dated the
      twentieth day of August two thousand seven to which the Seller and
      the Purchaser are a Party;————————————————

      (C) "<u>Arbitrazh Court</u>" means the Arbitrazh Court of the City of Moscow
      (Арбитражный суд г. Москвы) in Moscow, Russian Federation;————

      (D) "<u>Articles</u>" means: the articles of association of the Company as
      presently in force and as partially amended by deed of amendment,
      executed on the eleventh day of September two thousand six before
      F.E. Roos, civil-law notary in Rotterdam, the Netherlands; —————

      (E) "<u>Attachment</u>" means: the Admitted Dutch Creditors Attachments
      and any subsequent conservatory or executory attachment made in the
      Netherlands on the Shares by an Admitted Creditor prior to the Execu-
      tory Sale; ————————————————————————

      (F) "<u>Company</u>" means: Yukos Finance B.V., a private company with
      limited liability   (*besloten vennootschap met beperkte aansprake-*



none
none



Simmons & Simmons                                                    -4-

the Shares and all claim rights and litigation rights – including but not limited to the right to bring actions before the applicable forum and any and all rights of Seller vis-à-vis Stichting AK and Yukos International and its current and former directors and the Former Management which Seller under Dutch or any other applicable laws has and will have and may bring as a consequence of or in connection with the transfer of all of the Company's transferable assets to Yukos International as a capital contribution in exchange for a share premium and the simultaneous transfer of the Yukos International Shares to Stichting AK in exchange for the Depository Receipts in or around April two thousand five;

(P) "Rosneft" means: OAO Rosneft, a company incorporated under the laws of the Russian Federation, having its office in Moscow, Russian Federation;

(Q) "Shares" means: two hundred forty-two thousand three hundred ninety-nine (242,399) ordinary shares, numbered 1 up to and including 242,399, each having a par value of one thousand euro (EUR 1,000), in the capital of the Company including the Dividends;

(R) "Surplus" means the Attachment Proceeds that will remain after the payments on the Admitted Claims and the Bailiff's Fees on account of the Attachments;

(S) "YNG" means: (formerly prior to the merger with Rosneft) OAO Yuganskneftegaz, a company incorporated under the laws of the Russian Federation and having its seat in Nefteyugansk, Russian Federation.

1.2   Unless indicated or evidently intended otherwise, capitalised words and expressions used herein shall have the meaning as defined in the Agreement.

1.3   Unless indicated or evidently intended otherwise, words or expressions in the singular shall include the plural and *vice versa.*

1.4   Unless indicated or evidently intended otherwise, references in the masculine form shall include the feminine and neutral form and *vice versa.*

## Article 2

### Transfer of the Shares and the Rights

2.1   The Seller hereby transfers the Shares and the Rights to the Purchaser, which the Purchaser hereby accepts.

2.2   The Shares transferred are subject to the Attachments, pursuant to article 474e of the DCCP and pursuant to currently applicable principles of Dutch international private (insolvency) law.



Simmons & Simmons                                                          -5-

2.3   The transfer of the Shares and the Rights are both subject to the terms
and conditions as set forth in the Agreement, including but not limited
to the non-warranty clause as set forth in article 3 of the Agreement
and the relevant clauses are explicitly quoted hereunder: ————————

*"3.1 The Shares and the Rights are transferred "as is where is" (voet-
stoots) and the Seller with the consent of the Purchaser shall not make
any representations and warranties to the Purchaser in relation to the
Deed of Transfer, the Shares and the Rights, Yukos Finance or the
Management.* ————————

*3.2 The Purchaser acknowledges that the Shares the Rights are sold
pursuant to the Auction and that the Seller is not required to provide
the Purchaser with any information beyond the scope of the Auction
Terms. Purchaser waives any right to require that the Seller shall pro-
vide additional information in relation to the Shares, the Rights and
Yukos Finance.* ————————

*3.3 The Seller shall not be liable vis-à-vis the Purchaser for any losses
and damages incurred by the Purchaser as a result of this Agreement
and of the execution of the Deed of Transfer."* ————————

Article 3 ————————

**Purchase Price and Acquittance for the Shares** ————————

3.1   The Seller hereby confirms receipt of the Purchase Price and therefore
acquits the Purchaser for the payment of the Purchase Price. ————————

Article 4 ————————

**Representations by the Seller** ————————

The Seller represents (without waiving the limitation of liability as stipulated in
the Agreement and as cited above) that:————————

(a)   the Shares were acquired by the Seller as follows: ————————

(i)   by way of subscription and acceptance in the deed of incorpora-
tion of the Company, executed on the twenty-second day of
September nineteen hundred ninety-eight before H.B.H. Kraak,
at that time civil-law notary in Amsterdam, the Netherlands, forty
(40) shares, numbered 1 up to and including 40, each with a
par value at the time of one thousand Dutch Guilders (NLG
1,000), which forty (40) shares were redenominated and con-
verted into eighteen (18) shares, numbered 1 up to and includ-
ing 18, each with a par value of one thousand euro (EUR
1,000), by a deed of amendment of the Articles, executed on
the thirteenth day of June two thousand two before A.A.
Voorneman, civil-law notary in Amsterdam, the Netherlands; ——

(ii)   by way of subscription and acceptance in the deed of issue of



Simmons & Simmons                                                        -6-

shares in the capital of the Company, executed the thirteenth day of June two thousand two before A.A. Voorneman, aforementioned seventy thousand three hundred and one (70,301) shares, numbered 19 up to and including 70,319, each with a par value of one thousand euro (EUR 1,000);————

(iii)  by way of subscription and acceptance in the deed of issue of shares in the capital of the Company, executed the thirteenth day of June two thousand two before A.A. Voorneman aforementioned, eleven thousand one hundred and eighty (11,180) shares, numbered 70,320 up to and including, 81,499 each with a par value of one thousand euro (EUR 1,000);————

(iv)  by way of subscription and acceptance in the deed of issue of shares in the capital of the Company, executed the nineteenth day of September two thousand two before A.A. Voorneman, aforementioned, eighty thousand one hundred and sixty two (80,162) shares, numbered 81,500 up to and including 161,661, each with a par value of one thousand euro (EUR 1,000);————

(v)  by way of subscription and acceptance in the deed of issue of shares in the capital of the Company, executed the eighteenth day of March two thousand three before A.A. Voorneman, aforementioned eighty thousand seven hundred thirty eight (80,738) shares, numbered 161,662 up to and including 242,399, each with a par value of one thousand euro (EUR 1,000). ————

(b)  the restrictions on share transfers contained in the Articles have no ef-fect since the Seller is the sole shareholder of the Company and the aforesaid restrictions do not contain an approval procedure.————

Article 5 ————

**Waiver** ————

5.1  The Seller and the Purchaser hereby waive the right to (cause to) dis-solve or nullify the transfer of the Shares laid down in this deed in whole or partially. ————

5.2  The Seller and the Purchaser hereby mutually accept the waiver as mentioned in paragraph 1. ————

Article 6 ————

**Notice of transfer of Shares and existence of Agreement** ————

6.1.  Each Party is authorised to arrange for the service of notice by a bailiff to the Company of the transfer of the Shares -subject to the Admitted Dutch Creditors Attachments- by the Seller to the Purchaser within the meaning of Section 2:196b (3) of the DCC in conjunction with Section



Simmons & Simmons                                                              -7-

2:196a (1) of the DCC.—————————————————————

6.2    Together with a true copy of this deed, the bailiff as above mentioned, will provide the Company with a copy of the Agreement.———————

6.3    Each Party agrees to notify each of the bailiffs, who made the Admitted Dutch Creditors Attachments, within five (5) working days after the service of notice as mentioned under 6.1 of the transfer of the Shares and to inform the Amsterdam Court in accordance with the Agreement. ———

6.4    Parties hereby authorize me, notary, who will execute this deed to take care on their behalf of the obligations as set forth in this article 6 if they are not taken care of within ten (10) working days after execution of this deed. ——————————————————————————

6.5    Each of the Parties is authorized to at any time notify each of the Rights' debtors of the transfer of the Rights. ——————————

Article 7 ——————————————————————————————

**Indemnification notary** ——————————————————————

The Parties hereby irrevocably and unconditionally undertake to indemnify me, the notary who will execute this deed and my successor(s) and the law firm of which I am a partner, against all costs, claims, expenses and liabilities in whichever way incurred by him as a result of the execution of this deed and the authorization as mentioned under 6.4., except with respect to conduct that will be deemed or held to be gross negligence or wilful misconduct.————

Article 8 ————————————————————————————

**Declaratory judgment of evasion from the Admitted Dutch Creditors Attachments** ——————————————————————————————

8.1    Parties hereby explicitly confirm that it is not their intention to evade (onttrekken aan het beslag) the Shares. ——————————————

8.2    Parties hereby repeat hereunder the language as set forth in article 8 paragraph 3 of the Agreement in which they declare that they are of the opinion that the Agreement and the transfer of the Shares as laid down in this deed is not to be regarded as an evasion of the Shares from the Admitted Dutch Creditors Attachments (onttrekken aan het beslag): ——————————————————————————

" 8.3 *It is the Parties' explicit desire and intent that transfer of the Shares that will be made in the Deed of Transfer shall not be determined as an evasion (onttrekking aan) of the Shares from the Admitted Dutch Creditors Attachments. The Parties believe that the contemplated transfer of the Shares under this Agreement is not to be regarded as an evasion of the Shares, since (i) the Admitted Dutch Creditors Attachments as made by the Bailiff remain in full force and effect and (ii) the rights of the Admitted Dutch Creditors in relation to the Shares and*



Simmons & Simmons                                                    -8-

*the Attachments will be respected in full as stipulated in article 474e DCCP and (iii) the Shares will continue to be in the Netherlands in the place of the registered seat of Yukos Finance and (iv) Yukos Finance will upon notice of the transfer be instructed to enter the transfer in the shareholders' register such that it is subject to the Admitted Dutch Creditors Attachments and (v) the transfer of the Shares will be served by means of a notice thereof to Yukos Finance (by a bailiff), which notice will explicitly clarify the unaffected continuation of the Admitted Dutch Creditor Attachments, and (vi) a copy of this Agreement and of the Deed of Transfer and of this notice shall be submitted to the Amsterdam Court in the Executory Sales Proceedings and to the Bailiff (vii) the value of the Shares will not decrease as a result of this Agreement or of the Deed of Transfer."*

8.3    Parties explicitly accept the consequence that if and when a Dutch competent court in a final decision in which the Purchaser is or may be a party would have determined that the transfer of the Shares must be regarded as an evasion of the Shares, then (i) the Shares will not be deemed to have been transferred under the Deed of Transfer, (ii) the Purchase Price will be deemed to have been given in full consideration for the sale and transfer of the Rights and (iii) the Purchaser shall not be entitled to any repayment of the Purchase Price or any part thereof or of any Purchaser Costs.

**Netherlands law. Forum**

9.1    The transfer of the Shares and the Rights and the further obligations laid down in this deed shall be governed by Netherlands law.

9.2    The competent court in Amsterdam, the Netherlands, shall have jurisdiction in the event of any disputes arising from this deed without prejudice to the jurisdiction as agreed between the Seller and the Purchaser in the Agreement.

<u>Article 10</u>

<u>Costs</u>

The costs of this deed are for the account of the Purchaser.

**Sworn Interpreter**

Also appeared before me, Gela Smit-Zhdanova, residing in 1271 LX Huizen, Zuiderweg 5, born in Magdagachi Tiga, Russian Federation, on the thirtieth day of May nineteen hundred fifty-five, married, holder of a valid passport of the Netherlands with number NE7495893, acting as a sworn interpreter - as appears from a report of the court session of the District Court of Amsterdam, the Netherlands, dated the thirtieth day of September nineteen hundred ninety-seven - who declared to have assisted the individual mentioned under



Simmons & Simmons                                                    -9-

(1) in accordance with article 42 of the Code of the Notarial Profession, with the translation of the contents of this deed and of the explanations made by me, civil-law notary, given to the Parties, all this to the best of her knowledge.–

Final statements

The originals or copies of the powers of attorney given to the said individuals, a copy of the executed Agreement and a copy of the report of the court session of the District Court of Amsterdam related to Mrs Gela Smit-Zhdanova, will be attached to this deed (annexes).————————————

I, civil-law notary, stated and explained the substance of this deed and pointed out the consequences of the contents of this deed to the said individuals, who are known to me, civil-law notary. The said individuals then declared that they had noted the contents of this deed and that they agreed therewith. Subsequently, this deed, which was executed in Amsterdam, was, immediately after it had been read aloud in part, signed by the said individuals, the interpreter and by me, civil-law notary, on the date first above written.————————

w.s. the said individuals and the civil law notary.

ISSUED FOR TRUE CERTIFIED COPY

# REDACTED

FULL DOCUMENT SUBJECT TO SEAL MOTION

JENNER & BLOCK LLP
Richard Levin
Stephen L. Ascher
919 Third Avenue
New York, NY 10022
(212) 891-1600
rlevin@jenner.com
sascher@jenner.com

*Attorneys for Stephen P. Lynch*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| KIRWAN OFFICES S.à R.L., | Case No. 16-22321 (RDD) |
| Debtor. | |

**SUPPLEMENTAL MEMORANDUM OF LAW IN**
**FURTHER SUPPORT OF STEPHEN P. LYNCH'S**
**MOTION FOR DISMISSAL, ABSTENTION, OR STAY**

# Table of Contents

Page(s)

Summary of Argument ..................................................................................2

Statement of Facts ........................................................................................4

A.   Kirwan's Acquisition of PNS and the Yukos Finance Shares............4

B.   Kirwan and its Shareholders Agreement .............................................5

C.   Kirwan's Financing...............................................................................6

D.   The Economics of Kirwan's Shareholders Agreement .......................7

E.   Lynch's Minority Protections Under the Kirwan
     Shareholders Agreement ......................................................................8

F.   The Yukos Finance Litigation..............................................................9

     1.   The Receiver Litigation .............................................................10

     2.   The Glendale Litigation..............................................................10

     3.   Other Litigation .........................................................................11

G.   Deitz's Attempts To Seize Control of PNS and of
     Negotiations With PNS's Litigation Adversaries Led to
     Corporate Governance Disputes Within Kirwan.............................11

     1.   The First Corporate Governance Dispute: Deitz's
          Amendment to the PNS Charter Create a PNS Board
          of Directors................................................................................12

     2.   The Second Corporate Governance Dispute: Deitz's
          Further Attempts to Amend the PNS Charter.......................12

     3.   The Third Corporate Governance Dispute: Another
          Deitz Attempt to Amend the PNS Charter ...........................13

     4.   The First Attempt to Settle the Yukos Finance
          Litigation ...................................................................................13

5.   The Fourth Corporate Governance Dispute: Deitz's Actions to Use the LCIA Award and the New PNS Charter to Exert Control.................................................14

6.   Additional Yukos Finance Litigation Settlement Discussions.................................................................17

H.   Deitz's Effort to Seize Control Through Other Means: The Involuntary Bankruptcy Petition.................................18

I.   The Change in Documentation for Operational Expenses Funding ...........................................................20

Relief Requested.................................................................21

Argument .........................................................................21

I.   The Court Should Dismiss this Chapter 11 Case Because It Lacks a Proper Bankruptcy Purpose. ...................................21

A.   Legal Standard.................................................21

B.   This Case Lacks a Proper Bankruptcy Purpose....................30

1.   Kirwan Has No Realistic Prospect of Reorganizing. .............30

2.   This Case is a Two-Party Dispute, With No Need for Bankruptcy's Collective Remedy...............................32

3.   The Case Seeks to Avoid a Corporate Governance Restriction. ..................................................34

4.   The Financing Shareholders Seek Relief Unavailable in a Nonbankruptcy Forum....................................35

II.   The Court Should Abstain Under Section 305(a). ....................35

A.   Legal Standard.................................................36

B.   The Court Should Abstain From Exercising Jurisdiction Over this Case.....................................................38

1.   The Case was Filed for an Improper Purpose. ................38

2.   Allowing the Case to Proceed Here Flouts the Parties' Legitimate Expectations. .....................................38

Conclusion ...................................................................................................................40

# Table of Authorities

Page(s)

CASES

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship),*
113 F.3d 1304 (2d Cir. 1997)..........................................................................21, 22, 23

*Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.),*
235 F.3d 375 (8th Cir. 2000)...............................................................................21, 28

*Clear Blue Water, LLC. v. Oyster Bay Mgmt. Co., LLC,*
476 B.R. 60 (E.D.N.Y. 2012)......................................................................................21

*In re ABQ–MCB Joint Venture,*
153 B.R. 338 (Bankr. D.N.M. 1993)..........................................................................28

*In re Beacon Reef Ltd. P'ship,*
43 B.R. 644 (Bankr. S.D. Fla. 1984).........................................................................28

*In re Diamondhead Casino Corp.,*
No. 15-11647(LSS), 2016 WL 3284674 (Bankr. D. Del. June 7, 2016) ...................passim

*In re Forever Green Athletic Fields, Inc.,*
804 F.3d 328 (3d Cir. 2015).......................................................................................22

*In re Houston Regional Sports Network L.P.,*
505 B.R. 468 (Bankr. S.D. Tex. 2014)..................................................................28, 29

*In re Kingston Square Associates,*
214 B.R. 713 (Bankr. S.D.N.Y. 1997)........................................................................29

*In re Mountain Dairies, Inc.*
372 B.R. 623 (Bankr. S.D.N.Y. 2007)........................................................................24

*In re Murray,*
543 B.R. 484 (Bankr. S.D.N.Y. 2016).................................................................passim

*In re Northshore Mainland Servs., Inc.,*
537 B.R. 192 (Bankr. D. Del. 2015) .........................................................36, 37, 38, 39

*In re Persico Contracting & Trucking, Inc.,*
No. 10–22736 (RDD), 2010 WL 3766555 (Bankr. S.D.N.Y. Aug. 20, 2010)...........36, 38

*In re Petro Fill, Inc.,*
144 B.R. 26 (Bankr. W.D. Pa. 1992) .........................................................................28

*In re Reyes,*
  No. 14-13233 (SMB), 2015 WL 4624156 (Bankr. S.D.N.Y. Aug. 4, 2015) .............................. 22, 23

*In re Syndicom Corp.,*
  268 B.R. 26 (Bankr. S.D.N.Y. 2001) .................................................................... 23, 24, 32

*In re TPG Troy, LLC,*
  492 B.R. 150 (Bankr. S.D.N.Y. 2013) ................................................................................. 37

*In re Wally Findlay Galleries (New York), Inc.,*
  36 B.R. 849 (Bankr. S.D.N.Y. 1984) .................................................................... 23, 24, 32

*In re Winshall Settlor's Trust,*
  758 F.2d 1136 (6th Cir. 1985) ................................................................................................ 23

*In re Yukos Oil Co.,*
  321 B.R. 396 (Bankr. S.D. Tex. 2005) ................................................................................... 30

*Little Creek Dev. Co. v. Commonwealth Mortg. Corp. (In re Little Creek Dev. Co.),*
  779 F.2d 1068 (5th Cir. 1986) ................................................................................................ 24

*Lynch v. Lapidem Ltd. (In re Kirwan Offices S.à R.L.),*
  No. 16-cv-6300(VB) (S.D.N.Y. Dec. 5, 2016), ECF No. 13 ................................................ 1

*Matter of Win–Sum Sports, Inc.,*
  14 B.R. 389 (Bankr. D. Conn. 1981) .................................................................................... 28

*NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.),*
  384 F.3d 108 (3d Cir. 2004) ........................................................................................... 21, 25

## STATUTES

11 U.S.C. § 305(a) ..........................................................................................................passim

11 U.S.C. § 707(a) ................................................................................................................. 25

11 U.S.C. § 1112(b) ......................................................................................................passim

11 U.S.C. § 1141(d) .............................................................................................................. 31

On March 15, 2016, two shareholders of the debtor Kirwan Offices S.à R.L., a Luxembourg company, demanded that Kirwan repay almost $345 million that they had advanced to Kirwan over the previous nine years. The same day, the shareholders, Lapidem Ltd., a Cayman Island company, and Mascini Holdings Limited, a Cyprus company, filed an involuntary petition against Kirwan. Having a conflicted board, Kirwan could not oppose the petition. Instead, on April 6, 2016, Kirwan's third shareholder, Stephen P. Lynch, filed his *Motion for Intervention and Dismissal, Abstention, or Stay* ("**Dismissal Motion**") [ECF No. 8], seeking relief on several alternative grounds. The Court heard the motion on June 17, 2016.

On July 5, 2016, the Court entered the *Order (I) For Relief Under Chapter 11 of the Bankruptcy Code and (II) Denying, in Part, Stephen P. Lynch's Motion for Intervention and Dismissal, Abstention, or Stay.* [ECF No. 43.] The Order for Relief (i) denied with prejudice Lynch's request to intervene to answer the Petition on Kirwan's behalf, and (ii) granted the petition and issued the order for relief, because Kirwan was unable to oppose the petition on the merits.[1] The Order for Relief also denied with prejudice (iii) Lynch's request to dismiss this case under the doctrine of *forum non conveniens* and (iv) Lynch's request for abstention under section 305[2] under the doctrine of *forum non conveniens* or in favor of arbitration. But it expressly preserved Lynch's other arguments under section 305. Last, the Order for Relief (v) adjourned Lynch's request to dismiss the chapter 11 case under section 1112 and on related section 305 abstention/dismissal grounds, and (vi) denied without prejudice Lynch's request to stay the chapter 11 case pending arbitration.

---

[1] Lynch timely appealed these rulings. The appeal is pending before the District Court, which has granted a stay of pending this Court's resolution of the remaining issues on the Dismissal Motion. *Lynch v. Lapidem Ltd. (In re Kirwan Offices S.à R.L.)*, No. 16-cv-6300(VB) (S.D.N.Y. Dec. 5, 2016), ECF No. 13.

[2] All section references are to the Bankruptcy Code, 11 U.S.C. § ___, except as otherwise noted.

The Court suggested the parties agree on a discovery schedule for the hearing on the remaining issues. Instead, the parties agreed on a Scheduling Order and a Stipulation of Facts on Motion to Dismiss or Abstain and its Exhibits, all filed November 21, 2016. [ECF Nos. 60, 62.] The Scheduling Order limits the record on the hearing. Accordingly, this Memorandum addressing the remaining issues cites exclusively to the Stipulation of Facts ("**Stip.**"), the Exhibits ("**Ex.**"), and the other materials permitted under the Scheduling Order. The Scheduling Order also provides for legal memoranda in support and in opposition to the remaining issues under the Dismissal Motion. Lynch respectfully submits this Memorandum of Law in further support of the Dismissal Motion and requests the Court (1) dismiss this chapter 11 case under section 1112(b) for cause, or (2) dismiss or abstain from exercising jurisdiction over the case under section 305(a).

## Summary of Argument

The Financing Shareholders have admitted—repeatedly, unambiguously, and with surprising candor—that their primary purpose in filing this bankruptcy case is to relieve themselves of their obligations to Lynch under the Kirwan Shareholders Agreement, especially their obligation to obtain his consent to any settlement of ongoing litigation involving Kirwan's only asset, its wholly owned subsidiary. In light of this admission, this case presents a particularly powerful application of the rule that bankruptcy should not be used to resolve two-party or corporate governance disputes that are unrelated to the reorganization of an ongoing business or to the determination of creditors' competing claims. Indeed, this case contains several factors that courts have found dispositive in holding that such a case is filed in bad faith:

- Kirwan exists solely to monetize a single investment; it has no operations, no business to reorganize, no cash flow, no employees, and no other material creditors.

- Although the Financing Shareholders claim to be creditors, they are primarily seeking to advance their interests as shareholders by voiding their own obligations

305

to Lynch under Kirwan's Shareholders Agreement; the Financing Shareholders are not primarily seeking relief for Kirwan nor seeking relief from Kirwan that creditors seek in bankruptcy.

- Because a single person (Richard Deitz) ultimately controls both Financing Shareholders, Lynch is the only other Kirwan shareholder, and no one else has a meaningful interest in this case, this case is in reality a litigation tactic in a two-party dispute between Deitz and Lynch over matters governed by the SHA.

- Deitz is unable to achieve the desired corporate governance change outside of bankruptcy; the Financing Shareholders filed this involuntary case only after multiple unsuccessful attempts to change their corporate governance obligations through other means, one of which was expressly rejected by the London Court of International Arbitration ("**LCIA**").

There is a second reason for dismissing or abstaining from this case: It has no meaningful connection to the United States. Kirwan is a Luxembourg company that owns a Russian subsidiary that purchased shares of a Dutch company in a Russian bankruptcy auction; the Financing Shareholders are Cayman and Cypriot and are controlled by Deitz in England; and all the shareholders agreed in Kirwan's Shareholder Agreement to binding arbitration in London under English law. The Financing Shareholders contrived bankruptcy jurisdiction in the United States based solely on retainers paid to New York law firms and should not be permitted to maintain the cases here because, among other reasons, it defies the parties' legitimate expectations.

Despite these undisputed facts, the Financing Shareholders based their claim for bankruptcy relief on their contention that Lynch will veto any settlement of the underlying litigation that does not result in a pay-out to him and that only a U.S. bankruptcy court can break that anticipated logjam. There is no evidence of that, and in fact, if Lynch is presented with a settlement that acknowledges, protects, and reasonably compensates him for his rights and interests, he would accept it. But even if the Financing Shareholders' contention were true, it would not make this a proper bankruptcy case. If the Financing Shareholders are entitled to any

relief from the bargain they struck, they must seek it in an LCIA arbitration. As described more fully below, the case should be dismissed for bad faith for lack of a proper bankruptcy purpose or because the parties did not reasonably expect an insolvency proceeding in this forum.

## Statement of Facts

### A. Kirwan's Acquisition of PNS and the Yukos Finance Shares

The Russian bankruptcy receiver for Russian oil company Yukos Oil scheduled an auction of the shares of Yukos Finance B.V., a Dutch company ("**Yukos Finance**"), which was the largest foreign subsidiary of Yukos Oil, for August 15, 2007. Three parties, VR Global Partners, LP ("**VRGP**"), Renaissance Holdings Management Limited ("**Renaissance**"), and Stephen P. Lynch, came together to consider a bid on the shares.



Lynch, representing PNS, attended the auction and made the winning bid for the Yukos Finance shares. [Stip. ¶ 21, Ex. 14/2 at 5.] At the closing of the sale, the Russian bankruptcy receiver removed the existing Yukos Finance directors and appointed Lynch and Robert Reid, then an employee of Renaissance Capital, as Yukos Finance directors. [*See* Stip. ¶ 41.]

### B. Kirwan and its Shareholders Agreement

On August 30, 2007, the consortium members signed the Kirwan Shareholders Agreement ("**SHA**"). [Stip. ¶ 25, Ex. 25/1.] Under the SHA, Lynch caused his company OOO Monte Valle to transfer the PNS participatory interests to Kirwan in consideration for 1 Class C share in Kirwan; Through their respective subsidiaries Lapidem and Mascini, whom the SHA refers to together as the "**Financing Shareholders**," VRGP and Renaissance invested in Kirwan the funds PNS needed to complete the Yukos Finance share purchase in consideration for 1,500,000 Class B and 1,000,000 Class A shares. [Stip. ¶¶ 2–3.]

The shareholders agreed in the SHA that Kirwan's sole purpose is to acquire legal title to and to monetize its investment in the Yukos Finance shares and distribute the proceeds to the shareholders. [SHA Recitals A–D at 1, cls. 4.3.1 at 10, 5.3 at 10, 5.4 at 10, 11.4 at 17.] The SHA

permits no other course of action for Kirwan and expressly commits the Shareholders to pursuing this course without time limit. [SHA cl. 23.1 at 29.] Kirwan's only material asset is its participatory (ownership) interest in PNS. [Stip. ¶ 7.] It never had and never was intended to have trading operations or employees or to generate income other than from its investment in Yukos Finance. [Stip. ¶ 7.] In short, Lynch made an "all or nothing" agreement with extremely sophisticated counterparties, the Financing Shareholders.

The SHA is governed by English law [SHA cl. 30 at 36] and provides for arbitration before the LCIA of "any dispute, controversy or claim between the Parties aris[ing] out of or in connection with th[e] Agreement, including any question regarding its existence, breach, termination or invalidity." [SHA cl. 25 at 31.]

### C.  Kirwan's Financing

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████ Initially, the Loans were partially interest-bearing but were converted to non-interest-bearing days later. [Stip. ¶ 35.b.] To minimize the risk to Kirwan, to Lapidem and Mascini (then under separate control), and to Lynch of treating at least the initial investment as a loan, the SHA makes the loans equity-like by providing that the Financing Shareholders "agree to waive any remedies that they may have in relation to any non-payment or non-performance by the Company" under the Loans. [SHA cl. 5.6 at 11.]

████████████████████████████████████████████████████

████████████████████████████████████████ the SHA commits the Financing