Shareholders to provide funds "specified by the Company in ... Cash Call Notice[s]"[3] to fund Operational Expenses, which include "all costs and expenses incurred in connection with asserting legal title to the shares in Yukos Finance BV and/or its Subsidiaries." [SHA cls. 1.1 at 5, 10.1 at 15, 10.4 at 16.]

### D. The Economics of Kirwan's Shareholders Agreement

The SHA provides that "all sums received by the Company (by way of capital or income) shall be allocated to and paid by way of consideration for the repurchase by the Company of its Shares (or as otherwise determined by the Board) to the Financing Shareholders pro rata to the number of Shares they hold." [SHA cl. 11.1 at 17.] That is, the SHA does not contemplate the repayment of any Loans or of funds advanced under Cash Calls, although the Board may later determine otherwise.

The SHA also gives the Class C Shareholder a priority: "No amount shall be paid by way of Return[4] unless the rights of the C Shareholder have been satisfied in full." [SHA cl. 11.3 at 17.] It requires the Financing Shareholders, "prior to the payment" by Kirwan of any Return, to "procure the payment of 10% of the Net Gain by the Company to the C Shareholder" before they share the remaining funds pro rata. [SHA cl. 12.5 at 17–18.]

---

[3] "**Cash Call Notice**" means "a request made by the Board specifying ... the consideration in US$ to be paid to the Company to meet the financing requirements of the Group and the date ... on which the [Financing Shareholders] are required to provide the relevant funds." [SHA cl. 1.1 at 3.]

[4] "**Return**" means "any payment of capital or income (or any other agreement or arrangement that involves any payment or transfer of rights or economic benefit to a Financing Shareholder or its Affiliate) by or on behalf of any Group Company to a Financing Shareholder or its Affiliate, including without limitation payment by way of dividend, repurchase of Shares, interest, or a distribution made on the winding-up of the Company." [SHA cl 1.1 at 5.]



### E.  Lynch's Minority Protections Under the Kirwan Shareholders Agreement

Importantly, the SHA built in specific shareholder protections, particularly for Lynch, the minority shareholder who holds only 1 out of 2,500,001 shares:

- The SHA grants Lynch one of the five seats on the board of directors, out of proportion to his small shareholding. Lapidem and Mascini control the other four seats. [SHA cl. 6.2 at 11–12.]

- The SHA requires the SHA Parties (Kirwan, the Financing Shareholders, VRGP and Lynch) to "procure that [PNS], subject to being put in funds pursuant to Clause 4.2.1 and 10 [Cash Call Notices], takes all actions, steps and proceedings legally available to it" to ensure that PNS acquires legal title to the Yukos Finance shares and commits the SHA Parties not to interfere with that effort. [SHA cls. 5.3– 5.4 at 10.]

- In a provision that has been subject to LCIA arbitration between the Kirwan shareholders described below, the SHA grants Lynch the sole authority to select PNS's General Director, who exercises sole management of PNS. [SHA cl. 7.1.2 at 13.] Lynch now serves as PNS's General Director.

- In another provision that was subject to the same LCIA arbitration, the SHA prohibits any Kirwan shareholder or any affiliate of a Kirwan shareholder, "save as contemplated by" the SHA from entering into any Third Party Agreement, and from soliciting, encouraging, or entering into any discussions "with any person

311

other than the other Shareholders in relation to a possible Third Party Agreement."[5] [SHA cl. 18.2 at 24.]

- The SHA also prohibits the Financing Shareholders from entering into any arrangement with Kirwan or PNS that has the effect of depriving Lynch of any part of the economic return to which he is entitled [SHA cl. 12.11 at 18.]

- Finally, and perhaps most importantly, the SHA requires unanimous shareholder consent, even though Lynch holds only a single share, for any "action or decision … (whether by the Shareholders, the Board, the [PNS] General Director, the [PNS] Management Committee, the Company, any other member of the Group or any of the directors, officers or managers of the Group) or resolution" for certain matters, including—

  o "Any change in the Company's By-Laws the effect of which would be to alter the rights attaching to the C Share,"

  o "The sale of [sic] disposition of Yukos Finance B.V.," and

  o "Any decisions which would result in the Company's liquidation, placing into receivership or administration of the Company." [SHA cl. 9.1.1 at 15, Sched. 3, Part 3 at 43.]

In short, through the SHA, the Financing Shareholders and their principals effectively granted Lynch a "Golden Share," giving him certain definitive control and veto rights and other protections, despite his very small percentage shareholding, in exchange for his contribution to the venture.

### F.  The Yukos Finance Litigation

The disputes the Kirwan shareholders anticipated in August 2007 materialized and are ongoing. Former Yukos Oil CFO Bruce Misamore and legal counsel David Godfrey and entities that they control are in litigation with PNS and other parties seeking to prevent PNS from

---

[5] A **"Third Party Agreement"** is "any contract or arrangement with any person, other than another Party (i) for the acquisition or sale of shares in the Yukos Subsidiaries or (ii) the acquisition of any part of the assets or undertaking of Yukos Subsidiaries or (iii) in relation to the settlement of any Claim or (iv) which would reasonably affect the ability or willingness of the Parties to proceed with the transactions contemplated by this agreement in the ordinary course or (v) in relation to any other matters relating to any claims whatsoever against any of the Yukos Subsidiaries." [SHA cl. 1.1 at 6.]

acquiring legal title to the Yukos Finance shares by trying to invalidate Yukos Oil's Russian bankruptcy receiver's sale of Yukos Finance shares to PNS and the appointment of Lynch and Reid as Yukos Finance directors and by pursuing attachments. Other litigation has followed.

## 1.   The Receiver Litigation

Godfrey and Misamore and entities they control challenged the validity under Dutch law of the Yukos Oil bankruptcy receiver's authority in the Netherlands and therefore indirectly the sale of the Yukos Finance shares—the precise issue analyzed in the Clifford Chance memo. On October 31, 2007, the Amsterdam District Court ruled against the bankruptcy receiver. [Stip. ¶ 41.] The Russian bankruptcy receiver appealed, and Yukos Finance (as represented by Lynch and Reid) and PNS joined as interested parties in the appeal. [Stip. ¶ 43.] After appeals and reversals on varying grounds, the Amsterdam Court of Appeal held a further hearing on the matter on November 28 and 29, 2016 and announced that it would issue a decision on April 18, 2017. All parties to the case will independently have an automatic right to appeal the Court of Appeals' decision to the Dutch Supreme Court.[6] PNS, not Kirwan, has the claim to the Yukos Finance shares, so Kirwan is not a party to this case, and Kirwan does not manage the litigation.

## 2.   The Glendale Litigation

On August 10 and 14, 2007, immediately before the Yukos Finance auction, two entities controlled by Godfrey and Misamore—Yukos Capital S.à R.L. ("**Yukos Capital**"), a subsidiary of Yukos Finance, and Glendale Group Ltd.—filed conservatory attachments over the shares of Yukos Finance for approximately $3 billion (together with the Receiver Litigation, the "**Yukos Finance Litigation**").[7] [Stip. ¶ 45.] Ultimately, the lawsuit sought to require a court-ordered

---

[6] In his capacity as a Yukos Finance director, Lynch intends to appeal if the decision is adverse.

[7] The attachments were based on loans allegedly made by Yukos Capital to Yukos Oil and promissory notes allegedly issued by Yukos Oil and subsequently endorsed to Glendale before its bankruptcy that were not recognized in the Russian bankruptcy.

auction of the Yukos Finance shares, with all proceeds going to satisfy the $3 billion Yukos Capital and Glendale claims. [Stip. ¶ 46.] In January 2009, PNS joined the Glendale Litigation. [Stip. ¶ 47.] The Glendale Litigation is pending in the first instance before the Amsterdam District Court. [Stip. ¶ 48.] Kirwan is not a party to the Glendale Litigation and does not manage the litigation.

### 3.  Other Litigation

The Stipulation of Facts describes other related litigation in the Netherlands, England, and the United States involving other parties, including Godfrey, Misamore, Yukos International, Lynch in his personal capacity, Deitz in his personal capacity, former principals of Renaissance, and an officer of a VR Capital subsidiary. [Stip. ¶¶ 49–54.] Kirwan is not a party to any of this litigation and does not manage the litigation.

Efforts by Deitz to settle all the litigation have been ongoing since at least late 2013. [Stip. ¶¶ 102–116; Ex. 98/1 ¶ 121.]

### G.  Deitz's Attempts To Seize Control of PNS and of Negotiations With PNS's Litigation Adversaries Led to Corporate Governance Disputes Within Kirwan

The corporate governance disputes that lie at the heart of this involuntary bankruptcy case began when VRGP's affiliate VR Capital acquired Mascini from Renaissance Capital in 2013. [*See* Stip. ¶ 38.] The acquisition concentrated control of Kirwan's majority shareholders Lapidem and Mascini in VR Capital and of a majority of its board of directors in a single person, Richard Deitz. [Stip. ¶ 4.]

Deitz then attempted to assert sole control over Kirwan, PNS, the Yukos Finance Litigation and possible settlement, despite the minority protections the Financing Shareholders had granted Lynch in the SHA. As described below, Deitz's actions and Lynch's resistance bred a long series of corporate governance disputes, essentially between Deitz and Lynch.

1. **The First Corporate Governance Dispute: Deitz's Amendment to the PNS Charter Create a PNS Board of Directors**

In 2014, Deitz's Kirwan directors proposed resolutions to change PNS's corporate governance structure to create a supervisory body, such as a board of directors, at PNS and transfer some of Kirwan's board's powers to that PNS body. The supervisory body would not have been bound by the SHA, rendering some of Lynch's SHA protections effectively unenforceable.

Lynch challenged the changes on the grounds that the SHA permitted PNS's governing bodies to be only the General Director (nominated by Lynch) and the "general meeting" (effectively the sole member, Kirwan) represented by Kirwan's board of directors and that the SHA did not provide for the creation of a supervisory body at PNS. On September 3, 2014, to enforce his rights, Lynch commenced an LCIA arbitration, as provided in the SHA, against Lapidem, Mascini, VRGP, and Kirwan, in which Lynch challenged the proposed resolutions, and on September 15, 2014, applied to the Commercial Court in London for interim injunctive relief to restrain them from making the changes. [Stip. ¶ 89; Ex. 98/1 ¶¶ 20–21.] Lynch's action resulted in a Consent Order, ███████████████████████████████████████████████ ████████████████████████████████████████████ [Ex. 92/1.]

2. **The Second Corporate Governance Dispute: Deitz's Further Attempts to Amend the PNS Charter**

Deitz and VR's other directors then proposed alternative changes to the PNS Charter which would have effectively stripped Lynch of his control over PNS as General Director by creating a second PNS "sole executive authority," that is, an executive authority who could act unilaterally on PNS's behalf, without the consent of the PNS General Director, who was the first sole executive authority. [Stip. ¶ 91.] The second sole executive authority would be an entity controlled by Deitz, not Lynch. Lynch objected, but at a November 5, 2014, board meeting, the

VR directors approved the proposed changes to create a second sole executive body that Deitz controlled. [Ex. 98/1 ¶ 24.]

Acting as the PNS General Director, Lynch refused to register the revised Charter on the grounds that it violated Russian law. [Stip. ¶ 94.] Without registration, the revised PNS Charter did not take effect as to third parties.

### 3. The Third Corporate Governance Dispute: Another Deitz Attempt to Amend the PNS Charter

Not to be deterred in his efforts to take control of PNS and of settlement discussions, Deitz and his directors proposed a further revised PNS Charter, which Lynch also opposed. [Stip. ¶ 95.] On January 30, 2015, before the Kirwan board meeting to consider the further revisions, Lynch revived the September LCIA arbitration by serving an amended arbitration request and a request for injunctive relief. [Stip. ¶ 96.] The parties agreed to an expedited arbitration and a standstill during the arbitration. [Stip. ¶¶ 97; Ex. 98/1 ¶ 31.] The tribunal issued its award on July 13, 2015 ("**LCIA Award**"), finding in favor of Lynch and concluding that the effort to create a second sole executive authority violated the SHA. [Ex. 98/1.] The award restrained Kirwan from approving a PNS Charter that would undermine the General Director's exclusive executive power and from appointing as the PNS General Director any person not nominated by Lynch. It awarded Lynch attorneys' fees and costs. [LCIA Award ¶¶ 71–72, 86, 158–59, 165.]

### 4. The First Attempt to Settle the Yukos Finance Litigation

Around the same time, beginning in late 2014 and continuing through the first half of 2015, there were settlement discussions between Deitz and representatives of the Yukos Finance Litigation adversaries. [Stip. ¶¶ 102, 103; Exs. 102/1, 102/2, 103/1, 103/2.] Consistent with his other efforts to exclude Lynch from any material role, Deitz never informed Lynch of the discussions. [Stip. ¶ 103.] The discussions resulted in a draft term sheet and draft settlement

agreement from David Godfrey on June 26, 2015. [Ex. 103/2.] However, due to a June 2015 litigation development in the Netherlands, Deitz unilaterally rejected the settlement proposal. [Ex. 104/1.] Although Deitz eventually shared the term sheet with Lynch, he has refused to this day to provide Lynch, a Kirwan shareholder, a copy of the draft settlement agreement.[8] [Stip. ¶ 103.]

Notably, Deitz also did not disclose these negotiations or his prior agreement to the deal embodied in the draft settlement term sheet and draft settlement agreement to the LCIA tribunal during its June 2015 hearings, even though the negotiations were well underway and substantially concluded by then [Stip. ¶¶ 102, 103; LCIA Award ¶ 46; Exs. 102/1, 102/2], and one of the Issues the parties agreed the tribunal should address was Deitz's "exploratory" discussions and his authority to have them. [LCIA Award ¶¶ 117–126.][9]

5.  **The Fourth Corporate Governance Dispute: Deitz's Actions to Use the LCIA Award and the New PNS Charter to Exert Control**

Right after the LCIA Award and the collapse of the June 2015 settlement efforts, further corporate governance disputes erupted. In July 2015, Kirwan approved another amendment to the PNS Charter ("**2015 PNS Charter**"). [Stip. ¶ 99.] ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█ ██████████████████████████████████████████████████

████████████████████████████████████████████

---

[9] In addressing that Issue, the LCIA Award disallowed Lynch's claim that these secret, unilateral negotiations violated Clause 18.2 of the SHA, the clause that prohibited "Third Party Agreements," because the arbitrator was not persuaded on the basis of the evidence available that Deitz had been acting on behalf of Lapidem or Mascini and not as a Kirwan director. The arbitrator thought Deitz was only "exploring possible settlement on behalf of [Kirwan]." [LCIA Award ¶ 122.]



In August, Lynch met with a representative of the other side in the Yukos Finance Litigation and expressed his opinions that a settlement had to be approved by all Kirwan shareholders and informed him that only the PNS General Director could validly represent PNS in negotiations or bind it to a settlement. [Stip. ¶ 104.] He wrote Deitz about the meeting on August 21, 2015. [Stip. ¶ 104; Ex. 104/2.] Lynch then wrote Deitz on August 28, 2015 that he was planning to meet with the Yukos representatives again the following week. [Stip. ¶ 105.] Deitz responded the next day:





Lynch sent a letter dated November 2, 2015 to a number of Yukos Oil representatives and their lawyers about his authority to act on PNS's behalf. In it, he identified himself as the PNS General Director and said, "As a matter of Russian law … I am the only person

authorized to represent [PNS] and act on its behalf without a power of attorney.... I have never authorized Mr. Deitz to conduct any settlement talks on behalf of [PNS] .... Similarly today no person (other than myself) has any authority to represent [PNS] in any settlement negotiations." [Ex. 107/1 at 2.]

### 6.  Additional Yukos Finance Litigation Settlement Discussions

On December 18, 2015, Godfrey made a new offer to Deitz to settle all litigation relating to Yukos Finance for $60 million. Lynch was copied on the email containing the settlement offer. [Stip. ¶ 111.]

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████

Deitz then began another round of settlement talks with Godfrey without consulting or informing Lynch. [Stip. ¶ 114.] In these talks, Deitz purportedly reached an agreement on a settlement amount of $137.5 million. [Stip. ¶ 113.] Again, there is no evidence of any other terms, nor even that the amount is still on the table.

████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████

320

### H. Deitz's Effort to Seize Control Through Other Means: The Involuntary Bankruptcy Petition

These corporate governance disputes and Deitz's inability under the SHA to effect a settlement of the Yukos Finance Litigation without Lynch's consent culminated in this involuntary bankruptcy case. On March 3, 2016, Lynch wrote to Lapidem, Mascini, Kirwan, and VRGP, formally requesting information on the most recent round of settlement discussions with Yukos Capital representatives and demanding that they and their affiliates terminate any on-going discussions for a Third Party Agreement. [Ex. 117/1.] On the same day, having received information on a Deitz scheme to "get rid of" Lynch, Lynch sent a separate letter to representatives of the Yukos Finance Litigation adversaries to protect his position, explaining that a settlement would violate the terms of the Kirwan Shareholders Agreement among Lynch, Lapidem, Mascini, VRGP and Kirwan. [Ex. 117/2.]

On March 15, 2016, Lapidem, Mascini, Kirwan, and VRGP formally responded to Lynch's request. They disputed Lynch's construction of the relevant corporate governance documents, denied that any approach toward a Third Party Agreement had been made or received, and denied Lynch any right to receive information on settlement discussions. [Stip. ¶ 118, Ex. 118/2.] The same day, based only on a $24,500 shortfall against an unapplied retainer on a law firm's bills issued within the prior eight days, Lapidem and Mascini declared an insolvency event, accelerated the Loans, and filed the involuntary petition commencing this chapter 11 case.

In the Stipulation, they acknowledge that they filed this case "to enable them to implement a resolution of the dispute over the Yukos Finance shares." [Stip. ¶ 119.] In their other representations to this Court, they have been even more explicit. In their *Motion to Terminate Plan Exclusivity Periods* ("**Exclusivity Motion**") [ECF No. 4], they explained that this Court "is the only realistic forum for resolving intractable, global litigation and the governance issues that Mr.

Lynch has fomented" [Excl. Mot. ¶ 7] and that "[t]he only way to resolve eight years of global litigation is through a plan that embodies a settlement proposed by the Petitioners." [Excl. Mot. ¶ 49.] *See* Hr'g Tr. 65:16-18, June 17, 2016 ("**Tr.**") [ECF No. 51] (explaining that the Financing Shareholders are "seeking to use the benefits of this forum to hopefully implement a settlement of this litigation"). Indeed, the plan they contemplated takes direct aim at Lynch: it would cancel Kirwan's stock, dissolve its governance structure, provide releases only for the Financing Shareholders, enjoin "Lynch and all other persons from pursuing any litigation against any of the settling parties in any forum on account of any matter connected to the litigation and/or Kirwan," and preserve the Financing Shareholders' right to sue Lynch and recover the costs of pursuing this involuntary case and any related litigation. [Excl. Mot. ¶ 44.] And the plan would affect only Lynch: the Financing Shareholders concede that there are no material parties other than the attorneys, their affiliates, and Kirwan. (*See* Tr. 118:15–18 ("THE COURT: Are there other parties? Material other parties other than the lawyers? MR. MCDERMOTT: Primarily attorneys, Your Honor, yes.")).

But they go further. The Financing Shareholders also acknowledge that filing this case was a way to deprive Lynch of his corporate governance rights and minority shareholder protections under the SHA, which Lynch and the LCIA Award have prevented them from doing. In their *Objection to the Dismissal Motion* [ECF No. 12], the Financing Shareholders explain "the aim of this chapter 11 case: implementation of a settlement over the dissent of one or more of the parties." [Obj. Mot. Dismiss ¶ 9.] They maintain that the case was filed "(i) to maximize the value of Kirwan by implementing a court-approved settlement that binds all parties, a goal that will be torpedoed by Mr. Lynch if this Court abstains, and (ii) to eliminate the possibility of further governance disputes that have precluded a rational resolution to the litigation." [Obj. Mot. Dismiss ¶ 93.] They also made plain their intent to obtain benefits in a two-party dispute

322

prohibited to them elsewhere by the SHA by using their purported role as creditors and controlling the settlement of the Yukos Finance litigation without Lynch's consent.

> THE COURT: [T]he invocation of this Court through an involuntary is, I guess, at least [tacit] recognition that Mr. Lynch, absent being sued for breach of fiduciary duty in an injunction … can bar Kirwan itself from implementing a settlement, from agreeing to a settlement. So the creditors would do it by imposing it on Kirwan.

> MR. MCDERMOTT: That's correct, Your Honor.

Tr. 65:25–66:8. And despite the SHA's requirement of LCIA arbitration to resolve SHA disputes, they have never initiated any proceeding to pursue any of their claims at the LCIA nor in a Russian court to test Lynch's interpretation of Russian law as applied to PNS and its Charter.

## I.  The Change in Documentation for Operational Expenses Funding

One other detail shows Deitz's efforts to abuse this Court's bankruptcy powers to deprive Lynch of the minority shareholder protections that Deitz agreed to include in the SHA and of Lynch's right to subject disputes to resolution under English law in an LCIA arbitration. The SHA permits the Board to serve Cash Call Notices on the Financing Shareholders to finance Operational Expenses. Documents evidencing the Financing Shareholders' advance of funds to Kirwan were entered into substantially contemporaneously with the funding. ███████████



## Relief Requested

Lynch requests entry of an order under sections 305(a)(1) and 1112(b) of the Bankruptcy Code dismissing or abstaining from this chapter 11 case for cause and in the interests of Kirwan and its creditors.

## Argument

**I.    The Court Should Dismiss this Chapter 11 Case Because It Lacks a Proper Bankruptcy Purpose.**

### A. Legal Standard

Section 1112(b)(1) requires a court to dismiss a chapter 11 case for "cause," unless the court specifically identifies unusual circumstances set forth in section 1112(b)(2) that are not present here. Section 1112(b)(4) sets forth a non-exclusive list of what constitutes "cause." Courts may "determine what additional circumstances, not enumerated in the statute, may constitute cause." *Clear Blue Water, LLC. v. Oyster Bay Mgmt. Co., LLC*, 476 B.R. 60, 67 (E.D.N.Y. 2012). Courts have uniformly determined that lack of good faith in filing the petition constitutes cause for dismissal. *C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d Cir. 1997); *NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.)*, 384 F.3d 108, 118 (3d Cir. 2004); *Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235

F.3d 375, 379 (8th Cir. 2000); 7 COLLIER ON BANKRUPTCY ¶ 1112.04 (Alan N. Resnick and Henry J. Sommer eds., 16th ed. 2016). These principles apply equally in an involuntary case. *In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015).

A case filed without a proper bankruptcy purpose is not filed in good faith. *In re Wally Findlay Galleries (New York), Inc.*, 36 B.R. 849, 850 (Bankr. S.D.N.Y. 1984). Whether there is a proper bankruptcy purpose is a fact-intensive inquiry conducted on a case-by-case basis. However, because petitioners "rarely admit to their own bad faith," courts have identified several "badges" of bad faith. *In re Reyes*, No. 14-13233 (SMB), 2015 WL 4624156, at *5 (Bankr. S.D.N.Y. Aug. 4, 2015). These include the absence of a realistic prospect of reorganization; an effort to use bankruptcy to resolve a two-party dispute, such as a collection action or a corporate governance dispute, especially where an alternative forum is available to resolve the dispute; an attempt to take advantage of a specific bankruptcy provision unavailable outside of bankruptcy; and an effort to change the outcome of a corporate governance contest. Although most cases involve more than one these badges, the presence of any one is sufficient to warrant dismissal.

**Absence of a Realistic Prospect of Reorganization**. The leading Second Circuit bad faith dismissal case is *C-TC 9th Avenue*. There, the partnership debtor had acquired land on credit for development. A dispute with the seller arose, leading to lengthy state court litigation to foreclose the mortgage and to one partners' withdrawal from the partnership. Under state law, the withdrawal resulted in the partnership's dissolution, which required it to wind up its affairs rather than continuing in business. The partnership nevertheless filed a chapter 11 petition. There was no business to save, because the partnership had only one asset, the development land, which was the subject of the foreclosure action, and it had dissolved. Its financial problems resulted from a two-party dispute, which could be resolved in the pending action; it had only a few small unsecured creditors and no employees; and the timing of the filing showed an intent to delay and

frustrate the seller's legitimate efforts to enforce its rights in the foreclosure action. *Id.* at 1312. These badges of bad faith warranted dismissal.

Other cases in this district have applied *C-TC 9th Avenue* to other kinds of two-party disputes that are not part of a realistic effort to reorganize and restructure debt. *In re Reyes* involved a voluntary bankruptcy case to gain advantage in a dispute arising out of a probate proceeding. Judge Bernstein reviewed the "badges" supporting a bad faith filing identified in *C-TC 9th Ave.* and found bad faith, because the debtor had only one asset, whose ownership dispute was subject to a state court proceeding, had no material other creditors, operations, employees or cash flow, and, "the most significant badge of bad faith," the case was a litigation tactic, "not to reorganize, but to relitigate" the issue the Surrogate's Court had already determined. 2015 WL 4624156, at *5. Judge Gerber also dismissed a case involving a dispute over real estate ownership (an apartment), finding similar badges, including the absence of any business to reorganize and the use of the bankruptcy court as a litigation tactic for the benefit of the equity holders, not the debtor corporation. *In re Syndicom Corp.,* 268 B.R. 26 (Bankr. S.D.N.Y. 2001).

The Sixth Circuit reached the same result on essentially the same facts. *In re Winshall Settlor's Trust,* 758 F.2d 1136 (6th Cir. 1985). Upholding dismissal of the case, the court said, "The purpose of Chapter 11 reorganization is to assist financially distressed business enterprises by providing them with breathing space in which to return to a viable state. If there is not a potentially viable business in place worthy of protection and rehabilitation, then Chapter 11 effort has lost its *raison d'etre* …." *Id.* at 1137 (internal citation and quotes omitted).

**Bankruptcy for a Two-Party Dispute, Rather than as a Collective Remedy**. "Bankruptcy is a *collective remedy*, with the original purpose—which continues to this day—to address the needs and concerns of creditors with competing demands to debtors' limited assets." *In re Murray,* 543 B.R. 484, 494–95 (Bankr. S.D.N.Y. 2016); *accord Little Creek Dev. Co. v. Commonwealth Mortg.*

*Corp. (In re Little Creek Dev. Co.)*, 779 F.2d 1068, 1072 (5th Cir. 1986) (bankruptcy is a "balancing process between the interests of debtors and creditors."). So a case filed to use the bankruptcy court as a rented battlefield in a two-party dispute is not filed for a proper bankruptcy purpose. *In re Mountain Dairies, Inc.* 372 B.R. 623 (Bankr. S.D.N.Y. 2007), illustrates the point. A supplier filed a one-creditor involuntary petition to collect disputed claims. The court found the petitioning creditor was ineligible to file the petition because its debt was subject to a bona fide dispute. 372 B.R. at 629–34. As an alternative ground for dismissal, the court felt compelled to abstain under section 305(a), because the case "is a two-party dispute for which the parties have adequate remedies in state court." *Id.* at 635. Similarly, where a debtor filed primarily to pursue a conspiracy claim against its principal creditor, hoping to use the proceeds as the principal source of funds to reorganize, and the state court had already ruled against the debtor on the conspiracy claims, the debtor did not have a realistic chance of reorganizing, the case was a two-party dispute, was filed for an improper purpose and was dismissed. *Wally Findlay Galleries,* 36 B.R. at 851. Dismissal is particularly appropriate where bankruptcy is used to secure benefits for non-debtors in a two-party dispute. *Syndicom*, 286 B.R. at 52.

**Achieving a Result Not Available Outside Bankruptcy**. Courts are also wary of a petitioner who seeks to achieve through bankruptcy a result unavailable under nonbankruptcy law when no proper bankruptcy purpose is present. Certainly, bankruptcy modifies debtor and creditor rights, so at a literal level, virtually any bankruptcy filing achieves a result that is "unavailable" outside bankruptcy. But merely seeking a tactical litigation advantage or the benefit for its own sake of a specific Bankruptcy Code provision, such as the lease damage cap of section 502(b)(6) or the automatic stay, without a good faith intent to reorganize, does not justify a chapter 11 petition; conversely, seeking the specific benefit of such a provision does not constitute bad faith if there is a valid purpose in seeking bankruptcy relief. Without the need for

327

bankruptcy as a collective remedy to relieve financial distress, preserve going concern value, and permit reorganization or a fresh start, the case is filed for an improper purpose. *Integrated Telecom Express*, 384 F.3d at 129–30 (case dismissed for bad faith where the business had terminated and the debtor was in dissolution proceedings under state law).

*Murray* illustrates the point. There, the creditor held a large judgment claim against an individual debtor, whose only material asset was a tenancy by the entirety interest in his family's apartment. The creditor's nonbankruptcy state law remedies permitted it to reach only the debtor's 50% interest in the apartment. The sale of the debtor's 50% interest alone would fetch substantially less than half the value of the entire apartment. To gain the advantage of section 363(h), under which the trustee could sell the entire apartment—both the debtor's interest and his wife's—the creditor filed an involuntary chapter 7 bankruptcy petition.[10] 543 B.R. at 487. In dismissing the case, the court identified the following factors as particularly probative of the filing's improper purpose:

- the filing arises solely from a two-party dispute;
- there are no other creditors' needs and concerns to protect;
- the filing was been made solely to achieve a result unavailable under non-bankruptcy law;
- no assets would be lost or dissipated if the bankruptcy case did not continue: the creditor's interest in the judgment and its ability to enforce the judgment against the apartment would remain; and
- the debtor did not want or need to be discharged.

*Id.* at 486, 492. The court found the creditor's use of bankruptcy to more than double its recovery at the expense of the debtor and his family without any other bankruptcy objective to be a particularly egregious abuse of the bankruptcy system. The court's ruling did not hinge on the

---

[10] *Murray* was a chapter 7 case, and thus, statutory cause was defined in section 707(a), rather than in section 1112(b). Sections 707(a) and 1112(b) are "closely similar" and involve similar analysis. *See Murray*, 543 B.R. at 490.

creditor's subjective intent. If the creditor was unaware of the improper purpose underlying the petition, the court would have dismissed for unenumerated cause; if the creditor was aware of the improper purpose, the filing was in bad faith. *See id.* at 497. "But the Court does not need to make a finding as to how ignorant [the creditor] was of the basic purposes for which the bankruptcy system exists, because either way, this case must be, and is, dismissed for cause." *Id.*

**Bankruptcy to Avoid a Corporate Governance Restriction**. Even more on point, a bankruptcy filing is also improper when used by a shareholder group to undermine or evade corporate governance constraints. *In re Diamondhead Casino Corp.*, No. 15-11647(LSS), 2016 WL 3284674, at *1 (Bankr. D. Del. June 7, 2016), is particularly on point. There, the debtor was a publicly traded company that issued convertible notes in 2010 to some of its shareholders, who had purchased their stock in 2000. The notes matured in 2012. The debtor's only material asset was its subsidiary, which owned a tract of undeveloped land that had been awaiting development since 2000. The land's value exceeded the amount of the debtor's debts. Before 2015, none of the noteholders initiated litigation to collect the notes. In 2014, management took actions that frustrated some of the shareholders and caused them to lose faith in management. In 2015, the debtor held its first shareholder meeting in seven years. Some of the noteholder/shareholders staged a proxy contest to oust management. After they lost, they filed an involuntary petition against the debtor, seeking a trustee to replace management.

At the trial on the debtor's motion to dismiss, "Each individual Petitioning Creditor expressed his frustration with the lack of development of the Property, not the non-payment of their notes." *Id.* at *18. Each individual petitioning creditor testified that he believed that the alleged debtor's current management was incapable of making a development deal. The bankruptcy was precipitated by the petitioning creditors' desire for "an independent fiduciary in this bankruptcy proceeding … empowered to look at proposals for the sale or development of

the Property and decide what is in the best interests of the Company and all stakeholders." *Id.* at *17. Singling out one petitioning creditor's testimony that "had the opposition slate won the proxy contest, he would not have filed the involuntary petition," the court determined that these were "the grievances of a stockholder who disagrees with management's decisions." *Id.* at *18. The court concluded that the petitioning creditors' "primary concern in filing the involuntary petition was to effect a change in management to benefit their investments as stockholders." *Id.* at *22. The court explained that "[w]hile it may be proper in some circumstances for noteholders to band together to file an involuntary bankruptcy petition, it is not appropriate here, where the noteholders are looking to vindicate their equity interests and where myriad state law remedies are available." *Id.*

Because of the close parallels with the facts of this case, it is worth noting one particular *Diamondhead* finding that applies equally here. The court acknowledged that the petitioning creditors had two capacities, as creditors and shareholders, but rather than decide the capacity in which they were acting or whether one capacity permitted action either unavailable or prohibited to the other, it ruled based on the petitioners' primary reason for filing the involuntary petition. *Id.* at *18 & n.142. Accepting all the petitioners' grievances against management's conduct and failed promises as true, the court found them to be grievances of stockholders, not creditors, and therefore found the petitioners' primary motivation was to seek a change in management, which is a factor warranting dismissal. *Id.* at *18. Based on that premise, the court also found that the petitioners' efforts to upend the results of the shareholder vote through bankruptcy, rather than through the Delaware General Corporation Law's provision that permit a shareholder to contest an election, was an attempt by one shareholder group to obtain an advantage over another, equally as reproachful as a creditor's improper attempt to obtain a disproportionate advantage over other creditors. *Id.* at *22.

Other courts have also determined that the bankruptcy court is not an appropriate forum to litigate shareholder or partnership disputes, particularly when an alternative forum is available, even if the debtor has proposed a confirmable reorganization plan. Thus, in *Cedar Shore Resort*, 235 F.3d 375, the Eighth Circuit affirmed dismissal for bad faith of a voluntary case the debtor filed with a confirmable plan that was intended to stay minority shareholders' derivative litigation against the debtor and its directors. *See, e.g.*, *In re ABQ–MCB Joint Venture*, 153 B.R. 338, 342–43 (Bankr. D.N.M. 1993) (dismissing bankruptcy petition filed to resolve intra-partnership disputes, and lender/borrower disputes, all of which were state law claims, when no showing that the claims could not be more effectively handled by a state court); *In re Petro Fill, Inc.*, 144 B.R. 26, 31 (Bankr. W.D. Pa. 1992) (bankruptcy improper in part because petitioning creditor-stockholder-director had standing to bring state law action for dissolution of the alleged debtor); *In re Beacon Reef Ltd. P'ship*, 43 B.R. 644, 646 (Bankr. S.D. Fla. 1984) (abstaining under section 305(a) where bankruptcy that primarily consisted of intra-partnership dispute where limited partner had an adequate remedy at state law to raise defenses in pending foreclosure proceedings and between parties to the partnership agreement); *Matter of Win–Sum Sports, Inc.*, 14 B.R. 389, 394–95 (Bankr. D. Conn. 1981) (dismissing case where petitioner sought to use the bankruptcy court as an alternate approach to state court procedures to resolve intra-company management and stockholder problems).

Of course, the use of bankruptcy in a corporate governance dispute or to avoid a corporate governance restriction does not necessarily require dismissal. The touchstone is whether the filing is for a proper bankruptcy purpose. For example, in *In re Houston Regional Sports Network L.P.*, 505 B.R. 468 (Bankr. S.D. Tex. 2014), the debtor's principal asset was a broadcast contract with one of the partners, the Houston Astros baseball team. The Astros were about to terminate the contract for default, which would have benefited the Astros but also would have caused the debtor to fail

by the loss of its principal operating asset. To avoid the partnership agreement's unanimous partner consent requirement for the partnership to file a voluntary bankruptcy petition, the other partners, who also were creditors, filed an involuntary petition. In this context, the court determined that modification of the Astros' partnership right to consent to the petition was appropriate. "[W]hen the petitioning creditors act with the intention of preserving the Estate, the sole fact that a voluntary filing was precluded by state-law organizational documents will not make the involuntary petition one filed in bad faith." *Id.* at 478. This circumvention of a corporate governance document's restriction on bankruptcy filings "does not necessarily lead to a conclusion that [the petitioning creditor] acted in bad faith," because a filing to preserve an operating debtor's going concern value was a proper bankruptcy purpose. *Id.*

Similarly, *In re Kingston Square Associates*, 214 B.R. 713 (Bankr. S.D.N.Y. 1997), involved a debtor whose corporate governance documents required unanimous consent of the directors to file a voluntary petition. The court denied a motion to dismiss for bad faith a collusive involuntary bankruptcy petition filed on the eve of foreclosure of the debtor's principal asset, because bankruptcy was critical to collective recovery and was appropriate where "the existence of the corporation is very much at risk." *Id.* at 731. The court explained that "bad faith will not normally be found where the primary motivation of petitioning creditors was to prevent further dissipation of assets through foreclosure in an attempt to facilitate an orderly workout among all the creditors." *Id.* at 736. Thus, the violation of corporate governance requirements did not lead to dismissal, because they were coupled with a core bankruptcy purpose—reorganization and preservation of going-concern value in the face of the risk of loss of the debtor's principal asset by the unilateral action of a lender or other counterparty.

**In re Yukos Oil**. Given the genesis of the disputes behind this case, we cannot conclude this analysis without mentioning the dismissal of the chapter 11 case of Yukos Oil Co., formerly

Russia's largest oil company, on grounds very similar to those present here. *In re Yukos Oil Co.,* 321 B.R. 396 (Bankr. S.D. Tex. 2005). With very limited U.S. contacts or assets, Yukos Oil filed a chapter 11 case in Texas to stay the Russian government's seizure of assets to pay claimed tax debts. The assets that created jurisdiction were transferred to the U.S. only days before the filing. The proposed reorganization was not a financial reorganization. Most of its assets were oil and gas assets located in Russia. By filing its chapter 11 case, Yukos sought to substitute U.S. law for Russian and international arbitration laws in its dispute with the Russian government. Based on the totality of the circumstances, the court dismissed the case under section 1112(b). *Id.* at 410–11.

## B.  This Case Lacks a Proper Bankruptcy Purpose.

As the cases above show, this case has nearly all the elements the courts cite as grounds for dismissal for lack of a proper bankruptcy purpose. This case contains several badges that support a bad faith finding: Kirwan has no prospect of reorganizing; there are no other creditors' needs and concerns to protect and no need for a discharge or fresh start; the case was filed primarily to evade a corporate governance restriction; and the petition was filed to achieve a result unavailable under non-bankruptcy law. The case represents Deitz's attempt to escape the plain terms of a corporate governance document, the SHA, and thereby resolve the two-party dispute between the Financing Shareholders he controls and Lynch. He is unhappy with the constraints the SHA imposes and, having repeatedly failed in previous attempts, contrived this U.S. bankruptcy case hoping to rewrite their arms'-length bargain.

## 1.  Kirwan Has No Realistic Prospect of Reorganizing.

Kirwan is not an operating business; it is a shell used for tax purposes. Its sole function is to hold the PNS membership interest while PNS pursues title to the Yukos Finance shares, then to become the holding company of Yukos Finance, monetize the value of the Yukos Finance shares and distribute this value to its shareholders. As a shell company with only one non-

operating asset and no ongoing business to reorganize, no income or expenditures, no employees, no creditors other than its shareholders, no going concern value to preserve, and not even any litigation to which it is a party, Kirwan is only tenuously a debtor at all. After the Yukos Finance Litigation concludes, even if the Financing Shareholders force the conclusion through this chapter 11 case, Kirwan will simply dissolve. Despite its balance-sheet debt, Kirwan does not need a discharge, because the SHA itself provides for the distribution to its shareholders of any sums it receives. [SHA cls. 11.1 at 17, 11.4 at 17.] And as a corporate debtor that will not continue in business after the chapter 11 case, it would not be entitled to receive a discharge. 11 U.S.C. § 1141(d). Therefore, it has no realistic prospect of reorganizing.

The Financing Shareholders admit that the only plan they have contemplated does not involve a reorganization in any meaningful sense. They say their plan would propose settlement of litigation, but only as an end in itself, not as a means of reorganizing Kirwan, of paying its debts, or of restructuring Kirwan or relieving it of its debts. Kirwan and the Financing Shareholders are not even parties to the litigation they propose to settle. Nor is it clear how they could use this Court and the Bankruptcy Code to effect the global settlement they tout. Among other things, they have not identified the parties—either the entities or the individuals—whose participation would be needed for such a settlement, how the Court would obtain jurisdiction over them, whether the other relevant jurisdictions—Luxembourg for Kirwan, Russia for PNS, The Netherlands for Yukos Finance, among others—would recognize this Court's order imposing either settlements or asset dispositions or, most importantly, the settlement. The Financing Shareholders are effectively seeking not to reorganize Kirwan, but to rewrite the SHA to freeze out Lynch and give themselves carte blanche to settle without Lynch's consent, while getting third-party releases from any claims that Lynch would have against them for violating the SHA. Such a plan is not an effective reorganization of Kirwan or a proper purpose for a chapter 11 case.

2.  **This Case is a Two-Party Dispute, With No Need for Bankruptcy's Collective Remedy.**

Although the existence of a two-party dispute does not always indicate an improper bankruptcy purpose, "it is a factor repeatedly considered in determining whether cases are filed in good faith, or where there otherwise is cause for dismissal. And it weighs in favor of dismissal when it is present," particularly in the absence of other "legitimate bankruptcy objectives." *Murray*, 543 B.R. at 493; *see Syndicom*, 286 B.R. at 31; *Wally Findlay Galleries*, 36 B.R. at 850. This principle applies with particular force in this case, because there are no legitimate bankruptcy objectives.

This case does not have the ostensible bankruptcy purpose usually present in a typical two-party debtor-creditor dispute, such as a creditor's collection action against a debtor or a debtor's claim seeking recovery for a creditor's misconduct. It does not even involve a debtor or a creditor. Indeed, the Financing Shareholders sit on both sides of the debtor-creditor relationship, with complete control over the resolution of that relationship, except for their agreement in the SHA not to take certain actions without Lynch's consent. As a result, the Debtor itself has been completely absent from the case—it has not filed schedules or a statement of financial affairs, sought to employ counsel, or otherwise taken actions consistent with a debtor or debtor in possession in a chapter 11 case. Nor have the purported creditors ever attempted to collect on their loans before filing the involuntary petition or raised their complaints with Kirwan either about the purported insolvency event (which they declared on the petition date) or Kirwan's purported default on the petition date under the Loans and Cash Call advances. There were no threats of separate collection actions from the other purported prepetition creditor: one law firm for a small amount.

Instead, this case is a shareholder dispute essentially between two individuals, Deitz and Lynch—an extension of Deitz's dispute with Lynch over the power to control and to negotiate and bind PNS to a settlement of the Yukos Finance Litigation, nothing more. Deitz, Renaissance, and Lynch agreed to a corporate structure that required unanimity for certain critical corporate decisions, such as settlement of litigation or any action that would result in Kirwan's liquidation or administration, with each individual holding veto power for those actions. [*See* SHA Sched. 3, Part 3 at 43.] VRGP's acquisition of Renaissance did nothing to change the unanimity requirement. But Deitz grew tired of the long-running Yukos Finance Litigation that the SHA specifically contemplated and of his inability to control it unilaterally, and he attempted to circumvent the unanimity requirement. [*See, e.g.*, Stip. ¶¶ 88–119.] Lynch challenged the ability of Deitz or Deitz-controlled entities to do so, asking that negotiations proceed only as the SHA requires. Instead, Deitz-controlled entities retained U.S.-based lawyers not long before the petition date and then, to concoct an insolvency event, simply stopped funding Kirwan to pay for work the lawyers had already done.

The Financing Shareholders concede there are no material claims other than theirs, and the Court recognized that there appear to be no other parties in the case. [*See* Tr. at 118.] No one other than Deitz and Lynch is involved or materially affected. No other creditors have appeared or filed proofs of claim in the case. Dismissal is particularly appropriate where there is (effectively) only one creditor: "There are no creditors competing with each other to be first in line to collect on claims. There are no other creditors to help. In fact, there are no other creditors." *Murray*, 543 B.R. at 492. Thus, allowing this case to proceed serves no collective action, creditor-protection or debtor-protection bankruptcy purpose. And this case is not even intended to relieve Kirwan of its obligations; its sole purpose is to relieve the extremely sophisticated Financing Shareholders of the obligations to Lynch they freely undertook in the SHA.

Dismissal is especially appropriate where there is an alternative forum to resolve any dispute over corporate governance rights. Here, the SHA specifically requires that shareholder disputes be resolved by arbitration before the LCIA, which has already decided one variation of the corporate governance dispute here.

### 3.   The Case Seeks to Avoid a Corporate Governance Restriction.

The Financing Shareholders concede they filed this case to avoid the SHA's unanimous consent requirement so they could deal with the Yukos Finance Litigation without Lynch's consent. [Excl. Mot. ¶ 7; Tr. 65:25–66:10.] Rather than attempt to square what is primarily an exercise of their shareholder rights with their SHA obligations, they attempt to characterize their actions as an assertion of creditor rights. The *Diamondhead* court rejected that characterization. It determined the primary reason the petitioning creditors filed the involuntary petition was the shareholder-driven desire to change management, rather than the creditor-driven desire to collect their notes. Thus, the court gave little weight to the petitioners' stated desire to collect their notes.

The facts here are remarkably similar. As in *Diamondhead*, the debtor's principal asset is a subsidiary whose sole asset—there undeveloped land, here litigation rights—requires additional investment to return value to the debtor. As in *Diamondhead*, frustrated shareholders, impatient with the lack of return on their investment, desire a change in corporate control to further their interests. As in *Diamondhead*, the Financing Shareholders have candidly admitted that shareholder grievances more than debt collection motives precipitated the involuntary petitions, which seek to alter non-bankruptcy corporate governance documents. And as in *Diamondhead* and for the same reasons as there, this case should be dismissed. If the bankruptcy court is not a rented battlefield or debt-collection agency, it should not be a place for shareholders to escape their agreements among themselves.

### 4. The Financing Shareholders Seek Relief Unavailable in a Nonbankruptcy Forum.

The Financing Shareholders seek bankruptcy relief solely to secure a benefit that they cannot achieve under nonbankruptcy law—rejection of the SHA's carefully-negotiated restrictions to benefit themselves at the expense of the only other shareholder. They admit the bankruptcy was filed "(i) to maximize the value of Kirwan by implementing a court-approved settlement that binds all parties, a goal that will be torpedoed by Mr. Lynch if this Court abstains, and (ii) to eliminate the possibility of further governance disputes that have precluded a rational resolution to the litigation." [Obj. Mot. Dismiss ¶ 93.] Their counsel made plain their intent to obtain benefits unavailable in a nonbankruptcy setting by asserting shareholder rights through their role as creditors. [Tr. 65:25–66:10.] As explained in *Murray*, bankruptcy's purpose is not to permit a party in a bilateral dispute to obtain favorable and unanticipated legal outcomes with no proper, independent bankruptcy rationale. Here, there is no such independent, proper purpose, only the purpose to seize control of the Yukos Finance Litigation.

Not only is the relief the Financing Shareholders seek unavailable in a nonbankruptcy forum, it has been denied to them by the LCIA. This case is a litigation tactic that attempts a fourth or fifth bite at that apple, to eliminate the SHA restrictions that the LCIA held against them. That is not a proper bankruptcy purpose.

## II.   The Court Should Abstain Under Section 305(a).

In the alternative, this Court should abstain from exercising jurisdiction over this case, because the involuntary bankruptcy petition was filed for an improper purpose and because resolution in this Court would be contrary to the parties' legitimate expectations.

### A. Legal Standard

Section 305(a)(1) permits a bankruptcy court to dismiss a case or suspend proceedings if "the interests of creditors and the debtor would be better served by such dismissal or suspension." 11 U.S.C. § 305(a). "Granting an abstention motion pursuant to § 305(a)(1) requires more than a simple balancing of harm to the debtor and creditors; rather, the interests of both the debtor and its creditors must be served by granting the requested relief." *See In re Northshore Mainland Servs., Inc.*, 537 B.R. 192, 203 (Bankr. D. Del. 2015) (internal citation omitted). Although the decision to dismiss or abstain under section 305(a) "is a fact-based consideration and no particular factor should decide the result," *In re Persico Contracting & Trucking, Inc.*, No. 10–22736 (RDD), 2010 WL 3766555, at *4 (Bankr. S.D.N.Y. Aug. 20, 2010), courts have developed a multi-factor test to evaluate the facts and circumstances. Where the matter was like a two-party collection action, and the normal reasons for filing a bankruptcy petition were absent, this Court listed those factors:

> economy and efficiency of administration, whether another forum is available to protect the interests of both parties or there is already a pending proceeding in state court, whether Federal proceedings are necessary to reach a just and equitable solution, whether there is an alternative means of achieving an equitable distribution of assets, whether the debtor and the creditors are able to work out a less expensive out-of-court arrangement which better serves all interests in the case, whether a non-Federal insolvency has proceeded so far as those proceedings that it would be costly and time consuming to start afresh with the Federal bankruptcy process, and most important, the purpose for which bankruptcy jurisdiction has been sought.

*Id.*; *see Northshore*, 537 B.R. at 203–04; *In re TPG Troy, LLC*, 492 B.R. 150, 160–61 (Bankr. S.D.N.Y. 2013).

*Northshore Mainland Services* provides a separate reason for abstention: the parties' legitimate expectations of where an insolvency proceeding would occur. 537 B.R. at 204–05. There, the debtors were formed to own, construct, and manage a resort in The Bahamas. One

debtor was a Delaware LLC; the rest were Bahamian corporations. They contracted with a Chinese construction firm to build the resort and primarily with Chinese lenders to finance the project. New York law governed the construction contracts, and the parties consented to New York jurisdiction and venue to resolve disputes. English law governed the credit agreement, and the parties consented to English jurisdiction and venue. Bahamian law governed the security interests. Construction was delayed, disputes arose, and the debtors ran short of cash. Attempts to negotiate a consensual resolution were unsuccessful.

The Bahamian debtors opened bank accounts in New York, and 10 days later, all debtors filed chapter 11 cases in Delaware. They also promptly filed a petition in the Bahamian Supreme Court for recognition of the Delaware chapter 11 cases and an action against the construction company in London. Three weeks later, the Bahamian Attorney General filed winding up petitions against the Bahamian debtors in the Bahamian Supreme Court. The Bahamian Supreme Court denied the recognition petitions and refused to enforce the chapter 11 automatic stay in The Bahamas.

The Chinese entities moved to dismiss the chapter 11 cases. After determining the debtors were eligible for chapter 11 based on their U.S. bank accounts and that they filed bankruptcy in good faith with a valid purpose to reorganize and not to gain litigation advantage, the court focused on abstention under section 305(a). The court recognized the debtor was "truly an international case with the main contestants hailing from Wilmington, Delaware, to Beijing, China, to Nassau, The Bahamas," but the focus of the case was a project in The Bahamas. *Id.* at 205–06. The court determined that "many stakeholders in the Project would expect that any insolvency proceedings would likely take place in The Bahamas, the location of this major development Project. I perceive no reason—and have not been presented with any evidence—that the parties expected that any 'main' insolvency proceeding would take place in the United

States." *Id.* at 206. Therefore, the court abstained from the cases of all the Bahamian companies. *Id.*

### B. The Court Should Abstain From Exercising Jurisdiction Over this Case.

#### 1. The Case was Filed for an Improper Purpose.

As this Court wrote in *Persico*, the "most important" factor in evaluating abstention is "the purpose for which bankruptcy jurisdiction has been sought." 2010 WL 3766555, at *4. As discussed in the preceding section, the Financing Shareholders' purpose here is to relieve themselves of the SHA's unanimity requirement. This factor supports not only dismissal under section 1112(b), but also abstention under section 305(a).

#### 2. Allowing the Case to Proceed Here Flouts the Parties' Legitimate Expectations.

The Court also should abstain because none of the parties could have reasonably expected to participate in a bankruptcy case for Kirwan in the Southern District of New York. The parties have no meaningful or relevant contacts with the United States. Kirwan is a company located in and organized under the laws of Luxembourg, with no business or property in the United States, other than retainers recently placed with its lawyers. Its sole corporate purpose was funding the efforts by its Russian subsidiary to obtain clear title to the shares of Yukos Finance, a Netherlands company. The two Financing Shareholders are a Cayman Islands company and Cyprus company, respectively, which are in turn controlled by VR and its affiliates, which are based in London. Under the SHA, the parties agreed to binding arbitration in the U.K., and the litigation over the Yukos Finance shares is pending in the Netherlands.

Kirwan was not supposed to have outside creditors at all, bolstering the argument that the parties could not have expected a U.S. bankruptcy case to resolve disputes. Rather than initiating this action in one of the five countries that actually has contacts with the parties, the

341

Financing Shareholders concocted minimal contacts with the United States, including their transparent, belated effort in the recent loan agreements to manufacture New York jurisdiction for an imminent bankruptcy case filing in New York, to obtain the benefit of an otherwise unrelated forum. The Financing Shareholders, like the *Northshore* debtors, have not, and likely cannot, adduce any evidence suggesting that the parties expected a main insolvency proceeding would take place in the United States.

At the June 17 hearing, this Court pointed to international shipping company cases, for which New York is probably as good a forum as anywhere and is at least arguably in the parties' contemplation based on New York-law based debt or other New York contacts. [*See* Tr. 58.] Nothing suggests that New York is convenient or well-suited to this dispute. To the contrary, English law governs most of the documents, so proceeding in New York would require English law experts, which would not be required in the agreed London venue, and the shareholders expressly agreed, both in the SHA and in the various loan agreements, on arbitration in London to resolve any disputes. Accordingly, the legitimate expectations of the parties weigh against an exercise of jurisdiction here.

Moreover, the legitimate expectations of the parties likely did not contemplate a bankruptcy at all, let alone in the United States. Kirwan's financing is from its shareholders, not outside creditors. The debts are equity investments dressed in loans' clothing. The Financing Shareholders specifically waived any remedies for Kirwan's nonpayment or nonperformance under the initial Loans used to finance the acquisition of the Yukos Finance shares. [SHA cl. 5.6 at 11.] The initial Loans as well as the later loans for Operational Expenses were non-interest bearing. [Stip. ¶ 35.b; Exs. 35/2, 36/1.] They had no fixed due date, becoming due only upon either one years' notice or upon an undefined "insolvency event," apparently added only to give the Financing Shareholders a seat at the table if Kirwan suffered such an event. If Kirwan received

any sums for available for distribution, it would be paid, after satisfying any Class C Shareholder rights, to the Financing Shareholders for repurchase of their shares, not as repayment of their Loans or Cash Call advances. And unlike the usual U.S. corporate document prohibition on filing a voluntary bankruptcy petition without unanimous director approval, the SHA prohibits the shareholders, in any capacity, from taking any decision "which would result in the Company's liquidation, placing into receivership or administration of the Company," without unanimous shareholder consent. [SHA, cl. 9.1 at 15, Sched. 3, Part 3 at 43.] By failing to distinguish between voluntary and involuntary proceedings or to reference any of the terms typically used to refer to a U.S. bankruptcy case, such as "bankruptcy," "title 11," or "petition," this provision shows the parties did not expect a U.S. bankruptcy filing at all.

## Conclusion

For the foregoing reasons, Lynch respectfully requests the Court dismiss or abstain from exercising jurisdiction over this chapter 11 case for cause and in the interests of Kirwan and its creditors.

Dated:   New York, New York
         December 9, 2016

/s/ Richard Levin_____

Richard Levin
Stephen L. Ascher
JENNER & BLOCK LLP
919 Third Avenue
New York, NY 10022-3908
(212) 891-1600
rlevin@jenner.com
sascher@jenner.com

*Attorneys for Stephen P. Lynch*

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| KIRWAN OFFICES S.À R.L., | : | Case No. 16-22321 (RDD) |
|  | : |  |
| Debtor. | : |  |
|  | : |  |

**SUPPLEMENTAL SUBMISSION OF LAPIDEM AND MASCINI
IN OPPOSITION TO STEPHEN LYNCH'S MOTION TO DISMISS THIS
CHAPTER 11 CASE AS A BAD FAITH FILING**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 2

BACKGROUND FACTS....................................................................................................... 7

    A.    Acquisition of Yukos Finance; Structure of Kirwan and PNS ............................ 7

    B.    Competing Claims To Yukos Finance And Subsequent Litigation
          Over Same ..................................................................................................... 9

    C.    Prepetition Disputes Among Petitioners and Mr. Lynch ................................. 14

ARGUMENT...................................................................................................................... 21

I.     DISMISSAL IS NOT WARRANTED UNDER § 1112 OF THE
       BANKRUPTCY CODE ........................................................................................... 21

    A.    Mr. Lynch Fails to Show That  Kirwan and Petitioners Cannot Use
          The Code To Resolve Kirwan's Affairs ........................................................ 21

    B.    Mr. Lynch Cannot Carry His Burden Of Proving That Petitioners
          Have Acted In Subjective Bad Faith .............................................................. 27

II.    ABSTENTION UNDER § 305 IS NOT WARRANTED ............................................ 37

CONCLUSION.................................................................................................................... 40

i

# TABLE OF AUTHORITIES

## CASES

*In re 68 West 127 Street, LLC*,
    285 B.R. 838 (Bankr. S.D.N.Y. 2002) .............................................................passim
*In re ABQ-MCB Joint Venture*,
    153 B.R. 338 (Bankr. D.N.M. 1993) ...............................................................33
*In re American Globus Corp.*,
    195 B.R. 263 (Bankr. S.D.N.Y. 1996) .............................................................31
*Bank of America, National Association v North LaSalle Street Ltd. Partnerhip*
    *(In re 203 North LaSalle Street Partnership)*,
    246 B.R. 325 (Bankr. N.D. Ill. 2000) ...............................................................26
*Baker v. Latham Sparrowbush Associates (In re Cohoes Industrial Terminal, Inc.)*,
    931 F.2d 222 (2d Cir. 1991) .............................................................................21
*In re Beacon Reef Ltd Partnership*,
    43 B.R. 644 (Bankr. S.D. Fla. 1984) ...............................................................33
*Board of Directors Directors of Multicanal S.A.*,
    314 B.R. 486 (Bankr. S.D.N.Y. 2004) .............................................................21
*Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*,
    235 F.3d 375 (8th Cir. 2000) ...........................................................................32
*In re Century/ML Cable Venture*,
    294 B.R. 9 (Bankr. S.D.N.Y. 2003) .................................................................21
*Commodity Futures Trading Commission v. Weintraub*,
    471 U.S. 343 (1985) .........................................................................................24
*In re Congregation Birchos Yosef*,
    535 B.R. 629 (Bankr. S.D.N.Y. 2015) .............................................................27
*Continental Insurance Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*,
    671 F.3d 1011 (9th Cir. 2012) .........................................................................25
*C-TC 9th Avenue Partnership v. Norton Co. (In re C-TC 9th Avenue Partnership)*,
    113 F.3d 1304 (2d Cir. 1997) .................................................................3, 21, 28
*Davis v. M&M Developer, LLC (In re MBM Entertainment, LLC)*,
    531 B.R. 363 (Bankr. S.D.N.Y. 2015) .............................................................21
*In re Diamondhead Casino Corp.*,
    No. 15-11647(LSS), 2016 WL 3284674 (Bankr. D. Del. June 7, 2016) .............31
*Durham v. BAI (Run Off) Ltd* [2012] UKSC 14 (Eng.) ....................................35
*Eastman v. Eastman (In re Eastman)*,
    188 B.R. 621 (B.A.P. 9th Cir. 1995) ...............................................................37
*Garza v. Marine Transport Lines, Inc.*,
    861 F.2d 23 (2d Cir. 1988) ...............................................................................36
*In re General Growth Properties, Inc.*,
    409 B.R. 43 (Bankr. S.D.N.Y. 2009) .............................................................passim
*In re Gucci*,
    174 B.R. 401 (Bankr. S.D.N.Y. 1994) .............................................................22

*In re Houston Regional Sports Network, L.P.,*
  505 B.R. 468 (Bankr. S.D. Tex. 2014) ........................................................25, 30
*In re Intervention Energy Holdings, LLC,*
  553 B.R. 258 (Bankr. D. Del. 2016)........................................................5, 25, 30
*In re Inwood Heights Housing Development Fund Corp.,*
  No. 11-13322, 2011 WL 3793324 (Bankr. S.D.N.Y. Aug. 25, 2011)...................22
*In re Kingston Square Associates,*
  214 B.R. 713 (Bankr. S.D.N.Y. 1997)..............................................................passim
*MBNA American Bank, N.A. v. Hill,*
  436 F.3d 104 (2d Cir. 2007) ............................................................................27
*In re Lake Michigan Beach Pottawattamie Resort, LLC,*
  547 B.R. 899 (Bankr. N.D. Ill. 2016) ......................................................5, 25, 30
*In re Murray,*
  543 B.R. 484 (Bankr. S.D.N.Y. 2016).........................................................28, 32
*In re Northshore Mainland Services, Inc.,*
  537 B.R. 192 (Bankr. D. Del. 2015) ................................................................39
*In re Paper I Partners, L.P.,*
  283 B.R. 661 (Bankr. S.D.N.Y. 2002) ............................................................37
*In re Persico Contracting & Trucking, Inc.,*
  No. 10-22736 (RDD), 2010 WL 3766555 (Bankr. S.D.N.Y.
  Aug. 20, 2010) .................................................................................................38
*In re Petro Fill, Inc.,*
  144 B.R. 26 (Bankr. W.D. Pa. 1992) ...............................................................33
*In re Pulp Finish 1 Company,*
  No. 12-13774, 2013 WL 5487933 (Bankr. S.D.N.Y. Oct. 2, 2013).....................21
*In re Quad-C Funding LLC,*
  496 B.R. 135 (Bankr. S.D.N.Y. 2013)........................................................25, 33
*In re RCM Global Long Term Capital Appreciation Fund, Ltd.,*
  200 B.R. 514 (Bankr. S.D.N.Y. 1996)............................................................4, 22
*In re Reyes,*
  No. 14-13233, 2015 WL 4624156 (Bankr. S.D.N.Y. Aug. 4, 2015)....................21
*In re Strand Music Hall Co.* (1865) 35 Beav. 153 (Eng.) ................................................35
*In re Syndicom Corp.,*
  268 B.R. 26 (Bankr. S.D.N.Y. 2001).................................................................21
*In re Win-Sum Sports, Inc.,*
  14 B.R. 389 (Bankr. D. Conn. 1981) ................................................................33
*In re Yoga Smoga, Inc.,*
  No. 16-13159 (MEW), Slip Op. at 6 (Bankr. S.D.N.Y. Dec. 27, 2016)...............36

**STATUTES**

11 U.S.C. § 101.......................................................................................................1
11 U.S.C. § 305(a)(1) ...........................................................................................37
11 U.S.C. § 363.....................................................................................................22
11 U.S.C. § 363(k)................................................................................................22
11 U.S.C. § 1123(a)(2) .........................................................................................22
11 U.S.C. § 1123(a)(3) .........................................................................................22

11 U.S.C. § 1123(a)(5)(D) ..................................................................................22
11 U.S.C. § 1123(a)(5)(H) ..................................................................................22
11 U.S.C. § 1123(a)(5)(I) ...................................................................................22
11 U.S.C. § 1123(a)(5)(J) ...................................................................................22
11 U.S.C. § 1123(b)(1) .......................................................................................22
11 U.S.C. § 1123(b)(1)(4) ..................................................................................22
11 U.S.C. § 1123(b)(2) .......................................................................................22
11 U.S.C. § 1123(b)(3)(A) ..................................................................................22

## OTHER AUTHORITIES

2 *Collier on Bankruptcy* ¶ 305.02 (Alan N. Resnick & Henry J. Sommer, eds.,
   16th ed. rev. 2016) ...................................................................................37

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| Debtor. | : | |
| | : | |

**SUPPLEMENTAL SUBMISSION OF LAPIDEM AND MASCINI
IN OPPOSITION TO STEPHEN LYNCH'S MOTION TO DISMISS THIS
CHAPTER 11 CASE AS A BAD FAITH FILING**

Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini," and together with Lapidem, the "Petitioners"), the largest unsecured creditors of debtor Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"), by and through their undersigned counsel, respectfully submit this supplemental submission in opposition to the motion of Stephen Lynch seeking to dismiss this chapter 11 case as a bad faith filing pursuant to §§ 305 and 1112 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code").  As and for their supplemental submission, Petitioners respectfully state as follows:

## PRELIMINARY STATEMENT

1.  Over nine years ago, Petitioners loaned Kirwan $309 million to acquire all of the outstanding stock of Yukos Finance.  Since then, Petitioners have had to loan Kirwan an additional ████████ to fund the costs of litigation with other parties asserting competing claims to Yukos Finance.  ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

2.  Mr. Lynch, however, opposes any such value-maximizing strategies, demanding instead continued litigation over the Yukos Finance shares, regardless of the merits and regardless of the cost.  The reason is obvious:  Mr. Lynch, who has never advanced a dime to Kirwan and therefore has no economic exposure, negotiated to obtain a recovery only *after* Petitioners are paid in full the $340 million they are owed.  Moreover, that recovery, which is strictly contingent, is limited and strictly contingent to less than 10% of any value above $340 million.  Mr. Lynch therefore does not want a settlement or any other resolution in an amount that is less than Petitioners' debt.  He instead wants further litigation, funded by Petitioners or anyone other than himself, in the hope of obtaining a litigation home run.  That's the only way he gets any payday.  Alternatively, he demands Petitioners buy him off.

2

3.     In light of the ▮▮▮▮▮▮▮▮▮▮ facing Kirwan and the large amount

of debt on its balance sheet, Petitioners filed this case to utilize the tools afforded by the

Bankruptcy Code to maximize the value of Kirwan for the benefit of all stakeholders.

These tools include the ability to neutralize Mr. Lynch's attempts to obstruct Kirwan's

restructuring   Indeed, this chapter 11 case is *no different* from *any* other chapter 11 case

that is filed in this country: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4.     Based on the foregoing and the record in this case, Mr. Lynch cannot carry

his burden of proving by a preponderance of the evidence that this Court should dismiss

or abstain from this case.   A chapter 11 case should not be dismissed pursuant to § 1112

unless the party seeking dismissal establishes *both* that (i) the case is objectively futile

*and* (ii) the petitioner is abusing the bankruptcy law by employing it for a purpose for

which it was not intended.   *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 56 (Bankr.

S.D.N.Y. 2009); *In re Kingston Square Assocs.*, 214 B.R. 713, 725 (Bankr. S.D.N.Y.

1997).   Mr. Lynch focuses almost solely on the latter requirement in his brief, devoting a

mere handful of sentences to objective futility.   But to establish objective futility, Mr.

Lynch must prove Kirwan has *no* reasonable probability of emerging from bankruptcy.

*C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310

(2d Cir. 1997).

3

5.      Moreover, "a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the *strongest evidentiary showing*." *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) (emphasis added).  Mr. Lynch submits no evidence of objective futility. His failure to do so is a sufficient basis for denial of his motion.  Moreover, Kirwan's managers -- including two, new independent managers appointed by Petitioners who will be assisted by separate advisors and experts -- will be actively considering plan, ███ ███████████████████████████ for Kirwan's litigation asset.  Mr. Lynch, as the owner of only one share and only one member of Kirwan's board, cannot veto the restructuring aims of Kirwan's other board members or the holders of 99% of Kirwan's debt.  He therefore cannot show that chapter 11 is objectively futile.

6.      In addition, Mr. Lynch fails to show that Petitioners filed this case for an improper purpose.  To the contrary, Petitioners filed this case for the eminently proper purpose of maximizing their chances of obtaining the highest and best recovery possible on $340 million of loans.  They also filed this case because, like lenders to many other insolvent enterprises, ███████████████████████████████████ ██████████████, only to benefit a small, out-of-the-money stakeholder who is exerting hold-up value.  Mr. Lynch's conduct is particularly egregious given that his selfish acts as a vanishingly small shareholder of Kirwan are directly at odds with his concurrent obligations as a manager to maximize value for all stakeholders.  The Bankruptcy Code, by its explicit terms, allows debtors and majority stakeholders like Petitioners to bind abstainers, dissenters and recalcitrant hold-outs like Mr. Lynch to preserve value for all stakeholders.  *See In re 68 W. 127 St., LLC*, 285 B.R. 838, 844

4

(Bankr. S.D.N.Y. 2002) ("[T]he exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith.").

7.      Mr. Lynch also fails to carry his burden of proving that abstention under § 305 is in "the interests of creditors and the debtor." Mr. Lynch is not a creditor, and he cannot unilaterally decide what is in Kirwan's best interests. By contrast, Petitioners comprise 99% of the creditors and their designees control Kirwan's board. Petitioners and a majority of Kirwan's board collectively believe that chapter 11 *is* in Kirwan's best interests and for that reason, chose not to oppose the petition in the first instance. Mr. Lynch's single share, which only affords Mr. Lynch certain minority shareholder protection rights, does not trump his and the other Kirwan managers' obligations as fiduciaries of this estate to consider and develop alternatives. *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258 (Bankr. D. Del. 2016); *In re Lake Mich. Beach Pottawattamie Resort LLC*, 547 B.R. 899 (Bankr. N.D. Ill. 2016).

8.      While Mr. Lynch continues to press for arbitration, arbitration would be solely about shareholder rights, which do not restrict Kirwan's or its fiduciaries' obligations under the Bankruptcy Code to consider alternatives. Arbitration therefore is completely irrelevant to, and cannot provide a solution for, the paramount issues facing Kirwan: how best to maximize the value ████████████████ for the benefit of its stakeholders. Indeed, the entire notion of arbitration is simply a ruse by Mr. Lynch to occasion delay to prevent Petitioners from restructuring Kirwan ████████████████ ████████████████. That is not in Petitioners' or Kirwan's interests.

5

9.      Finally, Mr. Lynch's attempts to cast this case as an improper, two-party shareholder dispute, including by characterizing the matter as a personal dispute solely between him and Mr. Richard Deitz, president of investment funds that own a slight majority of Petitioners, is grossly off-base.   Mr. Lynch's position ignores Petitioners' clear, contractual rights as creditors -- which this Court recognized at the June 17, 2016 hearing -- to declare their litigation loans due if they determine in their sole discretion that Kirwan is insolvent.   Moreover, Mr. Lynch's effort to look through Petitioners' corporate forms to the executive of one of their ultimate owners willfully ignores the large number of parties whose interests are affected here.   Mr. Deitz acts as a fiduciary to Petitioners' largest shareholder, VR Global Partners, LP, and its hundreds of outside investors, including pension funds, charitable foundations, university endowments and other institutional investors.   Further, Petitioners have substantial minority shareholders (including investment funds) entirely unaffiliated with Mr. Deitz's funds who *also* support this chapter 11 case.

10.     In short, the parties and interests here are far broader than Mr. Lynch suggests.   Yet the ambiguity caused by Mr. Lynch's improper efforts to usurp control has frustrated efforts to achieve a global resolution.   And the time to do so may be rapidly closing.   The Dutch Court of Appeals is scheduled to issue a major ruling on April 18, 2017. ███████████████████████████████████████████████████████████
████████████████████   Petitioners therefore should be allowed to utilize chapter 11 the same way other large, fulcrum creditors do:  to set the stage for a rational solution that binds small hold-outs like Mr. Lynch.   For these and the other reasons described below, Mr. Lynch's motion is meritless and should be denied.

6

## BACKGROUND FACTS

**A.    Acquisition of Yukos Finance;**
**Structure of Kirwan and PNS**

11.    On March 6, 2006, certain creditors of Yukos Oil Company ("Yukos Oil")
commenced involuntary bankruptcy proceedings against it in Russia.  [Stipulation of
Facts on Motion To Dismiss or Abstain ("Stip.") ¶ 11.]  A little over a year later, the
court-appointed Russian bankruptcy receiver noticed an auction for 100% of the shares of
Yukos Finance B.V., a Netherlands company and wholly-owned subsidiary of Yukos Oil
("Yukos Finance").  [Stip. ¶ 12.]  A consortium of investors comprised of affiliates of
Petitioners and Mr. Lynch agreed to participate in the auction through an investment
vehicle, OOO Promneftstroy ("PNS"), a Russian entity which is Kirwan's sole asset.
[Stip. ¶¶ 13-20.]  On August 15, 2007, PNS submitted the winning bid for Yukos Finance
in the amount of $309 million.  [Stip. ¶ 21.]

12.    Petitioners provided all of the funding for PNS's acquisition of Yukos
Finance in the form of loans to Kirwan, a Luxembourg entity which owns 100% of the
interests in PNS.  [Stip. ¶¶ 1, 7, 35; Exhibits 35/1-35/6.]  Kirwan in turn loaned the funds
to PNS, which used the funds to pay the Russian receiver.  [Stip. ¶ 26.]  Petitioners
together own 2.5 million of Kirwan's shares, which is over 99.99% of Kirwan's
outstanding share capital.  [Stip. ¶¶ 2-3.]  Mr. Lynch owns a single share, or 0.0054% of
Kirwan's outstanding share capital.  [Stip. ¶¶ 2-3.]  Petitioners are entitled to appoint up
to six managers to Kirwan's board of managers, and Mr. Lynch is entitled to appoint one
manager.  [Stip. ¶ 8; SHA (defined below) Exhibit 25/1 cl. 6.2.]  Petitioners have
appointed five managers to Kirwan's board, including (i) Mr. Richard Deitz, who is the
president of VR Capital Group Ltd., which controls certain entities and funds

7

(collectively, "VR Capital") which ultimately own a slight majority of the Petitioners, [Stip. ¶¶ 4, 5, and 8.], and (ii) two recently-appointed independent managers to assist Kirwan in considering its strategic alternatives.

13.     Mr. Lynch serves as sole general director of PNS.  [Stip. ¶ 3.]     Under PNS's charter, Mr. Lynch's role as general director is restricted to managing the day-to-day business of the company. [2015 PNS Charter, Exhibit 99/4, ¶ 10.1]   However, he cannot exercise authority over matters that exceed $10,000 [2015 PNS Charter, Exhibit 99/4, ¶ 10.4.3], and he must follow the directives of Kirwan with respect to any disposition of PNS's claims to Yukos Finance, including the settlement of the Yukos Finance litigation. [2015 PNS Charter, Exhibit 99/4, ¶ 9.5.12.] Pursuant to the terms of a pre-petition shareholders' agreement among Petitioners and Mr. Lynch (the "SHA"), Petitioners' loans, advances and capital contributions must be paid in full before Mr. Lynch is entitled to any recovery.  [SHA Exhibit 25/1 § 12.4 and sch. 4, at 17, 44.]  Mr. Lynch is entitled to 10% of any recovery after payment in full of the foregoing amounts; Petitioners are entitled to the balance.  [SHA Exhibit 25/1 § 12.5 and sch. 4, at 17, 44.] In 2010, Mr. Lynch assigned a portion of his entitlement to VR Capital entities, such that his current net entitlement is less than 10% of excess recoveries. [Stip. ¶ 33.]

14.     Since PNS acquired Yukos Finance, Petitioners have been the sole source of funding for Kirwan and PNS, having loaned approximately ████████ to Kirwan over the last nine years.  [Stip. ¶¶ 36, 40; Exhibit 36/1.]  The SHA and documents evidencing these loans give Petitioners the exclusive right to stop funding whenever they want, and as found by this Court at the June 17, 2016 hearing, the documents evidencing the litigation funding loans allow petitioners to call the loans if Petitioners determine, in

8

their sole discretion, that Kirwan is insolvent.[1]  [Exhibit 36/1, § 5.]  Mr. Lynch has not

provided any funding, advances or other credit directly to Kirwan.  [Stip. ¶ 40.]

**B.**   **Competing Claims To Yukos Finance**
       **And Subsequent Litigation Over Same**

   15.



   16.

---

[1]   Mr. Lynch criticizes the fact that documentation evidencing certain of the more recent litigation funding loans was created after the loans were made.  *See* Supp. Mem. of Stephen P. Lynch, at pp. 20-21.  But as a closely held corporation, Kirwan has been run informally for years.  Board meetings have been very limited, with some decisions made by phone calls among managers without formal board action.  [Stip. ¶ 120.]  Since Yukos Finance was acquired, Petitioners have made litigation funding loans to Kirwan without formal board or shareholder meetings.  [Stip. ¶ 36.]  While the SHA contemplated Kirwan's issuance of formal "cash call" notices to Petitioners whenever Kirwan needed funds, [SHA § 10, Exhibit 25/1, at pp. 15-17.], following VR Capital's acquisition of control of both Petitioners, funding needs were handled informally, with VR Capital personnel simply sending emails to Petitioners' investors.  [Stip. ¶ 39.]  However, Kirwan's activities, including its expenses and the need to fund them, were topics of consortium emails and calls on which Mr. Lynch participated.  [Stip. ¶ 36.]  There's no question that all the money to fund Kirwan and PNS came from Petitioners.

9

████████████████ Accordingly, when Petitioners entered into the agreement with the Russian bankruptcy receiver to acquire Yukos Finance, the Petitioners believed that their purchase would be recognized by all parties and authorities. [Stip. ¶ 26.] They therefore closed on the acquisition and funded the initial purchase price on August 31, 2007. [Stip. ¶ 26.] Notably, at the time of the auction, the Glendale attachments discussed below were unknown to the consortium members. [Stip. ¶ 45.]

### 1. The Recognition Litigation

17. ████████████████████████████ Messrs. Godfrey and Misamore chose not to support the global settlement. ██████████ They instead pressed forward with a claim before the Amsterdam District Court against the Russian bankruptcy receiver, alleging that he had wrongfully removed them as Yukos Finance directors during the bankruptcy. [Stip. ¶ 41.] On October 31, 2007, less than three months after the auction of Yukos Finance, the Amsterdam District Court ruled in favor of Messrs. Godfrey and Misamore, finding that the Yukos Oil bankruptcy violated principles of Dutch public order and that, as a result, the bankruptcy receiver had not been empowered to dismiss them. [Stip. ¶ 41.] This ruling called into question whether the actions of the receiver in selling Yukos Finance were valid and could be recognized in the Netherlands. [Stip. ¶ 41.]

18. As a result of this unexpected ruling, the settlement the Petitioners thought had been negotiated among the competing claimants to Yukos Finance fell apart, which in turn has drawn the Kirwan consortium into years of litigation over the ownership of the Yukos Finance shares. [Stip. ¶ 42.] The bankruptcy receiver appealed the October 31, 2007 ruling, with PNS joining as an interested party. [Stip. ¶ 43.] That appeal remained pending for almost three years. In 2010, the Amsterdam Court of Appeals

10

ruled against PNS, holding that no actions of a Russian bankruptcy receiver could be recognized in the Netherlands and hence, that PNS had never validly purchased Yukos Finance. [Stip. ¶ 43.]

19.     PNS promptly appealed the Amsterdam Court of Appeals ruling to the Dutch Supreme Court. [Stip. ¶ 44.] That appeal remained pending for three years before the Supreme Court reversed the Court of Appeals, finding that private international law provided no bar to the recognition of the acts of a Russian receiver in the Netherlands. [Stip. ¶ 44.] The matter was remanded to the Court of Appeals so that alternate grounds advanced by Messrs. Godfrey and Misamore could be considered. [Stip. ¶ 44.] The appeal was heard on November 28 and 29, 2016. The Court of Appeals set April 18, 2017 as the date for its decision. All parties to the case will independently have an automatic right to appeal the Court of Appeals' decision to the Dutch Supreme Court. [Stip. ¶ 44.] Given the amounts involved -- Yukos Finance is worth $800 million -- further appeals are assured, regardless of who wins. [Stip. ¶ 10]

**2.     The Glendale Litigation**

20.     ████████████████████████████████████████

████████████████████████ After PNS submitted the winning bid for Yukos Finance, Petitioners learned for the first time that two entities controlled by Messrs. Godfrey and Misamore (collectively, "Glendale") asserted claims in the amount of approximately $3 billion that Messrs. Godfrey and Misamore sought to satisfy in the form of "conservatory attachments" over the shares of Yukos Finance. [Stip. ¶ 45.] The amount of these claims is vastly in excess of the estimated $800 million value of Yukos Finance, and will leave Petitioners' loans valueless if the attachments are recognized, even if PNS prevails in the recognition litigation. [Stip. ¶¶ 10, 45.] Eight years ago,

11

Messrs. Godfrey and Misamore attempted to obtain a court-ordered auction of the Yukos Finance shares to satisfy their "conservatory attachments" and thereby wipe out PNS's interests. [Stip. ¶ 46.]

21.    In January 2009, PNS attempted to intervene in the Glendale litigation, filing defenses to the attachments on procedural grounds. [Stip. ¶ 47.] The matter languished for over three years until 2012 before the Amsterdam District Court rejected PNS's defenses. [Stip. ¶ 47.] PNS appealed the Amsterdam District Court's decision to the Court of Appeals; two years later, in 2014, the Court of Appeals rejected PNS's claims. [Stip. ¶ 47.] PNS appealed to the Dutch Supreme Court, which rejected PNS's claims on November 13, 2015. [Stip. ¶ 47.] ███████████████████████

███████████████████████████████████████████████████

The merits of the litigation are now back before the Amsterdam District Court. [Stip. ¶ 48.] ███████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████

3.    **The "Freezing Order" Litigation**

22.    There is yet a third litigation █████████████████████████

█████████████████ PNS obtained an order from the Amsterdam District Court in March 2008 restraining Messrs. Godfrey and Misamore from distributing funds from accounts of Yukos Finance's subsidiary until ownership of the Yukos Finance shares could be determined. [Stip. ¶ 50.] However, in 2011, the Dutch Supreme Court ruled that this so-called "freezing" order had been improperly granted in light of the District Court's initial ruling in the recognition litigation that the Netherlands would not recognize the Russian receiver's sale of Yukos Finance. [Stip. ¶ 50.] █████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████

23.     After this ruling, Messrs. Godfrey and Mismore sued PNS for over $300 million in damages allegedly caused by the improperly issued restraining order. [Stip. ¶ 51.] On February 11, 2015, the Amsterdam District Court held PNS liable for damages, with the amount of damages to be determined in separate assessment proceedings, which have not yet begun.  [Stip. ¶ 51.]   The matter is now on appeal before the Court of Appeals, which recently postponed its judgment in this matter for the third time, until March 14, 2017.  Whichever way the Court of Appeals rules, the losing party will appeal the decision to the Supreme Court and it is likely that ███████████████████████

### 4.     Litigation Considerations

24.     Petitioners and Mr. Lynch obviously hope that PNS ultimately will prevail in the foregoing litigation.▌ They therefore have caused PNS to continue prosecuting the litigation as vigorously as possible.  That said, there is no basis for second-guessing Petitioners' and their board designees' business judgment to ███████████████████████

███████████.  The litigation has been *extreme*:  it has lasted over nine years; has entailed very protracted appeals and delays; ████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

---

2
███████████████████████████████████████████████
███████████████

25.     Moreover, the views of Petitioners' expert in Netherlands commercial and insolvency law, Mr. Job van Hooff of Stibbe N.V., are not encouraging regarding the likelihood of a speedy conclusion to the proceedings.   Mr. van Hooff's views are reflected in his expert report (the "van Hooff Rep.") filed concurrently with the Stipulation of Facts.  [Docket No. 64.]  According to Mr. van Hooff, it is not unusual for Netherlands courts to defer judgments for several months to a year after a matter has been submitted, with the Court of Appeals in particular facing a significant backlog of cases. [van Hooff Rep. ¶¶ 21, 30.]   Indeed, it is not uncommon for complex cases like those involving Yukos Finance to last over 10 years.  [van Hooff Rep. ¶ 39.]  While these cases have lasted over nine years, each of the Glendale and freezing order litigations is still at an early stage procedurally.[3]  [van Hooff Rep. ¶ 67.]

**C.      Prepetition Disputes Among
       Petitioners and Mr. Lynch**

26.

---
[3]

14

▬▬▬▬▬▬▬▬▬ Petitioners therefore wanted to explore alternatives. Mr. Lynch instead became increasingly entrenched and attempted to arrogate to himself more authority.

### 1. The Arbitration

27.     Accordingly, in October 2014, not long after the Dutch Court of Appeals ruled against PNS in the Glendale attachment proceedings, Petitioners' designees to Kirwan's board proposed amendments to PNS's charter to create a second executive body for PNS that more accurately reflected the parties' economic exposure and that would have ensured smoother operations. [Stip. ¶ 91.] This was consistent with Russian law, which recently had been modified to allow the charters of Russian entities like PNS to create multiple executive bodies who could act independently of one another in directing the entities' affairs. [Stip. ¶ 90.] Seeing a threat to his continued free ride, Mr. Lynch objected and threatened arbitration. After several months of unsuccessful efforts to resolve matters, Mr. Lynch commenced arbitration proceedings in London on January 30, 2015. [Stip. ¶¶ 89-97.]

28.     On July 13, 2015, the arbitrator issued a split decision. He disallowed changes to PNS's governance structure. [Stip. ¶ 98; Exhibit 98/1, ¶ 165(3).] Much more significantly, he clarified the limited scope of Mr. Lynch's authority:

> [Under PNS's original charter,] numerous matters including all important decisions on financial matters and settlements were exclusively reserved to [Kirwan] as the sole member of PNS. . . . The role of the General Director [of PNS, i.e., Mr. Lynch], apart from day to day management and relatively minor decisions, was essentially limited to the carrying into effect of decisions within the exclusive power of [Kirwan].

> [T]he original charter of PNS did not give the General Director power to block transactions, such as the settlement of major litigation related to the assets of PNS, with which he disagreed. The exclusive power to decide in relation to such matters rested with the sole member

15

[Kirwan], and the General Director was obliged to carry its decision into effect.

[Exhibit 98/1, ¶¶ 66-67.] Incredibly, it came to light during the arbitration that five years before, Mr. Lynch had unilaterally amended PNS's charter, without approval of Kirwan's board, to strip Kirwan of the foregoing powers. [Stip. ¶ 99; Exhibits 99/2 and 99/3.] Mr. Lynch blamed this amendment on a "back-office" error, and agreed to fix the PNS charter to restore Kirwan's powers. [Stip. ¶ 99; Exhibit 99/4.] Those powers include Kirwan's right to approve of PNS's participation in any legal proceeding, "including inter alia initiating, settling and withdrawing of any actions or any out-of-court settlements and/or resolutions." [Exhibit 99/4, ¶ 9.5.12.]

29.    Mr. Lynch had also complained in the arbitration about Mr. Deitz's efforts to explore possible settlement of PNS's litigation over the Yukos Finance shares. The arbitrator rejected this complaint, stating that Mr. Deitz was entitled to explore settlement. [Exhibit 98/1, ¶ 122.] That is not a surprising or controversial conclusion, given Mr. Deitz's role as a manager and fiduciary of Kirwan and the economic interests that his funds and co-investors have in Petitioners and hence, in Kirwan and the PNS litigation. However, beginning almost immediately after the arbitration award came down, Mr. Lynch embarked on a sustained campaign of repeatedly and intentionally arrogating more power to himself in derogation of PNS's charter and the arbitrator's ruling, and interfering with Mr. Deitz's efforts to consider other alternatives for Kirwan.

**2.    Mr. Lynch's Purposeful Disregard
Of The Arbitrator's Ruling And
Improper Efforts to Expand His Authority**

30.    ▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄▄

16

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

Mr. Lynch's effort to seize such broad authority clearly was in direct contravention of the arbitrator's ruling that Mr. Lynch's role as PNS's director was "relatively minor." [Exhibit 98/1, ¶¶ 66] ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ on August 14, 2015, Mr. Lynch met by himself with a representative of PNS's litigation adversaries and told him that only he, Mr. Lynch, "could validly represent PNS in settlement negotiations or bind it to a settlement." [Stip. ¶ 104.]

31.    On November 2, 2015, Mr. Lynch ▉▉▉▉▉▉▉▉▉▉▉▉ further by sending a letter to representatives of PNS's litigation adversaries in which he said "no person (other than myself) has any authority to represent [PNS] in any settlement negotiations"; "I have never authorized Mr. Deitz to conduct any settlement talks." [Exhibit 107/1.] Mr. Lynch can point to nothing that gives Mr. Lynch such vast control. To the contrary, Mr. Lynch's assertions were at odds with the arbitrator's conclusion that it is Kirwan that instructs Mr. Lynch, not vice versa, and PNS's charter, which gives Kirwan the exclusive right to address settlement issues. [2015 PNS Charter, Exhibit 99/4, ¶ 9.5.12.]

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉ The timing of this meeting is significant:  it came on the heels of the Dutch Supreme Court's ruling in the Glendale attachment litigation.

▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉

17

32.     Mr. Lynch met with Mr. Godfrey alone on November 24, 2015.  At one point, he called Mr. Deitz from the meeting, but they could not agree on strategy, so the meeting ended.  [Stip. ¶ 109.]  Mr. Lynch has never afforded Mr. Deitz a written record of his meeting with Mr. Godfrey or explained his reason for thinking he had the authority to meet at all in light of the very limited scope of his authority.  [Stip. ¶ 109.]  Whatever discussions occurred, they resulted in little for Mr. Lynch:  a month later, on December 18, 2015, Mr. Godfrey offered to settle the Yukos Finance litigation for $60 million.  [Stip. ¶ 111.]

33.

That is an incredible response from a board member of an enterprise                          Mr. Lynch obviously was putting his interests as an out-of-the-money equity holder ahead of his duties as a manager of Kirwan to consider all stakeholder interests and other alternatives.

18