34.     A little over a month later, on January 30, 2016, Mr. Lynch had another separate conversation with a representative of PNS's litigation adversaries, Mr. Eric Wolf, about Mr. Lynch's "settlement number." [Stip. ¶ 116.]   Mr. Lynch had this conversation without Kirwan's approval. ███████████████████████████████

███████████████████████████████████████████████████

███████████████████ The very next day, Mr. Lynch told Mr. Wolf, without consulting Mr. Deitz or Kirwan's board, that he wanted $35 million to settle.   [Stip. ¶ 116.] █████████████████████████████████████████

██████████████████████████████████████

35.    ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████ Mr. Lynch sent another letter to PNS's litigation adversaries on March 3, 2016 directing them to stop any settlement discussions, and again stating that only he could have settlement discussions.  [Exhibit 117/2.]

36.     Mr. Lynch was out of line, and out of control.  He had a grossly outsized view of his own authority, directly contrary to the rulings of the arbitrator and PNS's charter.  He also had been acting solely in his interests as a shareholder, desperately

trying to salvage something on account of his small, minority equity interest ████████
██████████████████████████████████ while paying no heed whatsoever to
his duties as a board member of an obviously troubled entity.   And his economic
demands were outrageous.   To put Mr. Lynch's $35 million settlement demand in
perspective, recall that Mr. Lynch is contractually entitled to less than 10% of any value
*after payment in full* of the $340 million owed to Petitioners.  [SHA § 12.5 and sch. 4,
Exhibit 25/1 at pp. 17, 44; Exhibit 33/1.]  Mr. Lynch's $35 million settlement proposal
therefore implies a $350 million equity gain *on top of* Petitioners' claims.  These amounts
together imply a settlement of almost $700 million, which is 88% of Yukos Finance's
total estimated value of $800 million.  [Stip. ¶ 10.] ██████████████████
████████████████████████████████████████████████████████
██████████

        37.     In light of the foregoing ████████████████████████████
████████████████████████████████ Mr. Deitz had
begun exploring other alternatives for Kirwan, including a possible settlement of the
litigation in an amount of $137.5 million and possible use of the Bankruptcy Code for
resolving Kirwan's affairs. ████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████ And because Kirwan has no source of
funding other than Petitioners, again as Mr. Lynch concedes, Petitioners exercised their
exclusive right under their funding loan agreements to determine that Kirwan was
insolvent and hence, to declare the loans due and payable.  [Exhibit 36/1, ¶ 5.]   The
involuntary petition followed, which this Court granted on July 5, 2016.

## ARGUMENT

**I.   DISMISSAL IS NOT WARRANTED UNDER
§ 1112 OF THE BANKRUPTCY CODE**

38.    In order to obtain dismissal pursuant to § 1112, Mr. Lynch must prove by

a preponderance of the evidence both that (i) this case is objectively futile and (ii)

Petitioners acted in subjective bad faith in filing the case.  *In re Gen. Growth Props., Inc.*,

409 B.R. 43, 56 (Bankr. S.D.N.Y. 2009); *In re Kingston Square Assocs.*, 214 B.R. 713,

725 (Bankr. S.D.N.Y. 1997).  Dismissal for bad faith is to be used "sparingly" and only

"in extraordinary circumstances" with "great caution."  *Davis v. M&M Developer, LLC*

*(In re MBM Entm't, LLC)*, 531 B.R. 363, 408 (Bankr. S.D.N.Y. 2015); *In re Bd. of Dirs.*

*of Multicanal S.A.*, 314 B.R. 486, 523 (Bankr. S.D.N.Y. 2004); *In re Century/ML Cable*

*Venture*, 294 B.R. 9, 34 (Bankr. S.D.N.Y. 2003); *In re Syndicom Corp.*, 268 B.R. 26, 49

(Bankr. S.D.N.Y. 2001).   Indeed, as this Court has stated, "the exercise of a statutory

right or remedy should rarely, *if ever*, be said to be in bad faith."  *In re 68 W. 127 St.*, 285

B.R. 838, 844 (Bankr. S.D.N.Y. 2002) (emphasis added).

**A.    Mr. Lynch Fails to Show That
Kirwan and Petitioners Cannot Use
The Code To Resolve Kirwan's Affairs**

39.    In order to carry his burden of proving objective futility, Mr. Lynch must

establish that Kirwan has "no reasonable probability of emerging from bankruptcy."  *C-*

*TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship)*, 113 F.3d 1304, 1310 (2d

Cir. 1997); *Baker v. Latham Sparrowbush Assocs. (In re Cohoes Indus. Terminal, Inc.)*,

931 F.2d 222, 227 (2d Cir. 1991); *In re Reyes*, No. 14-13233, 2015 WL 4624156, at *4

(Bankr. S.D.N.Y. Aug. 4, 2015); *In re Pulp Finish 1 Co.*, No. 12-13774, 2013 WL

5487933, at *2 (Bankr. S.D.N.Y. Oct. 2, 2013); *In re Inwood Heights Hous. Dev. Fund*

21

*Corp.*, No. 11-13322, 2011 WL 3793324, at *11 (Bankr. S.D.N.Y. Aug. 25, 2011); *In re Gen. Growth Props.*, 409 B.R. at 56; *In re Kingston Square Assocs.*, 214 B.R. at 725; *In re 68 W. 127 St. LLC*, 285 B.R. at 843, 846; *In re Gucci*, 174 B.R. 401, 410 (Bankr. S.D.N.Y. 1994). However, "a court should reach the conclusion that there is no demonstrable ability to reorganize only upon the *strongest evidentiary showing*." *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 520 (Bankr. S.D.N.Y. 1996) (emphasis added).

> **1.    Mr. Lynch Cannot Unilaterally Defeat
> Kirwan's and Petitioners' Efforts To Resolve
> Kirwan's Affairs Under Chapter 11**

40.    Mr. Lynch cannot establish objective futility, especially given the numerous tools available to Petitioners and Kirwan under the Bankruptcy Code. For example, they could propose a plan that compromises Kirwan's debt or leaves it unimpaired. 11 U.S.C. § 1123(a)(2), (3), (5)(H), (b)(1). They could propose a liquidating plan. 11 U.S.C. § 1123(a)(5)(D). Under any plan, they can re-write Kirwan's governance structure, including by rejecting the SHA. 11 U.S.C. § 1123(a)(5)(I), (b)(2). They could, via Kirwan's ownership of PNS and the terms of PNS's charter, direct PNS to settle the Yukos Finance litigation. 11 U.S.C. § 1123(b)(3)(A). They could also obtain third-party funding for it. They could sell the stock in PNS, either to a third-party or to Petitioners in satisfaction of their claims. 11 U.S.C. §§ 363(k); 1123(a)(5)(J). They could effectuate any sale under a plan or pursuant to § 363 of the Bankruptcy Code. 11 U.S.C. §§ 363; 1123(b)(1)(4).

41.    Mr. Lynch cannot show that *any*, let alone *all*, of these alternatives is unworkable; that there is "no reasonable probability" of *any* of them being successful. To the contrary, Petitioners have the ability, through their overwhelming position in

Kirwan's capital structure, including as holders of 99% of Kirwan's debt, to drive any one of these alternatives to successful completion. Indeed, in accordance with Petitioners' rights under the SHA and Kirwan's charter, Petitioners appointed two new independent managers to Kirwan's board, each of whom has extensive experience in distressed investing and complex assets such as PNS. At the request of Petitioners' other board appointees, a board meeting will be called to consider creation of a special committee of Kirwan's board comprised of these independent managers vested with the authority to consider, develop and recommend alternatives for Kirwan, including by ███████████████████████████████████████████████████████████.

42.     Mr. Lynch makes no serious effort to make a "strong evidentiary showing" that these efforts are objectively futile. Indeed, there simply is no way under the Bankruptcy Code that the holder of only a single share of a debtor-in-possession can override the far greater interests of entities that hold 99% of the debtor's debt and over 99% of its stock. Moreover, Mr. Lynch is only one member of Kirwan's six-member board. A mere majority of the board can make decisions on behalf of the company. Mr. Lynch therefore cannot unilaterally dictate the course of Kirwan's board. As a fiduciary under both the Bankruptcy Code and Luxembourg law, Mr. Lynch is obligated to assist in this process by placing the estate's interest before his own. If he is unwilling to set aside his conflicting interests as a shareholder, then he should resign. Alternatively, nothing prevents Mr. Lynch from proposing his own, competing plan. If Mr. Lynch disagrees with the proposed restructuring alternatives, he is free to finance an alternative deal.

> **2.    The SHA And Mr. Lynch's Single
>         Share Do Not Prohibit Kirwan
>         <u>From Considering Alternatives</u>**

43.    Mr. Lynch asserts in his brief that because of his single share -- which he refers to as a -- "golden share" -- and the terms of the SHA, Kirwan is irrevocably bound to "no other course of action" than continued litigation over the Yukos Finance shares, and that Kirwan is committed "to pursuing this course without time limit." *See* Supp. Mem. of Stephen P. Lynch at 5-6.  In other words, Mr. Lynch construes his share and the SHA as prohibiting Kirwan from utilizing any of the tools available to a debtor-in-possession unless he, through the purported veto of his single share, agrees to do so.  That is wrong.  Kirwan is a debtor-in-possession whose managers, including Mr. Lynch, have fiduciary duties to all stakeholders to consider, develop and pursue strategic alternatives for maximizing value, including via the statutory rights and mechanisms available under the Bankruptcy Code.  *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56 (1985).

44.    Accordingly, no pre-bankruptcy agreement, including a charter provision or shareholders' agreement (which can be rejected), can (i) sign away the fiduciary duties of a corporate entity's directors; (ii) waive a corporate entity's ability to file a voluntary bankruptcy petition or consent to an involuntary petition in derogation of its board's fiduciary obligations; or (iii) bind the entity to a pre-determined course even after bankruptcy or otherwise restrict the entity's fiduciaries from utilizing the Bankruptcy Code to explore alternatives for maximizing value once that entity becomes a debtor under the Bankruptcy Code.

45.    Especially relevant are recent rulings by Judge Carey and Judge Barnes that the holder of a single so-called "golden share" as part of a corporate entity's

24

Case 1:17-cv-04338-CM    Document 13-4    Filed 07/23/17    Page 7 of 71

governance structure may not use the rights afforded by that share to override or nullify efforts by a corporate entity's fiduciaries to utilize the tools afforded by the Bankruptcy Code. *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265 (Bankr. D. Del. 2016) (provision in a governance document that placed into the hands of a single, minority equity holder the ultimate authority to eviscerate the right of that entity to utilize the tools of bankruptcy, where the equity holder had no duty to anyone but itself, is contrary to federal bankruptcy policy and not enforceable); *In re Lake Mich. Beach Pottawattamie Resort, LLC*, 547 B.R. 899, 914 (Bankr. N.D. Ill. 2016) (member of entity could not arrogate to itself the right to vote against bankruptcy while disclaiming any fiduciary duty to consider entity's best interests).

46.     These are basic propositions of bankruptcy law, with a long history of support in published decisions from this and other Districts. *See, e.g., In re Hous. Reg'l Sports Network, L.P.*, 505 B.R. 468, 482 (Bankr. S.D. Tex. 2014) (rejecting contention that bankruptcy remote structure absolves entity's directors of fiduciary responsibilities under the Bankruptcy Code); *In re Quad-C Funding LLC*, 496 B.R. 135, 143 (Bankr. S.D.N.Y. 2013) (minority equity veto over use of bankruptcy would hold company hostage to equity holder's whims even where there's no dispute judicial reorganization is the best course); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 63-64 (Bankr. S.D.N.Y. 2009) (directors of corporate borrowers appointed by lenders could not act solely in lenders' interests; directors were fiduciaries obligated to act in estate's best interests); *In re Kingston Square Assocs.*, 214 B.R. 713, 738 (Bankr. S.D.N.Y. 1997) (single board member could not hold up entity's consideration of bankruptcy alternatives where he was motivated solely by his own interests, despite his pre-petition governance rights); *see also*

25

*Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*, 671 F.3d 1011, 1026 (9th Cir. 2012) ("'[A]ny attempt by a creditor in a private pre-bankruptcy agreement to opt out of the collective consequences of a debtor's future bankruptcy filing is generally unenforceable. The Bankruptcy Code preempts the private right to contract around its essential provisions.'" (alteration in original) (citation omitted)); *Bank of Am., Nat'l Ass'n v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St. P'ship)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000) ("[S]ince bankruptcy is designed to produce a system of reorganization and distribution different from what would obtain under non-bankruptcy law, it would defeat the purpose of the Code to allow parties to provide by contract that the provisions of the Code should not apply.").

47.     Notwithstanding the foregoing, Mr. Lynch wants to use his single share and the SHA to commence arbitration proceedings in London against Petitioners to obtain a mandatory injunction from an arbitrator compelling Petitioners to direct their designees to Kirwan's board to ignore their fiduciary duties by refraining from utilizing any of the tools that fiduciaries of debtors-in-possession customarily utilize in considering value-maximizing alternatives, including the creation of a special committee of independent managers and consideration of a possible sale or plan process for Kirwan. In furtherance of this aim, Mr. Lynch has filed a complaint and related papers requesting a declaration by this Court that the automatic stay does not preclude him from pursuing the arbitration or, alternatively, an injunction against the calling of any board meeting pending his pursuit of arbitration. *See Verified Complaint For Declaratory Relief Or, In The Alternative, For Stay Relief Or An Injunction* [Adv. Proc. Docket No. 17-08200(RDD).]

48.     As explained in Petitioners' separate objection to this extraordinary request, the automatic stay unquestionably applies to Mr. Lynch's efforts to pursue arbitration of such matters.  *In re Congregation Birchos Yosef*, 535 B.R. 629 (Bankr. S.D.N.Y. 2015) (Drain, J.) (automatic stay applied to efforts by non-debtors to obtain an injunction from a non-bankruptcy tribunal directing debtor's principals to compromise estate asset).  If estate fiduciaries could be so easily targeted, "there would be such a hole in the automatic stay that it would have no force." *Id*. at 634.  Moreover, to allow a non-U.S. arbitrator to prohibit the board of a debtor-in-possession to consider value-maximizing alternatives, including via a possible compromise of an estate asset and/or a plan of liquidation or sale, would necessarily jeopardize and inherently conflict with core bankruptcy functions.  *MBNA American Bank, N.A. v. Hill*, 436 F.3d 104 (2d. Cir. 2007).  Indeed, the exclusive jurisdiction of the U.S. bankruptcy courts would be rendered meaningless by such an approach.

49.     As fiduciaries, Kirwan and its board therefore can proceed however they choose, subject to this Court's ultimate approval.  Because Mr. Lynch cannot unilaterally dictate the results here or override Petitioners' far greater interests under the Bankruptcy Code, Mr. Lynch has failed to carry his burden of showing that chapter 11 is objectively futile.  Accordingly, Petitioners have "earned the right to at least make the case for confirmation of [their] plan." *See also In re 68 W. 127 St.*, 285 B.R. at 848; *In re Gen. Growth Props.*, 409 B.R. at 65.

**B.     Mr. Lynch Cannot Carry His Burden Of Proving
That Petitioners Have Acted In Subjective Bad Faith**

50.     To establish subjective bad faith, Mr. Lynch must prove that Petitioners are using the Bankruptcy Code for a purpose for which it was not intended.  *See In re 68*

*W. 127 St., LLC*, 285 B.R. at 844.  As this Court has said, "taken out of context, the exercise of certain rights under the Code that are perfectly legitimate may appear hurtful, even malicious, yet the exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith."  *Id.*  Accordingly, "[w]hen a debtor is motivated by plausible, legitimate reorganization (or liquidation) purposes and not solely or predominantly by the mere desire to prevent foreclosure or hinder creditors, bad faith is not present in a chapter 11 case."  *Id.*

51.     Courts consider a number of factors in assessing whether a case should be dismissed as a bad faith filing, including whether the debtor has only a single asset subject to foreclosure and whether the case is a two-party dispute.  *In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311.  However, these factors are not to be applied mechanically.  *In re 68 W. 127 St.*, 285 B.R. at 844 (declining to dismiss a case even though all but one factor favored dismissal).  That a case concerns primarily two parties is not sufficient by itself to warrant dismissal, especially where, as here, there are other legitimate bankruptcy objectives to achieve, including the resolution of "competing demands to [a] debtor['s] limited assets," *In re Murray*, 543 B.R. 484, 493-95 (Bankr. S.D.N.Y. 2016), and where the petitioner is attempting to avoid risks of loss caused by a hold-out shareholder/board-member like Mr. Lynch.  *In re Kingston Square Assocs.*, 214 B.R. at 736.

### 1.     It Is Proper to Use Bankruptcy To Bind Hold-Outs And to Override Prepetition Voting Agreements

52.     Mr. Lynch's arguments can be boiled down to the following:  this case lacks a proper bankruptcy purpose because it is a two-party shareholder dispute over Kirwan's governance.  Mr. Lynch is wrong.  As an initial matter, and as described in the

Preliminary Statement, while there may be two *sides* to this case – Mr. Lynch's and everyone else's – the parties and interests in this case extend far beyond Mr. Lynch's crabbed characterization, and include several investment funds and their respective investors. ███████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

53.     Moreover, Petitioners are not seeking to litigate matters of corporate governance in this chapter 11 case. Although the elimination of Mr. Lynch's hold-up tactics may be an ultimate result of Petitioners' filing, that is a function of bankruptcy policy that accords his single share its proper weighting in insolvency. There is no prohibition against using the Bankruptcy Code to eliminate dissenters, abstainers and hold-outs, regardless of their pre-petition voting rights. In fact, this is one of the core tools in the bankruptcy toolbox. Virtually every chapter 11 debtor utilizes it. That Petitioners may use this feature of the Bankruptcy Code to bind Mr. Lynch therefore cannot constitute an improper purpose. *See In re 68 W. 127 St., LLC*, 285 B.R. 838, 844 (Bankr. S.D.N.Y. 2002) ("[T]he exercise of a statutory right or remedy should rarely, if ever, be said to be in bad faith.").

54.     Indeed, several courts have held that use of bankruptcy to defeat a party's governance rights is not bad faith, especially where the complaining party is a fiduciary who has overstepped his authority, or is a non-fiduciary seeking to trump the duties of estate fiduciaries. For example, the debtor's principal in *In re Kingston Square Associates* orchestrated an involuntary with certain of the debtor's creditors. 214 B.R. at 714. He did so as an end-run around requirements in the debtor's charter that required

29

unanimity among the debtor's directors to file a bankruptcy petition. The principal was forced to do so because one director, appointed by the debtor's lenders, consistently refused to give any consideration to any stakeholders' interests other than his own. Chief Judge Brozman declined the lenders' request to dismiss the petition as a violation of the lenders'/board designee's governance rights, finding that the debtor's principal had been forced to pursue bankruptcy because of the self-interested tactics of the hold-up director.

55.    Another instructive case is *In re Houston Regional Sports Network, L.P.*, where the court declined to dismiss an involuntary petition filed by certain parties who, like Petitioners here, were both shareholders and creditors. 505 B.R. at 472, 478. In that case, a minority shareholder alleged that the filing was in bad faith because the filing constituted an admitted effort to void the governance rights of the minority shareholder, which required unanimity among shareholders for a bankruptcy filing. *Id.* at 479-80. However, the objecting shareholder, through its board designee, had threatened to veto any restructuring plan not to its liking. *Id.* Those threats are not dissimilar to Mr. Lynch's conduct here. The court found that the petitioning creditors had proceeded in good faith under such circumstances. *Id.* at 447-80. Indeed, the court found that the board designee's threatened vetoes constituted a wholesale abdication of his fiduciary duties that could not be used to defeat the company's reorganization efforts. *Id.* at 481.

56.    And as noted above, the holder of a single "golden share" may not use the rights afforded by that share to override or nullify efforts by a corporate entity's fiduciaries to utilize the tools afforded by the Bankruptcy Code. *See In re Intervention Energy Holdings, LLC*, 553 B.R. at 258; *In re Lake Michigan Beach Pottawattamie Resort, LLC*, 547 B.R. at 899; *see also Hous. Reg'l*, 505 B.R. at 480. Again, that is

30

exactly what Mr. Lynch has been attempting to do here. *See also In re Am. Globus Corp.*, 195 B.R. 263, 265-66 (Bankr. S.D.N.Y. 1996) (minority shareholder could not complain of majority shareholder's alleged breach of charter provision requiring unanimity for authorizing bankruptcy where minority shareholder himself had flouted parties' governance agreement); *In re Gen. Growth Props., Inc.*, 409 B.R. at 43 (directors of corporate borrowers appointed by lenders could not act solely in lenders' interests; directors were fiduciaries obligated to act in estate's best interests).

57.     The cases that Mr. Lynch cites are distinguishable. For example, in *In re Diamondhead Casino Corp.*, No. 15-11647 (LSS), 2016 WL 3284674 (Bankr. D. Del. June 7, 2016), the debtor was highly solvent, with assets worth over five times the amount of its debt. *See id.* at *19-*20. A group of minority stakeholders, who owned no more than 11% of the debtor's stock and 6% of its debt, initiated a proxy contest to remove management. They lost the vote. Two months later, they filed an involuntary petition in a conceded effort to remove management. Judge Silverstein dismissed the petition as a bad faith filing, holding that bankruptcy should not be used to vindicate shareholder grievances under such circumstances. The petitioners had adequate remedies under state law, i.e., the proxy process which they initiated and lost, and the involuntary petition was nothing more than an improper attempt to obtain a disproportionate advantage over other stockholders who had already voted petitioners down.

58.     The facts of this case are completely different from *Diamondhead*. The petitioners there clearly were not proceeding as creditors given their enormous collateral coverage. However, Petitioners here are not protected by any equity cushion. ████████

████████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████ Moreover,

Petitioners are not small players in Kirwan's capital structure like the petitioners in

*Diamondhead*.  And unlike the petitioners in *Diamondhead*, Petitioners have been forced

to bankruptcy court in order to resolve Mr. Lynch's outsized views of his single share and

the scope of his authority.

59.    This case also is unlike *In re Murray*, 543 B.R. at 484, cited by Mr.

Lynch.  In that case, a law firm that had acquired a judgment filed an involuntary petition

against an individual whose only asset was entireties property he owned with his wife and

that served as the family home.  *See id.* at 486-88.  The judgment creditor's only purpose

in filing the case was to use § 363(h) to increase the pool of assets from which it could

collect its judgment.  *See id.* at 488-89.  Judge Gerber rightfully dismissed the

involuntary as a bad faith filing.  *See id.* at 493.  Beyond the fact that the petitioner was

cherry picking a single section of the Code to invoke in its filings, there is something

unseemly about a law firm using the Code as a debt collection device to expand the value

of its claim at the expense of throwing a family out of its home.  Here, there are no such

considerations.  Petitioners do not have a judgment against the Debtor and hence, are not

seeking to use this bankruptcy case as a debt collection tool.  And bankruptcy will not

result in more assets being allocated to Petitioners to Mr. Lynch's detriment as was the

case with the entireties property in *In re Murray*.  The value of PNS will be as determined

in the process to be overseen by Kirwan's independent managers and outside advisors.

60.    The other cases Mr. Lynch cites are distinguishable for similar reasons.

*See Cedar Shore Resort, Inc. v. Mueller (In re Cedar Shore Resort, Inc.)*, 235 F.3d 375,

380 (8th Cir. 2000) (debtor was financially healthy; board authorized bankruptcy solely to resolve a shareholder suit against them); *In re ABQ-MCB Joint Venture*, 153 B.R. 338, 340 (Bankr. D.N.M. 1993) (venture partner filed involuntary out of spite after other partner's parent declared petitioner in default on debt owed to parent); *In re Petro Fill, Inc.*, 144 B.R. 26, 30-31 (Bankr. W.D. Pa. 1992) (involuntary petition denied because debtor was paying its debts as they came due); *In re Beacon Reef Ltd. P'ship*, 43 B.R. 644, 647 (Bankr. S.D. Fla. 1984) (limited partner filed involuntary to obtain payment on unpaid distribution; other creditors were current); *In re Win-Sum Sports, Inc.*, 14 B.R. 389, 391 (Bankr. D. Conn. 1981) (one partner filed involuntary against partnership after efforts to buy-out the other partner fell through).

61.    In sum, Mr. Lynch is wrong that use of bankruptcy to sideline a hold-up director or other hold-out.  The voting rights of out-of-the money hold-out stakeholders are overridden in bankruptcy every day.  Indeed, the purported veto afforded by a "golden share" is especially suspect in distressed situations given their potential for abuse, a potential which has been actualized here.  *See In re Quad-C Funding LLC*, 496 B.R. 135, 143-44 (Bankr. S.D.N.Y. 2013) (minority equity veto over use of bankruptcy would hold company hostage to equity holder's whims even where there's no dispute that judicial reorganization is the best course).

### 2.    This Case Is Not A Mere Shareholder Dispute; Petitioners Are Properly Utilizing Their Rights As Creditors To Maximize Recoveries

62.    Mr. Lynch's misplaced focus on shareholder governance cases like *Diamondhead* also improperly ignores Petitioners' separate rights as creditors.  Those rights are the focus of Petitioners here, not the parties' prepetition shareholder disputes.  Mr. Lynch, nonetheless, points to §§ 5.3 and 5.4 of the SHA in support of his assertion

33

that the Debtor has no ability to consider any alternative other than the litigated acquisition of Yukos Finance "without time limit" including, presumably, Petitioners' unlimited funding of same. ███████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Respectfully, Mr. Lynch misconstrues §§ 5.3 and 5.4 and the loan documents. Petitioners have two critical sets of rights that allow them to pursue alternatives other than litigation "without time limit."

63.     First, the obligations of the parties under §§ 5.3 and 5.4 of the SHA are expressly subject to PNS "being put in funds" by Petitioners in the form of additional litigation loans. However, pursuant to § 9.1.2, § 10.1 and schedule 3 of the SHA, Petitioners have the exclusive discretion to stop funding ████████████████████████ ████████████████████████████ Mr. Lynch concedes that he has no legal right to compel Petitioners to fund more if they choose not to do so. [Stip. ¶ 37.] The Petitioners therefore do not, as Mr. Lynch argues, have the obligation to fund without limit. They are free to change their minds and thereby cause a change in course, as any lender is free to do ████████████████████████.

64.     Second, § 5 of the loan agreements evidencing Petitioners' litigation funding loans provides that Petitioners may call the loans and pursue appropriate remedies if Kirwan becomes insolvent, *as determined by the Lenders*," i.e., as determined by Petitioners. Mr. Lynch tried at the June 17, 2016 hearing to convince this Court that § 5 of such agreements had been rendered meaningless by other sections of the SHA. However, this Court disagreed. *See Hr'g Tr.* June 17, 2016 at 90-91; 106:8-10

34

Indeed, both Mr. Lynch's English law expert and Petitioners' English law expert agree that the phrase "as determined by the Lenders" vests Petitioners with very broad discretion.  *See* Dec. of Martin Pascoe at 11-16, May 3, 2016 [Docket No. 14] (the "Pascoe Initial Dec."); Dec. of Martin Pascoe at 6-8, June 14, 2016 [Docket No. 29] (the "Pascoe Reply Dec."); Dec. of Ming-Yee Shiu at 38-42, June 6, 2016 [Docket No. 23] (the "Shiu Dec.").

65.    As both experts further agree, Petitioners' exercise of that discretion cannot be second-guessed by any tribunal unless Mr. Lynch carries his burden of proving that such discretion was abused, i.e., that there were no objective grounds to support Petitioners' determination that Kirwan is insolvent, and that their determination of insolvency was "arbitrary, perverse, and capricious." *See* Pascoe Initial Dec. at 11-16; Pascoe Reply Dec. at 6-8; Shiu Dec. at 38-42.  Petitioners' discretionary right to exercise creditor remedies under § 5 of the loan agreements would be rendered meaningless if, as Mr. Lynch advocates, the SHA nonetheless allows him to compel Petitioners to pursue only a single course "without time limit," i.e., the litigated acquisition of Yukos Finance shares, regardless of the merits or of cost.

66.    Mr. Lynch cannot simply ignore these contractual rights or attempt to re-cast them as mere equity.  Pursuant to § 27.1 of the SHA, the loan agreements and the SHA constitute a single, integrated agreement.  [SHA § 27.1; Exhibit 25/1.]  It is a basic maxim of contract law that one cannot construe one clause of an agreement, like §§ 5.3 and 5.4 of the SHA, to render another clause, like § 5 of the funding loans, completely meaningless. *See Re Strand Music Hall Co Ltd* (1865) 35 Beav. 153, at [159], (Eng.); *see also Durham v. BAI (Run Off) Ltd* [2012] UKSC 14, at [69], (Eng.); *see also Garza v.*

35

*Marine Transp. Lines, Inc.*, 861 F.2d 23, 27-28 (2d Cir. 1988). And as for Mr. Lynch's limpid effort to re-cast Petitioners' loans as equity, Judge Wiles recently made clear that a "bankruptcy court does not have the power to alter the actual arrangement that the parties intended and that they adopted"; a court "cannot impose a different relationship than the one the parties actually adopted." *In re Yoga Smoga, Inc.*, No. 16-13159 (MEW), Slip Op. at 6 (Bankr. S.D.N.Y. Dec. 27, 2016) (declining to dismiss involuntary based on efforts to re-characterize petitioner's convertible loans to equity; documents made clear the parties contemplated debt instruments, and debtor recognized obligations as debt in its own records).[4]

67.     Mr. Lynch nonetheless attempts to second-guess Petitioners' exercise of their discretionary rights by arguing that certain unpaid legal bills were incurred by Kirwan without formal approval and that the outstanding amounts are too small to justify the declaration of an insolvency event. *See* Supp. Memo. of Stephen P. Lynch at 32. However, the parties have retained counsel and operated Kirwan informally for years, without complaint and without requiring formal approval of every matter or prompt documentation of every expense. [Stip. ¶¶ 36, 39, 120.] Moreover, Mr. Lynch does not dispute that under Luxembourg corporate law, an entity's mere substantial compliance with formalities suffices, *See* Dec. of Paul Mouse at ¶¶ 7-19, June 14, 2016 [Docket No.

---

[4]   As Judge Wiles further said, "it is far too often the case that parties use recharacterization arguments to try to change the relationships between the parties," but "it is wrong to try to use recharacterization arguments in this way." *Yoga Smoga*, Slip Op. at 5. Mr. Lynch is improperly attempting to do just that in this case. Despite the fact that the SHA and litigation funding loans contain explicit creditor remedies; that the SHA and loan documents were purposefully and explicitly structured as loans; and that they have been carried as such on Kirwan's annual statements every year since 2007, [Stip. ¶¶ 55-59], ██████████████████████████████████████████████████████████████████. This is yet another instance of Mr. Lynch putting his interests as a shareholder above his duties as a fiduciary.

36

30]; and that under Luxembourg insolvency law, an entity is deemed insolvent if it fails to pay a *single* invoice, no matter how small the amount. *See* Dec. of Jean Brucher at ¶ 36, June 6, 2016 [Docket No. 24.]; and that, as of and before the petition date, Kirwan had no credit available from alternative sources. [Stip. ¶ 85].

68.    Based on the foregoing, Mr. Lynch's own English law expert concedes that she "cannot say that an English Court would be likely to make such a finding" that Petitioners abused their discretion in declaring Kirwan insolvent. Shiu Dec. at ¶ 90.

## II.    ABSTENTION UNDER § 305 IS NOT WARRANTED

69.    As an alternative to dismissal, Mr. Lynch seeks abstention under § 305. Abstention is "an extraordinary remedy that should be used sparingly and not as a substitute for a motion to dismiss under other sections of the Bankruptcy Code." 2 *Collier on Bankruptcy* ¶ 305.02 (Alan N. Resnick & Henry J. Sommer, eds., 16th ed. rev. 2016); *see also In re Paper I Partners, L.P.*, 283 B.R. 661, 678 (Bankr. S.D.N.Y. 2002). Section 305 allows a court to dismiss or suspend all proceedings in a case if "the interests of *creditors* and the *debtor* would be better served" by doing so. 11 U.S.C. § 305(a)(1) (emphasis added); *see also Eastman v. Eastman (In re Eastman)*, 188 B.R. 621, 624-25 (B.A.P. 9th Cir. 1995) (reversing lower court that failed to make a finding that dismissal was in interests of *both* the debtor and its creditors). Because the standard requires that both the debtor's and creditors' interests are served, "few fact patterns fall within section 305(a)." 2 *Collier on Bankruptcy, supra*, ¶ 305.02[1].

70.    Here, Mr. Lynch is not a creditor, nor does he have the unilateral ability to decide what is in Kirwan's best interests. By contrast, Petitioners comprise 99% of the creditors and their designees control Kirwan's board. Petitioners and a majority of Kirwan's board collectively believe that chapter 11 *is* in Kirwan's best interests and for

37

that reason, chose not to direct Kirwan to oppose the petition in the first instance. Accordingly, Kirwan's and its creditors' interests are not better served by abstention. Mr. Lynch's single share cannot be allowed to outweigh these other, much more significant, interests.

71.     This Court has identified certain factors that should be considered in deciding whether to grant a motion to abstain. *See In re Persico Contracting & Trucking, Inc.*, No. 10-22736 (RDD), 2010 WL 3766555, at *3 (Bankr. S.D.N.Y. Aug. 20, 2010). The most important factor is "the purpose for which bankruptcy jurisdiction have been sought." *Id.* at *4. Petitioners addressed above the legitimate purposes for which they seek to utilize chapter 11. Additionally, none of the other *Persico* factors identified by this Court warrant abstention. For example, two related factors are whether there is already a proceeding pending in state court or whether a non-Federal insolvency proceeding has already proceeded so far that it would be costly and time-consuming to start afresh under chapter 11. *See id.* However, there are no other proceedings pending here.

72.     Other factors in the abstention calculus are whether another forum is available to protect the interests of creditors and the debtor; whether chapter 11 is necessary to reach a just and equitable solution; and whether there is "an alternative means of achieving an equitable distribution of assets." *Id.*. While Mr. Lynch likes to tout the word "arbitration," arbitration here has nothing to do with the interests of creditors and Kirwan. Arbitration under the SHA would be solely about shareholder rights and therefore is completely irrelevant to, and cannot provide a solution for, the

paramount issues facing Kirwan:  how best to maximize the value of its ████████ litigation asset for the benefit of its stakeholders.

73.    Finally, Mr. Lynch asserts that abstention is warranted if the parties' "legitimate expectations" would be undermined by chapter 11.  Mr. Lynch cites Judge Carey's decision in *In re Northshore Mainland Services, Inc.*, 537 B.R. 192 (Bankr. D. Del. 2015) in support of his position.  However, that case is distinguishable.  The debtor in that case was an enormous Bahamian resort that was projected to generate 12% of The Bahamas' gross domestic product.  *See id.* at 196.  The Bahamian Supreme Court entered orders appointing joint provisional liquidators for the debtor and declining to recognize the debtor's chapter 11 case filed in Delaware.  *See id.* at 204-5.  It made eminent sense for Judge Carey to abstain under such circumstances.  But those circumstances are completely unlike the circumstances here.  PNS is not a major aspect of any nation's economy, and no foreign insolvency proceeding is pending.

74.    Mr. Lynch nonetheless argues that Petitioners have no rights as creditors and hence, there was no "legitimate expectation" of United States insolvency proceedings for Kirwan.  However, no one ever expects bankruptcy.  This therefore cannot be a reason for abstention under § 305.  Moreover, Mr. Lynch's argument ignores Petitioners' rights as creditors, discussed above.  At the June 17, 2016 hearing, this Court denied Mr. Lynch's request to dismiss this case based on the doctrine of *forum non conveniens* and the London forum selection clause in the SHA.  *Order (I) For Relief Under Chapter 11 Of The Bankruptcy Code And (II) Denying, In Part, Stephen P. Lynch's Motion For Intervention And Dismissal, Abstention Or Stay* [Docket No. 24] §§ 3-4.  Mr. Lynch cannot re-litigate these matters under the guise of abstention.

75.     Indeed, Mr. Lynch conveniently ignores the fact that both he and Mr. Deitz are United States citizens; that this Court has already presided over formal proceedings involving Yukos Oil in which Mr. Lynch willingly participated; that there have been other United States proceedings ancillary to the Netherlands litigation, including multiple 1782 proceedings in the Southern District of New York in which Mr. Lynch also participated [Stip. ¶ 52]; and that United States Bankruptcy Courts routinely take jurisdiction of non-U.S. enterprises with minimal contacts to this country, regardless of parties' "expectations." In short, Mr. Lynch has failed to carry his burden of proving that abstention is in both creditors' (Petitioners') and Kirwan's interests. His abstention request therefore should be denied.

## CONCLUSION

76.     For the foregoing reasons, Petitioners respectfully request that the Court (i) enter an order denying Mr. Lynch's motion to dismiss or abstain and (ii) granting Petitioners such other relief as the Court deems just, proper and equitable.

Dated: New York, New York

January 9, 2017

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: */s/ Mark A. McDermott*
    Jay M. Goffman
    Mark A. McDermott
    Jonathan Frank
    Suzanne Lovett
    Four Times Square
    New York, New York 10036
    (212) 735-3000

*Counsel to Petitioning Creditors,*
*Lapidem Ltd. and Mascini Holdings*
*Limited*

40

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| In re | : | **Chapter 11** |
|  | : |  |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
|  | : |  |
| Debtor. | : |  |
|  | : |  |
| | : | |
| **STEPHEN P. LYNCH,** | : | |
|  | : | |
| Plaintiff, | : | |
|  | : | |
| v. | : | **Adversary Proceeding No. 17-08200 (RDD)** |
|  | : | |
| **MASCINI HOLDINGS LIMITED, LAPIDEM LTD., and KIRWAN OFFICES, S.À.R.L.,** | : | |
|  | : | |
| Defendants. | : | |

**OMNIBUS OBJECTION OF PETITIONERS TO STEPHEN LYNCH'S
(I) EMERGENCY MOTION FOR A DECLARATION THAT THE AUTOMATIC
STAY DOES NOT APPLY OR, IN THE ALTERNATIVE, FOR RELIEF FROM
THE AUTOMATIC STAY, AND (II) MOTION FOR PRELIMINARY
INJUNCTION**

Case 1:17-cv-04339-CM   Document 13-4   Filed 07/26/17   Page 24 of 71

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND FACTS.......................................................................................5

    A.    Pre-Bankruptcy Matters..........................................................................5

    B.    Post-Bankruptcy Matters .......................................................................7

ARGUMENT.........................................................................................................9

    A.    The Matters at Issue are Core, And Granting the Motion to
         Institute Arbitration Would Inherently Conflict With Fundamental
         Aims Of The Bankruptcy Code and This Proceeding ..............................10

         1.    The Matters Mr. Lynch Seeks To Arbitrate Are Core
                 Bankruptcy Matters ...................................................................11

         2.    Arbitration Would Inherently Conflict With Bankruptcy
                 Policy .........................................................................................14

    B.    The Automatic Stay Applies, And It Should Not Be Modified................18

    C.    Mr. Lynch Is Not Entitled To An Injunction............................................22

## TABLE OF AUTHORITIES

Page

### CASES

*344 Individuals v. Giddens (In re Lehman Bros. Holdings, Inc.)*,
    No. 14 Civ. 7643(ER), 2015 WL 5729645 (S.D.N.Y. Sept. 30, 2015) ................ 10

*Alcatel Space, S.A. v. Loral Space & Communications Ltd.*,
    154 F. Supp. 2d 570 (S.D.N.Y. 2001) ................................................. 17

*In re American Media Distributors, LLC*,
    216 B.R. 486 (Bankr. E.D.N.Y. 1998) ............................................... 17

*Bank of American, National Ass'n v. North LaSalle Street Ltd. Partnership (In re
    203 North LaSalle Street Partnership)*,
    246 B.R. 325 (Bankr. N.D. Ill. 2000) ................................................ 17

*Bank of America, NT & SA v. Nickele*,
    No. CIV.A. 98-1501, 1998 WL 181827 (E.D. Pa. Apr. 16, 1998) ....................... 13

*Commodity Futures Trading Commission v. Weintraub*,
    471 U.S. 343 (1985) ................................................................. 12

*In re Congregation Birchos Yosef*,
    535 B.R. 629 (Bankr. S.D.N.Y. 2015) ........................................... 19, 20

*Continental Insurance Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*,
    671 F.3d 1011 (9th Cir. 2012) ...................................................... 17

*Credit One Financial v. Anderson (In re Anderson)*,
    553 B.R. 221 (S.D.N.Y. 2016) ...................................................... 11

*Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy
    Co.)*,
    226 F.3d 160 (2d Cir. 2000) ....................................................... 11

*In re General Growth Properties, Inc.*,
    409 B.R. 43 (Bankr. S.D.N.Y. 2009) ................................................ 16

*In re GMG Capital Partners III, L.P.*,
    503 B.R. 596 (Bankr. S.D.N.Y. 2014) ................................................. 8

*In re Hostess Brands, Inc.*,
    No. 12-22052-rdd, 2013 WL 82914 (Bankr. S.D.N.Y. Jan. 7, 2013) .............. 11, 12

ii

*In re Houston Regional Sports Network, L.P.,*
    505 B.R. 468 (Bankr. S.D. Tex. 2014) ................................................................16

*In re Intervention Energy Holdings, LLC,*
    553 B.R. 258 (Bankr. D. Del. 2016) ....................................................................16

*Johns-Manville Corp. v. Asbestos Litigation Group (In re Johns-Manville Corp.),*
    40 B.R. 219 (Bankr. S.D.N.Y. 1984) ..................................................................23

*JWL Entertainment Group, Inc. v. Solbey+Westbrae Partners (In re Fisher Is. Investments, Inc.),*
    778 F.3d 1172 (11th Cir. 2015) ...........................................................................12

*In re Kingston Square Associates,*
    214 B.R. 713 (Bankr. S.D.N.Y. 1997) ................................................................17

*In re Lake Mich. Beach Pottawattamie Resort, LLC,*
    547 B.R. 899 (Bankr. N.D. Ill. 2016) .................................................................16

*Lomas Financial Corp. v. Northern Trust Co. (In re Lomas Financial Corp.),*
    117 B.R. 64 (S.D.N.Y. 1990) ..............................................................................20

*LTV Corp. v. Back (In re Chateaugay Corp.),*
    201 B.R. 48 (Bankr. S.D.N.Y. 1996) ..................................................................24

*Manville Corp. v. Equity Security Holders Committee (In re Johns-Manville Corp.),*
    801 F.2d 60 (2d Cir. 1986) .......................................................................13, 18, 24

*MBNA America Bank, N.A. v. Hill,*
    436 F.3d 104 (2d Cir. 2007) ........................................................................11, 14, 15

*North Star Contracting Corp. v. McSpedon (In re North Star Contracting Corp.),*
    125 B.R. 368 (S.D.N.Y. 1991) ............................................................................20

*Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.),*
    365 B.R. 401 (S.D.N.Y. 2007) ............................................................................24

*Oracle Real Estate Holdings I LLC v. Adrian Holdings Co. I,*
    582 F. Supp. 2d 616 (S.D.N.Y. 2008) ................................................................17

*Phillips v. Congleton, L.C.C. (In re White Mountain Mining, Co.),*
    403 F.3d 164 (4th Cir. 2005) ...............................................................................13

*In re Potter Instrument Co.,*
    593 F.2d 470 (2d Cir. 1979) ................................................................................24

iii

*In re Quad-C Funding LLC,*
  496 B.R. 135 (Bankr. S.D.N.Y. 2013) ...............................................16

*Queenie, Ltd. v. Nygard International,*
  321 F.3d 282 (2d Cir. 2003) ...........................................................20

*In re Sanjel (USA) Inc.,*
  No. 16-50778-CAG, 2016 Bankr. LEXIS 2771 (Bankr. W.D. Tex. July 28,
  2016) ...............................................................................................23

*SCK Corp. v Rosenblum (In re SCK Corp.),*
  54 B.R. 165 (Bankr. D.N.J. 1984) ...................................................13

*SEC v. Brennan,*
  230 F.3d 65 (2d Cir. 2000) .............................................................19

*Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax
  Industries, Inc.),*
  907 F.2d 1280 (2d Cir. 1990) ......................................................20, 21

*U.S. Lines, Inc. v. American Steamship Owners Mutual Protection & Indemn.
  Ass'n (In re U.S. Lines, Inc.),*
  197 F.3d 631 (2d Cir. 1999) ......................................................11, 14

*In re Sturman,*
  No. 10 Civ. 6725(RJS), 2011 WL 4472412 (S.D.N.Y. 2011) ..............20

*Wisdom Import Sales Co. v. Labatt Brewing Co.,*
  339 F.3d 101 (2d Cir. 2003) ...........................................................17

## STATUTES

11 U.S.C. § 362(a)(3) .........................................................................19

11 U.S.C. § 1107.................................................................................12

11 U.S.C. § 1108.................................................................................12

28 U.S.C. § 1334(e) ............................................................................12

28 U.S.C. § 157(b)(2)(A).................................................................12, 13

28 U.S.C. § 157(b)(2)(L).....................................................................12

28 U.S.C. § 157(b)(2)(M)....................................................................12

28 U.S.C. § 157(b)(2)(O).....................................................................13

iv

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Suzanne Lovett
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioning Creditors, Lapidem Ltd. and Mascini Holdings Limited*

## UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **In re** | : | **Chapter 11** |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| **Debtor.** | : | |
| | : | |

### OMNIBUS OBJECTION OF PETITIONERS TO STEPHEN LYNCH'S (I) EMERGENCY MOTION FOR A DECLARATION THAT THE AUTOMATIC STAY DOES NOT APPLY OR, IN THE ALTERNATIVE, FOR RELIEF FROM THE AUTOMATIC STAY, AND (II) MOTION FOR PRELIMINARY INJUNCTION

Lapidem Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini," and together with Lapidem, the "Petitioners"), the largest unsecured creditors of debtor Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"), by and through their undersigned counsel, respectfully submit this omnibus objection to Mr. Stephen Lynch's (i) emergency motion for a declaration that the automatic stay does not apply, or, in the alternative, relief from the automatic stay, and (ii) motion for preliminary injunction. As and for their omnibus objection, Petitioners respectfully state as follows:

### PRELIMINARY STATEMENT

1.      Mr. Lynch's latest salvo – this time in the form of a motion seeking an emergency declaration that the automatic stay does not apply or, in the alternative, for

394

relief from the automatic stay, or a preliminary injunction – is just his latest attempt to disrupt the Debtor's bankruptcy by seeking permission to arbitrate claims against the Petitioners in London over supposed "corporate governance" matters.  In reality, however, Mr. Lynch seeks to prevent the Debtor and the Debtor's fiduciaries from even considering the various tools available to them under the Bankruptcy Code and stop these bankruptcy proceedings in their tracks – something this Court has already declined to do.

2.    To put Mr. Lynch's current actions in perspective, it is essential to keep in mind that Mr. Lynch is a minuscule shareholder and minority board member of the Debtor, and not a creditor. Mr. Lynch has already filed motions seeking, among other things, to intervene in the place of the Debtor; to extend the Debtor's period of exclusivity to ensure continued stalemate; to dismiss the petition as a bad faith filing; and to abstain so that he could circumvent these proceedings and enable another tribunal to arbitrate the propriety of the involuntary filing.

3.    Mr. Lynch has pursued all this notwithstanding the fact that the majority of the Debtor's board and virtually all (if not all) of the Debtor's creditors have a different view.  But Mr. Lynch, although a member of Kirwan's board, is not interested in maximizing the value of Kirwan unless it inures to his personal benefit.  ██████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████

4.    In his latest filings, Mr. Lynch seeks permission to commence an action against the Petitioners in London pursuant to a pre-petition shareholders' agreement. The genesis of Mr. Lynch's motion is an agenda for a proposed board meeting to consider the

Debtors' options concerning the chapter 11 proceeding.  The agenda items at issue concern *consideration* by the Debtor's board of the various tools afforded by the Bankruptcy Code, and analysis of what available course of action best maximizes value. *Implementation* of any of these courses of action would ultimately require this Court's approval, on notice to all parties in interest.  Mr. Lynch is and remains a director of the Debtor.  He received the agenda, was invited to the board meeting and will be free to vote as a director at that meeting.  He is also free to, and encouraged to, bring suggestions to the board that are in the best interests of the Debtor and the Debtor's creditors, including any alternative restructuring proposals.

5.      Careful to frame his proposed action as distant from the Debtor — emphasizing that the proposed arbitration would not be "against the Debtor Kirwan," and "would have no 'clear adverse effects' on Kirwan's property interests" — Mr. Lynch's arguments do not pass the straight-face test. *Stephen P. Lynch's Emergency Motion for a Declaration that the Automatic Stay Does Not Apply or, in the Alternative, for Relief from the Automatic Stay* [Docket No. 71] at pp. 4-5.  What Mr. Lynch seeks is to enjoin the Debtor's fiduciaries from even considering the various options available. Stated differently, he seeks an injunction *requiring* these fiduciaries to breach the obligations they owe to the Debtor and the Debtor's creditors to analyze and select the proper option so that he stands a chance — no matter how remote — of personally benefitting years in the future, all at the risk of the Debtor and the Debtor's creditors and at no risk to himself.

6.      It would be difficult to fathom a proposed course of action that would have a more direct impact on the estate and the authority of this Court under the Bankruptcy Code.  To allow an unhappy stakeholder like Mr. Lynch to go to a non-

Case 1:17-cv-04339-CM    Document 13-4    Filed 07/13/17    Page 31 of 71

bankruptcy forum to obtain an order directing the actions of the debtor-in-possession's fiduciaries would effect a complete end-run around the authority of the Bankruptcy Court and would render bankruptcy meaningless.    In truth, Mr. Lynch's complaint is that, as a result of the bankruptcy process, he ultimately may lose any prospect of recovery as a vanishingly small equity holder of the Debtor.  Such rights include what he contends is a right pursuant to the shareholders' agreement to veto certain transactions.    But shareholder agreements and equity interests must often yield in bankruptcies.  Indeed, no pre-petition agreement can restrict a corporate debtor and its fiduciaries from utilizing the Bankruptcy Code to explore and implement alternatives for maximizing value.

7.    In the end, Mr. Lynch's motions, while cleverly phrased, are nothing more than an unhappy equity holder seeking to derail the entire bankruptcy process because the Code does not place priority on his small, contingent interest at the expense of maximizing the value of the estate.    His requests do not state a compelling case for this Court to yield its jurisdiction in favor of arbitration.  Accordingly, there is no reason to lift the stay, which unquestionably applies to Mr. Lynch's proposed actions.  Indeed, even if this Court were to find the stay inapplicable, which it should not, Mr. Lynch should be enjoined pursuant to section 105(a) because his proposed course of action would have a direct and harmful impact on these proceedings.  His motions should be denied.

## BACKGROUND FACTS

**A.**   **Pre-Bankruptcy Matters**[1]

8.     In August 2007, a consortium of investors comprised of affiliates of Petitioners and Mr. Lynch agreed to participate in the auction for Yukos Finance through an investment vehicle, OOO Promneftstroy ("PNS"), a Russian entity which is Kirwan's sole asset.  On August 15, 2007, PNS submitted the winning bid for Yukos Finance in the amount of $309 million.  Petitioners provided all of the funding for PNS's acquisition of Yukos Finance in the form of loans to Kirwan, a Luxembourg entity which owns 100% of the interests in PNS.  Kirwan in turn loaned the funds to PNS, which used the funds to acquire Yukos Finance.   Mr. Lynch has never loaned Kirwan or PNS any money. Petitioners together own 2.5 million shares of Kirwan.  Mr. Lynch owns a single share.

9.     Shortly after PNS's acquisition of Yukos Finance, PNS became embroiled in litigation in the Netherlands with several parties asserting competing claims to the ownership of Yukos Finance's shares. ██████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[1]   The facts surrounding this matter are discussed in detail in Petitioners' supplemental submission in response to Mr. Lynch's motion to dismiss.  [Docket No. 79]  The discussion of the facts herein focuses only on certain matters especially relevant to Mr. Lynch's motions with respect to the stay and an injunction.

███████████████████████████████████████████████

██████████████████████████████

10.     Like any lender to a troubled enterprise, Petitioners therefore wanted to explore alternatives.  But Mr. Lynch did not.  This led to pre-petition disputes between the parties, including a pre-petition arbitration.   The arbitration concerned select provisions of the parties' shareholders' agreement (the "SHA"), but the arbitration did not and could not resolve the stakeholders' fundamental disagreements over the direction of Kirwan, PNS and the Yukos Finance litigation.  ███████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████   Petitioners exercised their exclusive right under their funding loan agreements to determine that Kirwan was insolvent and hence, to declare the loans due and payable.

11.     The involuntary petition followed, which this Court granted on July 5, 2016.  Petitioners filed this case to utilize the tools afforded by the Bankruptcy Code to maximize their chances of obtaining a recovery on their loans while minimizing further exposure.   These tools include the ability to eliminate Mr. Lynch's attempts to be a continued obstructionist to Kirwan's restructuring.  ███████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

**B.    Post-Bankruptcy Matters**

12.    Mr. Lynch's current arbitration demand is the second time in this case that he has requested arbitration of irrelevant shareholder matters, and the third time he has sought to act unilaterally on Kirwan's behalf. First, Mr. Lynch sought permission from this Court to intervene on Kirwan's behalf to contest the validity of the involuntary petition that Petitioners had filed against Kirwan. This Court denied Mr. Lynch's request, in part because Mr. Lynch did not offer any evidence to suggest that Kirwan, through its board, could not act. As the Court stated:

> If a corporation is the subject of an involuntary case and a minority shareholder doesn't like the fact, but the board and/or the controlling shareholders don't want to contest, I don't think under the case law there's an ability of the minority shareholder to contest the petition because the company has the power to act to contest. It's just made the corporate decision not to. And congress didn't give minority shareholders or minority board members the ability to second guess that corporate governance.

*See Tr. of Hr'g on Involuntary Pet.* ("Tr. of Hr'g") at 15-16, June 17, 2016.

13.    At the same time Mr. Lynch made his intervention request, he also requested this Court order the parties to arbitration, focusing in particular on Petitioners' asserted breaches of the SHA and their alleged "usurpation of [Mr. Lynch's] governance rights." *Reply Memorandum Of Law In Further Support Of Motion For Intervention And Dismissal, Abstention Or Stay* [Docket No. 12], at 8. The Court focused on whether the SHA could be construed to prohibit Petitioners, acting in their capacity as creditors, from utilizing chapter 11 to restructure Kirwan's affairs, and whether the parties' position on this question should be arbitrated. *See id.* at 106. After lengthy argument, this Court

concluded that the matters Mr. Lynch sought to have arbitrated were core matters, and that arbitration of them would conflict with the fundamental aims of the Bankruptcy Code, including the adjustment of Petitioners' rights as creditors. The Court therefore denied Mr. Lynch's arbitration demand. *See id.* at 120.

14.     Mr. Lynch has also filed a motion to extend Kirwan's exclusive period for filing a plan, even though a majority of Kirwan's board do not want to do so. *See Stephen P. Lynch's Motion To Extend The Debtor's Exclusivity Periods* [Docket No. 55]. Mr. Lynch's motion does not cite a single case where one member of a multiple-member board requested, and was granted, such an extension. The reason is clear: exclusivity is a *debtor* protection, not a protection for a single director or shareholder. *See, e.g., In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) (exclusivity recognizes "the *debtor's* need to remain in control to some degree.") (emphasis added). Mr. Lynch fails to show how Kirwan can confirm a plan without Petitioners' support. Mr. Lynch, as only one member of Kirwan's six member board, cannot single-handedly cause Kirwan to propose its own plan.

15.     Mr. Lynch's motion to extend exclusivity was filed on October 31, 2016 shortly before the statutory expiration date. It was not set for hearing until January 27, 2017, resulting in a de facto three-month extension of exclusivity by virtue of the Local Rules. Because January 27, 2017 is also the continued date on the hearing on Mr. Lynch's motion to dismiss this case as a bad faith filing, Petitioners chose not to seek a more expedited hearing. During that time, Petitioners instead considered other bankruptcy options for Kirwan and added two independent managers to Kirwan's board. The independent members joined the board effective January 1, 2017.

16.    Petitioners' designees called a board meeting for January 19, 2017.  As Kirwan's charter requires 20 business days' notice of any board meeting, the notice of the board meeting was sent on December 13, 2016, almost a month ago.  The agenda included customary matters for any debtor-in-possession, including retention of bankruptcy counsel for Kirwan and retention of a financial expert to assist it in considering its options.  Mr. Lynch objects to neither of these agenda items.  Rather, he objects to creation of a special committee of the independent managers vested with authority to consider and recommend alternatives to the full board; the board's consideration of one or more possible processes for considering alternatives; and the board's rejection of the SHA.  Mr. Lynch's current filings ensued.

17.    ████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████

## **ARGUMENT**

18.    Distilled to its essence, Mr. Lynch seeks to commence arbitration proceedings in London against Petitioners in order to obtain a mandatory injunction compelling Petitioners to direct their designees to Kirwan's board of managers to refrain from considering alternatives and using the appropriate bankruptcy tools to maximize the

estate's value.  These customary bankruptcy steps Mr. Lynch wants to enjoin include the

creation of a special committee of independent managers, consideration of a possible sale

or plan process for Kirwan and rejection of the SHA.  Instead, Mr. Lynch wants this

Court to abstain from consideration and oversight of these clearly core bankruptcy

matters and cede control to a non-bankruptcy arbitral tribunal in London.

19.     Using the SHA as a sword, Mr. Lynch wants this non-bankruptcy tribunal

to direct the bankruptcy proceedings by compelling Petitioners to direct their designees to

cause the Debtor's subsidiary, PNS, to continue to fund protracted litigation over Yukos

Finance, in disregard of the majority of Kirwan's board, unless and until Mr. Lynch

directs otherwise. Mr. Lynch is not doing this to maximize the expected value of the

estate, but rather for his own personal opportunity to pursue a strategy at the Debtor's

expense. Because the purpose and effect of Mr. Lynch's motion is patently antithetical to

core bankruptcy goals and, absent relief, is the very type of conduct prohibited by the

automatic stay, the motions should be denied.[2]

### A. The Matters at Issue are Core, And Granting the Motion to Institute Arbitration Would Inherently Conflict With Fundamental Aims Of The Bankruptcy Code and This Proceeding

20.     In considering whether Mr. Lynch's motion to permit arbitration should be

granted, this Court must apply a two-part test.  *See 344 Individuals v. Giddens (In re*

*Lehman Bros. Holdings, Inc.)*, No. 14 Civ. 7643(ER), 2015 WL 5729645, at *5

(S.D.N.Y. Sept. 30, 2015), *aff'd*, No. 15-3480-6k, 2016 WL 5853265 (2d Cir. Oct. 6,

---

[2]     We have assumed for purposes of this submission that the SHA remains in force, as Mr. Lynch has done in his motions.  We do not, however, concede the point as, pursuant to Section 23.1, the SHA terminates upon a winding up. *See* SHA Sections 1.9, 1.11 & 23.1.

2016). First, the Court must determine whether the proceeding is core or non-core. *See U.S. Lines, Inc. v. Am. S.S. Owners Mut. Prot. & Indemn. Ass'n (In re U.S. Lines, Inc.)*, 197 F.3d 631, 636-39 (2d Cir. 1999). If the proceeding is non-core, arbitration must be permitted to proceed. If, however, the proceeding is core, the Court should decline to compel arbitration if doing so would "inherently conflict" with, or "seriously jeopardize," the policies and aims of the Bankruptcy Code. *MBNA Am. Bank, N.A. v. Hill*, 436 F.3d 104, 107-08 (2d Cir. 2007); *Credit One Fin. v. Anderson (In re Anderson)*, 553 B.R. 221, at 226 (S.D.N.Y. 2016); *Crysen/Montenay Energy Co. v. Shell Oil Co. (In re Crysen/Montenay Energy Co.)*, 226 F.3d 160, 166 (2d Cir. 2000).

21.     Proceedings are core if either (i) they are unique to or are uniquely affected by the bankruptcy proceedings or (ii) they directly affect a core bankruptcy function. *See In re U.S. Lines*, 197 F.3d at 637. This Court has elaborated on this definition, holding that a core proceeding is one that is "central to the bankruptcy process that Congress contemplated as substantially altering otherwise existing and enforceable rights under applicable non-bankruptcy law." *In re Hostess Brands, Inc.*, No. 12-22052-rdd, 2013 WL 82914, at *3 (Bankr. S.D.N.Y. Jan. 7, 2013); *see also In re Anderson*, 553 B.R. at 228-29.

**1.     The Matters Mr. Lynch Seeks To Arbitrate Are Core Bankruptcy Matters**

22.     The Debtor seeks to consider fully its options for a plan that would maximize estate value, and it will use bankruptcy tools for doing so. To that end, the majority of the Debtor's duly constituted board would like to consider forming a special committee to guide, in independent fashion, the board's consideration and direction of such measures. Thereafter, the board – acting as the Debtor's fiduciaries – would like to

review the alternatives and recommendations and vote on a proposed course of action. Any such approved plan would be presented to this Court for its review and approval, amendment or rejection.

23.     Such actions are plainly at the heart of the bankruptcy process.   As a debtor-in-possession, Kirwan has the same duties as a bankruptcy trustee.   11 U.S.C. §§ 1107, 1108.   Both Kirwan and its board have fiduciary duties to all stakeholders to consider, develop and pursue strategic alternatives for maximizing value, including via the statutory rights and mechanisms available under the Bankruptcy Code.   *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355-56 (1985).   Such matters clearly concern the administration of the estates and hence, are core.   28 U.S.C. § 157(b)(2)(A).   The property of Kirwan's estate is subject to the exclusive jurisdiction of this Court, 28 U.S.C. § 1334(e), and any determination by Kirwan to sell PNS, compromise the Yukos Finance litigation,  pursue a plan of reorganization or liquidation, or reject the SHA, undisputedly are statutory core functions under the Bankruptcy Code. 28 U.S.C. § 157(b)(2)(L), (M).   Indeed, little could be more "core" to the bankruptcy process than consideration and promulgation of a bankruptcy plan and this Court's analysis and review of that plan. *See In re Hostess Brands*, 2013 WL 82914 at *4.

24.     Based on the foregoing, courts uniformly have held that "control of a debtor-in-possession goes to the very heart of the administration of the debtor's estate, [and] it necessarily follows that the bankruptcy court may properly determine where such control resides." *JWL Entm't Grp., Inc. v. Solbey⁺Westbrae Partners (In re Fisher Is. Invs., Inc.)*, 778 F.3d 1172, 1186-95, n.11 (11th Cir. 2015) (finding bankruptcy court had core jurisdiction, in the context of an involuntary petition, to resolve intra-shareholder

dispute over control of alleged debtor embroiled in global litigation); *see Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville Corp.)*, 801 F.2d 60 (2d Cir. 1986) (request for injunction to compel shareholders' meeting constituted core bankruptcy proceeding); *Bank of Am., NT & SA v. Nickele*, No. CIV.A. 98-1501, 1998 WL 181827 (E.D. Pa. Apr. 16, 1998) (lender's effort to obtain non-bankruptcy injunction enjoining the debtor's directors from doing anything on the debtor's behalf constituted core proceeding); *SCK Corp. v Rosenblum (In re SCK Corp.)*, 54 B.R. 165 (Bankr. D.N.J. 1984) (former shareholder's request for declaration that he remained in control of the debtor "goes to the very heart of the administration of the debtor's estate" and therefore constituted a core proceeding).

25.     This Court already found that Mr. Lynch's initial motion to compel arbitration over Petitioners' rights as creditors involved core bankruptcy matters. *Tr. of Hr'g*, at 116-17; *see also Phillips v. Congleton, L.C.C. (In re White Mountain Mining, Co.)*, 403 F.3d 164 (4th Cir. 2005) (denying motion to dismiss involuntary case and to compel London arbitration over proper characterization of loans made by shareholder to debtor against whom shareholder filed involuntary petition; characterization of shareholder's loans and rights were core proceedings that necessarily impacted distribution of estate assets). This Court should do the same with respect to Mr. Lynch's latest motion to compel an arbitrator to direct the actions of estate fiduciaries, as actions of estate fiduciaries directly concern the administration of the estate, the liquidation of the estate, and the adjustment of the debtor-creditor and equity holder relationships. *See* 28 U.S.C. § 157(b)(2)(A), (O).

**2.      Arbitration Would Inherently
          Conflict With Bankruptcy Policy**

26.      As the matters at issue are certainly core, the question becomes whether

permitting arbitration to proceed would inherently conflict with the bankruptcy process.

The answer is clearly, "Yes." The objectives of the Bankruptcy Code relevant to this

inquiry include "the goal of centralized resolution of purely bankruptcy issues, the need

to protect creditors and reorganizing debtors from piecemeal litigation, and the

undisputed power of a bankruptcy court to enforce its own orders." *MBNA Am. Bank,*

436 F.3d at 108. As this Court stated at the June 17, 2016 hearing on Mr. Lynch's first

request to order arbitration, arbitration should be denied if it "would interfere with or

affect a distribution of the estate and whether the resolution of [the arbitration claims]

would directly implicate matters central to the purposes and policies of the Bankruptcy

Code." *Tr. of Hr'g* at 124. Significantly, "[i]n the bankruptcy setting, congressional

intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override

even international arbitration agreements." *In re U.S. Lines,* 197 F.3d at 639.

27.      Here, Mr. Lynch wants to halt estate fiduciaries' development and pursuit

of a bankruptcy plan to be proposed, evaluated and adopted in conformance with and

pursuant to the statutory process set forth in the Bankruptcy Code. He wants to do so

through an indirect process in a non-U.S., non-bankruptcy tribunal outside of this Court's

purview. Mr. Lynch is not doing so in his capacity as a fiduciary to forward bankruptcy

related policies; he is seeking, as holder of a solitary share of Kirwan, to derail

consideration and implementation of proper bankruptcy alternatives by the Debtor's

fiduciaries. Without consideration and analysis of maximizing creditor value, Mr. Lynch

asserts that, pursuant to the SHA, Kirwan is irrevocably bound to pursue continued

litigation over the Yukos Finance shares and "no other course of action" "without time limit." And, of course, this pursuit is not to be paid for by him, but by the Petitioners ███

███████████████████████████████████████████████

28.　　Granting Mr. Lynch's arbitration request in such circumstances would "necessarily jeopardize" core bankruptcy functions.  It would  prevent the Debtor and its board members from complying with their obligations to the estate and all stakeholders; substitute the judgment of a foreign arbitrator for the business judgment of the debtor-in-possession; nullify the fiduciary duties of board members; and deprive this Court of its exclusive jurisdiction over the bankruptcy estate.   Bankruptcy would be rendered meaningless if a disgruntled stakeholder could run to a non-bankruptcy tribunal and obtain an order directing the debtor's fiduciaries to act according to the terms of a pre-petition agreement, regardless of the fiduciaries' duties or the policies of the Bankruptcy Code.

29.　　Indeed, it would be difficult to imagine a scenario that would more completely defeat "the goal of centralized resolution of purely bankruptcy issues, the need to protect creditors and reorganizing debtors from piecemeal litigation, and the undisputed power of a bankruptcy court to enforce its own orders." *MBNA Am. Bank*, at 108. Or, as this Court phrased matters at the June 17, 2016 hearing, Mr. Lynch's request, if granted, "would interfere with or affect a distribution of the estate" and "would directly implicate matters central to the purposes and policies of the Bankruptcy Code." *Tr. of Hr'g* at 124.  For this reason, no pre-bankruptcy agreement, including a charter provision or shareholders' agreement, can (i) sign away the fiduciary duties of a corporate entity's directors; (ii) waive a corporate entity's ability to file a voluntary bankruptcy petition or

consent to an involuntary petition in derogation of its board's fiduciary obligations; or (iii) bind the entity to a pre-determined course even after bankruptcy or otherwise restrict the entity's fiduciaries from utilizing the Bankruptcy Code to explore alternatives for maximizing value once that entity becomes a debtor under the Bankruptcy Code.

30.     Especially relevant to this analysis are recent rulings by Judge Carey and Judge Barnes that the holder of a single so-called "golden share" as part of a corporate entity's governance structure may not use the rights afforded by that share to override, nullify or interfere with efforts by a corporate entity's fiduciaries to utilize the tools afforded by the Bankruptcy Code.   *See In re Intervention Energy Holdings, LLC*, 553 B.R. 258, 265 (Bankr. D. Del. 2016) (provision in a governance document that placed into the hands of a single, minority equity holder the ultimate authority to eviscerate the right of that entity to utilize the tools of bankruptcy, where the equity holder had no duty to anyone but itself, is contrary to federal bankruptcy policy and not enforceable); *In re Lake Mich. Beach Pottawattamie Resort, LLC*, 547 B.R. 899, 914 (Bankr. N.D. Ill. 2016) (member of entity could not arrogate to itself the right to vote against bankruptcy while disclaiming any fiduciary duty to consider entity's best interests).

31.     These are basic propositions of bankruptcy law, with a long history of support in published decisions from this and other Districts.  *See, e.g., In re Houston Reg'l Sports Network, L.P.*, 505 B.R. 468, 482 (Bankr. S.D. Tex. 2014) (rejecting contention that bankruptcy remote structure absolves entity's directors of fiduciary responsibilities under the Bankruptcy Code); *In re Quad-C Funding LLC*, 496 B.R. 135, 143 (Bankr. S.D.N.Y. 2013) (minority equity veto over use of bankruptcy would hold company hostage to equity holder's whims even where there's no dispute judicial

reorganization is the best course); *In re Gen. Growth Props., Inc.*, 409 B.R. 43, 63-64
(Bankr. S.D.N.Y. 2009) (directors of corporate borrowers appointed by lenders could not
act solely in lenders' interests; directors were fiduciaries obligated to act in estate's best
interests); *In re Kingston Square Assocs.*, 214 B.R. 713, 738 (Bankr. S.D.N.Y. 1997)
(single board member could not hold up entity's consideration of bankruptcy alternatives
where he was motivated solely by his own interests, despite his pre-petition governance
rights); *see also Cont'l Ins. Co. v. Thorpe Insulation Co. (In re Thorpe Insulation Co.)*,
671 F.3d 1011, 1026 (9th Cir. 2012) ("'[A]ny attempt by a creditor in a private pre-
bankruptcy agreement to opt out of the collective consequences of the debtor's future
bankruptcy filing is generally unenforceable. The Bankruptcy Code preempts the private
right to contract around its essential provisions.'") (alteration in original) (citation
omitted); *Bank of Am., Nat'l Ass'n v. N. LaSalle St. Ltd. P'ship (In re 203 N. LaSalle St.
P'ship)*, 246 B.R. 325, 331 (Bankr. N.D. Ill. 2000) ("[S]ince bankruptcy is designed to
produce a system of reorganization and distribution different from what would obtain
under non-bankruptcy law, it would defeat the purpose of the Code to allow parties to
provide by contract that the provisions of the Code should not apply.").

32.     The governance cases Mr. Lynch cites are inapposite. While the Court in
*In re American Media Distributors, LLC* ordered a debtor's shareholders to arbitrate
certain governance matters, there was no evidence the arbitrator was being asked to direct
estate fiduciaries to ignore their overriding fiduciary obligations. 216 B.R. 486, 490
(Bankr. E.D.N.Y. 1998). The case, respectfully, is irrelevant here. The same is true of
the non-bankruptcy cases that Mr. Lynch cites. *Wisdom Imp. Sales Co. v. Labatt
Brewing Co.*, 339 F.3d 101 (2d Cir. 2003); *Oracle Real Estate Holdings I LLC v. Adrian*

Case 1:17-cv-04339-CM    Document 13-4    Filed 07/13/17    Page 45 of 71

*Holdings Co. I*, 582 F. Supp. 2d 616 (S.D.N.Y. 2008); *Alcatel Space, S.A. v. Loral Space & Commc'ns Ltd.*, 154 F. Supp. 2d 570 (S.D.N.Y. 2001), *aff'd*, 25 F. App'x 83 (2d Cir. 2002). None of them had occasion to consider the Bankruptcy Code's preemptive effect and its underlying policies in furtherance of estate fiduciaries' obligations to consider alternatives and maximize the value of the debtor's estate.

33.    Finally, the Second Circuit's decision in *In re Johns-Manville* does not support Mr. Lynch. 801 F.2d 60. Indeed, it supports Petitioners. That case involved the non-controversial notion that shareholders' ability to select board members is not impeded by the company's bankruptcy; the case has nothing to do with the propriety of the efforts of the holder of a single share to compel fiduciaries to abandon their duties under the Bankruptcy Code. Moreover, the Second Circuit noted that denial of the shareholders' ability to call a board meeting "would likely be proper" where, as in Kirwan's case, the debtor is insolvent, *id.* at 65 n.6, or where, as here, the shareholder has "demonstrate[d] a willingness to risk rehabilitation altogether in order to win a larger share for equity." *Id.*

34.    In short, Mr. Lynch should not be permitted to end run this Court's oversight of the Debtor and its management by invoking arbitration. The Court already reached this conclusion once before. Although Mr. Lynch tries to recast his argument by framing it differently, the analysis, and the result, is the same. Mr. Lynch's arbitration request is meritless and should be denied.

**B.    The Automatic Stay Applies,
And It Should Not Be Modified**

35.    This Court already recognized that the stay applies to Mr. Lynch's efforts to compel arbitration. *Tr. of Hr'g* at 135 ("I am . . . denying without prejudice the request

for arbitration which I take is a request to lift the stay to permit arbitration in the case for the reasons I've stated."). The automatic stay is "the debtor's primary protection during a bankruptcy case" which is designed to "ensur[e] the orderly determination of the debtor's liabilities, realization on the estate's assets, and allocation of that value to creditors and interest holders according to the Bankruptcy Code's priority scheme and policy of equality of distribution." *In re Congregation Birchos Yosef*, 535 B.R. 629, 633 (Bankr. S.D.N.Y. 2015) (citing *SEC v. Brennan*, 230 F.3d 65, 70 (2d Cir. 2000)), *appeal dismissed*, No. 15-CV-6408 (CS), 2016 WL 5394755 (S.D.N.Y. 2016). As this Court has recognized in very analogous circumstances, proceedings instituted against non-debtors may be considered to be "directed against a Debtor" when such non-debtors share an "identity of interest" with the Debtor. *In re Congregation Birchos Yosef*, 535 B.R. at 633.[3]

36.    In *In re Congregation Birchos Yosef*, this Court examined an injunction issued by a religious tribunal against the debtor's principals that would have prevented them from prosecuting an adversary proceeding in the Bankruptcy Court. This Court held that while the actions were nominally against the debtor's principals, the religious tribunal's action was "actually directed at the Debtor through its principals with the intention of wresting control of the Debtor's adversary proceeding and exerting pressure to have it dismissed." *Id.* at 633. Where an action is directed against a debtor's principals because of "their status or actions in that capacity," such action "is effectively

---

[3]    Despite the near identical issues presented in *In re Congregation Birchos Yosef*, Mr. Lynch fails to distinguish, or even cite it, in his brief.

a proceeding against the debtor and, thus, subject to the automatic stay." *Id.* at 633 n.3;
*see* 11 U.S.C. § 362(a)(3).

37.     All the same concerns underlying the *In re Congregation Birchos Yosef*
decision apply here.  If estate fiduciaries can be targeted indirectly by enjoining the
shareholders who appointed them, "there would be such a hole in the automatic stay that
it would have no force.  Parties in interest in bankruptcy cases could walk right through it
by simply suing the debtor's principals for actions which they took in that capacity." *Id.*
at 634.  Indeed, this Court's own holding in *In re Congregation Birchos Yosef* would be
eviscerated if targeting an appointing shareholder was a valid work-around.  *See also*
*Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) (the automatic stay may
apply to non-debtors when the estate will suffer "immediate adverse economic
consequence[s]"); *N. Star Contracting Corp. v. McSpedon (In re N. Star Contracting
Corp.)*, 125 B.R. 368 (S.D.N.Y. 1991) (automatic stay protects against action targeting
officer in official capacity); *Lomas Fin. Corp. v. N. Tr. Co. (In re Lomas Fin. Corp.)*, 117
B.R. 64 (S.D.N.Y. 1990) (same).  Not only is the Debtor the ultimate target of this action,
but Mr. Lynch also seeks to exercise control over property of the estate in directing the
board of manager's actions with respect to core functions of a debtor-in-possession.  *See*
*In re Sturman*, No. 10 Civ. 6725(RJS), 2011 WL 4472412, at *1-2 (S.D.N.Y. 2011)
(action in Surrogate's Court to prevent trustee from taking steps to close, or distribute any
money from, bankruptcy case violates automatic stay).

38.     In short, Mr. Lynch's thinly-veiled action against Petitioners and their
board designees is really against the Debtor and subject to the automatic stay.  Moreover,
"cause" does not exist to lift the automatic stay to allow Mr. Lynch to obtain his proposed

injunction. Under *Sonnax Industries, Inc. v. Tri Component Products Corp. (In re Sonnax Industries, Inc.)*, courts consider twelve factors[4] when determining whether to lift the automatic stay. 907 F.2d 1280, 1286 (2d Cir. 1990). All such factors that could be implicated here counsel strongly in favor of continuing the automatic stay:

1) *Whether relief would result in partial or complete resolution of the issues.* The proposed arbitration at best could only resolve narrow governance issues among shareholders related to this one board meeting. An unsuccessful attempt by Mr. Lynch would undoubtedly result in numerous additional arbitrations. Indeed, this is already Mr. Lynch's second attempt to commence arbitration in connection with these proceedings. Moreover, arbitration via this piecemeal approach ultimately cannot efficiently address Kirwan's financial issues, which can only be resolved in this Court.

2) *Whether the non-bankruptcy litigation would interfere with the bankruptcy case.* The proposed arbitration would prevent estate fiduciaries from even considering strategic alternatives aimed at a successful reorganization process and, in so doing, threatens to derail the process. There could not be more direct interference.

3) *Whether the other proceeding involves the Debtor as a fiduciary.* The proposed arbitration targets the Debtor indirectly by seeking to enjoin estate fiduciaries from taking action in their official capacity.

4) *Whether a specialized tribunal with necessary expertise has been established to hear the cause of action.* This Court, not a foreign arbitrator, is best equipped to determine whether the Bankruptcy Code preempts the SHA and how estate fiduciaries should exercise their obligations.

---

[4] As Mr. Lynch correctly notes, the factors are: "(1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms." *Sonnax*, 907 F.2d at 1286.

5) *Whether the action primarily involves third parties.* Each of the parties to the proposed arbitration is already intimately involved in the bankruptcy case and the relief ultimately is directed against the Debtor.

6) *Whether arbitration advances judicial economy and the expeditious resolution of litigation.* The latest proposed arbitration is a mere recast of Mr. Lynch's previous request for arbitration, which this Court denied after hundreds of pages of briefing and hours of oral argument. An arbitration tribunal would need to be convened from scratch and briefed in full. And any such arbitration still would not resolve all the issues facing Kirwan.

7) *Whether the parties are ready for trial.* The arbitration panel has not yet been convened, much less briefed on this dispute.

8) *Impact of the stay and balance of harms.* The proposed arbitration seeks to prevent the continued prosecution of the bankruptcy case. ███████

For all the foregoing reasons, along with the reasons provided above, "cause" does not exist for relief from the automatic stay.

## C.  Mr. Lynch Is Not Entitled To An Injunction

39.  Finally, Mr. Lynch's request for an injunction is wildly off base, as he can establish none of the requisite elements. As explained above, Mr. Lynch's fundamental premise – that his single share overrides everything else, effectively ending these proceedings – is false. Mr. Lynch therefore has no likelihood of success on the merits, itself a basis for denying any requested injunction. Moreover, as explained, he has no likelihood of success in obtaining relief from the automatic stay. Thus, no matter how analyzed, Mr. Lynch's request for an injunction falls flat.

40.  For the same reasons, and notwithstanding Mr. Lynch's sleight of hand, he has not established even the possibility of irreparable harm. In addition, the proposed

board agenda seeks only consideration of alternatives available under the Bankruptcy Code as any prudent fiduciary would undertake. Indeed, Mr. Lynch does not, and cannot, explain how mere consideration of options, which will require this Court's approval before implementation, will cause him irreparable harm, particularly where he is being afforded all of his rights as a director of the Debtor. If Mr. Lynch has an objection to the ultimate proposed course of action, he can raise that objection with this Court at the appropriate time.[5]

41.    Finally, the balance of hardships tips overwhelmingly in favor of denying the injunctive relief. The proposed injunction would require the Debtor's directors to breach or at least delay the exercise of their fiduciary obligations. Delay alone could harm the Debtor: ███████████████████████████████

████████████████████████████████████████████████

████████████████████████████   While Mr. Lynch has chosen for himself the option of breaching and delaying the exercise of his fiduciary duties, that does not mean it is appropriate for all directors to do the same.

42.    Indeed, even if the automatic stay did not apply (and, as explained above, it does), Mr. Lynch has things upside down. It is Mr. Lynch's proposed course of conduct that should be enjoined. Bankruptcy courts may enjoin actions against non-debtors when doing so would protect the debtor's estate. *See Johns-Manville Corp. v. Asbestos Litig. Grp. (In re Johns-Manville Corp.)*, 40 B.R. 219, 226 (Bankr. S.D.N.Y.

---

[5]    Mr. Lynch's reliance on *In re Sanjel (USA) Inc.*, No. 16-50778-CAG, 2016 Bankr. LEXIS 2771 (Bankr. W.D. Tex. July 28, 2016) is misplaced. That case concerned a chapter 15 recognition of a Canadian bankruptcy. In that connection, the court modified a stay it had entered of actions against the debtor's officers and directors because the stay could have prevented plaintiffs from commencing actions under the Fair Labor Standards Act prior to the expiration of the applicable statutes of limitation. There are no similar concerns here.

1984) ("[U]nder § 105, the Bankruptcy Court may use its injunctive authority to 'protect the integrity of a bankrupt's estate and . . . issue or extend stays to enjoin a variety of proceedings which will have an adverse impact on the Debtor's ability to formulate a Chapter 11 plan.'" (citation omitted)).

43.    When determining whether to issue an injunction, courts in the Second Circuit apply "the traditional preliminary injunction standard as modified to fit the bankruptcy context." *Nev. Power Co. v. Calpine Corp. (In re Calpine Corp.)*, 365 B.R. 401, 409 (S.D.N.Y. 2007); *see also LTV Corp. v. Back (In re Chateaugay Corp.)*, 201 B.R. 48, 71 (Bankr. S.D.N.Y. 1996) (It is well settled that a "debtor need not satisfy the more rigorous requirements for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure" to enjoin proceedings under Section 105).

44.    Here, it is plain that Mr. Lynch seeks to "torpedo" any potential restructuring of the Debtor. Thus, even if Mr. Lynch's proposed conduct related to corporate governance (itself a dubious proposition given any rights he has are derived from his status as a minority shareholder), his conduct constitutes "clear abuse" that "seriously threatens" Kirwan's rehabilitation and may be enjoined. *Manville Corp. v. Equity Sec. Holders Comm. (In re Johns-Manville)*, 801 F.2d 60, 64-5 (2d Cir. 1986) (clear abuse includes "a willingness to risk rehabilitation altogether in order to win a larger share for equity"); *In re Potter Instrument Co.*, 593 F.2d 470, 475 (2d Cir. 1979) (shareholder's efforts to appoint new directors to vote against steps necessary for the debtor to implement reorganization plan constituted "clear abuse" and would be enjoined).

## CONCLUSION

For the foregoing reasons, Petitioners respectfully request that the Court (i) enter an order denying Mr. Lynch's motions and (ii) granting Petitioners such other relief as the Court deems just, proper and equitable.

Dated: New York, New York
    January 11, 2017

<div style="margin-left:40%">

SKADDEN, ARPS, SLATE,
MEAGHER & FLOM LLP

By: /s/ Mark A. McDermott
    Jay M. Goffman
    Mark A. McDermott
    Jonathan Frank
    Suzanne Lovett
    Four Times Square
    New York, New York 10036
    (212) 735-3000

*Counsel to Petitioning Creditors,*
*Lapidem Ltd. and Mascini Holdings*
*Limited*

</div>

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| In re | : Chapter 11 |
| | : |
| KIRWAN OFFICES S.À R.L. | : Case No. 16-22321 (RDD) |
| | : |
| Debtor. | : |
| | : |
| | : |

---

## ORDER DENYING STEPHEN P. LYNCH'S MOTION FOR INTERVENTION AND DISMISSAL, ABSTENTION OR STAY

This matter having first come before the Court for a hearing on the *Motion For Intervention And Dismissal, Abstention Or Stay* [Dkt. No. 8] (the "Motion") on June 17, 2016; and the Court having entered its *Order (I) For Relief Under Chapter 11 Of The Bankruptcy Code And (II) Denying, In Part, Stephen P. Lynch's Motion For Intervention And Dismissal, Abstention Or Stay* on July 5, 2016 [Dkt. No. 43] (the "Order for Relief"), which granted the involuntary petition against the debtor herein, granted the order for relief, and denied the Motion with prejudice with respect to certain matters listed therein and without prejudice as to other matters listed therein; and upon consideration of all papers filed in support of and in opposition to the Motion; and upon the record of the hearings held by the Court on the Motion on June 17, 2016 and January 27, 2017 and all of the proceedings herein; and, after due deliberation and for the reasons stated by the Court in its bench ruling at the January 27 2017 hearing, which constitute the Court's findings of fact and conclusions of law, and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, THAT:**

1.   Except as provided in paragraphs 3 and 4 in the Order for Relief, the Motion is denied without prejudice with respect to its request to dismiss this case pursuant to section 1112 of

the Bankruptcy Code and on related abstention/dismissal grounds under section 305 of the

Bankruptcy Code.

2.      This Court shall retain jurisdiction to hear and to determine all matters arising from the

interpretation and/or implementation of this Order.


Dated:  White Plains, New York
        January 31, 2017


                                        /s/Robert D . Drain
                                        HONORABLE ROBERT D. DRAIN
                                        UNITED STATES BANKRUPTCY JUDGE

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
Jay M. Goffman
Mark A. McDermott
Raquelle Kaye
Four Times Square
New York, New York 10036
(212) 735-3000

*Counsel to Petitioners*

<div align="center">

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

</div>

| | | |
|---|---|---|
| | : | |
| **In re** | : | **Chapter 11** |
| | : | |
| **KIRWAN OFFICES S.À R.L.,** | : | **Case No. 16-22321 (RDD)** |
| | : | |
| **Debtor.** | : | |
| | : | |

<div align="center">

**NOTICE OF FILING OF THE CHAPTER 11 PLAN OF REORGANIZATION OF**
**KIRWAN OFFICES S.À R.L.**

</div>

**PLEASE TAKE NOTICE** that Lapidem Ltd. ("Lapidem") and Mascini

Holdings Limited ("Mascini"), the largest unsecured creditors of debtor Kirwan Offices S.à r.l.

("Kirwan" or the "Debtor"), by and through their undersigned counsel, hereby file the Chapter

11 Plan of Reorganization of Kirwan Offices S.à r.l. (the "Plan").

Dated: New York, New York
     February 15, 2017

         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

         By:  */s/ Mark A. McDermott*
             Jay M. Goffman
             Mark A. McDermott
             Raquelle Kaye
             Four Times Square
             New York, New York 10036-6522
             Telephone: (212) 735-3000
             Fax: (212) 735-2000

         *Counsel for Petitioners*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re:                                  :
                                        :        Case No. 16-22321 (RDD)
KIRWAN OFFICES S.À R.L,                  :
                                        :        Chapter 11
            Debtor.                     :
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

## PLAN OF REORGANIZATION
## OF KIRWAN OFFICES S.À R.L

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM, LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Counsel for Lapidem Ltd. and Mascini Holdings Limited

Dated:  February 15, 2017

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF
TIME AND GOVERNING LAW ...................................................................................1
    A.    Defined Terms .......................................................................................................1

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS .....................................................10

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS .........11
    A.    Classification of Claims and Interests.................................................................11
    B.    Treatment of Claims and Interests .....................................................................11
    C.    Special Provision Governing Unimpaired Claims ...............................................13
    D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code ....................13

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN .........................................13
    A.    Transaction Process............................................................................................13
    B.    Implementation of Transactions .........................................................................14
    C.    Post-Effective Date Governance .........................................................................14
    D.    New Money Loan; Post-Effective Date Loans .....................................................15
    E.    Plan Support Conditions .....................................................................................15
    F.    Restructuring Transactions .................................................................................16
    G.    Corporate Action ................................................................................................16
    H.    Effectuating Documents; Further Transactions ..................................................16
    I.    Securities Exemption ..........................................................................................17
    J.    Preservation of Causes of Action .......................................................................17

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS ................................................18
    A.    Disposition of Executory Contracts ....................................................................18
    B.    Claims Based on Rejection of Executory Contracts ............................................19
    C.    Cure of Defaults for Assumed Executory Contracts ...........................................19
    D.    Reservation of Rights..........................................................................................19
    E.    Contracts and Leases Entered Into After the Petition Date.................................19

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS .............................................20
    A.    Timing and Calculation of Amounts to Be Distributed .......................................20
    B.    Disbursing Agent ................................................................................................20
    C.    Rights and Powers of Disbursing Agent .............................................................20
    D.    Cash Distributions...............................................................................................21
    E.    Rounding of Payments ........................................................................................21
    F.    Distributions on Account of Claims Allowed After the Effective Date................21
    G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...........21
    H.    Withholding and Reporting Requirements ..........................................................22
    I.    Setoffs ................................................................................................................22
    J.    Allocation of Distributions Between Principal and Unpaid Interest ....................23

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED
    AND DISPUTED CLAIMS ...............................................................................23
    A.    Proofs of Claim ...........................................................................................23
    B.    Prosecution of Objections to Claims...........................................................23
    C.    Allowance of Claims....................................................................................23
    D.    Distributions After Allowance .....................................................................23
    E.    Estimation of Claims...................................................................................24
    F.    Deadline to File Objections to Claims ........................................................24

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION AND RELATED
    PROVISIONS ......................................................................................................24
    A.    Compromise and Settlement of Claims, Interests and Controversies..................24
    B.    Vesting of Assets in the Reorganized Debtor ..............................................25
    C.    Discharge of Claims.....................................................................................25
    **D.**    **Releases by the Debtor**..............................................................................25
    **E.**    **Exculpation**..............................................................................................26
    F.    Injunction ....................................................................................................27
    G.    Term of Injunctions or Stays.......................................................................28

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
    AND THE EFFECTIVE DATE ............................................................................28
    A.    Conditions Precedent to Confirmation.........................................................28
    B.    Conditions Precedent to the Effective Date .................................................28
    C.    Waiver of Conditions ...................................................................................29
    D.    Effect of Failure of Conditions ...................................................................29

ARTICLE X MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN...........29
    A.    Modification and Amendments.....................................................................29
    B.    Revocation or Withdrawal of the Plan .........................................................30

ARTICLE XI RETENTION OF JURISDICTION ...........................................................30

ARTICLE XII MISCELLANEOUS PROVISIONS .........................................................32
    A.    Immediate Binding Effect............................................................................32
    B.    Additional Documents ..................................................................................32
    C.    Reservation of Rights...................................................................................32
    D.    Successors and Assigns.................................................................................32
    E.    Service of Documents ..................................................................................33
    F.    Entire Agreement .........................................................................................33
    G.    Severability of Plan Provisions ...................................................................33
    H.    Exhibits .......................................................................................................34

Schedule A Existing Loans ............................................................................................ A-1

Schedule B PNS Transition Matters ..............................................................................B-1

Schedule C Yukos Finance Litigation ............................................................................C-1

ii

# INTRODUCTION

Lapidem, Ltd., a Cayman Islands registered company ("Lapidem"), and Mascini Holdings Limited, a limited company of Cyprus ("Mascini," and together with Lapidem, the "Plan Proponents"), respectfully propose the following chapter 11 plan of reorganization for the resolution of the outstanding Claims against and Existing Interests in Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation.

## ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A. *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1.     "*Administrative Claim*" means a Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estate pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code; and (e) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.

2.     "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

3.     "*Allowed*" means, with respect to a Claim or Existing Interest within a particular Class, an Allowed Claim or Allowed Existing Interest of the type described in such Class.

4.     "*Allowed Claim*" means a Claim (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Bar Date or the expiration of such other applicable period fixed by the Bankruptcy Court or the Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Debtor or the Reorganized Debtor or (c) pursuant to the terms of the Plan, including the Existing Loan Claims; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" under (i) above, the Plan Proponents

and the Debtor do not waive their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under the Plan, include interest on such Claim accruing from and after the Petition Date.

5. *"Amended Kirwan Governance Documents"* means the amended articles of association, by-laws and any similar constituent document for Kirwan required under the laws of Luxembourg and consistent in all respects with the terms of the Plan, a substantially final form of which will be filed with the Plan Supplement.

6. *"Bankruptcy Code"* means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

7. *"Bankruptcy Court"* means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case or any other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

8. *"Bankruptcy Rules"* means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court.

9. *"Board and Shareholder Circulars"* means those certain board and shareholder resolutions authorizing and approving the Amended Kirwan Governance Documents and the issuance of the New Class A-1 Shares, the New Class A-2 Share and the New Class B-1 Shares, substantially final forms of which will be filed with the Plan Supplement.

10. *"Business Day"* means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

11. *"Cash"* means legal tender of the United States of America.

12. *"Causes of Action"* means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law. Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims

2

Case 1:17-cv-04339-CM    Document 13-4    Filed 07/13/17    Page 61 of 71

or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

13.    "*Chapter 11 Case*" means the chapter 11 case of the Debtor pending under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14.    "*Claim*" means any claim as defined in section 101(5) of the Bankruptcy Code.

15.    "*Claims Objection Bar Date*" means, for each Claim, the latest of (a) the date that is one hundred and eighty (180) days after the Effective Date, (b) as to a particular Claim, one hundred and eighty (180) days after the filing of a Proof of Claim, or request for payment of such Claim, and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

16.    "*Class*" means a category of holders of Claims or Existing Interests as set forth in Article III.

17.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

18.    "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

19.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

20.    "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Plan Proponents in their sole discretion.

21.    "*Cure*" means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure monetary defaults under an executory contract or unexpired lease of the Debtor and to permit the Debtor to assume that contract or lease under section 365(a) of the Bankruptcy Code.

22.    "*Debtor*" means Kirwan in its capacity as a debtor and debtor in possession in the Chapter 11 Case.

23.    "*Disbursing Agent*" means Reorganized Kirwan or the Person or Persons chosen by Reorganized Kirwan to make or facilitate distributions pursuant to the Plan.

24.    "*Disputed*" means, with respect to any Claim or Existing Interest, any Claim or Existing Interest that is not yet Allowed, and includes any Proof of Claim filed, or any other Claim asserted, by Stephen Lynch.

3

25. "*Distribution Date*" means the date, occurring as soon as practicable after the Effective Date, on which the Disbursing Agent first makes distributions to holders of Allowed Claims as provided in Article VI of the Plan and any date thereafter on which the Disbursing Agent makes distributions to holders of Allowed Claims as provided in Article VI of the Plan.

26. "*Effective Date*" means the first business day after which all provisions, terms and conditions specified in Article IX.B have been satisfied or waived pursuant to Article IX.C.

27. "*Estate*" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

28. "*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to or arising out of the Debtor's, the Plan Proponents', or VR Global's or their Affiliates' in or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation or filing of the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, or the distribution of property under the Plan or any other related agreement; provided, however, that Exculpated Claims shall not include any claim arising out of any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

29. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

30. "*Existing Interest*" means any equity interest in Kirwan as evidenced by an "equity security" as defined in § 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of Kirwan and any right to Net Gain as such term is defined in the SHA, as adjusted to reflect the Lynch Net Gain Sale Agreement, together with any warrants, options or contractual rights (including any rights under registration agreements or equity incentive agreements) to purchase or acquire such equity securities at any time and all rights arising with respect thereto, *provided however*, that "Existing Interests" do not include General Unsecured Claims or Existing Loans.

31. "*Existing Loans*" means those certain loans Lapidem and Mascini made to Kirwan identified on Schedule A hereto, the proceeds of which Kirwan loaned to PNS.

32. "*Existing Loan Claim*" means a Claim arising out of or in connection with the Existing Loans.

33. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any

4

petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

34. "*General Unsecured Claim*" means any unsecured claim that is not (a) an Administrative Claim, (b) an Existing Notes Claim, (c) a Priority Tax Claim, or (d) a Priority Non-Tax Claim.

35. "*Governmental Authority*" means any United States or non-United States national, federal, state, or local governmental regulatory or administrative authority, agency, or commission, or any judicial or arbitral body.

36. "*Impaired*" means, when used in reference to a Claim or an Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

37. "*Impaired Class*" means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

38. "*Kirwan Claims*" means any Claims owned by Kirwan against any Person.

39. "*Lynch Net Gain Sale Agreement*" means that certain agreement dated March 31, 2010 whereby Stephen Lynch sold to VR Global Partners, LP and VR Capital Group Ltd. certain of his rights to Net Gain as defined in the SHA.

40. "*Lynch Causes of Action*" means any Cause of Action of any Person, including the Debtor and the Plan Proponents, against Stephen Lynch arising out of or in connection with the SHA and his service as a manager of the Debtor or general director of PNS, whether arising before or after the Petition Date.

41. "*Lynch Release*" means a full and unconditional release granted by Stephen Lynch, in a form acceptable to the Plan Proponents, to all parties to the SHA for any and all Claims arising out of or in connection with the SHA or otherwise arising out of or in connection with his Existing Interests in the Debtor. If applicable, a substantially final form of the Lynch Release will be filed with the Plan Supplement.

42. "*Modified Loans*" means new unsecured loans issued to Lapidem and Mascini under the Plan in exchange for the Existing Loans, in an aggregate amount equal to the Allowed Existing Loan Claims, with a maturity date of December 31, 2018 and zero interest, *provided however*, that the holders of the Modified Loans and Reorganized Kirwan may agree to modify the Modified Loans to provide for interest at a mutually agreeable rate. Substantially final forms of the Modified Loans will be filed with the Plan Supplement.

43. "*New Class A-1 Shares*" means 2,500,000 class A-1 shares in Reorganized Kirwan to be authorized and issued under the Plan.

"*New Class A-2 Share*" means a share in Reorganized Kirwan that entitles its holder to receive an amount equal to the percentage of Net Gain the holder of the existing class C share in the Debtor is entitled to receive under the SHA, adjusted to reflect the Lynch Net Gain Settlement Agreement, the New Money Loan, and any Post-Effective Date Loans or other contributions.

44.    "*New Class B-1 Shares*" means 50,000 class B-1 shares in Reorganized Kirwan to be authorized under the Plan *pari passu* with the New Class A-1 Shares, to be issued in connection with the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date.

45.    "*New Money Loan*" means a new unsecured loan to be provided by the New Money Loan Participants pursuant to the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date.  The New Money Participants shall advance an amount equal to $3 million and receive in exchange (i) the New Money Loan Participations in an aggregate face amount equal to $7.5 million, with a maturity date of December 31, 2018 and zero interest, which New Money Loan shall rank *pari passu* with the Modified Loans, plus (ii) their pro rata share of the New Class B-1 Shares based upon their New Money Loan Participations.  Lapidem and Mascini or their assignees will have the exclusive right to extend the maturity of the New Money Loan or exercise any remedies thereunder on behalf of all New Money Loan Participants, *provided however*, that in all events the New Money Loan shall be repaid *pari passu* with the Modified Loans.  A substantially final form of the New Money Loan will be filed with the Plan Supplement.

46.    "*New Money Loan Offering*" means (i) the offering of a New Money Loan Participation to Stephen Lynch in an amount up to $1 million, subject to his satisfaction of the Plan Support Conditions, and (ii) the offering of New Money Loan Participations to Lapidem and Mascini in an aggregate amount equal to $3 million minus the amount of the New Money Loan Participation purchased by Stephen Lynch, if any, with Lapidem and Mascini being obligated to acquire such New Money Loan Participations pro rata based on their pro rata holdings of Existing Loans as of the Effective Date.

47.    "*New Money Loan Participants*" means (i) Lapidem, (ii) Mascini and (iii) Lynch, but only to the extent Mr. Stephen Lynch (a) elects to participate in the New Money Loan Offering and (b) satisfies the Plan Support Conditions.

48.    "*New Money Loan Participations*" means participations in the New Money Loan pursuant to the New Money Loan Offering in minimum increments of $25,000.

49.    "*Person*" has the meaning set forth in section 101(41) of the Bankruptcy Code.

50.    "*Petition Date*" means the date on which the Plan Proponents filed an involuntary petition for reorganization relief against the Debtor in the Bankruptcy Court.

51.    "*Plan*" means this Chapter 11 Plan of Reorganization of Kirwan Offices S.à r.l., including the Plan Supplement and all exhibits, appendices and schedules hereto, which are incorporated herein by reference, in either present form or as may be further amended, restated,

supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case acceptable in form and substance to the Plan Proponents in their sole discretion.

52.    "*Plan Supplement*" means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Plan Proponents by the Plan Supplement Date in each case in form and substance acceptable to the Plan Proponents in their sole discretion. Such documents shall include, but not be limited to, (i) the Amended Kirwan Governance Documents, (ii) the Board and Shareholder Circulars, (iii) the Modified Loan, (iv) the New Money Loan, (v) any Purchase Agreement or other document evidencing a proposed Transaction contemplated by Article IV.A of the Plan, (vi) the identities of the initial members of the board of managers of the Reorganized Debtor, and (vii) if applicable, the Lynch Release.

53.    "*Plan Supplement Date*" means a date no later than ten calendar days before the date of the Confirmation Hearing.

54.    "*Plan Support Conditions*" means the conditions and requirements described in Article IV.E of this Plan.

55.    "*PNS*" means OOO Promneftstroy, a limited liability company incorporated under the laws of the Russian Federation.

56.    "*PNS Transition Matters*" means those matters described in Schedule B of this Plan.

57.    "*Post-Effective Date Loans*" means any loans made to the Reorganized Debtor after the Effective Date to fund its obligations, including for purposes of the Reorganized Debtor loaning the proceeds thereof to PNS to fund the Yukos Finance Litigation. Any Post-Effective Date Loans shall be *pari passu* with the Modified Loans.

58.    "*Priority Non-Tax Claim*" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim or (b) a Priority Tax Claim.

59.    "*Priority Tax Claim*" means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

60.    "*Proof of Claim*" means any proof of Claim filed against the Debtor in the Chapter 11 Case.

61.    "*Purchase Agreement*" means an agreement, in form and substance acceptable to Lapidem and Mascini in their sole discretion, evidencing a Transaction between Kirwan and one or more Persons for the acquisition of one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims.

62.    "*Renaissance*" means Renaissance Capital Holdings Limited (Bermuda) and Renaissance Holdings Management Ltd.

7

63. *"Reinstate," "Reinstated" or "Reinstatement"* means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Existing Interest entitles the holder of such Claim or Existing Interest so as to leave such Claim or Existing Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Existing Interest to demand or receive accelerated payment of such Claim or Existing Interest after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Existing Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Existing Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim or Existing Interest entitles the holder of such Claim or Existing Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Existing Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

64. *"Released Party"* means each of (a) the Debtor; (b) the Plan Proponents; (c) the current and former directors and officers of the Debtor other than Stephen Lynch; (d) HBK Master Fund, L.P.; (e) Jervis Properties, Inc.; (f) Renaissance; (g) VR Global; (h) Stephen Lynch to the extent the Plan Support Obligations are satisfied; and (i) with respect to each of the foregoing Persons in clauses (a) through (h), to the extent relevant, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

65. *"Reorganized Debtor"* means the Debtor on and after the Effective Date.

66. *"SHA"* means that certain Shareholders' Agreement by and among Lapidem, Mascini, Kirwan, VR Global Partners, L.P., Renaissance Holdings Management Limited, and Stephen Lynch dated August 30, 2007, as amended, modified, or supplemented from time to time.

67. *"Transaction"* means (i) a settlement and resolution of the Yukos Finance Litigation or (ii) an agreement to invest in the Yukos Finance Ligation, directly or indirectly, and/or sell one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, subject to Bankruptcy Court approval under the Plan, and upon such terms as are acceptable to Lapidem and Mascini in their sole discretion.

68. *"Transaction Proceeds"* means any Cash or non-Cash consideration received by Kirwan in connection with a Transaction.

8

69.    *"Transaction Process"* means a process conducted by representatives of Lapidem and Mascini (i) to settle and resolve the Yukos Finance Litigation or (ii) to identify one or more Persons to invest in the Yukos Finance Litigation, directly or indirectly, and/or acquire one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, in each case upon terms acceptable to Lapidem and Mascini in their sole discretion.

70.    *"Unimpaired"* means any Claim or Existing Interest that is not designated as Impaired.

71.    *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

72.    *"VR Global"* means VR Advisory Services Ltd., VR Advisory Services (USA) LLC, VR Capital Group Ltd., and VR Global Partners, LP and their Affiliates (excluding the Debtor and PNS).

73.    *"Yukos Finance"* means Yukos Finance, B.V., a private company with limited liability incorporated under the laws of the Netherlands.

74.    *"Yukos Finance Litigation"* means those certain cases identified on <u>Schedule C</u> and any and all other claims made in connection with asserted ownership or control of the equity interests in Yukos Finance and its Subsidiaries.

B.    *Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of the Plan; (c) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (d) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.    *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

9

### D. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtor shall be governed by the laws of Luxembourg.

### E. Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Existing Interests set forth in Article III and shall have the following treatment:

### A. Administrative Claims

Each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Administrative Claim, cash equal to the unpaid portion of its Allowed Administrative Claim on the latest of (i) the first Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Plan Proponents or the Reorganized Debtor, as the case may be. The Plan Proponents believe that any Administrative Claims are de minimis.

### B. Priority Tax Claims

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtor and the Plan Proponents agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated. The Plan Proponents do not believe there are any Priority Tax Claims.

10

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A. *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Existing Interests. A Claim or Existing Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Existing Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date. The categories of Claims and Existing Interests set forth below classify all Claims against and Existing Interests in the Debtor for all purposes of this Plan. A Claim or Existing Interest shall be deemed classified in a particular Class only to the extent the Claim or Existing Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Existing Interest qualifies within the description of such different Class. The treatment with respect to each Class of Claims and Existing Interests provided for in this <u>Article III</u> shall be in full and complete satisfaction, release and discharge of such Claims and Existing Interests.

| Class | Designation | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Existing Loan Claims | Impaired | Yes (deemed to accept) |
| Class 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Existing Interests | Impaired | Yes (deemed to accept) |

B. *Treatment of Claims and Interests*

1. **Class 1 – Priority Non-Tax Claims.**

1. <u>Impairment and Voting</u>. Class 1 is Unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim shall be conclusively deemed to have accepted the Plan. The Plan Proponents do not believe there are any Allowed Priority Non-Tax Claims.

2. <u>Distribution</u>. On the Effective Date, or as soon as reasonably practicable thereafter, unless the holder of a Priority Non-Tax Claim and the Plan Proponents agree to different treatment, each holder of an Allowed Priority Non-Tax Claim shall have its Claim Reinstated or paid in full in cash.

11

2.     **Class 2 – Existing Loan Claims.**

1.     <u>Impairment and Voting</u>. Class 2 is Impaired by the Plan.  Lapidem and Mascini are deemed to accept the Plan.  Lapidem's Existing Loan Claims are Allowed Claims in the total amount of no less than (i) $112,023,399 million and (ii) €16,596,240.  Mascini's Existing Loan Claims are Allowed Claims in the amount of no less than (i) $168,031,600 million and (ii) €24,894,360.

2.     <u>Distribution</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, each of Lapidem and Mascini shall receive in satisfaction of all Allowed Existing Loan Claims, upon their joint election exercised in their sole discretion, each of their pro rata shares of and interests in either:  (i) if there is a Transaction acceptable to Lapidem and Mascini in their sole discretion, the Transaction Proceeds after payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims until the Allowed Existing Loan Claims are paid in full; or (ii) if there is no Transaction acceptable to Lapidem and Mascini in their sole discretion, the Modified Loans plus all New Class A-1 Shares, *provided however*, that if the Plan Support Conditions are satisfied, Mr. Lynch shall receive the New Class A-2 Share.

3.     **Class 3  – General Unsecured Claims.**

1.     <u>Impairment and Voting</u>. Class 3 is Unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted the Plan.  The Plan Proponents estimate that General Unsecured Claims total approximately $300,000.

2.     <u>Distributions</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the holder of a General Unsecured Claim and the Plan Proponents agree to a different treatment, each holder of an Allowed General Unsecured Claim shall be paid in full either from the Transaction Proceeds or proceeds from the New Money Loan.

4.     **Class 4 – Existing Interests.**

1.     <u>Impairment and Voting</u>.  Lapidem and Mascini are deemed to accept the Plan on account of their Existing Interests.  Accordingly, Class 4 is deemed to accept the Plan.

2.     <u>Distributions</u>.

i.     In the event Lapidem and Mascini elect to consummate a Transaction, holders of Existing Interests shall receive all Transaction Proceeds remaining, if any, after payment in full of all Allowed Administrative Claims, Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims, Allowed General Unsecured Claims, and Allowed Existing Loan Claims. Lapidem and Mascini shall receive, on account of their Existing Interests, their pro rata share of 90% of such remaining Transaction Proceeds based on their pro rata shares of Existing Loans as of the Effective Date, and Stephen Lynch shall receive, on account of his Existing Interests, 10% of such remaining Transaction Proceeds, with such distributions to Lapidem, Mascini and Stephen Lynch adjusted to reflect the Lynch Net Gain Sale Agreement.

12

ii.      In the event Lapidem and Mascini elect not to consummate a Transaction and elect instead to receive the Modified Loans and the New Class A-1 Shares in satisfaction of their Allowed Existing Loan Claims, then no holder of Existing Interests shall receive or retain any property on account of such Existing Interests under the Plan, and all such Existing Interests shall be cancelled, and of no further force or effect.

C.   *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan will affect the Plan Proponents' or the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

D.   *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Classes of Claims and Existing Interests. The Plan Proponents reserve the right to modify the Plan in accordance with Article X hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE IV

# MEANS FOR IMPLEMENTATION OF THE PLAN

A.   *Transaction Process*

In an effort to explore all reasonable alternatives for maximizing the value of the Debtor's Estate, the Plan Proponents shall pursue the Transaction Process in order to identify one or more Transactions, if any, for the direct or indirect disposition of the Debtor's assets, including possible resolution of the Yukos Finance Litigation or sale of the participation interests in PNS. On or before the Plan Supplement Date, the Plan Proponents or their designees shall file a statement with the Bankruptcy Court, which may include one or more affidavits, summarizing actions taken in connection with the Transaction Process. If any such Transactions are identified, developed and negotiated to Lapidem's and Mascini's satisfaction, as determined by them in their sole discretion, they shall also file with the Bankruptcy Court on the Plan Supplement Date any Purchase Agreement or other documentation evidencing such Transactions. Lapidem and Mascini will seek approval of any such proposed Transactions at the Confirmation Hearing, with such Transactions to be implemented under the Plan. If Lapidem and Mascini choose not to pursue any Transaction, as determined by them in their sole discretion, then they shall elect to receive the Modified Loans, and shall so state in the statement they file with the Bankruptcy Court on the Plan Supplement Date. The Plan Proponents will offer to provide periodic updates to Stephen Lynch and his counsel on the Transaction Process, and will solicit their input as the Transaction Process progresses.

13