32.     *"Existing Loans"* means those certain loans Lapidem and Mascini made to Kirwan identified on <u>Schedule A</u> hereto, the proceeds of which Kirwan loaned to PNS.

33.     *"Existing Loan Claim"* means a Claim arising out of or in connection with the Existing Loans.

34.     *"Final Order"* means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

35.     *"General Unsecured Claim"* means any unsecured claim that is not (a) an Administrative Claim, (b) an Existing Notes Claim, (c) a Priority Tax Claim, or (d) a Priority Non-Tax Claim.  The General Unsecured Claims identified on <u>Schedule B</u> hereto are Allowed Claims.

36.     *"Governmental Authority"* means any United States or non-United States national, federal, state, or local governmental regulatory or administrative authority, agency, or commission, or any judicial or arbitral body.

37.     *"Impaired"* means, when used in reference to a Claim or an Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

38.     *"Impaired Class"* means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

39.     *"Kirwan Claims"* means any Claims owned by Kirwan against any Person.

40.     *"Lynch Net Gain Sale Agreement"* means that certain agreement dated March 31, 2010 whereby Stephen Lynch sold to VR Global Partners, LP and VR Capital Group Ltd. certain of his rights to Net Gain as defined in the SHA.

41.     *"Lynch Causes of Action"* means any Cause of Action of any Person, including the Debtor and the Plan Proponents, against Stephen Lynch arising out of or in connection with the SHA and his service as a manager of the Debtor or general director of PNS, whether arising before or after the Petition Date.

42.     *"Lynch Release"* means a full and unconditional release granted by Stephen Lynch, in a form acceptable to the Plan Proponents, to all parties to the SHA for any and all Claims arising out of or in connection with the SHA or otherwise arising out of or in connection with his Existing Interests in the Debtor.  If applicable, a substantially final form of the Lynch Release will be filed with the Plan Supplement.

10

43.    *"Modified Loans"* means new unsecured loans issued to Lapidem and Mascini under the Plan in exchange for the Existing Loans, in an aggregate amount equal to the Allowed Existing Loan Claims, with a maturity date of December 31, 2018 and zero interest, *provided however*, that the holders of the Modified Loans and Reorganized Kirwan may agree to modify the Modified Loans to provide for interest at a mutually agreeable rate.  Substantially final forms of the Modified Loans will be filed with the Plan Supplement.

44.    *"New Class A-1 Shares"* means 2,500,000 class A-1 shares in Reorganized Kirwan to be authorized and issued under the Plan.

45.    *"New Class A-2 Share"* means a share in Reorganized Kirwan that entitles its holder to receive an amount equal to the percentage of Net Gain the holder of the existing class C share in the Debtor is entitled to receive under the SHA, adjusted to reflect the Lynch Net Gain Settlement Agreement, the New Money Loan, and any Post-Effective Date Loans or other contributions.

46.    *"New Class B-1 Shares"* means 50,000 class B-1 shares in Reorganized Kirwan to be authorized under the Plan *pari passu* with the New Class A-1 Shares and any New Class A-2 Share, to be issued in connection with the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date.

47.    *"New Money Loan"* means a new unsecured loan to be provided by the New Money Loan Participants pursuant to the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date.  The New Money Participants shall advance an amount equal to $3 million and receive in exchange (i) the New Money Loan Participations in an aggregate face amount equal to $7.5 million, with a maturity date of December 31, 2018 and zero interest, which New Money Loan shall rank *pari passu* with the Modified Loans, plus (ii) their pro rata share of the New Class B-1 Shares based upon their New Money Loan Participations.  Lapidem and Mascini or their assignees will have the exclusive right to extend the maturity of the New Money Loan or exercise any remedies thereunder on behalf of all New Money Loan Participants, *provided however*, that in all events the New Money Loan shall be repaid *pari passu* with the Modified Loans.  A substantially final form of the New Money Loan will be filed with the Plan Supplement.

48.    *"New Money Loan Offering"* means (i) the offering of a New Money Loan Participation to Stephen Lynch in an amount up to $1 million, subject to his satisfaction of the Plan Support Conditions, and (ii) the offering of New Money Loan Participations to Lapidem and Mascini in an aggregate amount equal to $3 million minus the amount of the New Money Loan Participation purchased by Stephen Lynch, if any, with Lapidem and Mascini being obligated to acquire such New Money Loan Participations pro rata based on their pro rata holdings of Existing Loans as of the Effective Date.

49.    *"New Money Loan Participants"* means (i) Lapidem, (ii) Mascini and (iii) Stephen Lynch, but only to the extent Mr. Lynch (a) elects to participate in the New Money Loan Offering and (b) satisfies the Plan Support Conditions.

11

50.    *"New Money Loan Participations"* means participations in the New Money Loan pursuant to the New Money Loan Offering in minimum increments of $25,000.

51.    *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

52.    *"Petition Date"* means the date on which the Plan Proponents filed an involuntary petition for reorganization relief against the Debtor in the Bankruptcy Court.

53.    *"Plan"* means this Combined First Amended Chapter 11 Plan of Reorganization and Disclosure Statement of Kirwan Offices S.à r.l., including the Plan Supplement and all exhibits, appendices and schedules hereto, which are incorporated herein by reference, in either present form or as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case acceptable in form and substance to the Plan Proponents in their sole discretion.

54.    *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Plan Proponents by the Plan Supplement Date in each case in form and substance acceptable to the Plan Proponents in their sole discretion.    Such documents shall include, but not be limited to, (i) the Amended Kirwan Governance Documents, (ii) the Board and Shareholder Circulars, (iii) the Modified Loan, (iv) the New Money Loan, (v) any Purchase Agreement or other document evidencing a proposed Transaction contemplated by Article IV.A of the Plan, (vi) the identities of the initial members of the board of managers of the Reorganized Debtor, and (vii) if applicable, the Lynch Release.

55.    *"Plan Supplement Date"* means a date no later than March 14, 2017.

56.    *"Plan Support Conditions"* means the conditions and requirements described in Article IV.E of this Plan.

57.    *"PNS"* means OOO Promneftstroy, a limited liability company incorporated under the laws of the Russian Federation.

58.    *"PNS Transition Matters"* means those matters described in Schedule C of this Plan.

59.    *"Post-Effective Date Loans"* means any loans made to the Reorganized Debtor after the Effective Date to fund its obligations, including for purposes of the Reorganized Debtor loaning the proceeds thereof to PNS to fund the Yukos Finance Litigation.    Any Post-Effective Date Loans shall be *pari passu* with the Modified Loans.

60.    *"Priority Non-Tax Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim or (b) a Priority Tax Claim.

61.    *"Priority Tax Claim"* means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

12

62.    "*Proof of Claim*" means any proof of Claim filed against the Debtor in the Chapter 11 Case.

63.    "*Purchase Agreement*" means an agreement, in form and substance acceptable to Lapidem and Mascini in their sole discretion, evidencing a Transaction between Kirwan and one or more Persons for the acquisition of one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims.

64.    "*Renaissance*" means Renaissance Capital Holdings Limited (Bermuda) and Renaissance Holdings Management Ltd.

65.    "*Reinstate,*" "*Reinstated*" *or* "*Reinstatement*" means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Existing Interest entitles the holder of such Claim or Existing Interest so as to leave such Claim or Existing Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Existing Interest to demand or receive accelerated payment of such Claim or Existing Interest after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Existing Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Existing Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim or Existing Interest entitles the holder of such Claim or Existing Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Existing Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

66.    "*Released Party*" means each of (a) the Debtor; (b) the Plan Proponents; (c) the current and former directors and officers of the Debtor other than Stephen Lynch; (d) HBK Master Fund, L.P.; (e) Jervis Properties, Inc.; (f) Renaissance; (g) VR Global; (h) Stephen Lynch to the extent the Plan Support Obligations are satisfied; and (i) with respect to each of the foregoing Persons in clauses (a) through (h), to the extent relevant, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

67.    "*Reorganized Debtor*" means the Debtor on and after the Effective Date.

68.    "*SHA*" means that certain Shareholders' Agreement by and among Lapidem, Mascini, Kirwan, VR Global Partners, L.P., Renaissance Holdings Management Limited, and

13

Stephen Lynch dated August 30, 2007, as amended, modified, or supplemented from time to time.

69. *"Transaction"* means (i) a settlement and resolution of the Yukos Finance Litigation or (ii) an agreement to invest in the Yukos Finance Ligation, directly or indirectly, and/or sell one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, subject to Bankruptcy Court approval under the Plan, and upon such terms as are acceptable to Lapidem and Mascini in their sole discretion.

70. *"Transaction Proceeds"* means any Cash or non-Cash consideration received by Kirwan in connection with a Transaction.

71. *"Transaction Process"* means a process conducted by representatives of Lapidem and Mascini (i) to settle and resolve the Yukos Finance Litigation or (ii) to identify one or more Persons to invest in the Yukos Finance Litigation, directly or indirectly, and/or acquire one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, in each case upon terms acceptable to Lapidem and Mascini in their sole discretion.

72. *"Unimpaired"* means any Claim or Existing Interest that is not designated as Impaired.

73. *"U.S. Trustee"* means the United States Trustee for the Southern District of New York.

74. *"VR Global"* means VR Advisory Services Ltd., VR Advisory Services (USA) LLC, VR Capital Group Ltd., and VR Global Partners, LP and their Affiliates (excluding the Debtor and PNS).

75. *"Yukos Finance"* means Yukos Finance, B.V., a private company with limited liability incorporated under the laws of the Netherlands.

76. *"Yukos Finance Litigation"* means those certain cases identified on <u>Schedule D</u> and any and all other claims made in connection with asserted ownership or control of the equity interests in Yukos Finance and its Subsidiaries.

B. *Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of the Plan; (c) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (d) unless otherwise stated, the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the

14

rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

### C. Computation of Time

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

### D. Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtor shall be governed by the laws of Luxembourg.

### E. Reference to Monetary Figures

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Existing Interests set forth in Article III and shall have the following treatment:

### A. Administrative Claims

Each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Administrative Claim, cash equal to the unpaid portion of its Allowed Administrative Claim on the latest of (i) the first Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Plan Proponents or the Reorganized Debtor, as the case may be. The Plan Proponents believe that any Administrative Claims are *de minimis*.

15

       B.     *Priority Tax Claims*

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan. Unless the holder of such Claim and the Debtor and the Plan Proponents agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated. The Plan Proponents do not believe there are any Priority Tax Claims.

## ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

       A.  *Classification of Claims and Interests*

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims and Existing Interests. A Claim or Existing Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Existing Interest has not been paid, released, withdrawn or otherwise settled before the Effective Date. The categories of Claims and Existing Interests set forth below classify all Claims against and Existing Interests in the Debtor for all purposes of this Plan. A Claim or Existing Interest shall be deemed classified in a particular Class only to the extent the Claim or Existing Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Existing Interest qualifies within the description of such different Class. The treatment with respect to each Class of Claims and Existing Interests provided for in this <u>Article III</u> shall be in full and complete satisfaction, release and discharge of such Claims and Existing Interests.

| Class | Designation | Impairment | Entitled to Vote |
|-------|-------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (deemed to accept) |
| Class 2 | Existing Loan Claims | Impaired | Yes (will vote to accept) |
| Class 3 | General Unsecured Claims | Unimpaired | No (deemed to accept) |
| Class 4 | Existing Interests | Impaired | Yes |

       B.  *Treatment of Claims and Interests*

1.    **Class 1 – Priority Non-Tax Claims.**

    1.  <u>Impairment and Voting</u>. Class 1 is Unimpaired by the Plan. Each holder of an Allowed Priority Non-Tax Claim shall be conclusively deemed to have accepted the Plan. The Plan Proponents do not believe there are any Allowed Priority Non-Tax Claims.

16

2.    <u>Distribution</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, unless the holder of a Priority Non-Tax Claim and the Plan Proponents agree to different treatment, each holder of an Allowed Priority Non-Tax Claim shall have its Claim Reinstated or paid in full in cash.

2.    **Class 2 – Existing Loan Claims.**

1.    <u>Impairment and Voting</u>. Class 2 is Impaired by the Plan.  Lapidem and Mascini support the Plan and will be deemed to accept the Plan on account of their Existing Loans without the need for formally casting a ballot in favor of the Plan.  Lapidem's Existing Loan Claims are Allowed Claims in the total amount of no less than (i) $112,023,399 million and (ii) €16,596,240.  Mascini's Existing Loan Claims are Allowed Claims in the amount of no less than (i) $168,031,600 million and (ii) €24,894,360.

2.    <u>Distributions</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, each of Lapidem and Mascini shall receive in satisfaction of all Allowed Existing Loan Claims, upon their joint election exercised in their sole discretion, each of their pro rata shares of and interests in either:  (i) if there is a Transaction acceptable to Lapidem and Mascini in their sole discretion, the Transaction Proceeds after payment in full of all Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and Allowed General Unsecured Claims until the Allowed Existing Loan Claims are paid in full; or (ii) if there is no Transaction acceptable to Lapidem and Mascini in their sole discretion, the Modified Loans plus all New Class A-1 Shares, *provided however*, that if the Plan Support Conditions are satisfied, Mr. Lynch shall receive the New Class A-2 Share.

3.    **Class 3 – General Unsecured Claims.**

1.    <u>Impairment and Voting</u>. Class 3 is Unimpaired by the Plan.  Each holder of an Allowed General Unsecured Claim shall be conclusively deemed to have accepted the Plan.

2.    <u>Distributions</u>.  On the Effective Date, or as soon as reasonably practicable thereafter, except to the extent that the holder of a General Unsecured Claim and the Plan Proponents agree to a different treatment, each holder of an Allowed General Unsecured Claim shall be paid in full either from the Transaction Proceeds or proceeds from the New Money Loan.

4.    **Class 4 – Existing Interests.**

1.    <u>Impairment and Voting</u>. Class 4 is Impaired by the Plan.  Lapidem and Mascini support the Plan and will be deemed to accept the Plan on account of their Existing Interests without the need for formally casting a ballot in favor of the Plan.  Stephen Lynch is allowed to cast a vote accepting or rejecting the Plan on account of his Existing Interest.

2.    <u>Distributions</u>.

i.    In the event Lapidem and Mascini elect to consummate a Transaction, holders of Existing Interests shall receive all Transaction Proceeds remaining, if any, after payment in full of all Allowed Administrative Claims, Allowed Priority Non-Tax Claims, Allowed Priority Tax Claims, Allowed General Unsecured Claims, and Allowed

17

Existing Loan Claims. Lapidem and Mascini shall receive, on account of their Existing Interests, their pro rata share of 90% of such remaining Transaction Proceeds based on their pro rata shares of Existing Loans as of the Effective Date, and Stephen Lynch shall receive, on account of his Existing Interests, 10% of such remaining Transaction Proceeds, with such distributions to Lapidem, Mascini and Stephen Lynch adjusted to reflect the Lynch Net Gain Sale Agreement.

   ii. In the event Lapidem and Mascini elect not to consummate a Transaction and elect instead to receive the Modified Loans and the New Class A-1 Shares in satisfaction of their Allowed Existing Loan Claims, then no holder of Existing Interests shall receive or retain any property on account of such Existing Interests under the Plan, and all such Existing Interests shall be cancelled, and of no further force or effect, *provided however*, that if the Plan Support Conditions are satisfied, Mr. Lynch shall receive the New Class A-2 Share.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan will affect the Plan Proponents' or the Debtor's rights in respect of any Unimpaired Claims, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claims, including the right to Cure any arrearages or defaults that may exist with respect to contracts to be assumed under the Plan.

D. *Special Provision Governing Executory Contracts*

Any Allowed Claims arising from the rejection of the Debtor's Executory Contracts, including termination or rejection of the SHA, shall share *pari passu* in any distributions made under Article III.B.2 of the Plan other than the New Class A-1 Shares. The Plan Proponents do not believe there are any such Claims. All such Claims are Disputed Claims. The Plan Proponents reserve the right to assert that any such Claims asserted with respect to the SHA shall be subordinated pursuant to Section 510(b) of the Bankruptcy Code.

E. *Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code*

The Plan Proponents shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Classes of Claims and Existing Interests. The Plan Proponents reserve the right to modify the Plan in accordance with <u>Article X</u> hereof to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification.

# ARTICLE IV

# MEANS FOR IMPLEMENTATION OF THE PLAN

A. *Transaction Process*

In an effort to explore all reasonable alternatives for maximizing the value of the Debtor's Estate, the Plan Proponents shall pursue the Transaction Process in order to identify one or more Transactions, if any, for the direct or indirect disposition of the Debtor's assets, including possible resolution of the Yukos Finance Litigation or sale of the participation interests in PNS. On or before the Plan Supplement Date, the Plan Proponents or their designees shall file a statement with the Bankruptcy Court, which may include one or more affidavits, summarizing actions taken in connection with the Transaction Process. If any such Transactions are identified, developed and negotiated to Lapidem's and Mascini's satisfaction, as determined by them in their sole discretion, they shall also file with the Bankruptcy Court on the Plan Supplement Date any Purchase Agreement or other documentation evidencing such Transactions. Lapidem and Mascini will seek approval of any such proposed Transactions at the Confirmation Hearing, with such Transactions to be implemented under the Plan. If Lapidem and Mascini choose not to pursue any Transaction, as determined by them in their sole discretion, then they shall elect to receive the Modified Loans, and shall so state in the statement they file with the Bankruptcy Court on the Plan Supplement Date. The Plan Proponents will offer to provide periodic updates to Stephen Lynch and his counsel on the Transaction Process, and will solicit their input as the Transaction Process progresses.

B. *Implementation of Transactions*

In the event the Bankruptcy Court approves one or more Transactions that contemplates a sale of the Debtor's ownership interests in the participation interests in PNS, the Confirmation Order shall direct each manager of the Debtor to pass a resolution by the Effective Date authorizing and directing the Debtor to (A) enter into a power of attorney (the "<u>Power of Attorney</u>") delegating powers to enter into a Purchase Agreement on behalf of the Debtor to a person nominated by the board of managers and enter into such other documents as may be legally required to evidence such transfer; (B) enter into the Purchase Agreement, as transferor, with the purchaser thereunder, as transferee, evidencing the transfer and vesting of the purchased assets in the purchaser; and (C)(X) execute the Purchase Agreement before a notary public in the Russian Federation and (Y) submit the Purchase Agreement, the Power of Attorney and such other papers as may be necessary before a notary public in the Russian Federation in connection with the submission of any necessary papers (by the notary public or otherwise) to the competent

19

Russian tax or other authorities and the making of any necessary entry in the Unified State Register of Legal Entities in accordance with Article 21 of the Russian Federal Law No. 14-FZ on Limited Liability Companies, dated 8 February 1998 (as amended) (the "Russian LLC Law"). To the extent Stephen Lynch is the general director of PNS at the time when any transfer of the participation interests in PNS is effected pursuant to any Purchase Agreement, he shall amend or shall procure the amendment by PNS' responsible officer of, the list of PNS' participants maintained by PNS in accordance with Article 31.1 of the Russian LLC Law to reflect the purchaser under the Purchase Agreement as the owner of the participation interests in PNS.

### C. Cancellation Of Existing Shares; Issuance Of New Shares

Except as otherwise specifically provided for in the Plan, on the Effective Date, all instruments, certificates, agreements and documents evidencing the Existing Interests in the Debtor shall be cancelled, and the obligations of the Debtor thereunder and in any way related thereto shall be fully satisfied, released and discharged.  On the Effective Date or as soon thereafter as practicable, the Reorganized Debtor shall issue or cause to be issued (i) the New Class A-1 Shares to the Plan Proponents, (ii) if the Plan Support Conditions are satisfied, the New Class A-2 Share to Stephen Lynch, and (iii) the New Class B-1 Shares to the New Money Participants.  All such New Class A-1 Shares, the New Class A-2 Share, and the New Class B-1 Shares shall be duly authorized, validly issued, fully paid and non-assessable.  The Amended Kirwan Governance Documents will provide for the issuance of the New Class A-1 Shares, the New Class A-2 Share if the Plan Support Obligations are satisfied, and the New Class B-1 Shares, with all of such Shares to have the same voting rights.

### D. Post-Effective Date Governance

#### 1. Governance of the Reorganized Debtor

The SHA shall be deemed terminated no later than the Effective Date by operation of §§ 1.9, 1.11 and 23.1 thereof and/or rejected pursuant to Article V of the Plan in the Plan Proponents' sole discretion.  Governance of the Reorganized Debtor shall be as provided for in the Amended Kirwan Governance Documents.  Such Documents will provide for a board of managers comprised of between three and five members, all of whom shall be selected by the Plan Proponents in their sole discretion, with the number of such members also determined by the Plan Proponents in their sole discretion, with such board members vested with exclusive authority to make all decisions on the Reorganized Debtor's behalf, except as otherwise directed by Lapidem and Mascini.  The names of the initial members of the board of managers of Reorganized Kirwan shall be included in the Plan Supplement.  Stephen Lynch shall be entitled to serve as board observer so long as the Plan Support Conditions are satisfied.   The Amended Kirwan Governance Documents shall otherwise comply with Luxembourg and any other applicable law.  All persons who serve as managers of the Debtor as of the Effective Date shall be deemed to resign as of such date.  All such persons are directed to deliver such forms of

20

resignation and any other related documents as may be necessary to evidence such resignation under Luxembourg law and any other applicable law. All managers of the Debtor and holders of Existing Interests are authorized and directed to execute such documents as are necessary under Luxembourg law, including the Board and Shareholder Circulars, to approve the Amended Kirwan Governance Documents and issuance of the New Class A-1 Shares, the New Class A-2 Share and New Class B-1 Shares.

   2.   *Governance of PNS*

   The Confirmation Order shall direct (i) the board of managers of the Debtor and the Reorganized Debtor or, alternatively, (ii) if a Transaction is approved resulting in a third-party's acquisition of the participation interests in PNS, such third-party, (A) to pass such resolutions and to cause any such changes to PNS's governing documents in each case as are necessary in order to vest sole and exclusive control of PNS in the Reorganized Debtor or such third-party, as appropriate; (B) to cause the removal of Stephen Lynch as PNS's general director and appointment of such other person as PNS's general director as the Reorganized Debtor or such third-party acquirer determines in its sole discretion, including such actions as may be necessary for the submission of any necessary papers to comply with the Russian LLC Law and other applicable law in the Russian Federation; and (C) to cause PNS to replace Stephen Lynch as provisional director of Yukos Finance. The Confirmation Order shall further direct Stephen Lynch to facilitate control of PNS by undertaking the PNS Transition Matters.

   E.   *New Money Loan; Post-Effective Date Loans*

   The Debtor shall implement the New Money Loan Offering by offering to sell New Money Loan Participations and New Class B-1 Shares to the New Money Loan Participants. The deadline for New Money Loan Participants to subscribe to New Money Loan Participations shall be the Plan Supplement Date, *provided however*, that the Plan Proponents may determine in their sole discretion not to consummate the New Money Loan Offering. After the Effective Date, the Plan Proponents shall have the exclusive right in their sole discretion to make Post-Effective Date Loans to the Reorganized Debtor without approval of the Bankruptcy Court.

   F.   *Plan Support Conditions*

   As a condition to Mr. Lynch (1) participating in the New Money Loan Offering and any future distributions contemplated by Article III.B.4 of the Plan; (2) participating in the governance of the Reorganized Debtor as contemplated by Article IV.C.1; and (3) receiving a release by the Plan Proponents and the Reorganized Debtor of the Lynch Causes of Action, Stephen Lynch (i) must not object, directly or indirectly, to the Plan or take any actions inconsistent with, or that would delay approval or confirmation of, the Plan or any Transaction; (ii) must not, directly or indirectly, seek or support or encourage or join with any other Person or entity in seeking to challenge, to disallow, subordinate or limit, in any respect, as applicable, the enforceability, priority, amount or validity of the Existing Loans; (iii) must not, directly or indirectly, propose, support, seek, solicit, participate in or encourage any negotiations regarding any other plan of reorganization, scheme of arrangement, sale, proposal, dissolution, consolidation, joint venture, winding up, liquidation, reorganization, merger, amalgamation or

21

restructuring of the Debtor or PNS or the disposition of the Yukos Finance Litigation, whether directly or indirectly; (iv) must use commercially reasonable efforts to promptly notify the Plan Proponents upon the receipt of any written solicitation or proposal relating to any other plan, scheme of arrangement, sale, proposal, dissolution, consolidation, joint venture, winding up, liquidation, reorganization, merger, amalgamation or restructuring of the Debtor or PNS or the disposition of the Yukos Finance Litigation; (v) must use commercially reasonable efforts in exercising any powers or rights available to him in favor of any matter requiring approval of the Plan, including by filing pleadings in respect thereof in any court or tribunal and before any Governmental Authority; (vi) must not file any Proof of Claim or assert any Claim of any kind against another Person, and (vii) must provide the Lynch Release, which shall grant full and unconditional releases to all parties to the SHA in a form acceptable to the Plan Proponents, for any and all Claims arising out of or in connection with the SHA or otherwise arising out of or in connection with his Existing Interests in the Debtor.

G.  *Restructuring Transactions*

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution or liquidation containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, debt or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (3) the filing of appropriate certificates or articles of incorporation or amendments thereof, reincorporation, merger, consolidation, conversion or dissolution pursuant to applicable law; and (4) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

H.  *Corporate Action*

Upon the Effective Date, all actions contemplated by the Plan shall be deemed authorized and approved in all respects, including all actions contemplated by the Plan, whether to occur before, on or after the Effective Date.  All matters provided for in the Plan involving the corporate structure of the Debtor or the Reorganized Debtor, and any corporate action required by the Debtor or the Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the shareholders or managers of the Debtor or the Reorganized Debtor.  On or (as applicable) before the Effective Date, the appropriate managers of the Debtor or the Reorganized Debtor, as applicable, shall be authorized and directed to issue, execute and deliver the agreements, documents, securities, certificates of incorporation, operating agreements and instruments contemplated by the Plan (or necessary or desirable to effect the transactions contemplated by the Plan) in the name of and on behalf of the Reorganized Debtor.  The authorizations and approvals contemplated by this Article IV shall be effective notwithstanding any requirements under non-bankruptcy law.

22

I.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Reorganized Debtor and the officers and members of the board of managers thereof are authorized to issue, execute, deliver, file or record such contracts, securities, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement and further evidence the terms and conditions of the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorization or consents except for those expressly required pursuant to the Plan.

J.    *Securities Exemption*

The New Class A-1 Shares and the New Class A-2 Share will be exempt from registration pursuant to section 1145 of the Bankruptcy Code.  The New Class B-1 Shares will be exempt from registration pursuant to section 1145 of the Bankruptcy Code to the extent permitted or under the Securities Act by virtue of Section 4(a)(2) thereof and Regulation D promulgated thereunder or other applicable non-bankruptcy law.

K.    *Exemption from Certain Taxes and Fees*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property in contemplation of, in connection with, or pursuant to the Plan shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate state or local governmental officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the making or assignment of any lease or sublease; (3) any restructuring transaction authorized by Article IV hereof; and (4) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including: (a) any merger agreements; (b) agreements of consolidation, restructuring, disposition, liquidation or dissolution; (c) deeds; or (d) assignments executed in connection with any transaction occurring under the Plan.

L.    *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, and except where such Causes of Action have been expressly released, including the Lynch Causes of Action if the Plan Support Obligations are satisfied, the Reorganized Debtor shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, including the Lynch Causes of Action, whether arising before or after the Petition Date, and the Reorganized Debtor's rights to commence, prosecute or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtor.  No Person may rely on the absence of a specific reference in the Plan to any Cause of Action against

23

them as any indication that the Debtor or Reorganized Debtor, as applicable, will not pursue any and all available Causes of Action against them. Except with respect to Causes of Action as to which the Debtor or Reorganized Debtor have released any Person on or before the Effective Date (including pursuant to the releases by the Debtor or otherwise), the Debtor or Reorganized Debtor, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Person, except as otherwise expressly provided in the Plan. Unless any Causes of Action against a Person are expressly waived, relinquished, exculpated, released, compromised or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtor expressly reserves all Causes of Action, for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches, shall apply to such Causes of Action upon, after or as a consequence of the Confirmation or consummation of the Plan.

## ARTICLE V

## TREATMENT OF EXECUTORY CONTRACTS

### A. *Disposition of Executory Contracts*

The Confirmation Order shall provide that the SHA shall be deemed terminated no later than the Effective Date by operation of §§ 1.9, 1.11 and 23.1 thereof. In the absence of any such determination, in the Plan Proponents' discretion, the SHA and every other Executory Contract, except for any engagement letter or fee agreement with any professional, shall be deemed rejected as of the Effective Date. All engagement letters and fee agreements shall be assumed except as otherwise provided in connection with any Transaction. The Plan Proponents do not believe the Debtor is party to any Executory Contract other than the SHA and engagement letters and fee agreements with professionals. Entry of the Confirmation Order shall constitute a Bankruptcy Court order approving the assumptions or rejections of such Executory Contracts, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated, all assumptions or rejections of Executory Contracts pursuant to the Plan are effective as of the Effective Date.

All assumed Executory Contracts shall remain in full force and effect for the benefit of the Reorganized Debtor, and be enforceable by the Reorganized Debtor in accordance with their terms, notwithstanding any provision in such assumed Executory Contract that prohibits, restricts or conditions such assumption, assignment or transfer. Any provision in the assumed Executory Contracts that purports to declare a breach or default based in whole or in part on commencement or continuance of this Chapter 11 Case or any successor cases is hereby deemed unenforceable. To the extent any provision in any Executory Contract assumed pursuant to the Plan (including, without limitation, any "change of control" provision) restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the Reorganized Debtor's assumption of such Executory Contract, then such provision will be deemed modified such that the transactions contemplated by the Plan will not entitle the non-debtor party thereto to terminate such Executory Contract or to exercise any other default-related rights with respect thereto. Each Executory Contract assumed pursuant to the Plan or by Bankruptcy Court order shall re-vest in and be fully enforceable by the Reorganized Debtor in accordance with its terms,

24

except as such terms may have been modified by such order or by applicable law. Notwithstanding anything to the contrary in the Plan, the Plan Proponents, the Debtor or the Reorganized Debtor, as applicable, reserve the right to alter, amend, modify or supplement any list of Executory Contracts at any time before the Effective Date. After the Effective Date, the Reorganized Debtor shall have the right to terminate, amend or modify any contracts, leases or other agreements without approval of the Bankruptcy Court.

### B. *Claims Based on Rejection of Executory Contracts*

All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts, including termination or rejection of the SHA, if any, must be filed with the Bankruptcy Court by the applicable claims bar date. Any such Claims not filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion and shall not be enforceable against the Debtor or the Reorganized Debtor, the Estate or their property without the need for any objection by the Reorganized Debtor or further notice to, or action, order or approval of the Bankruptcy Court. All Allowed Claims arising from the rejection of the Debtor's Executory Contracts, including termination or rejection of the SHA, shall be treated in accordance with Article III.D of the Plan unless otherwise ordered by the Bankruptcy Court.

### C. *Cure of Defaults for Assumed Executory Contracts*

Any monetary amounts by which any Executory Contract to be assumed under the Plan is in default shall be satisfied, under section 365(b)(1) of the Bankruptcy Code, by Cure. If there is a dispute regarding (i) the nature or amount of any Cure, (ii) the ability of the Reorganized Debtor to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract to be assumed or (iii) any other matter pertaining to assumption, Cure shall occur following the entry of a Final Order of the Bankruptcy Court resolving the dispute and approving the assumption. Assumption of any Executory Contract pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy related defaults, arising under any assumed Executory Contract at any time before the effective date of the assumption.

D. *Reservation of Rights.*

Nothing contained in the Plan shall constitute an admission by the Plan Proponents or the Debtor that any particular contract is in fact an Executory Contract or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract is or was executory at the time of assumption or rejection, the Plan Proponents or Reorganized Debtor shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

E. *Contracts and Leases Entered Into After the Petition Date.*

Contracts and leases entered into after the Petition Date by the Debtor, including any Executory Contracts assumed by the Debtor, will be performed by the Debtor or Reorganized Debtor in the ordinary course of its business. Accordingly, such contracts and leases will survive and remain unaffected by entry of the Confirmation Order.

## ARTICLE VI

## PROVISIONS GOVERNING DISTRIBUTIONS

A. *Timing and Calculation of Amounts to Be Distributed*

Except as otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter, each holder of an Allowed Claim or Existing Interest against the Debtor shall receive the full amount of the distributions that the Plan provides for Allowed Claims and Allowed Existing Interests in the applicable Class and in the manner provided herein. There shall be no record date for distributions under the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII hereof. Except as otherwise provided herein, holders of Claims shall not be entitled to interest, dividends or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B. *Disbursing Agent*

Except as otherwise provided herein, all distributions under the Plan shall be made by the Reorganized Debtor as Disbursing Agent or such other Person designated by the Reorganized Debtor as a Disbursing Agent on the Effective Date.

C.   *Rights and Powers of Disbursing Agent*

1.   <u>Powers of the Disbursing Agent</u>

The Disbursing Agent shall be empowered to: (a) affect all actions and execute all agreements, instruments and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.   <u>Expenses Incurred On or After the Effective Date</u>

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent in connection with distributions under or implementation of the Plan on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement claims (including reasonable attorney fees and expenses) made by the Disbursing Agent shall be paid in Cash by the Reorganized Debtor.

D.   *Cash Distributions*

Distributions of Cash may be made either by check drawn on a domestic bank or wire transfer from a domestic bank, at the option of the Reorganized Debtor, except that Cash payments made to foreign creditors may be made in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

E.   *Rounding of Payments*

Whenever payment of a fraction of a cent would otherwise be called for, the actual payment shall reflect a rounding down of such fraction to the nearest whole dollar, or zero if the amount is less than one dollar.

F.   *Distributions on Account of Claims Allowed After the Effective Date*

1.   <u>Payments and Distributions on Disputed Claims</u>

Distributions made after the Effective Date to holders of Disputed Claims that are not Allowed Claims as of the Effective Date but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

2.   <u>Special Rules for Distributions to Holders of Disputed Claims</u>

Notwithstanding any provision otherwise in the Plan and except as may be agreed to by the Debtor or the Reorganized Debtor, on the one hand, and the holder of a Disputed Claim, on the other hand, no partial payments and no partial distributions shall be made with respect to any

27

Disputed Claim until all Disputed Claims held by the holder of such Disputed Claim have become Allowed Claims or have otherwise been resolved by settlement or Final Order.

### G.  Delivery of Distributions and Undeliverable or Unclaimed Distributions

#### 1.  Delivery of Distributions in General

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be made to holders of record by the Disbursing Agent: (a) to the signatory set forth on any of the Proofs of Claim filed by such holder or other representative identified therein (or at the last known addresses of such holder if no Proof of Claim is filed or if the Debtor has been notified in writing of a change of address); (b) at the addresses set forth in any written notices of address changes delivered to the Disbursing Agent after the date of any related Proof of Claim; (c) on any counsel that has appeared in the Chapter 11 Case or any successor cases on the holder's behalf; or (d) at the addresses reflected in the Debtor's books and records.  Distributions under the Plan on account of Allowed Claims or Allowed Existing Interests shall not be subject to levy, garnishment, attachment or like legal process, so that each holder of an Allowed Claim or Allowed Existing Interest shall have and receive the benefit of the distributions in the manner set forth in the Plan.  None of the Debtor, the Reorganized Debtor and the applicable Disbursing Agent shall incur any liability whatsoever on account of any distributions under the Plan except for gross negligence, willful misconduct or fraud.

#### 2.  Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder, at which time such distribution shall be made as soon as practicable after such distribution has become deliverable or has been claimed to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and forfeited at the expiration of six months from the applicable distribution date.  After such date, all "unclaimed property" or interests in property shall revert to the Reorganized Debtor (notwithstanding any applicable federal or state escheat, abandoned or unclaimed property laws to the contrary), and the Claim of any holder to such property shall be discharged and forever barred.

### H.  Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith, the Disbursing Agent shall comply with all applicable withholding and reporting requirements imposed by any federal, state or local taxing authority, and all distributions under the Plan shall be subject to any such withholding or reporting requirements.

### I.  Setoffs

Except as set forth herein, the Debtor and the Reorganized Debtor may withhold (but not set off except as set forth below) from the distributions called for under the Plan on account of

any Allowed Claim or Allowed Existing Interest an amount equal to any claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim or Allowed Existing Interest. In the event that any such claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim or Allowed Existing Interest are adjudicated by Final Order or otherwise resolved, the Debtor may, pursuant to section 558 of the Bankruptcy Code or applicable non-bankruptcy law, set off against any Allowed Claim or Allowed Existing Interest and the distributions to be made pursuant hereto on account of such Allowed Claim or Allowed Existing Interest (before any distribution is made on account of such Allowed Claim or Allowed Existing Interest) the amount of any adjudicated or resolved claims, equity interests, rights and Causes of Action of any nature that the Debtor or the Reorganized Debtor may hold against the holder of any such Allowed Claim or Allowed Existing Interest, but only to the extent of such adjudicated or resolved amount. Neither the failure to effect such a setoff nor the allowance of any Claim or Allowed Existing Interest under the Plan shall constitute a waiver or release by the Debtor or the Reorganized Debtor of any such claims, equity interests, rights and Causes of Action that the Debtor or the Reorganized Debtor may possess against any such holder, except as specifically provided herein.

J.  *Allocation of Distributions Between Principal and Unpaid Interest*

To the extent that any Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall, for income tax purposes, be allocated on the Debtor's books and records to the principal amount of the Claim first and then, to the extent the consideration exceeds the principal amount of the Claim, to the accrued but unpaid interest.

## ARTICLE VII

## PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED AND DISPUTED CLAIMS

A.  *Proofs of Claim*

Notwithstanding anything herein, in the Bankruptcy Code, in the Bankruptcy Rules, or in any other order of the Bankruptcy Court to the contrary, the Plan Proponents will not be required to file Proofs of Claim in the Chapter 11 Case or any successor cases on account of the Existing Loan Claims and their Existing Interests, and the findings of fact in the Confirmation Order shall be deemed to constitute a timely filed Proof of Claim.

B.  *Prosecution of Objections to Claims*

The Plan Proponents (before the Effective Date) and the Reorganized Debtor (on or after the Effective Date), as applicable, shall have the exclusive authority to file, settle, compromise, withdraw or litigate to judgment any objections to Claims as permitted under the Plan. From and after the Effective Date, the Reorganized Debtor may settle or compromise any Disputed Claim without approval of the Bankruptcy Court. The Plan Proponents and the Reorganized Debtor

29

reserve all rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law. The Plan Proponents dispute any Proof of Claim filed, or other Claim asserted, by Stephen Lynch, and such Proof of Claim or Claim is a Disputed Claim.

### C. Allowance of Claims

Except as expressly provided herein or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), the Reorganized Debtor after the Effective Date will have and retain any and all rights and defenses held by the Debtor with respect to any Claim as of the Petition Date. All claims of any Person against any Debtor shall be disallowed unless and until such Person pays, in full, the amount it owes the Debtor.

### D. Distributions After Allowance

On the Distribution Date following the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim.

### E. Estimation of Claims

The Plan Proponents (before the Effective Date) and the Reorganized Debtor (on or after the Effective Date) may, at any time, and from time to time, request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether an objection was previously filed with the Bankruptcy Court with respect to such Claim, or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim against any party or Person, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Plan Proponents (before the Effective Date) and the Reorganized Debtor (after the Effective Date), may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. All of the objection, estimation, settlement and resolution procedures set forth in the Plan are cumulative and not necessarily exclusive of one another. Claims may be estimated and subsequently compromised, objected to, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### F. Deadline to File Objections to Claims

Any objections to Claims shall be filed no later than the Claims Objection Bar Date; provided, however, that the Plan Proponents or the Reorganized Debtor's failure to file an objection by the Claims Objection Bar Date shall not cause any Claim to be deemed an Allowed Claim nor shall it prejudice their rights to resolve any Disputed Claim outside the Bankruptcy Court under applicable governing law.

30

# ARTICLE VIII

## SETTLEMENT, RELEASE, INJUNCTION AND RELATED PROVISIONS

### A.  *Compromise and Settlement of Claims, Interests and Controversies*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims, Existing Interests and controversies relating to the contractual, legal and subordination rights that a holder of a Claim or Existing Interest may have with respect to any Allowed Claim or Existing Interest, or any distribution to be made on account of such Allowed Claim or Existing Interest.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Claims, Existing Interests and controversies, as well as a finding by the Bankruptcy Court that such compromise or settlement is in the best interests of the Debtor, its Estate and holders of Claims and Existing Interests and is fair, equitable and reasonable.  In accordance with the provisions of the Plan, without any further notice to or action, order or approval of the Bankruptcy Court, after the Effective Date, the Reorganized Debtor may compromise and settle Claims and Causes of Action against other Persons.

### B.  *Vesting of Assets in the Reorganized Debtor*

Except as otherwise provided in the Plan or any agreement, instrument or other document incorporated therein, and except with respect to any assets of the Debtor acquired in a Transaction as evidenced by a Purchase Agreement or otherwise, on the Effective Date, all property of the Estate and all Causes of Action (except those released pursuant to the Plan) shall vest in the Reorganized Debtor, free and clear of all liens, Claims, charges or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the Reorganized Debtor may operate its businesses and may use, acquire or dispose of property and compromise or settle any Claims, Existing Interests, and Causes of Action, including by causing PNS to compromise or settle the Yukos Finance Litigation to the extent PNS is not sold in a Transaction, in each case without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code, Bankruptcy Rules, or any prepetition agreement, including the SHA.

### C.  *Discharge of Claims*

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan, the distributions, rights and treatment that are provided in the Plan shall be in full and final satisfaction, settlement, release and discharge, effective as of the Effective Date, of all Claims, Existing Interests and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Existing Interests from and after the Petition Date, whether known or unknown, against the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Existing Interests, including demands, liabilities and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or

31

warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, in each case whether or not: (1) a Proof of Claim or Existing Interest based upon such Claim, debt, right or Existing Interest is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (2) a Claim or Existing Interest based upon such Claim, debt, right or Existing Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (3) the holder of such a Claim or Existing Interest has accepted the Plan. Except as otherwise provided herein, any default by the Debtor with respect to any Claim or Existing Interest that existed before or on account of the filing of the Chapter 11 Case shall be deemed cured on the Effective Date. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Existing Interests subject to the Effective Date occurring, except as otherwise expressly provided in the Plan.

### D. *Releases by the Debtor*

**Pursuant to section 1123(b) of the Bankruptcy Code and to the fullest extent allowed by applicable law, and except as otherwise specifically provided in the Plan or the Plan Supplement, for good and valuable consideration, including (i) the service of the Released Parties in facilitating the expeditious reorganization of the Debtor and the implementation of the restructuring contemplated by the Plan, (ii) the New Money Loan Participants' participation in the New Money Loan Offering, and (iii) the discharge of debt and all other good and valuable consideration paid pursuant hereto, on and after the Effective Date, the Released Parties and their respective property are released and discharged by the Reorganized Debtor from any and all claims, obligations, rights, suits, damages, Causes of Action, remedies and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Reorganized Debtor, whether known or unknown, foreseen or unforeseen, liquidated or unliquidated, contingent or non-contingent, existing or hereinafter arising, in law, equity or otherwise, whether for tort, fraud, contract, violations of federal or state securities laws or otherwise, that the Reorganized Debtor would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Existing Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtor, the Debtor's restructuring, the Debtor's Chapter 11 Case, the SHA, the purchase, sale or rescission of the purchase or sale of any security of the Debtor or the Reorganized Debtor, the subject matter of, or the transactions or events giving rise to, any Claim or Existing Interest that is treated in the Plan, the business or contractual arrangements between the Debtor, Reorganized Debtor, or Estate and any Released Party, the restructuring of Claims and Existing Interests before or during the Chapter 11 Case, the negotiation, formulation or preparation of the Plan, the Plan Supplement or related agreements, instruments or other documents, or with respect to any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date; provided, however, that nothing in this <u>Article VIII.D</u> shall be construed to release any party or entity from gross negligence, intentional fraud, willful misconduct, or criminal conduct, as determined by a Final Order. Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor releases pursuant to this <u>Article VIII.D</u>, which includes by reference each of the related provisions and definitions contained herein, and further shall constitute the Bankruptcy Court's finding that such**

32

Debtor releases are (i) in exchange for the good and valuable consideration provided by the Released Parties, (ii) a good faith settlement and compromise of the Claims released by such Debtor releases, (iii) in the best interests of the Debtor and all holders of Claims and Existing Interests, (iv) fair, equitable and reasonable, (v) given and made after due notice and opportunity for hearing, and (vi) a bar to any of the Debtor or the Reorganized Debtor asserting any Claim or Cause of Action released pursuant to such Debtor releases.

### E. *Exculpation*

Except as otherwise specifically provided in the Plan or Plan Supplement, no Released Party shall have or incur, and each Released Party is hereby released and exculpated from, any Exculpated Claim, obligation, Cause of Action or liability for any Exculpated Claim. The Plan Proponents, Debtor and Reorganized Debtor (and each of their respective Affiliates, agents, directors, officers, employees, advisors and attorneys) have, and upon Confirmation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation and distribution of the Plan consideration, and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

### F. *Injunction*

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN, THE PLAN SUPPLEMENT OR RELATED DOCUMENTS, OR FOR OBLIGATIONS ISSUED PURSUANT TO THE PLAN, ALL PERSONS WHO HAVE HELD, HOLD OR MAY HOLD CLAIMS OR EXISTING INTERESTS THAT HAVE BEEN RELEASED, DISCHARGED, OR ARE SUBJECT TO EXCULPATION, ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE APPLICABLE PERSONS: (1) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EXISTING INTERESTS; (2) ENFORCING, ATTACHING, COLLECTING OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE OR ORDER AGAINST SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EXISTING INTERESTS; (3) CREATING, PERFECTING OR ENFORCING ANY ENCUMBRANCE OF ANY KIND AGAINST SUCH PERSONS OR THE PROPERTY OR ESTATES OF SUCH PERSONS ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EXISTING INTERESTS; AND (4) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR EXISTING INTERESTS RELEASED, SETTLED OR DISCHARGED PURSUANT TO THE PLAN.

THE RIGHTS AFFORDED IN THE PLAN AND THE TREATMENT OF ALL CLAIMS AND EXISTING INTERESTS HEREIN SHALL BE IN EXCHANGE FOR AND IN

33

COMPLETE SATISFACTION OF ALL CLAIMS AND EXISTING INTERESTS OF ANY NATURE WHATSOEVER, INCLUDING ANY INTEREST ACCRUED ON CLAIMS FROM AND AFTER THE PETITION DATE, AGAINST THE DEBTOR OR ANY OF ITS ASSETS, PROPERTY OR ESTATE. ON THE EFFECTIVE DATE, ALL SUCH CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR HEREIN OR IN OBLIGATIONS ISSUED PURSUANT TO THE PLAN FROM AND AFTER THE EFFECTIVE DATE, ALL CLAIMS AGAINST THE DEBTOR SHALL BE FULLY RELEASED AND DISCHARGED, AND ALL INTERESTS SHALL BE CANCELLED, AND THE DEBTOR'S LIABILITY WITH RESPECT THERETO SHALL BE EXTINGUISHED COMPLETELY, INCLUDING ANY LIABILITY OF THE KIND SPECIFIED UNDER SECTION 502(G) OF THE BANKRUPTCY CODE. ALL PERSONS SHALL BE PRECLUDED FROM ASSERTING AGAINST THE DEBTOR, THE DEBTOR'S ESTATE, THE REORGANIZED DEBTOR, EACH OF ITS SUCCESSORS AND ASSIGNS, AND EACH OF ITS ASSETS AND PROPERTIES, ANY OTHER CLAIMS OR EXISTING INTERESTS BASED UPON ANY DOCUMENTS, INSTRUMENTS OR ANY ACT OR OMISSION, TRANSACTION OR OTHER ACTIVITY OF ANY KIND OR NATURE THAT OCCURRED BEFORE THE EFFECTIVE DATE.

G. *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and extant on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## ARTICLE IX

## CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE

A. *Conditions Precedent to Confirmation*

It shall be a condition to Confirmation hereof that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C.

1.      The Confirmation Order shall be in form and substance acceptable to the Plan Proponents in their sole discretion  and shall include a determination by the Bankruptcy Court that the SHA has been terminated by its terms, including §§ 1.9, 1.11 and 23.1 thereof and/or that the SHA has been rejected in the Plan Proponents' sole discretion.

34

2.     The Plan, the Plan Supplement, any Purchase Agreement, and any document evidencing a Transaction, including any schedules, documents, supplements and exhibits thereto shall, in form and substance, be acceptable to the Plan Proponents in their sole discretion.

3.     No Proofs of Claim or other liabilities shall have been filed or asserted by any Person on account of any matter unless such Proof of Claim or other liability has been determined to the Plan Proponents' satisfaction in their sole discretion.

## B.    Conditions Precedent to the Effective Date

It shall be a condition to the Effective Date that the following provisions, terms and conditions shall have been satisfied or waived pursuant to the provisions of Article IX.C.

1.     The Bankruptcy Court shall have entered one or more orders (which may include the Confirmation Order) authorizing the assumption and rejection of Executory Contracts as contemplated herein in form and substance acceptable to the Plan Proponents in their sole discretion.

2.     The Confirmation Order  shall have been entered by the Bankruptcy Court and shall not be subject to any stay subject to an unresolved request for revocation under section 1144 of the Bankruptcy Code.

3.     The New Money Loan Offering shall have been consummated, unless the Plan Proponents determine in their sole discretion not to consummate the New Money Loan Offering.

4.     All of the schedules, documents, supplements and exhibits to the Plan shall have been filed in form and substance acceptable to the Plan Proponents in their sole discretion.

5.     All authorizations, consents, and regulatory approvals required, if any, in connection with the consummation of the Plan shall have been obtained.

6.     All actions, documents, certificates, and agreements necessary to implement this Plan shall have been effected or executed and delivered to the required parties and, to the extent required, filed with the applicable governmental units in accordance with applicable laws.  All conditions precedent to the effectiveness of such documents and agreements shall have been satisfied or waived pursuant to the terms thereof.

## C.    Waiver of Conditions

The conditions to Confirmation of the Plan and to consummation of the Plan set forth in this Article IX may be waived at any time by the Plan Proponents in their sole discretion.

## D.    Effect of Failure of Conditions

If the consummation of the Plan does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan shall:  (1) constitute a waiver or release of any Claims against or Existing Interests in the Debtor; (2) prejudice in any manner the rights of the Debtor,

35

any holders of Claims or any other Person; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor, any holders or any other Person in any respect.

# ARTICLE X

## MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN

### A.  *Modification and Amendments*

The Plan Proponents reserve the right to modify the Plan and seek Confirmation consistent with the Bankruptcy Code.  Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in the Plan, the Plan Proponents expressly reserve their rights to alter, amend or modify materially the Plan one or more times, after Confirmation, and, to the extent necessary, may initiate proceedings in the Bankruptcy Court to so alter, amend or modify the Plan or remedy any defect or omission, or reconcile any inconsistencies in the Plan or the Confirmation Order, in such matters as may be necessary to carry out the purposes and intent of the Plan.

### B.  *Revocation or Withdrawal of the Plan*

The Plan Proponents reserve the right to revoke or withdraw the Plan before the Effective Date.  If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Existing Interest or Class of Claims or Existing Interests), assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Existing Interests; (b) prejudice in any manner the rights of the Debtor, the Plan Proponents or any other Person; or (c) constitute an admission, acknowledgement, offer or undertaking of any sort by the Plan Proponents or any other Person.

# ARTICLE XI

## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case and all matters arising out of or related to the Chapter 11 Case and the Plan including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate or establish the priority, secured or unsecured status, or amount of any Claim or Existing Interest, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount or allowance of Claims;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to professionals authorized pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to:  (a) the assumption, assumption and assignment or rejection of any Executory Contract to which the Debtor is party or with respect to which the Debtor may be liable in any manner and to hear, determine and, if necessary, liquidate, any Claims arising therefrom, including Claims based on the Debtor's rejection of Executory Contracts, Cure Claims pursuant to section 365 of the Bankruptcy Code or any other matter related to such Executory Contract; (b) any potential contractual obligation under any Executory Contract that is assumed; (c) the Reorganized Debtor amending, modifying or supplementing, after the Effective Date, any Executory Contracts or the list of Executory Contracts to be assumed or rejected or otherwise; and (d) any dispute regarding whether a contract or lease is or was executory or expired.

4.      ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

5.      adjudicate, decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters, and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

6.      adjudicate, decide or resolve any and all matters related to any Cause of Action;

7.      adjudicate, decide or resolve any and all matters related to section 1141 of the Bankruptcy Code;

8.      resolve any avoidance or recovery actions under sections 105, 502(d), 542 through 551 and 553 of the Bankruptcy Code;

9.      resolve any cases, controversies, suits, disputes or Causes of Action that may arise in connection with the consummation, interpretation or enforcement of the Plan or any Person's obligations incurred in connection with the Plan;

10.      issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Person with consummation or enforcement of the Plan;

11.      resolve any cases, controversies, suits, disputes or Causes of Action with respect to the discharge, releases, injunctions, exculpations, indemnifications and other provisions contained in the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions and other provisions;

12.      enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

13.      adjudicate any and all disputes arising from or relating to distributions under the Plan;

37

14.     consider any modifications of the Plan, cure any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

15.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

16.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents or instruments executed in connection with the Plan, including the Amended Kirwan Governance Documents and the Board and Shareholder Circulars;

17.     hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

18.     hear and determine all disputes involving the existence, nature or scope of the Debtor's discharge;

19.     determine any other matters that may arise in connection with or related to the Plan or the Confirmation Order;

20.     enforce all orders previously entered by the Bankruptcy Court;

21.     hear any other matter not inconsistent with the Bankruptcy Code; and

22.     enter an order concluding or closing the Chapter 11 Case.

# ARTICLE XII

## MISCELLANEOUS PROVISIONS

### A.   Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h) or 7062 or any other Bankruptcy Rule, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Supplement shall be immediately effective and enforceable and deemed binding upon the Debtor, the Reorganized Debtor and any and all holders of Claims or Existing Interests (irrespective of whether such Claims or Existing Interests are deemed to have accepted the Plan), all Persons that are parties to or are subject to the settlements, compromises, releases, discharges and injunctions described in the Plan, each Person acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts with the Debtor.

### B.   Additional Documents

On or before the Effective Date, the Debtor may file with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtor or Reorganized Debtor, as applicable, and all holders of Claims or Existing Interests and all other parties in interest shall, from time to

38

time, prepare, execute and deliver any agreements or documents and take any other actions as
may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.   *Reservation of Rights*

None of the Plan, any statement or provision contained in the Plan or any action taken or
not taken by the Plan Proponent or the Debtor with respect to the Plan or the Plan Supplement
shall be or shall be deemed to be an admission or waiver of any rights of the Plan Proponent or
the Debtor with respect to the holders of Claims or Existing Interests before the Effective Date.

D.   *Successors and Assigns*

The rights, benefits and obligations of any Person named or referred to in the Plan shall
be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or
assign, affiliate, officer, director, manager, agent, representative, attorney, beneficiaries or
guardian, if any, of each Person.

E.   *Service of Documents*

After the Effective Date, any pleading, notice or other document required by the Plan to
be served or delivered shall be served as follows:

1.   If to the Plan Proponents, to:

VR Capital Group Ltd.
300 Park Avenue, Suite 1602
New York, New York  10022
Attn:   Sina Toussi

with copies to:

Skadden, Arps, Slate, Meagher and Flom LLP
4 Times Square
New York, New York 10036
Attn:   Mark A. McDermott

2.   After the Effective Date, the Debtor may, in its sole discretion, notify Persons
that, in order to continue receiving documents pursuant to Bankruptcy Rule 2002, such Persons
must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the
Effective Date, the Debtor is authorized to limit the list of Persons receiving documents pursuant
to Bankruptcy Rule 2002 to those Persons who have filed such renewed requests.

### F. Entire Agreement

Except as otherwise indicated, the Plan and the Plan Supplement supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings and representations on such subjects, all of which have become merged and integrated into the Plan.

### G. Severability of Plan Provisions

If, before Confirmation of the Plan, any term or provision of the Plan is held by the Bankruptcy Court or any other court exercising proper jurisdiction to be invalid, void or unenforceable, the Bankruptcy Court or other court exercising proper jurisdiction shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. Notwithstanding the foregoing, if any provision of the Plan is materially altered or rendered unenforceable, the Plan shall not be confirmed without the written consent of the Plan Proponents..

### H. Exhibits

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be available upon request to the Plan Proponents' counsel, by contacting Skadden, Arps, Slate, Meagher and Flom LLP, 4 Times Square, New York, New York 10036, or by accessing the Bankruptcy Court's website at https://ecf.nysb.uscourts.gov. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

40

Dated:  February 28, 2017

Respectfully submitted,

LAPIDEM, LTD.,

By:    */s/Emile du Toit*
Name: Emile du Toit
Title:  Director

MASCINI HOLDINGS LIMITED

By:    */s/Emile du Toit*
Name: Emile du Toit
Title:  Director

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye

SKADDEN, ARPS, SLATE, MEAGHER
 & FLOM, LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Counsel for Lapidem, Ltd. and Mascini Holdings
Ltd.

41

**Schedule A**
**Existing Loans**

| Date | Amount |
|------|--------|
| **Mascini USD Loan Agreements** | |
| 30 August 2007 | $127,500,000.00 |
| 30 August 2007 | $21,000,000.00 |
| 07 December 2007 | $300,000.00 |
| 29 January 2008 | $600,000.00 |
| April 2008 | $600,000.00 |
| 11 June 2008 | $500,000.00 |
| 06 August 2008 | $600,000.00 |
| 03 October 2008 | $900,000.00 |
| April 2009 | $350,000.00 |
| June 2009 | $350,000.00 |
| 27 July 2009 | $900,000.00 |
| 19 October 2009 | $900,000.00 |
| November 2009 | $1,800,000.00 |
| 21 December 2009 | $2,304,000.00 |
| 26 March 2010 | $300,000.00 |
| May 2010 | $600,000.00 |
| 23 July 2010 | $600,000.00 |
| 10 September 2010 | $600,000.00 |
| 23 December 2010 | $1,020,000.00 |
| 04 March 2011 | $420,000.00 |
| 07 July 2011 | $441,000.00 |
| 07 August 2012 | $360,000.00 |

A-1

| Date | Amount |
|---|---|
| 30 May 2013 | $12,000.00 |
| 22 August 2013 | $416,000.00 |
| 18 September 2013 | $65,000.00 |
| 26 September 2013 | $6,000.00 |
| 01 November 2013 | $2,700.00 |
| 12 November 2013 | $60,000.00 |
| 03 December 2013 | $87,000.00 |
| 31 December 2013 | $25,200.00 |
| 29 January 2014 | $21,000.00 |
| 03 February 2014 | $26,000.00 |
| 20 March 2014 | $52,200.00 |
| 24 April 2014 | $164,100.00 |
| 28 May 2014 | $127,000.00 |
| 21 July 2014 | $20,400.00 |
| 03 September 2014 | $51,000.00 |
| 16 September 2014 | $3,500.00 |
| 12 November 2014 | $80,000.00 |
| 23 December 2014 | $129,000.00 |
| 13 January 2015 | $45,000.00 |
| 18 March 2015 | $93,500.00 |
| 17 April 2015 | $1,200,000.00 |
| 21 August 2015 | $2,400,000.00 |
| **TOTAL** | **$168,031,600.00** |

A-2

| Date | Amount |
|------|--------|
| **Mascini EUR Loan Agreements** | |
| 30 March 2011 | € 24,894,359.53 |
| **TOTAL** | **€ 24,894,359.53** |
| **Lapidem USD Loan Agreements** | |
| 30 August 2007 | $85,000,000.00 |
| 30 August 2007 | $14,000,000.00 |
| 07 December 2007 | $200,000.00 |
| 29 January 2008 | $400,000.00 |
| April 2008 | $400,000.00 |
| 11 June 2008 | $333,333.00 |
| 06 August 2008 | $400,000.00 |
| 03 October 2008 | $600,000.00 |
| April 2009 | $233,333.00 |
| 15 June 2009 | $233,333.00 |
| 27 July 2009 | $600,000.00 |
| 19 October 2009 | $600,000.00 |
| November 2009 | $1,200,000.00 |
| 21 December 2009 | $1,536,000.00 |
| 26 March 2010 | $200,000.00 |
| May 2010 | $400,000.00 |
| 23 July 2010 | $400,000.00 |
| 08 September 2010 | $400,000.00 |
| 23 December 2010 | $680,000.00 |
| 04 March 2011 | $280,000.00 |

A-3

| Date | Amount |
|------|--------|
| 07 July 2011 | $294,000.00 |
| 05 June 2012 | $132,000.00 |
| 07 August 2012 | $108,000.00 |
| 30 May 2013 | $8,000.00 |
| 22 August 2013 | $277,000.00 |
| 18 September 2013 | $43,000.00 |
| 26 September 2013 | $4,000.00 |
| 01 November 2013 | $1,800.00 |
| 12 November 2013 | $40,000.00 |
| 03 December 2013 | $58,000.00 |
| 31 December 2013 | $16,800.00 |
| 29 January 2014 | $14,000.00 |
| 03 February 2014 | $18,000.00 |
| 20 March 2014 | $34,800.00 |
| 24 April 2014 | $109,400.00 |
| 28 May 2014 | $85,000.00 |
| 21 July 2014 | $13,600.00 |
| 03 September 2014 | $34,000.00 |
| 16 September 2014 | $2,500.00 |
| 12 November 2014 | $55,000.00 |
| 23 December 2014 | $86,000.00 |
| 13 January 2015 | $30,000.00 |
| 18 March 2015 | $62,500.00 |
| 17 April 2015 | $800,000.00 |

A-4

| Date | Amount |
|------|--------|
| 21 August 2015 | $1,600,000.00 |
| **TOTAL** | **$112,023,399.00** |
| **Lapidem EUR Loan Agreements** | |
| 30 March 2011 | € 16,596,239.69 |
| **TOTAL** | **€ 16,596,239.69** |

A-5

**Schedule B**

**Allowed General Unsecured Claims**

| | |
|---|---|
| Akin Gump Strauss Hauer & Feld | $491,646.18 |
| Clifford Chance | €1,674,135.61 |
| Houthoff Buruma | €689,616.69 |
| MZS & Partners | €3,295.00 |
| The Michel-Shaked Group | $3,616.50 |

## Schedule C
## PNS Transition Matters

1.  <u>Preliminary steps</u>.  Stephen Lynch shall deliver to each of Lapidem and Mascini complete and detailed lists (the "<u>Detailed List</u>") of:

 (a)  all current employees of PNS, listing their names, positions, compensation and additional arrangements;

 (b)  all bank accounts and securities accounts of PNS and all means of access/control over such accounts, including any specimen bank cards, bank-client online systems, etc.;

 (c)  all agreements that are in force to which PNS is a party;

 (d)  all powers of attorney issued on behalf of PNS to any party which are in force (including any subsequent powers of attorney further delegating any powers);

 (e)  all registration certificates, including corporate registration, tax registration and title certificates pertaining to PNS, specifying the location at which the originals of such certificates are kept;

 (f)  all minutes and resolutions of PNS' governing bodies, specifying the location at which the originals are kept;

 (g)  all internal documents, bylaws and regulations of PNS currently in force, specifying the location at which the originals are kept;

 (h)  all corporate seals of PNS specifying the location at which they are kept; and

 (i)  all offices of PNS, means of access to such offices and persons holding such means of access (keys, keycards, etc.).

2.  <u>Implementation steps</u>.  Stephen Lynch thereafter:

 (a)  shall deliver to each of Lapidem and Mascini a confirmation that each Detailed List is complete and accurate as of the date of the Transfer Agreement;

 (b)  shall deliver to each of Lapidem and Mascini evidence satisfactory to each of Lapidem and Mascini of:

C-1

(i)    termination of all powers to manage accounts referred to in paragraph 1(b) above by Mr. Lynch and, to the extent Lapidem or Mascini requested that such powers be revoked, by any other person; and

(ii)    revocation of each power of attorney referred to in paragraph 1(d) above to the extent Lapidem or Mascini requested that such power of attorney be revoked;

(c)    shall deliver a written resignation as general director and execute and promptly file any necessary documents to effectuate the appointment of such person designated by Lapidem and Mascini as the new general director;

(d)    shall deliver to shall deliver to Lapidem and Mascini or the new general director of PNS as designated by them:

(i)    an original of each agreement  referred to in paragraph 1(c) above;

(ii)    an original of each certificate referred to in paragraph 1(e) above;

(iii)    an original of each resolution or set of minutes referred to in paragraph 1(f) above;

(iv)    an original of each document referred to in paragraph 1(g) above;

(v)    all corporate seals referred to in paragraph 1(h) above; and

(vi)    all means of access referred to in paragraph 1(i) above.

C-2

**Schedule D**

**Yukos Finance Litigation**

The proceedings under case number 200.002.097/01 between Godfrey, Misamore, and Yukos Finance B.V. (as represented by Godfrey), and Misamore v. Promneftstroy and Yukos Finance B.V. (as represented by Lynch and Reid), and under case number 200.002.104/01 between Godfrey, Misamore, and Yukos Finance B.V. (as represented by Godfrey) v. Promneftstroy, Shmelkov and Yukos Finance B.V. (as represented by Lynch and Reid) in the Amsterdam Court of Appeals;

The proceeding styled Yukos Capital S.à.r.l. v. Yukos Oil Company in the Amsterdam District Court at docket number 419369/09/449;

The proceeding styled Glendale v. Yukos Oil Company in the Amsterdam District Court at docket number 08/3565; and

JUDGMENT 6 March 2008, Civil-law Section, Preliminary Relief Judge, case/cause-list number: 388931 / KG ZA 08-104 P/CN
Parties
1. the legal entity under the laws of the Russian Federation, 000 PROMNEFTSTROY, having its registered office in Moscow, Russian Federation, claimant by summons dated 21 January 2008, counsel mr. D.J. Oranje,
2. the legal entity under the laws of the Russian Federation, OAO ROSNEFT, and having its registered office in Moscow, Russian Federation, claimant by summons dated 21 January 2008, Counsel mr. M. Deckers,
vs.
1. the private company with limited liability YUKOS INTERNATIONAL UK. B.V., having
its registered office in Amsterdam, the Netherlands
2. DAVID ANDREW GODFREY, residing in Honolulu, Hawaii, United States
3. BRUCE KELVERN MISAMORE, residing in Houston, Texas, United States defendants, Counsel mr. R.J. van Galen,
4. the company under foreign law, MORAVEL INVESTMENT LIMITED, having its registered office in Limassol, Cyprus, joining party on the part of the defendants, Counsel mr. A.A.H.J. Huizing,


JUDGMENT 24 February 2009, Case number: 200.005.433/01 SKG
Parties
1. the private company with limited liability YUKOS INTERNATIONAL UK. B.V., having
its registered office in Amsterdam, the Netherlands
2. DAVID ANDREW GODFREY, residing in Honolulu, Hawaii, United States
3. BRUCE KELVERN MISAMORE, residing in Houston, Texas, United States
Appellants and respondents in the cross-appeal, Counsel mr. R.J. van Galen,
vs.
1. the legal entity under the laws of the Russian Federation, 000 PROMNEFTSTROY, having its registered office in Moscow, Russian Federation, Respondent and cross-appellant, Counsel mr. D.J. Oranje,
2. the legal entity under the laws of the Russian Federation, OAO ROSNEFT, and having its registered office in Moscow, Russian Federation, Respondent, Counsel mr. M. Deckers,

JUDGMENT 7 January 2011, Case number: 09/02232, Supreme Court of the Netherlands
Judgment in the case of:
1.      YUKOS INTERNATIONAL UK B.V., with its registered office in Amsterdam,
2.      David Andrew GODFREY, residing in Honolulu, Hawaï, United States of America,

D-1

3.     Bruce Kelvern MISAMORE, residing in Houston, Texas, United States of America, CLAIMANTS in cassation proceedings, attorney: mr. K.G.W. van Oven,

vs.

1.     OOO PROMNEFTSTROY, with its registered office in Moscow, Russian Federation, DEFENDANT in cassation proceedings, attorney: mr. E. Grabandt,

2.     OAO ROSNEFT, with its registered office in Moscow, Russian Federation, DEFENDANT in cassation proceedings, failed to make an appearance.

D-2

**EXHIBIT B**

**Redline**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - x
- -
                                    :

In re:                           :      Case No. 16-22321 (RDD)
                                   :

KIRWAN OFFICES S.À R.L,      :

                                 :      Chapter 11

             Debtor.        :

                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
- -

## COMBINED FIRST AMENDED PLAN OF REORGANIZATION
## AND DISCLOSURE STATEMENT OF KIRWAN OFFICES S.À R.L

Jay M. Goffman
Mark A. McDermott
Raquelle L. Kaye
SKADDEN, ARPS, SLATE, MEAGHER
  & FLOM, LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Counsel for Lapidem Ltd. and Mascini Holdings Limited

Dated:  February ~~15~~28, 2017

# TABLE OF CONTENTS

ARTICLE I DEFINED TERMS, RULES OF INTERPRETATION,  COMPUTATION
OF TIME AND GOVERNING LAW ................................................................ ~~1~~6
    A.    Defined Terms ................................................................................. ~~1~~6

ARTICLE II TREATMENT OF UNCLASSIFIED CLAIMS ........................... ~~10~~15

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS ........................................................................................................ ~~11~~16
    A.    Classification of Claims and Interests ........................................... ~~11~~16
    B.    Treatment of Claims and Interests ................................................. ~~11~~16
    C.    Special Provision Governing Unimpaired Claims .......................... ~~13~~18
    D.    Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code .......... ~~13~~18

ARTICLE IV MEANS FOR IMPLEMENTATION OF THE PLAN ................. ~~13~~18
    A.    Transaction Process ....................................................................... ~~13~~18
    B.    Implementation of Transactions ..................................................... ~~14~~19
    C.    Post-Effective Date Governance .................................................... ~~14~~20
    D.    New Money Loan; Post-Effective Date Loans ............................... ~~15~~21
    E.    Plan Support Conditions ................................................................ ~~15~~21
    F.    Restructuring Transactions ............................................................ ~~16~~21
    G.    Corporate Action ........................................................................... ~~16~~22
    H.    Effectuating Documents; Further Transactions .............................. ~~16~~22
    I.    Securities Exemption ..................................................................... ~~17~~22
    J.    Preservation of Causes of Action .................................................. ~~17~~23

ARTICLE V TREATMENT OF EXECUTORY CONTRACTS ...................... ~~18~~24
    A.    Disposition of Executory Contracts ............................................... ~~18~~24
    B.    Claims Based on Rejection of Executory Contracts ....................... ~~19~~25
    C.    Cure of Defaults for Assumed Executory Contracts ...................... ~~19~~25
    D.    Reservation of Rights. .................................................................... ~~19~~25
    E.    Contracts and Leases Entered Into After the Petition Date. ........... ~~19~~25

ARTICLE VI PROVISIONS GOVERNING DISTRIBUTIONS ..................... ~~20~~25
    A.    Timing and Calculation of Amounts to Be Distributed ................. ~~20~~25
    B.    Disbursing Agent ........................................................................... ~~20~~26
    C.    Rights and Powers of Disbursing Agent ........................................ ~~20~~26
    D.    Cash Distributions ......................................................................... ~~21~~26
    E.    Rounding of Payments ................................................................... ~~21~~27
    F.    Distributions on Account of Claims Allowed After the Effective Date ...... ~~21~~27
    G.    Delivery of Distributions and Undeliverable or Unclaimed Distributions ...... ~~21~~27
    H.    Withholding and Reporting Requirements ..................................... ~~22~~28
    I.    Setoffs ........................................................................................... ~~22~~28

J.      Allocation of Distributions Between Principal and Unpaid Interest      2328

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED
          AND DISPUTED CLAIMS      2329
          A.      Proofs of Claim      2329
          B.      Prosecution of Objections to Claims      2329
          C.      Allowance of Claims      2329
          D.      Distributions After Allowance      2329
          E.      Estimation of Claims      2429
          F.      Deadline to File Objections to Claims      2430

ARTICLE VIII SETTLEMENT, RELEASE, INJUNCTION AND RELATED
          PROVISIONS      2430
          A.      Compromise and Settlement of Claims, Interests and Controversies      2430
          B.      Vesting of Assets in the Reorganized Debtor      2530
          C.      Discharge of Claims      2531
          D.      **Releases by the Debtor**      2531
          E.      **Exculpation**      2632
          F.      Injunction      2733
          G.      Term of Injunctions or Stays      2834

ARTICLE IX CONDITIONS PRECEDENT TO CONFIRMATION OF THE PLAN
          AND THE EFFECTIVE DATE      2834
          A.      Conditions Precedent to Confirmation      2834
          B.      Conditions Precedent to the Effective Date      2834
          C.      Waiver of Conditions      2935
          D.      Effect of Failure of Conditions      2935

ARTICLE X MODIFICATION, REVOCATION OR WITHDRAWAL OF THE PLAN      2935
          A.      Modification and Amendments      2935
          B.      Revocation or Withdrawal of the Plan      3036

ARTICLE XI RETENTION OF JURISDICTION      3036

ARTICLE XII MISCELLANEOUS PROVISIONS      3238
          A.      Immediate Binding Effect      3238
          B.      Additional Documents      3238
          C.      Reservation of Rights      3238
          D.      Successors and Assigns      3238
          E.      Service of Documents      3339
          F.      Entire Agreement      3339
          G.      Severability of Plan Provisions      3339
          H.      Exhibits      3440

Schedule A Existing Loans      A-1

i

Schedule B  Allowed General Unsecured Claims .......................... B-1

Schedule ~~B~~ C  PNS Transition Matters .......................... ~~B~~ C-1

Schedule ~~C~~ D  Yukos Finance Litigation .......................... ~~C~~ D-1

ii

# INTRODUCTION AND DISCLOSURE STATEMENT

Lapidem, Ltd., a Cayman Islands registered company ("Lapidem"), and Mascini Holdings Limited, a limited company of Cyprus ("Mascini," and together with Lapidem, the "Plan Proponents"), respectfully propose the following combined, first amended chapter 11 plan of reorganization and disclosure statement (the "Combined Plan and Disclosure Statement" or the "Plan") for the resolution of the outstanding Claims against and Existing Interests in Kirwan Offices S.à r.l. ("Kirwan" or the "Debtor"). Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw the Plan prior to its substantial consummation. Capitalized terms not defined in this Introduction and Disclosure Statement have the meanings provided in Article I of the Plan below.

A. *Overview Of Kirwan And The Plan*

This section of the Combined Plan and Disclosure Statement provides a summary and overview of Kirwan and the Plan, including a discussion of certain aspects of the Plan and their rationale and related requirements of the Bankruptcy Code. Kirwan's only asset is its participation interest in PNS, whose only asset in turn is a Claim to Yukos Finance that is being pursued in the Yukos Finance Litigation. All funds PNS used to acquire Yukos Finance and pursue the Yukos Finance Litigation have been provided by the Plan Proponents, almost entirely in the form of the Existing Loans. The Plan Proponents filed this Chapter 11 Case against Kirwan in an effort to explore and possibly implement alternatives for disposition of the Yukos Finance Litigation, including alternatives other than litigation which, to date, has spanned almost 10 years and has cost the Plan Proponents over $32.5 million.

To that end, as of the date hereof, the Plan Proponents have begun exploring alternatives for disposition of Kirwan's interests in PNS. These efforts have included, and will continue to include through the Plan Supplement Date, discussions with investment funds and other entities with expertise in investing in litigation assets and other troubled assets with very unique investment profiles such as the Yukos Finance Litigation. In furtherance of this process, the Plan Proponents carefully crafted a list of potential investors based on the institutional knowledge of their majority owners, the VR Global entities, built over 18 years of investing in emerging markets, distressed securities, and other special situations. To the Plan Proponents' knowledge, the candidates they contacted comprise the universe of those investors most likely to find interest in the Yukos Finance Shares and the Yukos Finance Litigation.

The Plan provides that the Plan Proponents will identify the best, value-maximizing alternative for the Yukos Finance Litigation, including possible terms for its settlement, by March 14, 2017. The Plan Proponents will make this determination in their sole discretion. However, they have and will continue to keep Mr. Stephen Lynch advised of the process as it unfolds and will solicit his input before making a final decision. Under the Plan, any value from a transaction will be distributed first to holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and General Unsecured Claims, then to the Plan Proponents

on account of their Existing Loans, then, to the extent of any excess, the Plan Proponents and Mr. Lynch on account of their Existing Interests in Kirwan. This is consistent with the priorities established in the SHA.

Without waiving any rights, the Plan Proponents anticipate that they would not decline to pursue a transaction with a third-party if such transaction yielded proceeds sufficient to make distributions to shareholders. However, given the Plan Proponents' significant exposure to Kirwan, they reserve the right not to pursue a transaction if, in their sole discretion, no satisfactory alternative is achievable. In such a case, the Plan provides for the restructuring of the Plan Proponents' debt, and either continued prosecution of the Yukos Finance Litigation after the Effective Date or other possible resolution or implementation of post-Effective Date alternatives. In this scenario, all Existing Interests in Kirwan will be cancelled, and post-Effective Date governance of Kirwan will be through a board of managers comprised exclusively of the Plan Proponents' designees and a new general director of PNS to be identified by the Plan Proponents in their sole discretion.

B.    *Plan Funding And Feasibility*

The Debtor does not generate any revenue. It never has since it was created in 2007 as a vehicle for acquiring Yukos Finance through PNS. All funds necessary to pursue the Yukos Finance Litigation and pay Kirwan's other costs have been provided exclusively by the Plan Proponents. The Plan Proponents have no legal obligation to continue such funding. However, if the Plan Proponents determine that there is no satisfactory alternative for disposition or resolution of the Yukos Finance Litigation, including via an investment or settlement, and that the best alternative under the circumstances is continued pursuit of the Yukos Finance Litigation, then the Plan Proponents will be prepared, through their majority owners and controlling investors, VR Global, to cause Kirwan to have sufficient funds to continue paying the fees and expenses necessary to do so, subject in all cases to the Plan Proponents' exclusive right after the Effective Date to suspend further funding and settle the Yukos Finance Litigation without Bankruptcy Court approval on such terms as they deem acceptable in their sole discretion.

VR Global has over $3.5 billion in assets under management. Its co-investors in the Plan Proponents, HBK Master Fund, L.P. and Jervis Properties, Inc., together have over $7.6 billion in assets under management. Together, they and Renaissance, one of the Plan Proponents' previous investors, have provided over $32.5 million to fund the Yukos Finance Litigation. Their resources today are at least as great as they were when the Debtor was created. The estimated value of the Yukos Finance Shares is approximately $800 million, and the Plan Proponents to date have invested over $340 million, in the form of the Existing Loans, to acquire the Yukos Finance Shares. The Plan Proponents therefore have ample resources and economic motivation to continue funding the Yukos Finance Litigation if need be. As further evidence of Kirwan's ability to fund its costs and emerge from this Chapter 11 Case, the Plan Proponents are prepared to fully fund a $3 million New Money Loan to pay in full all Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims, and General Unsecured Claims. The Plan Proponents estimate that the total amount of such Claims is as indicated in Schedule B attached hereto.

2

## C.    *Best Interests Test; Related Matters*

Under the Bankruptcy Code, each holder of an impaired claim or interest must either (a) accept the plan or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such non-accepting holder would receive or retain if the debtor's assets were to be liquidated under chapter 7 of the Bankruptcy Code on the effective date. In determining whether this "Best Interests Test" has been met, the dollar amount that would be generated from a hypothetical liquidation of the debtor's assets in a chapter 7 proceeding must be estimated. Such amount then would be reduced by the costs and expenses of the liquidation. Prior to determining whether the Best Interests Test has been satisfied, available cash and the proceeds from the liquidation of the debtor's assets would be applied to secured claims (to the extent of the value of the underlying collateral) and to satisfy administrative, priority tax and other priority claims, all of which are senior in priority to general unsecured claims, including any incremental administrative claims that may result from the termination of the debtor's business and the liquidation of its assets. Any remaining cash would be available for distribution to general unsecured claims and stockholders in accordance with the distribution hierarchy established by the Bankruptcy Code.

The Plan Proponents believe that the Best Interests Test is satisfied here. The Plan Proponents believe that, absent a Transaction with a third-party in connection with the Transaction Process described above that generates Transaction Proceeds in excess of all Claims against the Debtor, including the Plan Proponents' Existing Loans, the value of the Yukos Finance Litigation is less than the amount of the Plan Proponents' Existing Loans and hence, that holders of Existing Interests in the Debtor are not entitled to any recovery on account of such Existing Interests. In particular, if no such Transaction materializes, the Debtors will continue to be beholden to the Plan Proponents for the funding of all litigation costs, as the Debtors have no ability to do so on their own. Accordingly, given the status of, and projected time necessary to fund and complete, the Yukos Finance Litigation, a settlement of the Yukos Finance Litigation in an amount less than the Plan Proponents' Existing Loans is the likely outcome. Because the prospects of success in the Yukos Finance Litigation would remain the same in either a chapter 11 or chapter 7 scenario, each holder of a Claim or Existing Interest therefore is receiving or retaining under the Plan at least as much as he would receive in chapter 7.

Indeed, the Plan Proponents believe the Plan ensures a greater recovery than under chapter 7. As described above, the Plan Proponents have guaranteed under the Plan that all holders of Administrative Claims, Priority Tax Claims, Priority Non-Tax Claims and General Unsecured Claims will be paid in full. Moreover, in a chapter 7 liquidation, a chapter 7 trustee would be entitled to a percentage, up to 3.00%, of any value realized in connection with the Yukos Finance Litigation, ahead of Claims and Existing Interests. A chapter 7 trustee's fees are avoided altogether under the Plan, thereby ensuring that recoveries under the Plan are greater than in a chapter 7 liquidation. Finally, for the reasons outlined below, the Plan Proponents do not believe there would be any Causes of Action under chapter 5 of the Bankruptcy Code that could be pursued in chapter 7 that could or would not be pursued in chapter 11. Accordingly, the Plan Proponents believe the Plan satisfies the Best Interests Test.

3

### D. Opportunities For Mr. Lynch

While the Plan Proponents believe that, in a scenario where no satisfactory Transaction materializes, the Yukos Finance Litigation will not be sufficient to afford any recovery on account of Existing Interests and hence, that it is appropriate for such Existing Interests to be cancelled under the Plan, the Plan Proponents nonetheless are prepared to offer Mr. Lynch a continuing role in the Reorganized Debtor, but only if he chooses to support the Plan by satisfying the Plan Support Conditions described in Article IV.E. of the Plan. If he does so, he will be afforded the right to maintain his current "net gain" entitlement in substantially unchanged form, along with the right to serve as an observer on the Reorganized Debtor's board of managers, with full rights to all information available to all other board members. Additionally, Mr. Lynch will be offered the opportunity to participate in the New Money Loan up to $1 million, in his discretion, which is one-third of the total amount of the New Money Loan.

A one-third participation interest is vastly in excess of what he would have been entitled to receive if participation percentages were determined by the parties' relative share ownership in the Debtors, as the Plan Proponents own 2.5 million shares, whereas Mr. Lynch only owns a single share. It also is vastly in excess of any contractual "net gain" he could receive under the SHA, which is less than 10% of any value in excess of the Plan Proponents' Existing Loans. The Plan Proponents nonetheless determined to afford Mr. Lynch this percentage participation in order to provide him with a significant participation opportunity, an opportunity that would be a mere token if based solely on shares. Financial contributions aside, all three shareholders in the Debtor have been putting in effort in furtherance of the Yukos Finance Litigation for almost ten years. Accordingly, the Plan Proponents wanted to provide each of them an ample opportunity to participate.

Because the New Money Loan will be *pari passu* with the Modified Loans given to the Plan Proponents under the Plan in exchange for their Existing Loans, the net result is that Mr. Lynch can participate from the first dollar of recoveries, and will be in the money should recoveries exceed $140 million, which is vastly superior to his current position behind over $340 million of debt. If the Reorganized Debtor ultimately recovers its invested costs and is thus able to repay all of its debt, new money participants will recover $2.50 for every dollar they invest in the offering. In addition, new money participants will share pro rata in an additional 2% of the equity of the Reorganized Debtor. If Mr. Lynch chooses to participate in the New Money Loan Offering in the amount of $1 million, he would receive one-third of this equity, which is over 7% of his current equity return entitlement.

### E. Estate And Other Claims; Releases

The Plan Proponents do not believe the Debtor has any Causes of Action against any Person under chapter 5 of the Bankruptcy Code. The Debtor has never transferred any value to any Person since inception in 2007 except on account of litigation costs incurred in the ordinary course of its business that were paid for exclusively with funds provided by the Plan Proponents pursuant to the Existing Loans. Accordingly, the Plan Proponents do not believe

4

there are any viable legal or commercial bases for the Debtor or Reorganized Debtor to attempt to recover any payments on account of these costs, whether as voidable preferences or otherwise. However, any such Causes of Action belong to the Estate, not the Plan Proponents. The Plan, therefore, does not contain a traditional "debtor release" by the Estate or the Debtor. Rather, the Plan provides in Article XIII.D. that if the Plan is confirmed, the Plan Proponents' designees to the Reorganized Debtors' board of managers, which under the Plan will comprise all of the Reorganized Debtors' board members, will cause the Reorganized Debtor to release any and all such Causes of Action.

Additionally, with the possible exception of the Lynch Causes of Action described below, the Plan Proponents are not aware of any other Claim of the Estate, the Debtor or PNS against any Person other than with respect to the Yukos Finance Litigation. In particular, with the possible exception of the Lynch Causes of Action, the Plan Proponents are not aware of any Claim against any manager of Kirwan, or against any direct or indirect owner of Kirwan or PNS, including the Plan Proponents and the current and former investors in the Plan Proponents. Such Persons' only substantive actions since the Debtors' creation have been funding and overseeing and/or monitoring prosecution of the Yukos Finance Litigation. While there have been setbacks in the Yukos Finance Litigation on account of adverse court rulings, such Persons have always ensured Kirwan's legal and related bills were paid and that the Yukos Finance Litigation was prosecuted as vigorously as possible, consistent with their fiduciary duties to their investors. Accordingly, the Plan provides in Article XIII.D. that if the Plan is confirmed, the Plan Proponents' designees to the Reorganized Debtors' board of managers, which under the Plan will comprise all of the Reorganized Debtors' board members, will cause the Reorganized Debtor to release any and all such Claims against any Person other than the Lynch Causes of Action.

Lynch Causes of Action include any Cause of Action of any Person, including the Debtor and its Estate, on the one hand, and the Plan Proponents, on the other hand, against Stephen Lynch arising out of or in connection with the SHA and his service as a manager of the Debtor or general director of PNS, whether arising before or after the Petition Date. The Plan Proponents believe Lynch Causes of Action exist on account of, among other things, Mr. Lynch's conduct in placing his interests as the holder of an Existing Interest above his contractual and legal duties under the SHA, Kirwan's articles of association, and Luxembourg law relating to fiduciaries of corporate entities. The Plan Proponents intend to retain any Lynch Causes of Action they own. They also anticipate that, if the Plan is confirmed, their designees to the Reorganized Debtor's board of managers will investigate and, if necessary, prosecute any Lynch Causes of Action owned by the Estate that vest in the Reorganized Debtor. However, if Mr. Lynch satisfies the Plan Support Obligations, the Plan Proponents will cause any and all such Lynch Causes of Action to be released.

F.    *Exculpation and Injunction*

The Plan provides, in Article VIII.C. and Article VIII.F., for a discharge of the Debtor pursuant to § 1141 of the Bankruptcy Code and a related injunction against the prosecution of any Claims against the Reorganized Debtor or its property pursuant to § 524 of the Bankruptcy Code. As noted above, the Plan does not contemplate a traditional "debtor

5

release" by Kirwan or its Estate. It instead provides for a release, in Article VIII.D. and only if the Plan is confirmed, by the Reorganized Debtor of certain Persons, including the Debtor's managers and the Plan Proponents, their co-investors, and their officers and directors. The Plan otherwise does not include any "third-party, non-debtor" releases. However, the Plan does provide, in Article VIII. E., a customary form of exculpation for the Plan Proponents and certain other parties that affords such Persons a limited, qualified immunity with respect to their actions in pursuing the Plan.

In particular, "Exculpated Claims" means any claim related to or arising out of, among other things, the Chapter 11 Case; the formulation or dissemination of the Plan or any document in connection therewith; the pursuit of Confirmation of the Plan; and the pursuit of consummation of the Plan. The exculpation clause has no effect on any liability that results from gross negligence, intentional fraud, or willful misconduct. The clause is typical of such clauses in other chapter 11 cases, and is warranted where, as here, the Chapter 11 Case was filed in good faith; the Plan has been proposed in good; and exculpation is necessary to ensure that neither Mr. Lynch nor any other Person will attempt a collateral attack on the Confirmation Order by seeking to impose liability on an exculpated party in another forum on account of its participation in a lawful chapter 11 proceeding, including by actively developing and implementing a solution to Kirwan's affairs.

# ARTICLE I

## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A. *Defined Terms*

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form:

1. "*Administrative Claim*" means a Claim for payment of costs and expenses of administration pursuant to sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred on or after the Petition Date and through the Effective Date of preserving the Estate and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses Allowed pursuant to sections 328, 330(a), 331 or 363 of the Bankruptcy Code or otherwise for the period commencing on the Petition Date and through the Effective Date; (c) all fees and charges assessed against the Estate pursuant to chapter 123 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001; (d) all requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Case pursuant to sections 503(b)(3), (4) and (5) of the Bankruptcy Code; and (e) all other claims entitled to administrative claim status pursuant to an order of the Bankruptcy Court.

2. "*Affiliate*" has the meaning set forth in section 101(2) of the Bankruptcy Code.

6

3. "*Allowed*" means, with respect to a Claim or Existing Interest within a particular Class, an Allowed Claim or Allowed Existing Interest of the type described in such Class.

4. "*Allowed Claim*" means a Claim (i) as to which no objection or request for estimation has been filed on or before the Claims Objection Bar Date or the expiration of such other applicable period fixed by the Bankruptcy Court or the Plan; (ii) as to which any objection has been settled, waived, withdrawn or denied by a Final Order or in accordance with the Plan; or (iii) that is allowed (a) by a Final Order, (b) by an agreement between the holder of such Claim and the Debtor or the Reorganized Debtor or (c) pursuant to the terms of the Plan, including the Existing Loan Claims; provided, however, that, notwithstanding anything herein to the contrary, by treating a Claim as an "Allowed Claim" under (i) above, the Plan Proponents and, the Debtor and the Reorganized Debtor do not waive their rights to contest the amount and validity of any disputed, contingent and/or unliquidated Claim in the time, manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced. An Allowed Claim (i) includes a Disputed Claim to the extent such Disputed Claim becomes Allowed after the Effective Date and (ii) shall be net of any valid setoff exercised with respect to such Claim pursuant to the provisions of the Bankruptcy Code and applicable law. Unless otherwise specified herein, in section 506(b) of the Bankruptcy Code or by Final Order of the Bankruptcy Court, "Allowed Claim" shall not, for purposes of distributions under the Plan, include interest on such Claim accruing from and after the Petition Date.

5. "*Amended Kirwan Governance Documents*" means the amended articles of association, by-laws and any similar constituent document for Kirwan required under the laws of Luxembourg and consistent in all respects with the terms of the Plan, a substantially final form of which will be filed with the Plan Supplement.

6. "*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended from time to time.

7. "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Case or any other court having jurisdiction over the Chapter 11 Case, including, to the extent of the withdrawal of any reference under 28 U.S.C. § 157, the United States District Court for the Southern District of New York.

8. "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, as applicable to the Chapter 11 Case, promulgated under section 2075 of title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as well as the general and local rules of the Bankruptcy Court.

9. "*Board and Shareholder Circulars*" means those certain board and shareholder resolutions authorizing and approving the Amended Kirwan Governance Documents and the issuance of the New Class A-1 Shares, the New Class A-2 Share and the New Class B-1 Shares, substantially final forms of which will be filed with the Plan Supplement.

7

10.    "*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

11.    "*Cash*" means legal tender of the United States of America.

12.    "*Causes of Action*" means any action, proceeding, agreement, claim, cause of action, controversy, demand, right, action, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license and franchise of any kind or character whatsoever, known, unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law.  Causes of Action also include: (a) any right of setoff, counterclaim or recoupment and any claim on contracts or for breaches of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any state law fraudulent transfer claim.

13.    "*Chapter 11 Case*" means the chapter 11 case of the Debtor pending under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

14.    "*Claim*" means any claim as defined in section 101(5) of the Bankruptcy Code.

15.    "*Claims Objection Bar Date*" means, for each Claim, the latest of (a) the date that is one hundred and eighty (180) days after the Effective Date, (b) as to a particular Claim, one hundred and eighty (180) days after the filing of a Proof of Claim, or request for payment of such Claim, and (c) such other period of limitation as may be specifically fixed by an order of the Bankruptcy Court for objecting to Claims.

16.    "*Class*" means a category of holders of Claims or Existing Interests as set forth in <u>Article III</u>.

<u>17.</u>    "<u>*Combined Plan and Disclosure Statement*</u>" means this Combined First Amended Chapter 11 Plan of Reorganization and Disclosure Statement of Kirwan Offices S.à r.l., including the Plan Supplement and all exhibits, appendices and schedules hereto, which are incorporated herein by reference, in either present form or as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case acceptable in form and substance to the Plan Proponents in their sole discretion.

~~17~~18.  "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

8

~~18~~19. "*Confirmation Date*" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Case within the meaning of Bankruptcy Rules 5003 and 9021.

~~19~~20. "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court on Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

~~20~~21. "*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, which order shall be in form and substance acceptable to the Plan Proponents in their sole discretion.

~~21~~22. "*Cure*" means the payment of Cash by the Debtor, or the distribution of other property (as the parties may agree or the Bankruptcy Court may order), as necessary to cure monetary defaults under an executory contract or unexpired lease of the Debtor and to permit the Debtor to assume that contract or lease under section 365(a) of the Bankruptcy Code.

~~22~~23. "*Debtor*" means Kirwan in its capacity as a debtor and debtor in possession in the Chapter 11 Case.

~~23~~24. "*Disbursing Agent*" means Reorganized Kirwan or the Person or Persons chosen by Reorganized Kirwan to make or facilitate distributions pursuant to the Plan.

~~24~~25. "*Disputed*" means, with respect to any Claim or Existing Interest, any Claim or Existing Interest that is not yet Allowed, and includes any Proof of Claim filed, or any other Claim asserted, by Stephen Lynch.

~~25~~26. "*Distribution Date*" means the date, occurring as soon as practicable after the Effective Date, on which the Disbursing Agent first makes distributions to holders of Allowed Claims and Allowed Existing Interests as provided in Article VI of the Plan and any date thereafter on which the Disbursing Agent makes distributions to holders of Allowed Claims and Allowed Existing Interests as provided in Article VI of the Plan.

~~26~~27. "*Effective Date*" means the first business day after which all provisions, terms and conditions specified in Article IX.B have been satisfied or waived pursuant to Article IX.C.

~~27~~28. "*Estate*" means the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

~~28~~29. "*Exculpated Claim*" means any claim related to any act or omission in connection with, relating to or arising out of the Debtor's, the Plan Proponents', or VR Global's or their Affiliates' in or out-of-court restructuring efforts, the Chapter 11 Case, the formulation, preparation, dissemination, negotiation or filing of the Plan or any contract, instrument, release or other agreement or document created or entered into in connection with the Plan, the filing of the Chapter 11 Case, the pursuit of Confirmation, the pursuit of consummation of the Plan, the administration and implementation of the Plan, ~~or the~~including the issuance of the New Class A-1 Shares, the New Class A-2 Shares, and the New Class B-1

9

Shares, or the distribution of property under the Plan or any other related agreement; provided, however, that Exculpated Claims shall not include any claim arising out of any act or omission that is determined in a Final Order to have constituted gross negligence, willful misconduct, or intentional fraud to the extent imposed by applicable non-bankruptcy law. For the avoidance of doubt, no Cause of Action, obligation or liability expressly set forth in or preserved by the Plan or the Plan Supplement constitutes an Exculpated Claim.

2930. "*Executory Contract*" means a contract to which the Debtor is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

3031. "*Existing Interest*" means any equity interest in Kirwan as evidenced by an "equity security" as defined in § 101(16) of the Bankruptcy Code, including all issued, unissued, authorized or outstanding shares of capital stock of Kirwan and any right to Net Gain as such term is defined in the SHA, as adjusted to reflect the Lynch Net Gain Sale Agreement, together with any warrants, options or contractual rights (including any rights under registration agreements or equity incentive agreements) to purchase or acquire such equity securities at any time and all rights arising with respect thereto, *provided however*, that "Existing Interests" do not include General Unsecured Claims or Existing Loans.

3132. "*Existing Loans*" means those certain loans Lapidem and Mascini made to Kirwan identified on Schedule A hereto, the proceeds of which Kirwan loaned to PNS.

3233. "*Existing Loan Claim*" means a Claim arising out of or in connection with the Existing Loans.

3334. "*Final Order*" means, as applicable, an order or judgment of the Bankruptcy Court or other court of competent jurisdiction, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment could be appealed or from which certiorari could be sought or the new trial, reargument or rehearing shall have been denied, resulted in no modification of such order or has otherwise been dismissed with prejudice.

3435. "*General Unsecured Claim*" means any unsecured claim that is not (a) an Administrative Claim, (b) an Existing Notes Claim, (c) a Priority Tax Claim, or (d) a Priority Non-Tax Claim. The General Unsecured Claims identified on Schedule B hereto are Allowed Claims.

3536. "*Governmental Authority*" means any United States or non-United States national, federal, state, or local governmental regulatory or administrative authority, agency, or commission, or any judicial or arbitral body.

3637. "*Impaired*" means, when used in reference to a Claim or an Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

10

3738. *"Impaired Class"* means a Class that is impaired within the meaning of section 1124 of the Bankruptcy Code.

3839. *"Kirwan Claims"* means any Claims owned by Kirwan against any Person.

3940. *"Lynch Net Gain Sale Agreement"* means that certain agreement dated March 31, 2010 whereby Stephen Lynch sold to VR Global Partners, LP and VR Capital Group Ltd. certain of his rights to Net Gain as defined in the SHA.

4041. *"Lynch Causes of Action"* means any Cause of Action of any Person, including the Debtor and the Plan Proponents, against Stephen Lynch arising out of or in connection with the SHA and his service as a manager of the Debtor or general director of PNS, whether arising before or after the Petition Date.

4142. *"Lynch Release"* means a full and unconditional release granted by Stephen Lynch, in a form acceptable to the Plan Proponents, to all parties to the SHA for any and all Claims arising out of or in connection with the SHA or otherwise arising out of or in connection with his Existing Interests in the Debtor. If applicable, a substantially final form of the Lynch Release will be filed with the Plan Supplement.

4243. *"Modified Loans"* means new unsecured loans issued to Lapidem and Mascini under the Plan in exchange for the Existing Loans, in an aggregate amount equal to the Allowed Existing Loan Claims, with a maturity date of December 31, 2018 and zero interest, *provided however*, that the holders of the Modified Loans and Reorganized Kirwan may agree to modify the Modified Loans to provide for interest at a mutually agreeable rate. Substantially final forms of the Modified Loans will be filed with the Plan Supplement.

4344. *"New Class A-1 Shares"* means 2,500,000 class A-1 shares in Reorganized Kirwan to be authorized and issued under the Plan.

45. *"New Class A-2 Share"* means a share in Reorganized Kirwan that entitles its holder to receive an amount equal to the percentage of Net Gain the holder of the existing class C share in the Debtor is entitled to receive under the SHA, adjusted to reflect the Lynch Net Gain Settlement Agreement, the New Money Loan, and any Post-Effective Date Loans or other contributions.

4446. *"New Class B-1 Shares"* means 50,000 class B-1 shares in Reorganized Kirwan to be authorized under the Plan *pari passu* with the New Class A-1 Shares and any New Class A-2 Share, to be issued in connection with the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date.

4547. *"New Money Loan"* means a new unsecured loan to be provided by the New Money Loan Participants pursuant to the New Money Loan Offering in the event a Transaction is not consummated in connection with the Effective Date. The New Money Participants shall advance an amount equal to $3 million and receive in exchange (i) the New Money Loan Participations in an aggregate face amount equal to $7.5 million, with a maturity

11

date of December 31, 2018 and zero interest, which New Money Loan shall rank *pari passu* with the Modified Loans, <u>plus</u> (ii) their pro rata share of the New Class B-1 Shares based upon their New Money Loan Participations. Lapidem and Mascini or their assignees will have the exclusive right to extend the maturity of the New Money Loan or exercise any remedies thereunder on behalf of all New Money Loan Participants, *provided however*, that in all events the New Money Loan shall be repaid *pari passu* with the Modified Loans. A substantially final form of the New Money Loan will be filed with the Plan Supplement.

46<u>48</u>. *"New Money Loan Offering"* means (i) the offering of a New Money Loan Participation to Stephen Lynch in an amount up to $1 million, subject to his satisfaction of the Plan Support Conditions, and (ii) the offering of New Money Loan Participations to Lapidem and Mascini in an aggregate amount equal to $3 million minus the amount of the New Money Loan Participation purchased by Stephen Lynch, if any, with Lapidem and Mascini being obligated to acquire such New Money Loan Participations pro rata based on their pro rata holdings of Existing Loans as of the Effective Date.

47<u>49</u>. *"New Money Loan Participants"* means (i) Lapidem, (ii) Mascini and (iii) <u>Stephen</u> Lynch, but only to the extent Mr. ~~Stephen~~ Lynch (a) elects to participate in the New Money Loan Offering and (b) satisfies the Plan Support Conditions.

48<u>50</u>. *"New Money Loan Participations"* means participations in the New Money Loan pursuant to the New Money Loan Offering in minimum increments of $25,000.

49<u>51</u>. *"Person"* has the meaning set forth in section 101(41) of the Bankruptcy Code.

50<u>52</u>. *"Petition Date"* means the date on which the Plan Proponents filed an involuntary petition for reorganization relief against the Debtor in the Bankruptcy Court.

51<u>53</u>. *"Plan"* means this <u>Combined First Amended</u> Chapter 11 Plan of Reorganization <u>and Disclosure Statement</u> of Kirwan Offices S.à r.l., including the Plan Supplement and all exhibits, appendices and schedules hereto, which are incorporated herein by reference, in either present form or as may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules, in each case acceptable in form and substance to the Plan Proponents in their sole discretion.

52<u>54</u>. *"Plan Supplement"* means the compilation of documents and forms of documents, schedules and exhibits to the Plan to be filed by the Plan Proponents by the Plan Supplement Date in each case in form and substance acceptable to the Plan Proponents in their sole discretion. Such documents shall include, but not be limited to, (i) the Amended Kirwan Governance Documents, (ii) the Board and Shareholder Circulars, (iii) the Modified Loan, (iv) the New Money Loan, (v) any Purchase Agreement or other document evidencing a proposed Transaction contemplated by <u>Article IV.A</u> of the Plan, (vi) the identities of the initial members of the board of managers of the Reorganized Debtor, and (vii) if applicable, the Lynch Release.

53<u>55</u>. *"Plan Supplement Date"* means a date no later than ~~ten calendar days before the date of the Confirmation Hearing~~March 14, 2017.

54<u>56</u>. *"Plan Support Conditions"* means the conditions and requirements described in <u>Article IV.E</u> of this Plan.

55<u>57</u>. *"PNS"* means OOO Promneftstroy, a limited liability company incorporated under the laws of the Russian Federation.

56<u>58</u>. *"PNS Transition Matters"* means those matters described in <u>Schedule B</u><u>C</u> of this Plan.

57<u>59</u>. *"Post-Effective Date Loans"* means any loans made to the Reorganized Debtor after the Effective Date to fund its obligations, including for purposes of the Reorganized Debtor loaning the proceeds thereof to PNS to fund the Yukos Finance Litigation. Any Post-Effective Date Loans shall be *pari passu* with the Modified Loans.

58<u>60</u>. *"Priority Non-Tax Claim"* means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than (a) an Administrative Claim or (b) a Priority Tax Claim.

59<u>61</u>. *"Priority Tax Claim"* means any Claim of a governmental unit, as defined in section 101(27) of the Bankruptcy Code, of the kind specified in section 507(a)(8) of the Bankruptcy Code.

60<u>62</u>. *"Proof of Claim"* means any proof of Claim filed against the Debtor in the Chapter 11 Case.

61<u>63</u>. *"Purchase Agreement"* means an agreement, in form and substance acceptable to Lapidem and Mascini in their sole discretion, evidencing a Transaction between Kirwan and one or more Persons for the acquisition of one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims.

62<u>64</u>. *"Renaissance"* means Renaissance Capital Holdings Limited (Bermuda) and Renaissance Holdings Management Ltd.

63<u>65</u>. *"Reinstate," "Reinstated" or "Reinstatement"* means (i) leaving unaltered the legal, equitable and contractual rights to which a Claim or Existing Interest entitles the holder of such Claim or Existing Interest so as to leave such Claim or Existing Interest unimpaired in accordance with section 1124 of the Bankruptcy Code or (ii) notwithstanding any contractual provision or applicable law that entitles the holder of such Claim or Existing Interest to demand or receive accelerated payment of such Claim or Existing Interest after the occurrence of a default, (a) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code; (b) reinstating the maturity of such Claim or Existing Interest as such maturity existed before such default; (c) compensating the holder of such Claim or Existing Interest for any damages incurred as a result of any reasonable reliance by such holder on such contractual provision or such

13

applicable law; and (d) not otherwise altering the legal, equitable or contractual rights to which such Claim or Existing Interest entitles the holder of such Claim or Existing Interest; provided, however, that any contractual right that does not pertain to the payment when due of principal and interest on the obligation on which such Claim or Existing Interest is based, including, but not limited to, financial covenant ratios, negative pledge covenants, covenants or restrictions on merger or consolidation, and affirmative covenants regarding corporate existence, prohibiting certain transactions or actions contemplated by the Plan, or conditioning such transactions or actions on certain factors, shall not be required to be reinstated in order to accomplish Reinstatement and shall be deemed cured on the Effective Date.

6466. *"Released Party"* means each of (a) the Debtor; (b) the Plan Proponents; (c) the current and former directors and officers of the Debtor other than Stephen Lynch; (d) HBK Master Fund, L.P.; (e) Jervis Properties, Inc.; (f) Renaissance; (g) VR Global; (h) Stephen Lynch to the extent the Plan Support Obligations are satisfied; and (i) with respect to each of the foregoing Persons in clauses (a) through (h), to the extent relevant, such Person's current and former affiliates, subsidiaries, managed accounts or funds, officers, directors, partners, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors and other professionals, and officers, directors, partners, principals, employees and agents thereof, in each case in their capacity as such.

6567. *"Reorganized Debtor"* means the Debtor on and after the Effective Date.

6668. *"SHA"* means that certain Shareholders' Agreement by and among Lapidem, Mascini, Kirwan, VR Global Partners, L.P., Renaissance Holdings Management Limited, and Stephen Lynch dated August 30, 2007, as amended, modified, or supplemented from time to time.

6769. *"Transaction"* means (i) a settlement and resolution of the Yukos Finance Litigation or (ii) an agreement to invest in the Yukos Finance Ligation, directly or indirectly, and/or sell one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, subject to Bankruptcy Court approval under the Plan, and upon such terms as are acceptable to Lapidem and Mascini in their sole discretion.

6870. *"Transaction Proceeds"* means any Cash or non-Cash consideration received by Kirwan in connection with a Transaction.

6971. *"Transaction Process"* means a process conducted by representatives of Lapidem and Mascini (i) to settle and resolve the Yukos Finance Litigation or (ii) to identify one or more Persons to invest in the Yukos Finance Litigation, directly or indirectly, and/or acquire one or more of Kirwan's assets, including the participation interests in PNS and/or the Kirwan Claims, in each case upon terms acceptable to Lapidem and Mascini in their sole discretion.

14

~~70~~72.  "*Unimpaired*" means any Claim or Existing Interest that is not designated as Impaired.

~~71~~73.  "*U.S. Trustee*" means the United States Trustee for the Southern District of New York.

~~72~~74.  "*VR Global*" means VR Advisory Services Ltd., VR Advisory Services (USA) LLC, VR Capital Group Ltd., and VR Global Partners, LP and their Affiliates (excluding the Debtor and PNS).

~~73~~75.  "*Yukos Finance*" means Yukos Finance, B.V., a private company with limited liability incorporated under the laws of the Netherlands.

~~74~~76.  "*Yukos Finance Litigation*" means those certain cases identified on <u>Schedule</u> <u>C</u><u>D</u> and any and all other claims made in connection with asserted ownership or control of the equity interests in Yukos Finance and its Subsidiaries.

B.  *Rules of Interpretation*

For purposes of this Plan: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to an existing document or exhibit having been filed or to be filed shall mean that document or exhibit, as it may thereafter be amended, modified or supplemented in accordance with the terms of the Plan; (c) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (d) unless otherwise stated, the words "herein," "hereof" and ''hereto'' refer to the Plan in its entirety rather than to a particular portion of the Plan; (e) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (f) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (g) any immaterial effectuating provisions may be interpreted by the Reorganized Debtor in a manner that is consistent with the overall purpose and intent of the Plan all without further Bankruptcy Court order.

C.  *Computation of Time*

The provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.

D.  *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated, the laws of the State of New York, without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction and implementation of the Plan, any agreements, documents, instruments or contracts executed or entered into in connection with the Plan (except as

15

otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate governance matters relating to the Debtor shall be governed by the laws of Luxembourg.

E.  *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

# ARTICLE II

## TREATMENT OF UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Existing Interests set forth in Article III and shall have the following treatment:

A.  *Administrative Claims*

Each holder of an Allowed Administrative Claim shall receive, in full satisfaction, settlement, release and discharge of and in exchange for its Administrative Claim, cash equal to the unpaid portion of its Allowed Administrative Claim on the latest of (i) the first Distribution Date, (ii) the date on which its Administrative Claim becomes an Allowed Administrative Claim, (iii) the date on which its Administrative Claim becomes payable under any agreement with the Debtor relating thereto, (iv) in respect of liabilities incurred in the ordinary course of business, the date upon which such liabilities are payable in the ordinary course of the Debtor's business, consistent with past practice, or (v) such other date as may be agreed upon between the holder of such Allowed Administrative Claim and the Plan Proponents or the Reorganized Debtor, as the case may be.  The Plan Proponents believe that any Administrative Claims are *de minimis*.

B.  *Priority Tax Claims*

The legal and equitable rights of the holders of Priority Tax Claims are Unimpaired by the Plan.  Unless the holder of such Claim and the Debtor and the Plan Proponents agree to a different treatment, on the Effective Date, each holder of an Allowed Priority Tax Claim shall have its Claim Reinstated.  The Plan Proponents do not believe there are any Priority Tax Claims.

# ARTICLE III

## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.  *Classification of Claims and Interests*

16