UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

In re
KIRWAN OFFICES S.À R.L.,

        Reorganized Debtor.

_____

STEPHEN P. LYNCH,

        Appellant,

      v.

LAPIDEM LIMTED AND MASCINI
HOLDINGS LIMITED,

        Appellees.

:_____x

| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: |
| DATE FILED: 10/10/18 |

17 Civ. 4339 (CM)
17 Civ. 4340 (CM)

## DECISION AND ORDER AFFIRMING DECISION OF BANKRUPTCY COURT

Appellant Stephen P. Lynch ("Appellant" or "Lynch"), *pro se*, brings this appeal from the

order of the United States Bankruptcy Court for the Southern District of New York Approving

and Confirming the Combined First Amended Plan of Reorganization of Debtor Kirwan Offices

S.à.r.l. ("Debtor" or "Kirwan"). The reorganization plan was proposed by Appellees Lapidem

Ltd. ("Lapidem") and Mascini Holdings Limited ("Mascini," and together with Lapidem, the

"Appellees"), unsecured creditors of Kirwan.

For the reasons set forth below, the Bankruptcy Court's order is AFFIRMED.

1

Copies mailed/faxed/handed to counsel on 10/10/18

## I.    Factual Background

### a. Overview of the Parties

Lynch brings this appeal against his co-investors in an investment scheme, Lapidem, a Cayman Islands company, and Mascini, a Cyprus Company.[1]  (16-22321 Dkt. No. 62 ¶¶ 3–6.) Lynch is a U.S. citizen who has lived in Russia since 2001.  (*Id.* ¶ 3.)  Through intermediate companies, Lapidem and Mascini are currently majority-owned and effectively controlled by VR Global Partners, LP, an investment fund domiciled in the Cayman Islands, and VR Capital Group Ltd., a Cayman Islands asset management company.  (*Id.* ¶ 4–6.)

Appellant and Appellees constitute the exclusive shareholders in Kirwan, a Luxembourg entity that was established as a special investment vehicle in February 2007 for the purpose of participating in the auction, and ultimate acquisition, of Yukos Finance B.V. ("Yukos Finance"). (*Id.* ¶¶ 1–2, 7.)  Yukos Finance was a subsidiary of Yukos Oil Company ("Yukos Oil"), which was the subject of an involuntary bankruptcy petition in Russia.  (*Id.* ¶¶ 11–12.)  In connection with that bankruptcy, a Russian court-appointed bankruptcy receiver noticed an auction for 100% of the shares in Yukos Finance for August 15, 2007.  (*Id.*)

Seeking to win that auction, Lapidem and Mascini agreed to fund the acquisition in the form of debt financing so as to avoid a 1% Luxembourg capital tax.  (16-22321 Dkt. No. 25 ¶¶ 8–9.)  They structured their investment as 85% interest bearing debt, 14% interest free debt, and 1% equity.  (16-22321 Dkt. No. 62 Ex. 25.1 at 15.)  Lynch, in turn, supplied the mechanism for

---

[1] Unless otherwise indicated, "Dkt. No. __" refers to the instant docket, No. 17 Civ. 4339, 4340. References to the underlying Kirwan Bankruptcy Court docket, *Kirwan Offices S.à.r.l.*, No. 16-22321, are designated as "16-22321 Dkt. No. __." References to an earlier appeal taken by Appellant challenging an order of the Bankruptcy Court, dated July 5, 2016, entitled "Order (I) For Relief Under Chapter 11 of the Bankruptcy Code, and (II) Denying, in part, Stephen P. Lynch's Motion for Intervention and Dismissal, Abstention or Stay," are designated as "16 Civ. 6300 Dkt. No. __."

effecting the acquisition – OOO Monte-Valle ("Monte-Valle), a company that he controlled, acquired OOO Promneftstroy ("PNS"), a Russian investment vehicle that had registered for the auction of Yukos Finance prior to the registration deadline and paid the required $60 million deposit.[2] (*Id.* ¶¶ 9, 17.)

On August 15, 2007, PNS won the auction for 100% of the shares of Yukos Finance. (*Id.* ¶ 21.) The winning bid was approximately $309 million. (*Id.*)

On August 30, 2007, Lynch, Kirwan, Lapidem, and Mascini formally established their legal relationship by entering into a Shareholders Agreement (the "SHA"). (*Id.* ¶ 25; *Id.* Ex. 25.1.) Pursuant to the SHA, Lapidem and Mascini capitalized Kirwan with $2.5 million as share capital and $247.5 million as loans, in consideration for approximately 2.5 million newly issued Class A and B shares in Kirwan, which, together, accounted for 99.99% of Kirwan's outstanding share capital. (*Id.* ¶ 2; *Id.* Ex. 25.1 at 8, 45.) Lynch received a single Class C share, constituting the entire share class. (*Id.* ¶ 3; *Id.* Ex. 25.1 at 8, 45.)

Lynch's Class C share carried with it certain rights. Specifically, the SHA provided that certain matters required unanimous shareholder approval, including decisions about liquidation, receivership, administration, or "any capital reorganization or other corporate action the effect of which would be to alter the rights attaching to the C share" – thereby giving Lynch tremendous influence over certain corporate actions. (*Id.* Ex. 25.1 at 43).

The SHA further provided that Appellee's loans had to be paid in full before they or Lynch could receive any recovery on account of their equity shares. (*Id.* Ex. 25.1 at 17–18, 44.) Upon full repayment of the loans, Appellees were entitled to 90% of any profits in excess of their loans; Lynch was entitled to the remaining 10%. (*Id.*)

[2] "OOO" is a Russian abbreviation for "LLC."

b.  Yukos Finance Litigation and Events Leading to the Chapter 11 Filing

Shortly after PNS acquired the shares of Yukos Finance, PNS became embroiled in litigation in the Netherlands with certain members of Yukos Oil's former management over control of Yukos Finance.  (16-22321 Dkt. No. 13 ¶¶ 15–23.)  This litigation involved, *inter alia*, the validity of certain claims and asserted attachments over the Yukos Finance shares that, if recognized, would render PNS' claims to the shares worthless.  (*Id.* ¶ 23–25.)  Because of the protracted Yukos litigation, Kirwan has not obtained clear title to the assets acquired in the auction, preventing it from generating a return on its investment and paying a return to its shareholders.  (*Id.*)

Lapidem and Manscini – as the sole sources of capital since Kirwan's inception – have financed the Yukos Finance litigation exclusively, loaning Kirwan an additional $32 million to cover litigation costs (on top of the $309 million they provided in acquisition loans).  (16-22321 Dkt. No. 62 ¶ 36.)  In light of these costs and litigation setbacks, Lapidem and Manscini sought to settle the case.  (16-22321 Dkt. No. 13 ¶ 25.)  Lynch, however, resisted the proposed settlement terms offered by Appellees, and stated that he would only agree to a settlement that netted him $35 million in his capacity as a Class C shareholder.  (*Id.* ¶¶ 25–28.)

Over the ensuing two years, as the parties disagreed over settlement, they further disagreed over the scope of Lynch's rights as a Class C shareholder.  Lynch maintained that, under the SHA, no settlement in the Yukos Finance litigation could be achieved without his approval – a position that Appellees flatly reject.  (*Id.* ¶ 30–35.)  Exercising that purported right, Lynch conveyed directly to his adversary in the Yukos Finance Litigation that his adversary could not explore settlement without Lynch's consent.  (16-22321 Dkt. No. 21 ¶ 97.)

4

Lynch alleges that, after repeated failed efforts by Appellees to wrest control of PNS'

corporate governance in an attempt to void his rights as a Class C shareholder, Lapidem and

Manscini contrived a bankruptcy "scheme" and "manufactured US jurisdiction" for the purpose

of bringing about a corporate reorganization of Kirwan. (Dkt. No. 12 at 17.)  Specifically, Lynch

argues that Mascini and Lapidem engaged two U.S. law firms, Akin Gump Strauss Hauer & Feld

LLP ("Akin Gump") and Mandel Bhandari LLP ("Mandel Bhandari"), pursuant to which Kirwan

paid retainers of $150,000 and $100,000, respectively, for the sole purpose of draining Kirwan's

funds. (*Id.* at 18–19 (citing 16-22321 Dkt. No. 62 ¶¶ 65, 77).)  Lapidem and Mascini counter

that these were legitimate and proper expenditures in connection with their continued efforts to

assert legal title to the shares in Yukos Finance. (16-22321 Dkt. No. 13 ¶¶ 37–38.)

By March 15, 2016, Kirwan owed Akin Gump $174,530.26 in legal fees. (*Id.* ¶ 52.)

Mascini and Lapidem determined that this constituted an insolvency event and, in accordance

with the parties' loan agreements, called their loans. (*Id.* ¶ 56.)  Kirwan (naturally) could not pay

off those loans, prompting Lapidem and Mascini to file that same day an involuntary bankruptcy

petition, pursuant to Chapter 11 of the Bankruptcy Code, in Bankruptcy Court for the Southern

District of New York. (*Id.*)

c.  Chapter 11 Proceedings

On April 6, 2016, Lynch – then represented by counsel – filed a motion for intervention

and dismissal of the involuntary petition, arguing, *inter alia*, that Appellees filed the case in bad

faith. (16-22321 Dkt. No. 8.)  In the alternative, he asked the court to stay or abstain so the

parties could arbitrate underlying claims of breach of the SHA, pursuant to an arbitration clause

in that agreement, which provided for arbitration in London under the Rules of the London Court

of International Arbitration. (*Id.*)  The gravamen of Lynch's filing was that Lapidem and

Mascini breached the SHA in calling their loans due, filing the involuntary petition, and pursuing a Chapter 11 plan that would restructure Kirwan's governance structure and settle the Yukos Finance litigation. (*Id.*)

The Bankruptcy Court presided over two separate hearings to consider the various issues posed by Lynch. Following a June 17, 2016 hearing, the Bankruptcy Court denied Lynch's request to abstain or stay the case so as to permit him to pursue arbitration in London, concluding that doing so would improperly interfere with the resolution of matters that were subject to the Court's core, subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a)-(b).[3] (16-22321 Dkt. No. 43.) Lynch appealed this determination, but voluntarily dismissed his appeal shortly thereafter. (16 Civ. 6300 Dkt. No. 18–20).

At a second hearing on January 27, 2017, the Bankruptcy Court denied all remaining aspects of Lynch's motion, concluding that (*i*) the Appellees did not file the case in bad faith, (*ii*) Lynch failed to establish that Appellees breached the SHA, and (*iii*) the SHA did not prevent the Appellees from pursuing a corporate reorganization of Kirwan in their capacity as creditors. (16-22321 Dkt. No. 174 at 98:17-101:2.) Lynch did not appeal this ruling.

On February 15, 2017, Appellees filed a proposed plan of reorganization for Kirwan that provided for reorganized capital and governance structures and termination of the SHA, pursuant to 11 U.S.C. §1123(a)(5)(1). (16-22321 Dkt. No. 97.) They also filed a motion to establish streamlined plan confirmation procedures. (16-22321 Dkt. No. 98.) Appellees served that motion on Appellant's counsel. The notice specified that appellees were seeking expedited

---

[3] *See also* 16-22321 Dkt. No. 96 at 122:23-123:8 (Court: "Here, it appears clear to me that [a] determination of petitioners' rights as creditors and the limitations on those rights under the shareholders' agreement is a core proceeding under the judicial code, 28 U.S.C. section 157. Clearly, that dispute affects every aspect of the petitioners' ability to not only obtain the relief they would be seeking in the bankruptcy case but also a distribution of any funds if they got that relief which is a fundamental aspect of bankruptcy law, *i e*, the resolution and allocation of the debtor's estate among creditors and shareholders.").

6

consideration of the proposed plan of reorganization and advised that a telephonic hearing on that issue was scheduled for February 27, 2017. (16-22321 Dkt. No. 102.) Shortly after service of the motion, Lynch fired his lawyers; since then, he has proceeded *pro se*.

Lynch, who conceded in subsequent Bankruptcy Court filings that he had knowledge of Appellee's filings (16-22321 Dkt. No. 148 ¶ 19), elected not to participate in either the telephonic hearing considering Appellee's motion for streamlined procedures (16-22321 Dkt. Nos. 118, 192) or a hearing on the proposed plan of reorganization. (16-22321 Dkt. No. 145.)

Following a March 20, 2017 hearing on the proposed plan of reorganization, the Bankruptcy Court found that Lynch had been properly served with notice of the hearing, (16-22321 Dkt. No. 131 ¶¶ E–F), determined that the SHA had terminated by its terms, (*id.* ¶ N(ix), and confirmed the plan of reorganization. (*Id.* ¶ 3.)

The plan of reorganization as confirmed restructured Kirwan's governance structure by vesting control of the company exclusively in Lapidem and Mascini, eliminating the potential for continued governance stalemate. The plan contains exculpation and injunction clauses that enjoin any person, including Lynch, from trying to sue Appellees in any other forum on account of the events arising from Kirwan's bankruptcy proceeding and reorganization. (*Id.* ¶¶ 4, 22–25.) Those provisions were specifically reviewed, addressed, and – with one minor amendment – approved by the Bankruptcy Court, which determined that they were appropriate under the circumstances and necessary to providing "the protection that one should get from acting in good faith . . . in a bankruptcy case, or [for] the actions that lead up to that bankruptcy case" – as the Bankruptcy Court had found the Appellees did in connection with the proceedings before it. (16-22321 Dkt. No. 145 at 23:11-16.) The Bankruptcy Court further determined that Lynch's "opposition to any reasonable restructuring . . . scurried, if not crossed the line, over into bad

faith." (*Id.* 32:9-17.) "It is in that context . . . that I am prepared to approve the exculpation and injunction provisions of the plan. . . . [S]uch provisions are here, narrowly tailored, to reflect legitimate concerns that those who acted in good faith with respect to the commencement, prosecution, and culmination of this bankruptcy case, and the debtor itself, not be subject to back-door attacks and collateral litigation for their activities related to those things." (*Id.* at 32:18-33:2.)

Lynch filed a motion for relief on April 4, 2017, seeking relief from the confirmation order, a new trial, or alteration or amendment of the confirmation order. (16-22321 Dkt. No. 148.) The court denied that motion following a hearing thereon. (16-22321 Dkt. No. 165.)

This appeal followed.

## II.    Discussion

Lynch raises a number of arguments on appeal, *viz.*:

i)   He was not given adequate and proper notice of the time fixed for filing objections to the plan of reorganization and for the hearing to consider the same, in violation of Fed. R. Bankr. P. 3017(a) & (d), 2002(b) & (g), and Article 15 of the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents, and in contravention of his due process rights;

ii)  The bankruptcy court lacked subject matter jurisdiction, pursuant to 28 U.S.C. § 1334(a), and constitutional adjudicatory authority, pursuant to *Stern v. Marshall*, 564 U.S. 462 (2011), to consider whether Appellees breached the SHA and to dispose of claims thereunder by virtue of the exculpation and injunction provisions in the confirmed plan of reorganization; and

iii) The bankruptcy court abused its discretion in denying his motion for relief, pursuant to Fed. R. Bankr. P. 9023 & 9024.

(Dkt. No. 2.)

a.   Standard of Review

The Court has jurisdiction to hear bankruptcy appeals, pursuant to 28 U.S.C. § 158(a).

Findings of fact are reviewed for clear error. *See In re Ames Dep't Stores, Inc.,* 582 F.3d 422,

8

426 (2d Cir. 2009) (citing *Momentum Mfg. Corp. v. Emp. Creditors Comm.,* 25 F.3d 1132, 1136 (2d Cir. 1994)). A finding of fact is clearly erroneous if the court is "'left with the definite and firm conviction that a mistake has been committed.'" *In re Manville Forest Prods. Corp.,* 896 F.2d 1384, 1388 (2d Cir. 1990) (quoting *United States v. U.S. Gypsum Co.,* 333 U.S. 364, 395 (1948)). Conclusions of law, by contrast, are reviewed *de novo. Ames*, 582 F.3d at 426. A bankruptcy court's decision to confirm a plan of reorganization is reviewed for abuse of discretion. *In re Brotby,* 303 B.R. 177, 184 (9th Cir. BAP 2003); *cf. In re Charter Commc'ns, Inc.*, 449 B.R. 14, 22 (S.D.N.Y. 2011), *aff'd but criticized on other grounds*, 691 F.3d 476 (2d Cir. 2012).

### b. Whether Lynch Was Given Adequate and Proper Notice of the Plan of Reorganization

Lynch argues that he was not given proper notice of the time fixed to file objections to the proposed reorganization plan and of the confirmation hearing thereon, because notice was not mailed to him to his home address in Russia. That failing, he alleges, coupled with the approval of the streamlined confirmation plan procedures, contravened Fed. R. Bankr. P. 3017(a) & (d), 2002(b) & (g), Article 15 of the Hague Convention on Service Abroad of Judicial and Extrajudicial Documents, and his due process rights. Based on these purported violations, he asks the Court to declare as void and vacate the confirmed reorganization plan, or, alternatively, to strike the exculpation and injunction provisions from the confirmed plan, pursuant to Fed. R. Civ. P. 60(b)(4).

Lynch has waived the right to challenge notice in light of his selective participation in the bankruptcy proceedings. A closer look at his conduct is revealing.

Following Appellees' service of their motion to approve streamlined procedures regarding their proposed plan of reorganization of Kirwan – but prior to the February 27, 2017

9

telephonic hearing thereon – Lynch fired his restructuring counsel, upon whom service had been made. (16-22321 Dkt. No. 104.) As a courtesy, Appellees emailed both Lynch and Lynch's English-law counsel, who had represented Lynch in other Kirwan-related matters, instructions for dialing into the telephonic hearing. (16-22321 Dkt. No. 189 Ex. B). After the telephonic hearing, at which Lynch did not appear, Appellees again emailed Lynch and his English-law counsel a notice stating that the Bankruptcy Court approved Appellees' motion for streamlined procedures and, to that end, that it set a confirmation hearing on the proposed plan of reorganization for March 20, 2017. (*Id.* Ex. F.) The email did not bounce back. (*Id.* ¶ 7.)

Immediately following the telephonic hearing, Appellees again emailed Lynch and his English-law counsel a draft proposed plan procedures order. (16-22321 Dkt. No. 164 Ex. 1 at 3.) Before the Bankruptcy Court had an opportunity to enter the order, Lynch responded to Appellees' message using the same email listed on the Jenner & Block motion to withdraw, notifying them that he would be disabling his email account later that day. (*Id.* at 4-7.) Appellees, who regarded Lynch's message as an "improper attempt to evade service in defiance of the [the Bankruptcy Court's] order," immediately forwarded the email exchange to the Bankruptcy Court. (*Id.* Ex. 1 at 2.) Within the hour, the Bankruptcy Court signed and entered an order expressly authorizing email service. (16-22321 Dkt. No. 109 ¶ 2.) ("All documents which may be required to be served on Stephen P. Lynch in the above-captioned case . . . may be served by email to [Lynch's email address] . . . . Service by email shall be deemed sufficient on its own to satisfy Rule 2002 [of] the Federal Rules of Bankruptcy Procedure.").) Thereafter, Appellees served Lynch via email with notice of the date of the confirmation hearing and of the objection deadline. (16-22321 Dkt. No. 102.) The email did not bounce back. (16-22321 Dkt. No. 189 ¶ 7.)

10

At the March 20, 2017 confirmation hearing on the proposed plan of reorganization –
which, like the February 27, 2017 telephonic hearing, Lynch did not attend – the Bankruptcy
Court made an express finding that service was proper.  (16-22321 Dkt. No. 145 at 27:22-28-7;
*see also* (16-22321 Dkt. No. 131 ¶¶ E–F) (reiterating propriety of notice in confirmation of
proposed reorganization plan.).)  A day later, the Bankruptcy Court confirmed the proposed
reorganization plan, instituting the exculpation and injunction provisions that prevent Lynch
from litigating Appellees' purported breaches of the SHA.  (16-22321 Dkt. No. 131 ¶¶ E–F.)

Two weeks later, Lynch filed a 30-page motion for relief, pursuant to Fed. R. Civ. P. 59
and 60, seeking relief from the exculpation and injunction clauses, so that he could pursue
arbitration against Lapidem and Mascini in London.  (16-22321 Dkt. No. 148.)  Critically, Lynch
admits in his moving papers that he deliberately skipped (and so was obviously aware of) the
March 20 confirmation hearing because "the risk of *res judicata*, both claim and issue-wise,
weighted [*sic*] heavily in [favor] of nonparticipation in the confirmation hearing."  (*Id.* ¶ 21.)  He
further wrote:

> Lynch did not expect the Bankruptcy Court to routinely approve the third party
> release, exculpation and injunction of his [London] arbitration claims against the
> [Appellees] and their majority shareholder . . . . Lynch expected the U.S. Trustee
> charged with protecting the integrity of the bankruptcy process would object to
> the extensive third party release, exculpation and injunction for violation of 11
> U.S. Code § 524(e) as being unprecedented, unwarranted and inequitable.

(*Id.*)  At a hearing on his motion for relief, Lynch reiterated his knowing decision to absent
himself from the confirmation proceedings, stating, "To avoid barring those [London arbitration]
claims on *res judicata*, I was advised by English counsel that I could not further participate in the
bankruptcy, and there was really no point since I had no role and no power in the bankruptcy."
(16-22321 Dkt. No. 170 at at 21:18-21.)  The bankruptcy court, in denying Lynch's motion,
remarked on Lynch's conduct:

Mr. Lynch has been actively participating in the case when he chose to do so. He was involved early on, but eventually chose, despite being served appropriately, he chose not to participate in the confirmation hearing. . . .

And here, Mr. Lynch was an active participate at his choosing, and other positions when he chose – at times when he chose not to participate. And that kind of selective participation is a problem. . . .

So despite sufficient notice of the confirmation proceedings, Mr. Lynch did not participate during those proceedings, and did not raise any of the objections he is now making.

(*Id.* at 42:25-43:4, 43:17-20, 45:9-12.)

The import of this procedural history is clear: Lynch was fully apprised of the bankruptcy proceedings below and chose not to participate, thinking it would preserve his ability to arbitrate his claim that Appellees breached the SHA. This sort of gamesmanship is inappropriate; more important, it amounts to a waiver of his present objections. *See, e.g.*, *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 493 (S.D.N.Y. 2003), *aff'd in part, vacated in part, remanded*, 388 F.3d 39 (2d Cir. 2004) ("the duplicitous 'gamesmanship' practiced by defendants in this case" which included the "refus[al] to participate in the long-scheduled trial of this case," "makes it an appropriate situation for the application of doctrines of waiver and the like.").

Where, as here, a party has actual knowledge of a matter, he cannot later complain about the form of notice, since "it is well established that due process is not offended by requiring a person with actual, timely knowledge of an event that may affect a right to exercise due diligence and take necessary steps to preserve that right." *GAC Enters., Inc. v. Medaglia*, 52 F.3d 451, 455 (2d Cir. 1995) (finding creditor's actual knowledge of bankruptcy petition was constitutionally sufficient notice of deadline for filing objections to discharge); *see also Bongiovanni ex rel. Bongiovanni v. Grubin*, 451 F. App'x 53, 54 n.1 (2d Cir. 2011) (summary order) (affirming *Medaglia*, finding waiver, and stating that notice requirements are same for shareholders and creditors); *In re Queen Elizabeth Realty Corp.*, 586 B.R. 95, 110 (S.D.N.Y. 2018).

Because Lynch, by his own admission, had actual notice of the February 27, 2017 and

March 20, 2017 hearings, his failure to participate has waived his challenge to the propriety of

notice of the time fixed to file objections to the proposed reorganization plan and of the

confirmation hearing thereon. Nor did Lynch preserve his objections by including them in his

motion for relief. A motion under Fed. R. Civ. P. 59 and 60 is not a proper vehicle for raising

"new arguments that could have been previously advanced." *See In re Terrestar Corp.*, No. 11-

10612 (SHL), 2016 WL 197621, at \*3 (Bankr. S.D.N.Y. Jan. 15, 2016) *aff'd*, No. 16 Civ. 1421

(ER), 2017 WL 1040448 (S.D.N.Y. March 16, 2017) (internal quotation marks and citation

omitted). This is especially true considering that Lynch's decision to reserve his arguments at

the eleventh-hour was entirely tactical. *See In re Britannia Bulk Holdings Inc. Sec. Litig.*, No. 08

Civ. 9554(DLC), 2010 WL 446529, at \*3 (S.D.N.Y. Feb. 9, 2010).

The Court finds that Lynch has waived his objections pertaining to notice of the February

27, 2017 and March 20, 2017 hearings. He also waived his objections to the Bankruptcy Court's

granting of streamlined procedures, since he had notice of the hearing thereon and chose not to

appeal the bankruptcy court's order.

That said, the Court also notes that the Bankruptcy Court's grant of the motion for

streamlined procedures was entirely proper. While a twenty-eight day notice period is ordinarily

required in advance of plan confirmation hearings, *see* Fed. R. Bankr. P. 2002(b), 3017(a) & (d),

that period can be shortened "for cause" under Fed. R. Bankr. P. 9006(c). The Bankruptcy Court

found cause for shortening the notice period so that confirmation could occur in advance of a

critical ruling date in a Netherlands appellate court relating to the Yukos Finance litigation, in

order to give Appellees time to attempt to settle that litigation. (16-22321 Dkt. No. 109 at 1; 16-

22321 Dkt. No. 118 at 15:7-11.)

13

Appellees argue that Lynch's skipping of the March 20, 2017 hearing amounts to a

waiver of a challenge to any aspect of the confirmed plan – including the exculpation and

injunctions provisions contained therein. However, in light of the serious jurisdictional and

constitutional issues that Lynch presses, which can be entertained without additional fact-

finding, the Court will exercise its discretion to consider them. *Allianz Ins. Co. v. Lerner*, 416

F.3d 109, 114 (2d Cir. 2005) (internal quotation marks and citation omitted).

> c. Whether the Bankruptcy Court had Subject Matter Jurisdiction and the
> Constitutional Adjudicatory Authority to Consider and Enjoin Claims under the
> SHA

Lynch argues that the Bankruptcy Court did not have subject matter jurisdiction or the

constitutional adjudicatory authority to consider, and subsequently enjoin by way of the

exculpation and injunction provisions in the confirmed reorganized plan, claims under the SHA.

These contentions will be considered separately.

## 1. Subject Matter Jurisdiction over Involuntary Third-Party Releases

Bankruptcy courts have original jurisdiction over all bankruptcy cases and related

proceedings. 28 U.S.C. § 1334(a)-(b). Their authority, however, depends upon whether the

matter qualifies as a "[c]ore proceedin[g]," *i.e.*, one that "aris[es] in" or "under" Title 11, or a

"[n]on-core proceedin[g]," *i.e.*, one that is "related to" a bankruptcy case 28 U.S.C. § 157.

"Congress identified as '[c]ore' a nonexclusive list of 16 types of proceedings in which it

thought bankruptcy courts could constitutionally enter judgment." *Wellness Int'l Network, Ltd.*

*v. Sharif*, 135 S. Ct. 1932, 1940 (2015) (citing *id.* § 157(b)(1)-(2)). If it is a core proceeding, a

bankruptcy court may "hear and determine" those cases, and "enter appropriate orders and

judgments," subject to appellate review by the district court. *Id.* § 157(b)(1). If it is a non-core

proceeding, the bankruptcy court's authority is limited – it may "hear and determine" such

14

proceedings, and "enter appropriate orders and judgments," but only "with the consent of all the
parties to the proceeding." *Id.* § 157(c)(2). "Absent consent, bankruptcy courts in non-core
proceedings may only 'submit proposed findings of fact and conclusions of law,' which the
district courts review *de novo*. *Wellness*, 135 S. Ct. at 1940 (citing 28 U.S.C. § 157(c)(1)).

As noted, Section 157 contains a non-exclusive list of bankruptcy proceedings that
qualify as "core;" among them is confirmations of plans of reorganization. *Id.* § 157(b)(2)(L).
At issue is whether all aspects of a reorganization plan – specifically, non-consensual releases of
non-debtor, third party claims (such as the exculpation and injunction clauses that are the subject
of this appeal) – are similarly within that core jurisdiction. If they are, then that ends the matter.
If not, the Court must consider whether Lynch consented to the Bankruptcy Court's non-core
jurisdiction so as to permit it to enter a final order extinguishing his claims against Appellees
over their purported breach of the SHA.

### *Core Subject Matter Jurisdiction*

Lynch argues that an involuntary release of non-debtor, third party claim always falls
outside a bankruptcy court's core jurisdiction. (Dkt. No. 12 at 43–45.)

The Court disagrees.

At the outset, the Court notes that involuntary releases of third-party, non-debtor claims
that are entered by bankruptcy courts are subject to considerable scrutiny. A minority of Circuits
prohibit them. *See In re Vitro S.A.B. DE C.V.*, 701 F.3d 1031, 1061 (5th Cir. 2012); *In re
Lowenschuss*, 67 F.3d 1394, 1401–02 (9th Cir. 1995), *cert denied*, 517 U.S. 1243 (1996); *In re
Western Real Estate Fund, Inc.*, 922 F.2d 592, 601 (10th Cir. 1990). A majority of Circuits –
this one included – permit them, but only if they meet certain conditions. *See, e.g.*, *In re Drexel
Burnham Lambert Group, Inc.*, 960 F.2d 285, 292 (2d Cir. 1992); *Monarch Life Ins. Co. v.*

15

*Ropes & Gray*, 65 F.3d 973, 984–985 (1st Cir. 1995); *In re Continental Airlines*, 203 F.3d 203, 214 (3d Cir. 2000); *In re A.H. Robins Co., Inc.*, 880 F.2d 694, 700–02 (4th Cir. 1989); *In re Dow Corning Corp.*, 280 F.3d 648, 655–658 (6th Cir. 2002); *In re Air Commc'ns, Inc.*, 519 F.3d 640, 655–58 (7th Cir. 2008); *In re Seaside Engineering & Surveying, Inc.*, 780 F.3d 1070, 1077-1079 (11th Cir. 2015), *cert. denied*, 136 S. Ct. 109 (2015).

There is no consensus among courts holding the majority view as to which jurisdictional basis is implicated when a bankruptcy court considers involuntary third-party releases. Some authorities posit that the only jurisdictional basis for a bankruptcy court to extinguish third-party claims permanently is through an exercise of non-core jurisdiction. *See, e.g., In re Metcalfe & Mansfield Alt. Invs.*, 421 B.R. 685, 696 (Bankr. S.D.N.Y. 2010); *In re Zale Corp*, 62 F.3d 746, 753 (5th Cir. 1995); *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 224, 233 (3d Cir. 2005); *In re Lower Bucks Hosp.*, 488 B.R. 303, 312 nn.28 & 30, 313 (E.D. Pa. 2013), *aff'd*, 571 Fed. Appx. 139 (3d Cir. 2014); *In re Medford Crossings N., LLC*, No. 07-25115, 2011 WL 182815, at *14 (Bankr. D.N.J. Jan. 20, 2011); *In re Congoleum Corp.*, 362 B.R. 167, 190-91 (Bankr. D.N.J. 2007); *In re Midway Gold US*, 575 B.R. 475, 517–20 (Bankr. D. Colo. Oct. 6, 2017); Eamonn O'Hagan, *On A "Related" Point: Rethinking Whether Bankruptcy Courts Can "Order" the Involuntary Release of Non-Debtor, Third-Party Claims*, 23 Am. Bankr. Inst. L. Rev. 531, 541 (2015); Joshua M. Silverstein, *Hiding in Plain View: A Neglected Supreme Court Decision Resolves the Debate over Non-Debtor Releases in Chapter 11 Reorganizations*, 23 Emory Bankr. Dev. J. 13, 20 n.38 (2006); Ralph Brubaker, *Nondebtor Releases and Injunctions in Chapter 11: Revisiting Jurisdictional Precepts and the Forgotten Callaway v. Benton Case*, 72 Am. Bankr. L.J. 1, 50 (1998). Others submit that, when involuntary third-party releases are considered in connection with confirmation proceedings, bankruptcy courts act pursuant to their core

16

Case 1:17-cv-04339-CM   Document 46   Filed 10/10/18   Page 17 of 33

jurisdiction. *See, e.g.*, *MPM Silicones, LLC*, No. 14-25503 (RDD), 2014 WL 4436335, at \*1,
\*34 (Bankr. S.D.N.Y. Sept. 9, 2014), *aff'd*, 531 B.R. 321 (S.D.N.Y. 2015), *aff'd in part, rev'd in
part on other grounds and remanded sub nom. Matter of MPM Silicones, L.L.C.*, 874 F.3d 787
(2d Cir. 2017); *In re AOV Industries, Inc.*, 792 F.2d 1140 (D.C. Cir. 1986); *In re Millennium Lab
Holdings II, LLC*, 575 B.R. 252, 263–71 (Bankr. D. Del. 2017), *aff'd sub nom.*, 2018 WL
4521941 (D. Del. Sept. 21, 2018); *In re Charles St. African Methodist Episcopal Church of
Boston*, 499 B.R. 66, 81 (Bankr. D. Mass. 2013); Ben H. Logan, *A New Millenium of Article III
Analysis: Which Court – a Bankruptcy Court or a District Court – Must Decide Whether to
Confirm a Plan that Contains a Nonconsensual Third-Party Release (Part I)*, 37 Bankr. L. Letter
No. 12 (December 2017) & *(Part II)* 38 Bankr. L. Letter No. 1 (January 2018).

The Court agrees with the latter approach. A bankruptcy court acts pursuant to its core
jurisdiction when it considers the involuntary release of claims against a third-party, non-debtor
in connection with the confirmation of a proposed plan of reorganization, which is a statutorily-
defined core proceeding. 28 U.S.C. § 157(b)(2)(L). A confirmed reorganization plan that
includes such releases does not address the merits of the claims being released; those, of course,
are governed by non-bankruptcy law. Rather, it effectively cancels those claims so as to permit a
total reorganization of the debtor's affairs in a manner available only in bankruptcy. *Id.*; *cf. Stoll
v. Gottlieb*, 305 U.S. 165, 169, 177 (1938) (holding that *res judicata* precluded state court action
seeking to enforce guarantee that bankruptcy court determined was "cancel[ed]," pursuant to §
77B of the Bankruptcy Act of 1898, in connection with confirmed reorganization plan); *Katchen
v. Landy*, 382 U.S. 323, 332 n.9 (1966) (noting that the claims allowance process "does not
constitute adjudication of a suit by the trustee"); *In re Ambac Fin. Grp., Inc.*, No. 10-B-15973
(SCC), 2011 WL 6844533, at \*7 (S.D.N.Y. Dec. 29, 2011), *aff'd*, 487 F. App'x 663 (2d Cir.

17

2012) (stating that "there is a fundamental difference between a court's entry of a final, binding judgment on the merits of a [shareholder derivative] claim and its approval of a settlement [relating to the property of the debtor's estate] of that claim."). The authority to effect that "cancellation" is delegated in the Bankruptcy Code, *see* 11 U.S.C. § 1123(b)(5)-(6), *id.* § 105(a) – *i.e.*, the request for cancellation "aris[es] in" the bankruptcy or "aris[es] under" Title 11.  28 U.S.C. § 157(b)(1).  That a bankruptcy court's decision may have a preclusive, incidental effect on claims beyond the scope of the immediate bankruptcy proceeding does not render the bankruptcy court's jurisdiction non-core.

*In re AOV* is particularly instructive.  There, certain creditors argued that the bankruptcy court could not constitutionally exercise non-core jurisdiction over third-party claims between two non-debtors by confirming a reorganization plan that contained a third-party release.  The D.C. Circuit rejected the premise underlying the argument – that the court was exercising jurisdiction over non-core claims.  Instead, it determined that, because it was considering a third-party release as part of a proposed plan of reorganization – a proceeding that is "clearly at the core of bankruptcy law" – the bankruptcy court acted pursuant to its core jurisdiction.  *In re AOV*, 792 F.2d at 1145.  "Although the bankruptcy court's decision may have an impact on claims outside the scope of the immediate proceedings, we do not read [*Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982)] and its progeny to prohibit all bankruptcy court decisions that may have tangential effects. The expansive reading of *Marathon* urged on us … would limit the power of these Article I courts to a far greater degree than we believe Congress or the Supreme Court intended." *Id.* at 1145–46. *See also Charles St.*, 499 B.R. at 81 (noting that where non-debtor's guarantee of certain claims against debtor would be released, the "matter before the Court is not a suit on the Guaranty; the merits of

Case 1:17-cv-04339-CM   Document 46   Filed 10/10/18   Page 19 of 33

the Guaranty are not in controversy. . . . Confirmation of a plan is not an adjudication of the various disputes it touches upon . . .; it is the total reorganization of the debtor's affairs in a manner only available in bankruptcy."); *Millenium*, 575 B.R. at 271 (holding that the "operative proceeding" for purposes of determining a court's authority to enter an involuntary third-party release, "is a confirmation of a plan, which is governed by [28 U.S.C. § 157(b).]"). At bottom, while an involuntary release may have the *effect* of a ruling on the merits, it is *not* a ruling on the merits – and thus operates on entirely different jurisdictional footing.

Critics of this jurisdictional approach argue that it amounts to giving bankruptcy courts a "blank check" and permits parties to boot-strap related claims to a chapter 11 plan so as to give the court "'infinite jurisdiction.'" *Midway*, 575 B.R. at 519 (quoting *In re Digital Impact, Inc.*, 223 B.R. 1, 11 (Bankr. N.D. Okla. 1998)). This argument overstates the Court's position. It surely would be improper for a bankruptcy court to confirm a plan releasing third-party, non-debtor claims that were unrelated (or even only tangentially related) to the debtor or the bankruptcy case. A third-party release must be sufficiently related to the issues before the bankruptcy court in order for core jurisdiction to cover an order extinguishing that claim. *See, e.g.*, *Drexel*, 960 F.2d at 293 ("a court may enjoin a creditor from suing a third party, *provided [that] the injunction plays an important role in the debtor's reorganization plan.*") (emphasis added). This conclusion also follows from the statutory requirement that a third-party release be "appropriate" to include in a reorganization plan and not violate another provision of the Bankruptcy Code. 11 U.S.C. § 1123(b)(6); *see also id.* § 1129(a)(1) ("The court shall confirm a plan only if . . . [t]he plan complies with the applicable provisions of this title.").

More generally, this approach finds support outside the context of third-party releases. The Second Circuit has repeatedly held that, where confronted with matters that qualify as core

and non-core, matters that are integral to the integrity of the bankruptcy process render the entire

proceeding core – even where the non-core issues arise under another jurisdiction's laws and

relate to prepetition events. *See In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002) ("the

contract dispute in this case was not independent of the reorganization. Accordingly, the impact

of the plan consummation motion on other core bankruptcy functions renders it core."); *In re*

*CBI Holding Co.*, 529 F.3d 432, 461–62 (2d Cir. 2008) (claims for fraud, negligence, and breach

of contract were "so factually and legally interconnected" to core proceedings because they were

"'based upon the same operative facts as' the ... core proceedings" that they too were core); *In re*

*G.M. Crocetti, Inc.*, No. 08 Civ. 6239(BRL), 2008 WL 4601278, \*4, (S.D.N.Y. Oct. 15, 2008)

(noting that, while a claim based on a pre-petition contract "weighs against a finding of core

status," non-core issue is "inextricably bound up with, and requires consideration of," the core

issues, and rendered entire proceeding core); *In re Delta Air Lines, Inc.*, No. 07 Civ. 2649(DC),

2007 WL 3166776, \*4 (S.D.N.Y. Oct. 30, 2007) (noting "the effect of Delta's claim on core

bankruptcy functions outweighs the importance of the contract's pre-petition origin."). Indeed,

"in making the core/non-core distinctions," courts must be mindful that "'Congress realized that

the bankruptcy court's jurisdictional reach was essential to the efficient administrated of

bankruptcy proceedings and intended that the 'core jurisdiction would be construed as broadly as

possible,'" subject to constitutional limits. *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir.

2002) (quoting *In re S.G. Phillips Constructors, Inc.*, 45 F.3d 702, 705 (2d Cir. 1995)).

Finally, the Supreme Court's decision in *Stern*, which will be discussed in further detail

below, *infra* at 25, lends clear support for the conclusion that a non-core matter that arises in

connection with a core proceeding renders that matter core, for purposes of determining a

bankruptcy court's subject matter jurisdiction, as long as the non-core matter is sufficiently

20

related to the core proceeding. *Stern*, 564 U.S. at 477 (holding that bankruptcy court had statutory authority to enter final judgment on tortious interference counterclaim in connection with bankruptcy core proceeding initiated under 28 U.S.C. § 157(b)(2)(C)).

Thus, it is of no moment that Lynch's related claims arise under a pre-petition contract, subject to the laws of another jurisdiction, and were against a non-debtor. Once Kirwan became insolvent – an event that occurred in this District – Kirwan's creditors were permitted to seek recourse by filing an involuntary chapter 11 petition in the Bankruptcy Court. *See* 28 U.S.C. 1334(a); *In re Octaviar Admin. Pty Ltd.*, 511 B.R. 36, 373–74 (Bankr. S.D.N.Y. 2014 (finding a non-U.S. entity may be a debtor under the Bankruptcy Code if it holds any property in the U.S., and that a law firm retainer suffices for purposes of this requirement). The Bankruptcy Court had the indisputable authority to adjudicate the proposed corporate reorganization of Kirwan, which, under 28 U.S.C. § 157(b)(2)(L), is a core function. The Bankruptcy Court explicitly found that it could not have performed that core function without including the exculpation and injunction provisions; otherwise, Lynch could collaterally attack the Bankruptcy Court's authority in a non-bankruptcy forum. (16-22321 Dkt. No. 145 at 23:10-16.) In fact, that is precisely what Lynch attempted to do.[4]

---

[4] Six days after the hearing on Appellees' motion to approve streamlined confirmation procedures, Lynch filed an arbitration complaint against Appellees in London, seeking to undercut the bankruptcy proceedings. (16-22321 Dkt. No. 134.) That complaint embodied all of the claims prohibited by the exculpation clause. (*Id* at 53 ("[Appellees] demanding early repayment of the loans . . . , the filing of the Involuntary petition with the US Bankruptcy Court and of the Reorganization Plan . . . represent breaches by [them] of the SHA in many respects and caused damage to [Lynch].").) Appellees responded by filing before the Bankruptcy Court a motion to compel Lynch to dismiss the arbitration in light of the exculpation and injunction clauses. (16-22321 Dkt. No. 133.) Determining that Lynch's arbitration complaint fell squarely within the injunction against bringing collateral suits, the Bankruptcy Court directed Lynch to dismiss his complaint. He did so without prejudice, preserving his right to re-file his arbitration complaint, pending the outcome of any appeal (such as this one). (16-22321 Dkt. No 157; *see also* 16-22321 Dkt. No. 150 at 20:2-16.)

Resolving Lynch's related claims was not merely related to the matters encompassed within the confirmed reorganization plan; it was necessary to the plan's operation. As noted, Lynch claimed that Appellees breached the SHA by declaring an insolvency event and filing an involuntary petition before the Bankruptcy Court. (16-22321 Dkt. Nos. 8, 134.) Those allegations, left unresolved, threatened the vitality of any confirmed reorganization plan. Lynch made no effort to hide his desire to undo the bankruptcy process by pursuing arbitration in London. As a result, the Bankruptcy Court did not err in concluding that it possessed core jurisdiction to release those claims in furtherance of its Congressionally-sanctioned objective – administering the estate of a debtor and allocating claims among creditors.

Notwithstanding the above, there is an additional, independent basis for concluding that the Bankruptcy court had core jurisdiction over the released third-party claims. Following Lynch's motion for intervention and dismissal, abstention, or stay of the involuntary proceeding – which, again, were predicated on Lynch's underlying third-party claims – the Bankruptcy Court held an extensive hearing, issued a denial and, in so doing, explicitly determined that it had core jurisdiction over that motion. (16-22321 Dkt. No. 43 at 1.) Lynch appealed to the District Court, (16 Civ. 6300 Dkt. No. 1), but, voluntarily dismissed his appeal. (16 Civ. 6300 Dkt. Nos. 18–20.) As a result, the Bankruptcy Court's order finding it possessed core jurisdiction over the parties' disputes under the SHA became final on the merits and is *res judicata* as to the parties in this case. *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 152, (2009) (citing *Nevada v. United States*, 463 U.S. 110, 130 (1983)). A final order is "not any the less preclusive because the attack is on the Bankruptcy Court's conformity with its subject-matter jurisdiction, for '[e]ven subject-matter jurisdiction ... may not be attacked collaterally.'" *Id.* (quoting *Kontric v. Ryan*, 540 U.S. 443, 455 n.9 (2004)).

22

Accordingly, the Bankruptcy Court possessed core jurisdiction over Lynch's third-party claims against Appellees, permitting it to enter the exculpation and injunction provision releasing those claims as part of the confirmed plan of reorganization.

### *Non-Core Subject Matter Jurisdiction*

Assuming *arguendo* that the only jurisdictional basis for the Bankruptcy Court to consider the release of Lynch's related claims were through an exercise of non-core jurisdiction, the Bankruptcy Court was permitted to enter a final order releasing those claims, because all parties to the proceeding, including Lynch, consented to the court's jurisdiction. 28 U.S.C. § 157(c)(2).

Consent need not be express. The Supreme Court stated as much in *Wellness*, holding that implied consent is sufficient under the Constitution and Section 157(c)(2), provided that such consent is knowing and voluntary. *Wellness*, 135 S. Ct. 1948. Relying on its opinion in *Roell v. Withrow*, 538 U.S. 580, 595 (2003), the Court reiterated that implied consent promotes the "pragmatic virtues" of "increasing judicial efficiency and checking gamesmanship." *Wellness*, 135 S. Ct. at 1948.

Here, finding that Lynch impliedly consented is consistent with – and, indeed, is necessary to – "checking gamesmanship." *Id.* Lynch's selective participation in the proceedings below, borne out by his "opposition to any reasonable restructuring . . . scurried, if not crossed the line, over into bad faith." (16-22321 Dkt. No. 145 at 32:9-17.) As outlined above, he attempted to dodge service by deactivating his email address (16-22321 Dkt. No. 164at 4–7); deliberately skipped hearings on the motion to streamline confirmation proceedings and confirm the proposed plan of reorganization in an effort to thwart being bound by the Bankruptcy Court's

23

holdings (16-22321 Dkt. No. 170 at 21:18-21); and improperly reserved certain objections to those proceedings for a last minute motion for relief. (16-22321 Dkt. No. 148.)

Where, as here, a party knowingly fails to participate in a proceeding, he impliedly consents to the entry of a final order in that proceeding. *See In re Men's Sportswear, Inc.,* 834 F.2d 1134, 1137–138 (2d Cir. 1987). While *Sportswear* predates the Supreme Court's decision in *Stern, infra* at 25, courts in this District – including this one – recognize the continued vitality of its core holding that implied consent may be derived from one's selective participation in litigation. *See In re Coudert Brothers LLP,* 2011 WL 5593147, at *10 (S.D.N.Y. Sept. 23, 2011); *Development Specialists, Inc. v. Akin Gump Strauss Hauer & Feld LLP,* 462 B.R. 457, 470 (S.D.N.Y.2011); *In re Oldco Corp.,* 484 B.R. 598, 615 (Bankr. S.D.N.Y. 2012) (finding that litigant impliedly consented to final order by failing to respond to a summons, which "clearly . . . told the consequences of failing to timely respond to the complaint.").

The notice that Appellees emailed to Lynch specifically notified him – in bolded language – about the confirmation hearing and the deadline for filing objections, and advised him that the failure to object would result in an order's being entered. He was also told that the proposed reorganization plan contained an exculpation clause that would impact his rights. (16-22321 Dkt. Nos. 109 ¶; 16 22321 Dkt. No. 113 at 1–3.) Because Lynch chose not to act on those warnings until now, Lynch cannot complain about the Bankruptcy Court's jurisdiction. Such conduct is tantamount to gamesmanship, easily satisfying the standard for clear and knowing implied consent. *Wellness,* 135 S. Ct. at 1948.

At bottom, no matter which way one cuts it, the Court had subject matter jurisdiction to enter a final order issuing the exculpation and injunction clauses.

### 2. Constitutional Adjudicatory Authority over Involuntary Third-Party Releases

24

Lynch argues that that the Bankruptcy Court lacked the constitutional adjudicatory authority to enter the exculpation and injunction provisions in the confirmed reorganization plan, pursuant to *Stern v. Marshall*.

While the Bankruptcy Court's constitutional authority is distinct from its subject matter jurisdiction to enter a final order, the analysis here proceeds in a similar fashion as above, and Lynch's argument fails on the merits. The Bankruptcy Court possessed the inherent constitutional adjudicatory authority to include the exculpation and injunction clauses in Kirwan's confirmed reorganization plan. Moreover, Lynch consented to the bankruptcy court's constitutional adjudicatory authority.

### Bankruptcy Court's Constitutional Adjudicatory Authority

This analysis begins with the Supreme Court's opinion in *Marathon* because, "[T]o understand *Stern*, it is necessary to first understand [*Marathon*]." *Wellness*, 135 S. Ct. at 1946.

In *Marathon*, a debtor, two months after filing a petition for reorganization, filed a complaint in bankruptcy court against its creditor, seeking damages for alleged breaches of contract and warranty, misrepresentation, coercion, and duress. The creditor sought to dismiss the complaint on the ground that the Bankruptcy Act of 1978 unconstitutionally conferred judicial power reserved for Article III courts on Article I judges. The Court, in a plurality opinion, sided with the creditor and ruled that the entire Bankruptcy Act of 1978 was unconstitutional. *Marathon*, 458 U.S. at 76. In so concluding, the Court reasoned that the "restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights." *Id.* at 71. Because the resolution of the state law claims in *Marathon* were "independent of and antecedent to the reorganization petition," *id.* at 84, and, more descriptively, were "related only peripherally to an

25

adjudication of bankruptcy under federal law," *id.* at 92 (Burger, C.J., dissenting), the Bankruptcy Act of 1978 – insofar as it permitted adjudication by the bankruptcy court in *Marathon* – violated Article III of the Constitution.

Congress responded by enacting the Bankruptcy Amendments and Federal Judgeship Act of 1984, the legislative scheme that remains in place today.

Nearly thirty years later, the constitutional issue presented in *Marathon* reared its head again in *Stern*.

In *Stern*, the Supreme Court evaluated whether a bankruptcy court had the constitutional authority to enter a final judgment on a state law counterclaim – there, tortious interference with an *inter vivos* gift – made by a debtor in the course of a bankruptcy proceeding against a claimant. Notably, the bankruptcy court conducted a five-day bench trial on that counterclaim, during which it "heard the testimony of the witnesses who testified at trial, considered the testimony of those that appeared through deposition transcript, and evaluated the credibility of all of the witnesses." *In re Marshall*, 253 B.R. 550, 553 (Bankr. C.D. Cal. 2000).

After considering its earlier decisions in *Katchen*, *supra* at 17, *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), *Langenkamp v. Culp*, 498 U.S. 42 (1990) (*per curiam*), the Supreme Court articulated a disjunctive test ("Disjunctive Test") for considering bankruptcy courts' constitutional authority to adjudicate claims. The Disjunctive Test provides that a bankruptcy court cannot enter a final order unless either the action at issue "stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process." *Stern*, 54 U.S. at 499. This test was intended to capture the category of cases involving "public rights" that Congress could constitutionally assign to Article I courts for resolution. *Id.* at 485.

26

As applied to the particular dispute in *Stern*, the Court determined that the tortious interference counterclaim failed the Disjunctive Test. It did not "stem" from the bankruptcy proceeding, as it "in no way derived from or [was] dependent upon bankruptcy law," "existed without regard to any bankruptcy proceeding," and did not "flow from a federal statutory scheme." *Id.* at 493, 499. Nor would the counterclaim necessarily be resolvable while adjudicating the creditor's proof of claim, since the counterclaim "raise[d] issues of law entirely different from those raised [on the original claim of defamation against the estate.]" *Id.* at 497–98.

In so holding, the Court clarified that its decision was "a narrow one," *id.* at 502, "replete with language emphasizing that the rule should be limited to the unique circumstances of that case," and in view of the division of labor between bankruptcy and district court judges. *In re Quigley Co., Inc.*, 676 F.3d 45, 52 (2d Cir. 2012) (citing *Stern*, 564 U.S. at 503).

*Stern*, in short, changed very little. As the majority opinion in *Stern* notes, if one were to substitute "tort" for "contract," *Stern* would be *Marathon*. *Id.* at 494. The Supreme Court simply restated and applied the foundational principle of bankruptcy law, as articulated in *Marathon*, to the existing statutory framework under the Bankruptcy Amendments and Federal Judgeship Act of 1984.

The most noteworthy aspect of *Stern*, however, is that the Supreme Court found that the' bankruptcy court – despite possessing the core *statutory* authority to hear the claim, pursuant to 28 U.S.C. § 157(b)(2), *see supra* at 21 – still lacked the *constitutional* authority to enter a final judgment. In other words, even where certain matters are statutorily core under the Bankruptcy Code, a bankruptcy court cannot enter final orders on matters that are not constitutionally core,

27

*i.e.*, ones that are not "integral to the restructuring of the debtor-creditor relationship." *Stern*, 564 U.S. at 497 (quoting *Langenkamp*, 498 U.S. at 44).

Be that as it may, *Stern* did not follow the same course set in *Marathon*. The Supreme Court did not invalidate the entire Bankruptcy Amendments and Federal Judgeship Act of 1984. Instead, *Stern* constituted an "isolated" constitutional incident, resolvable on the facts of the case, while still leaving intact the broader congressional scheme referring core proceedings to bankruptcy judges for adjudication. *Id.* at 503.

At bottom, these cases illustrate that a bankruptcy court's constitutional adjudicatory authority depends, not on the nature of a related claim at issue, but rather on how resolving that claim relates to a core Article 1 bankruptcy process. As a practical matter, resolving claims against a debtor will nearly always be integral to resolving a bankruptcy process, while claims against third parties will be integral only in "rare cases." *In re Metromedia Fiber Network, Inc.*, 416 F.3d 136, 141 (2d Cir. 2005).

This is such a case.

Unlike the resolution of the claims in *Stern* and *Marathon*, which "simply attempt[ed] to augment the bankruptcy estate," *Stern*, 564 U.S. at 495, the release of Lynch's claims was absolutely necessary to the operation of Kirwan's reorganization plan, *supra* at 22, because it was integral to the "restructuring of debtor-creditor relations" between Kirwan and Appellees. *Marathon*, 458 U.S. at 71. The release also satisfies *Stern*'s Disjunctive Test, for it "stems" from the bankruptcy process. The exculpation and injunction clauses "derive[] from . . . bankruptcy law" – they are embedded within a confirmed reorganization plan, the "operative proceeding" for constitutional purposes. *Millenium*, 575 B.R. at 271. A reorganization plan is a creature solely of Bankruptcy law and must comply with all of the provisions of 11 U.S.C. § 1129(a) & (b).

28

And the third-party releases contained in a confirmed plan are subject to 11 U.S.C. §§ 1129(a)(1), 1123(b)(5) & (6), 105, and 524(e). In other words, those releases "flow from a federal statutory scheme." *Id.* at 493.

This statutory scheme reflects Congress's exercise of its preemption powers, which permit the "abolition of [rights] to attain a permissible legislative object. . . ." *Duke Power Co. v. Carolina Envtl. Study Grp., Inc.*, 438 U.S. 59, 88 n.32 (1978). Congress possesses exceedingly "broad power 'To establish . . . uniform Laws on the subject of Bankruptcies throughout the United States.'" *Wright v. Vinton Branch of Mountain Trust Bank of Roanoke*, 300 U.S. 440, 470 (1937) (quoting U.S. Const. art. 1, § 8, cl. 4). By way of the Bankruptcy Code, Congress authorized "wholesale preemption of state laws regarding creditors' rights" and has delegated this preemptive power to bankruptcy courts. *In re Tribune Co. Fraudulent Conveyance Litig.*, 818 F.3d 98, 111 (2d Cir. 2016). This power includes the authority to preempt non-bankruptcy suits alleging that the Bankruptcy Code has been utilized to degrade a person's non-bankruptcy rights. *Id.*; *see also E. Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 120–21 (2d Cir. 2001).

Bankruptcy courts, by way of involuntary third-party releases as part of confirmed reorganization plans, may constitutionally preempt private rights of actions, provided that the requirement articulated in *Marathon* and *Stern* is met. Rather than constituting an adjudication of the merits of third-party claims, involuntary third-party releases merely extinguish those claims as part of a core bankruptcy process, preempting "an obstacle to the accomplishment and execution of [an] important federal objective[,]" *i.e.*, the Bankruptcy Code. *Geier v. American Honda Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (quotation marks and internal citation omitted); *see also supra* at 17–18.

The release at issue here does just that. It preempts Lynch from impeding the reasonable restructuring of Kirwan – impediments that the bankruptcy court characterized as "scurr[ying], if not cross[ing] the line, over into bad faith." (16-22321 Dkt. No. 145 at 32:9-17.)

Finally, the Court is also persuaded, as the bankruptcy court in *Millennium* catalogued, that a contrary finding would "dramatically change the division of labor" between bankruptcy courts and district courts, including with respect to any sale of assets under Section 363 in which a purchaser seeks to be free of successful liability – which arises in virtually "every § 363 sale." 575 B.R. 285–86.

The bankruptcy court thus possessed the inherent constitutional adjudicatory authority to include the exculpation and injunction clauses in Kirwan's confirmed reorganization plan.

### *Consent to Adjudication*

Even assuming that the Bankruptcy Court did not have the constitutional adjudicatory authority to enter a final order confirming Kirwan's reorganization plan, Lynch consented to the Bankruptcy Court's exercise of such authority. The basis for consent is the same as above. Lynch's selective participation in the Bankruptcy Court proceedings suffices for constitutional purposes under *Wellness*. 135 S. Ct. at 1948; *supra* at 23–24.

Related to the concept of consent is waiver, which can also support a finding that a bankruptcy court has the constitutional adjudicatory authority to enter a final order. *See id.* at 1944 –45. Waiver entails the "'intentional relinquishment or abandonment of a known right.'" *Kontrick v. Ryan*, 540 U.S. 443, 458 n.13 (2004) (citation omitted). A party can waive his right to adjudication of non-core matters before an Article III judge by failing to press his *Stern* challenge throughout a bankruptcy proceeding.[5] *See, e.g.*, *In re Allegro Law LLC*, 545 B.R. 675,

---

[5] The Supreme Court regards consent as a form of waiver. *See Wellness*, 135 S. Ct. at 1947. Forfeiture, by contrast, is regarded as a distinct concept. *See id.* at 1949. Both waiver and forfeiture suffice in this context.

700 (Bankr. M.D. Ala. 2016) (waiver "by failing to subsequently reiterate" right to an Article III adjudication "and by giving the Court (and opposing counsel) the false impression that they intended to defend this suit at a bench trial conducted by this Court.").

Here, Lynch pressed his SHA-related claims when he first moved to dismiss the involuntary petitions. Those claims were extensively briefed. The Bankruptcy Court was presented with a 42-page expert declaration by an English qualified attorney that was devoted entirely to an interpretation of the parties various rights under the SHA. (16-22321 Dkt. No. 23.) The SHA-related claims were addressed by the parties, and scrutinized by the Bankruptcy Court, over the course of two separate hearings. The Bankruptcy Court specifically considered the applicability of the SHA and whether it permitted Appellees to pursue a chapter 11 plan. (*See* 16-22321 Dkt. No. 96 at 98:17-99:1.) It found that Lynch had not established that Appellees breached the SHA by filing a petition in bad faith. (*Id.* at 98:13-17.) Lynch never appealed this ruling. That works a waiver, precluding Lynch from challenging the bankruptcy court's constitutional adjudicatory authority here.

d. Whether the Bankruptcy Court Abused its Discretion in Denying Appellant's Motion for Relief

Lynch argues that the Bankruptcy Court abused its discretion in denying his post-confirmation motion seeking either relief from the confirmation order, a new trial, or alteration or amendment of the confirmation order to strike the exculpation and injunction provisions, pursuant to Fed. R. Civ. 59 and 60, as incorporated into bankruptcy cases by Fed. R. Bankr. P. 9023 and 9024.

As an initial matter, the Court reiterates that Lynch's motion for relief from the exculpation and injunction clauses was not a proper vehicle for challenging those clauses for the first time. *Supra* at 13. It was also improper for him to use Fed. R. Civ. P. 59 and 60 as a means

31

to re-litigate his motion to dismiss, secure another hearing on the merits, or otherwise take a second bite at the apple on any of the matters previously raised to the Bankruptcy Court – including his assertions that the Appellees filed the involuntary petition in bad faith, that the Appellees breached the SHA, and that the SHA required the Bankruptcy Court to dismiss, stay, or abstain from deciding the case so as to permit the parties to pursue arbitration in London. *See Terrestar*, 2016 WL 197621, at \*3.

Insofar as Lynch's appeal from the denial of his motion for relief concerns the exculpation and injunction provisions – and it is that particular issue to which Appellant devotes the entirety of his moving papers on appeal – that argument is inextricably bound up with the issues that the Court already has addressed above. Contrary to his assertion on appeal, the Bankruptcy Court was not required to issue proposed findings of fact and conclusions of law, because, as noted, the exculpation and injunction provisions were "core" matters within the Bankruptcy Court's subject matter jurisdiction. Nor are the exculpation and injunction provisions inconsistent with the Second Circuit's case law requiring that they be integral to the success of a confirmed reorganization plan, because, as stated a number of times already, they undoubtedly were. *Drexel*, 960 F.2d at 293; *In re Quigley., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012) (court's authority to address related third-party claims depends upon whether the outcome "might have any 'conceivably effect' on the bankruptcy estate.") (internal citation omitted); *Metromedia*, 416 F.3d at 141 (non-debtor release should be approved where finding that "truly unusual circumstances render the release terms important to the success of the plan"). These factors, coupled with the Bankruptcy Court's findings that Lynch consented to the entry of a final order by his deliberate decision not to contest the exculpation and injunction clauses at the appropriate juncture (16-22321 Dkt. No. 170 45:9-12), necessarily mean that the Bankruptcy

Court did not abuse its discretion in denying Lynch's motion for relief from the inculpation and exculpation injunctions, or, in the alternative, for a new hearing on the same issue. (*Id.* at 46:16-47:1.)

## CONCLUSION

The Bankruptcy Court's decision is AFFIRMED.

Dated: October 10, 2018

Chief Judge

BY ECF TO ALL PARTIES