I9L5kirA

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   In Re:  KIRWAN OFFICES
    S.a.R.L.,
4
                                    17 Civ. 4339 (CM)
5                                   17 Civ. 4340 (CM)

6
    ------------------------------x
7
                                    September 21, 2018
8                                   11:15 a.m.

9   Before:

10                  HON. COLLEEN MCMAHON,

11                                      District Judge

12

13                      APPEARANCES

14

15  STEPHEN LYNCH, Pro se

16  SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP
         Attorneys for Appellees Mascini and Lapidem
17  BY:  MARK A. McDERMOTT
         JONATHAN FRANK
18       JASON N. KESTECHER

19

20

21

22

23

24

25

I9L5kirA

```
 1              (Case called)
 2              THE DEPUTY CLERK:  If the parties could please state
 3     your appearance for the record.
 4              MR. LYNCH:  Stephen Lynch, appearing pro se as the
 5     appellant.
 6              MR. McDERMOTT:  Mark McDermott on behalf of the
 7     appellees Lapidem and Mascini.
 8              MR. KESTECHER:  Jason Kestecher on behalf of appellees
 9     as well.
10              MR. FRANK:  Jonathan Frank.
11              THE COURT:  Have a seat.  Okay, you have each got 10
12     minutes.
13              Mr. Jones, anything you want to say?
14              MR. LYNCH:  Mr. Lynch.
15              THE COURT:  I'm sorry.  Mr. Lynch.
16              MR. LYNCH:  Yes.
17              Thank you, your Honor.  10 minutes is exactly my
18     prepared statement.
19              THE COURT:  How convenient.
20              MR. LYNCH:  And thank you for the opportunity to
21     orally present my case.
22              Your Honor, I am appealing a bankruptcy court
23     confirmation order's exculpations and injunctions and a denial
24     of relief from the same.  The exculpations and injunction bar
25     me from answering a claim for damages under a pre-bankruptcy
```

I9L5kirA

agreement at the London Court of International Arbitration, the
LCIA.  If permitted, my claims at the LCIA are based upon that
pre-bankruptcy contract.  It is a contract between shareholders
and other third-parties who are not part of the bankruptcy.  My
claims are not against a debtor or its assets, and have no
effect on its estate.  The third-party releases I appeal are
respectfully overreached by the bankruptcy court.  The
bankruptcy court exceeded the limits of its authority as
clearly set by controlling precedent in the Second Circuit and
by the Supreme Court.  The bankruptcy court did not have
subject matter jurisdiction, nor either statutory or
constitutional authority to adjudication my claims.  My LCIA
claims are not against the debtor and have no conceivable
effect on either the debtor or its estate.  The discharge of
the debtor was complete and did not require restraining me from
pursuing my claims.  My LCIA claims are neither core, nor
related to bankruptcy matters.  They exist outside of
bankruptcy law and the bankruptcy case.  They are based on
English contract law.

          Moreover, the Second Circuit standard for the granting
of third-party consensual releases -- the Metro Media
standards -- in a bankruptcy was neither considered nor
remotely met in the granting of these releases.  There were no
unusual or unique circumstances that made the releases or
exculpations necessary.  For all these reasons, the bankruptcy

I9L5kirA

1    court never should have approved the confirmation plan in the

2    form it did, nor the granting of nonconsensual third-party

3    releases, and for the same reasons the bankruptcy court was

4    wrong to deny me the relief I timely sought.

5            Your Honor, this is an incredible bankruptcy.  It was

6    manufactured and it had no legitimate nexus to the United

7    States, let alone the district.  The only reason the offshore

8    majority shareholders created this bankruptcy and schemed it

9    into the United States was to obtain the exculpations and

10   releases for actions they were taking and intended to take, and

11   for which I have made loud and clear I was going to sue them.

12   Something they could not obtain in our agreed jurisdiction or

13   any jurisdiction with nexus to the debtor.  The universe of

14   parties adversely affected by this bankruptcy is incredibly

15   small.  In fact, there is only one adversely affected party.

16   It is me.  The debtor did not even participate in the

17   bankruptcy.  The entire purpose and only effect of the

18   bankruptcy was to get rid of Lynch.  This is ironic as in fact

19   I am the only U.S. or district connection as I am a U.S.

20   citizen who was born down the street -- since we are in this

21   courtroom you can actually see where I was born -- and raised

22   in the district.  However, I left the district for college, and

23   after graduating from Boston University, the Peace Corps sent

24   me to Russia where I served as a volunteer from 1992 to 1994.

25   Then I worked for the U.S. government in the region, and with

I9L5kirA

1    the exception of two years to get my MBA at Wharton, I have

2    lived and worked in Russia.

3          Your Honor, we know the insolvency and bankruptcy were

4    created to get rid of Lynch because this is actually admitted

5    by the majority shareholders.  The fact stipulation made clear,

6    no nexus to the United States, no employees, no production, no

7    taxes.  The $150,000 in retainer money was moved without

8    corporation authorization to an Akin Gump bank account in

9    Washington, D.C.  The insolvency itself was fake and temporary.

10   The legals services beyond debt, while provided in New York by

11   Akin, were not known to or proved by the debtors' board and

12   were for services provided to officers of VR Capital, the

13   ultimate owner of the majority shareholders.

14         When the Akin bill came due, VR Capital instructed

15   Akin not to apply the retainer against the bill and then used

16   the approximate $25,000 of shortfall to declare an insolvency

17   event at the debtor, a company that was then and is today

18   potentially worth in excess of a billion dollars.  A $25,000

19   insolvency shortfall.  The insolvency was not only fake, but it

20   was only temporary, just long enough for the bankruptcy to be

21   entered.  The legal bills started to be paid again in June

22   2016, days after Judge Drain affirmed the bankruptcy.

23         And I should add as an aside we have, in the two years

24   since this was filed, each party spent far in excess of the

25   expenses required by the company.  Millions of dollars have

I9L5kirA

 1    been spent on this bankruptcy and not the company, which only

 2    required several million.

 3              Using the retainer in Washington, the petitioners

 4    claimed jurisdiction in SDNY and then somehow convinced the

 5    court clerk to assign the case to the Westchester Division.

 6    This last bit of the scheme I do not know the particulars of as

 7    it was only admitted --

 8              THE COURT:  We don't have a Westchester Division.  We

 9    have two court houses, we don't have divisions.

10              MR. LYNCH:  I'm sorry, your Honor.

11              THE COURT:  Move on.

12              MR. LYNCH:  It was only admitted after the bankruptcy.

13    Needless to say, I did not timely know of any of this, nor

14    consent to any of it.

15              In sum, the only effect of the bankruptcy was to

16    surgically remove my golden share and create a bar, an

17    injunction, from me seeing the perpetrators.  There was no

18    other purpose for or effect from the bankruptcy, and now two

19    years later nothing else has changed except majority

20    shareholders achieved their goal and got rid of Lynch for free.

21              I want to make them pay.  This is all done because my

22    rights in the company were substantial and the majority

23    shareholders wanted to obtain those rights for free.  The

24    debtor, as I said, is potentially worth a billion dollars or

25    more, or potentially nothing.  This was the case in 2007 when I

I9L5kirA

1    contributed the company to the joint venture and is the case

2    today.  The litigation the company must overcome is complex but

3    until it does so, the company has no value.  This is why the

4    SHA, the pre-petition contract, was without time limit and why

5    it required quiet title to finance before my share could be

6    bought out.

7            What changed from when we established the SHA until

8    the insolvency petition was that two financing shareholders

9    became one, one of the financing shareholders consolidated into

10   the other.

11           THE COURT:  I understand.

12           MR. LYNCH:  Okay.

13           What I had done originally was these were much more

14   powerful groups than I was, I was a single individual, an

15   entrepreneur.  In essence, I created a shark cage with all of

16   the rights to the company being held by me.  When there were

17   two financing shareholders, they agreed to that.  I had the

18   single golden share, that was all that was required for me to

19   maintain those corporate rights.  The structure I designed and

20   negotiated was a shark cage and incentivized wealthier and more

21   powerful financing shareholders to either finance our joint

22   asset until we obtained quiet title to it, or pay me for any

23   rights that needed to be waived.  The majority shareholders are

24   among the most sophisticated merchant market investors in the

25   world and they willingly entered into this SHA contract with

I9L5kirA

1    me.  The litigation existed at the time we entered into the SHA

2    contract.  It was never envisioned and specifically was not

3    allowed that anyone but the LCIA would hold the key to the

4    shark cage and allow them to renege on their deal with me.  It

5    was specifically undertaken by the majority shareholders that

6    they would not enforce the loan or declare bankruptcy, or seek

7    SHA dispute resolution anywhere but the LCIA.

8            VR Capital took a nihilistic approach and wanted to

9    pay me nothing for my rights.  Five distinct times, but

10   actually regularly, majority shareholders tried to get rid of

11   me.  They were repeatedly rebuffed by me turning to the LCIA

12   where I persevered in protecting my rights five times.  Still

13   their goal was often and loudly stated:  Get rid of Lynch.  To

14   achieve what they could not achieve by our contract or at the

15   LCIA, or in any court with jurisdiction, the majority

16   shareholders decided on the scheme.  It was blatantly admitted.

17   It was a scheme that got rid of Lynch for free in a venue where

18   I had limited rights to protect my asset and no rights to make

19   my claims for damages.

20           Moreover, I was barred from my right to sue the

21   perpetrators for the damages they caused me.  This injunction

22   is respectfully not within the authority of the bankruptcy

23   court and should not be allowed and that is why I am here

24   today.

25           THE COURT:  Thank you.

I9L5kirA

1          MR. LYNCH:  I spoke a bit faster than --

2          THE COURT:  As long as the court reporter could take

3    it down.  You could give lessons to some lawyers in this court

4    about speaking clearly, I will say that, Mr. Lynch.

5          MR. LYNCH:  Thank you.  Then if I have just one minute

6    before I step to the side -- well, I will wait.

7          THE COURT:  Counsel?

8          MR. McDERMOTT:  Good morning, your Honor.  Again, for

9    the record, Mark McDermott on behalf of the appellees.

10          Mr. Lynch raises three issues on this appeal.

11          THE COURT:  Yes.

12          MR. McDERMOTT:  One, that he didn't get proper notice

13    of the confirmation hearing; and two and three, that the

14    bankruptcy court didn't have the jurisdiction or the

15    constitutional authority.

16          THE COURT:  Let's deal with the jurisdictional issue.

17    The notice issue is an easy issue.

18          MR. McDERMOTT:  Okay, going to jurisdiction.

19          An exculpation clause, in sum and substance, does

20    nothing more than reflect long-standing principles of

21    preemption which basically say when a bankruptcy court rules on

22    a matter or considers a matter, people can't sue somebody else

23    in some other tribunal if they're unhappy with the result.  We

24    cite a number of decisions by Judge Gerber that explain the

25    rationale of that.

I9L5kirA

1          THE COURT:  So, I understand that.  I am just curious,

2     I recognize that Judge Drain ruled on the issue of whether it

3     was a manufactured bankruptcy.

4          MR. McDERMOTT:  Yes.

5          THE COURT:  It was litigated before Judge Drain, Judge

6     Drain concluded that it was not.  I am not sure, because I

7     inherited this case with the estate of Judge Griesa -- I got

8     one of his law clerks and a whole bunch of his cases -- was

9     there an immediate appeal taken from that?

10          MR. McDERMOTT:  Yes, there was.

11          So, if I may just add just a couple of comments around

12     that process, your Honor, because it is important.  Mr. Lynch

13     sought to get the case thrown out so he could arbitrate alleged

14     breach of contract.

15          THE COURT:  I understand.  He said it was manufactured

16     bankruptcy and he wants to arbitrate in London.

17          MR. McDERMOTT:  Yes.  So, the Judge denied that, and

18     as part of that ruling he found that he had core jurisdiction

19     over the parties' disputes under the shareholders' agreement.

20     That will be found in the transcript of June 17th.

21          THE COURT:  I understand that he did that.  The

22     question I asked was was an appeal taken from that.

23          MR. McDERMOTT:  Yes, and it was dismissed.

24          THE COURT:  Okay.  And before whom was that appeal?

25          MR. McDERMOTT:  Mr. Lynch took that appeal to one of

I9L5kirA

1    your colleagues.

2              THE COURT:  Do you know who?

3              MR. McDERMOTT:  I don't.

4              THE COURT:  Okay.

5              So, Lynch appealed that order over disputes arising

6    under the shareholders agreement and the order was appealed and

7    we don't know to whom and I'm curious, was it dismissed?  It

8    was adjudicated and dismissed?

9              MR. McDERMOTT:  No.  Mr. Lynch voluntarily dismissed

10   it.

11             THE COURT:  Mr. Lynch voluntarily dismissed this

12   appeal?

13             MR. McDERMOTT:  Yes.

14             THE COURT:  Okay.  So that order is final.

15             MR. McDERMOTT:  Correct.  And it is final for purposes

16   of this challenge to jurisdiction that he raises now.

17             THE COURT:  Well, let's start with it is final on the

18   merits.

19             MR. McDERMOTT:  Yes.

20             THE COURT:  And your position is that by bringing

21   dispute to the bankruptcy court, submitting the dispute to the

22   bankruptcy court not pursuing his appeal the order has become

23   final and that establishes jurisdiction.

24             MR. McDERMOTT:  Yes.  Judge Drain found he had

25   jurisdiction.

I9L5kirA

1      THE COURT:  Okay.  And when -- forgive me, it has been

2  very difficult to reassemble this whole thing which is why it

3  has taken so long and I apologize for that -- when was that

4  order entered?  You don't know by whom but when was that order

5  entered or when was the order voluntarily dismissing the

6  appeal?

7      MR. McDERMOTT:  It would have been, I believe, in

8  March of 2017 or thereabouts, your Honor.

9      THE COURT:  And, do you happen to know the docket

10  number of that appeal?

11      MR. McDERMOTT:  If you give one of my colleagues a

12  couple minutes we can probably find it.

13      THE COURT:  He will find it.  Let's just you and me,

14  let's keep on going.  Let us keep on going while he looks for

15  that.  I would like to know what the docket number is on that

16  case.  Mr. Lynch seems to know what the docket number is.

17      Okay.  So that happened.

18      MR. McDERMOTT:  Yes.

19      THE COURT:  All right.  So now let's talk about all of

20  your responses to the jurisdictional argument, one of them,

21  obviously, is that it's law of the case.

22      MR. McDERMOTT:  Yes.  And the Supreme Court did speak

23  directly to this in Travelers' Indemnity v. Bailey, 557 U.S.

24  137.  Once an order is final on direct review it is *res*

25  *judicata* and the subject matter jurisdiction may not be

I9L5kirA

1    attacked collaterally.

2            THE COURT:  Okay.  Next?

3            MR. McDERMOTT:  Next, I will stick with jurisdiction.

4    A bankruptcy judge has core jurisdiction to decide whether or

5    not a case belongs properly before it.  It doesn't matter that

6    there are non-bankruptcy law issues involved regarding the

7    interpretation of a shareholders' agreement.  28 U.S.C.

8    Section 1334(a) vests exclusive jurisdiction in a bankruptcy

9    court where a matter regarding the case.  That means --

10           THE COURT:  I'm sorry.  For what?

11           MR. McDERMOTT:  Matters for the case.

12           THE COURT:  I am not hearing a word.  I am sorry.

13   Your voice is dropping.  I apologize.

14           MR. McDERMOTT:  28, U.S.C., Section 1334(a) vests, in

15   federal bankruptcy courts, exclusive jurisdiction over the

16   disposition of a case.  Challenges to the propriety of a

17   petition, therefore, are the exclusive jurisdiction of a

18   bankruptcy judge.

19           THE COURT:  That, I understand.  The Judge has

20   jurisdiction, like as with any court the Judge has jurisdiction

21   to decide whether he has jurisdiction.

22           MR. McDERMOTT:  Well, he has jurisdiction to decide

23   whether or not to dismiss the case, which Judge Drain decided

24   he did have jurisdiction to keep the case.

25           THE COURT:  I understand.  He had jurisdiction to

I9L5kirA

1    decide whether he had jurisdiction.  He concluded that he did

2    have jurisdiction.

3              MR. McDERMOTT:  Yes.

4              THE COURT:  And it is your position that that order is

5    final and therefore it is res judicata, period, the end of

6    story.

7              What am I missing here?  Nothing, I don't think.

8              MR. McDERMOTT:  I think you and I are saying the same

9    thing, your Honor.

10             THE COURT:  Okay.

11             Did we get a docket number on that bankruptcy appeal?

12             MR. McDERMOTT:  Docket was in front of Judge Vincent

13   Briccetti.

14             THE COURT:  Briccetti.

15             MR. McDERMOTT:  Docket no. 20, the case number at the

16   time for that appeal --

17             THE COURT:  Docket no. 20.  What is the case number?

18             MR. McDERMOTT:  7:16-CV-6300.

19             THE COURT:  Thank you.  That's the number I wanted but

20   you are sending me to docket no. 20.  Okay.  Great.  That was

21   what I wanted.  So, let's move on.  Next argument.

22             MR. McDERMOTT:  I will be guided by your Honor.  I

23   will leave jurisdiction alone, I think I have said what I

24   needed to stay on that.

25             *Stern v. Marshall*.  When we were in front of Judge

I9L5kirA

1    Drain Mr. Lynch was represented by two sets of counsel.  I

2    nervous once heard anybody say anything about *Stern v.*

3    *Marshall*.

4              THE COURT:  Who, besides Jenner & Block, represented

5    him?

6              MR. McDERMOTT:  I forget the names of the other firms

7    that preceded Jenner & Block.  They were a couple of sole

8    practitioners that worked together.

9              THE COURT:  Okay.  So you are saying that *Stern*

10   argument was never raised.

11             MR. McDERMOTT:  Correct.  More than that, going back a

12   little bit to the notice issue, as I said in our papers and I'm

13   not going to quote everything in length, Mr. Lynch actually

14   made a conscious decision to not appear at that confirmation.

15             THE COURT:  That I understand and you are going to win

16   on notice.  You are absolutely going to win on notice.

17             MR. McDERMOTT:  Okay.  Fine.

18             THE COURT:  There is no question about it.  All three

19   arguments that you make are correct.

20             MR. McDERMOTT:  Okay.

21             THE COURT:  So you are going to win on notice.

22             MR. McDERMOTT:  Okay.  Thank you, your Honor.

23             So, just going back to *Stern v. Marshall*, Judge Drain,

24   in considering Mr. Lynch's motion for new trial, under Rule 59

25   and 60, found that Mr. Lynch had consented by his decision not

I9L5kirA

1    to go to the confirmation hearing and consented the final

2    adjudication on matters regarding the shareholders agreement

3    and the exculpation clause.  That was not an abuse of

4    discretion, your Honor.

5              THE COURT:  *Stern* is a constitutional case.

6              MR. McDERMOTT:  That's correct.

7              THE COURT:  Okay.  So we don't have any discretion

8    about the constitution so what are you saying is that Judge

9    Drain concluded essentially that he had waived the argument.

10   He didn't come.  He had notice, I agree, he had plenty of

11   notice.

12             MR. McDERMOTT:  Correct.

13             THE COURT:  Apparently some English solicitor told him

14   you don't want to do that.  That's always bad advice to listen

15   to English lawyers on points of American law, and vice versa.

16   And so, he didn't come.  Of his own free will he didn't come.

17             MR. McDERMOTT:  Correct.

18             THE COURT:  It doesn't matter what motivated him, he

19   didn't come.  And he did not challenge jurisdiction there so

20   you are saying it is consented to and the Constitutional issue

21   drops out of the case.

22             MR. McDERMOTT:  Correct.  Just to be clear, the

23   Constitutional question is different from jurisdiction.

24             THE COURT:  I know that.

25             MR. McDERMOTT:  The Supreme Court said that you can

I9L5kirA

1    consent to the Constitutional.

2              THE COURT:  Next.

3              MR. McDERMOTT:  That only leaves one last point I will

4    make, your Honor.

5              Even if, for some reason, you are not comfortable with

6    the finding that Mr. Lynch consented, exculpation clauses are

7    something over which bankruptcy courts can issue a final ruling

8    because in accordance with *Stern v. Marshall*, exculpation

9    clauses stem from the bankruptcy.  The Supreme Court said

10   bankruptcy courts can enter final rulings with respect to the

11   things that stem from the bankruptcy, that all an exculpation

12   clause does is say we are not going to let people sue good

13   faith bankruptcy participants in non-bankruptcy tribunals over

14   things that a bankruptcy court has already considered and found

15   to comply with the bankruptcy code, which Judge Drain did here.

16   He found we filed the case in good faith, we filed the plan in

17   good faith, he found we did not breach the shareholders'

18   agreement, and he did all of that when he confirmed the plan.

19   You cannot have litigants who are unhappy go before some other

20   court, especially a London arbitrator, and then try to seek

21   damages from some other court on account of matters that a

22   federal bankruptcy judge approved.  By definition, these are

23   the matters that stem from the bankruptcy and that a bankruptcy

24   court, therefore, may adjudicate on a final basis under *Stern*

25   *v. Marshall*.

I9L5kirA

1            THE COURT:  Okay.

2            Anything else?

3            MR. McDERMOTT:  Not unless your Honor has any other

4    questions.

5            THE COURT:  No.

6            MR. McDERMOTT:  Thank you, your Honor.

7            THE COURT:  Mr. Lynch, I will give you two minutes.

8            MR. LYNCH:  Respectfully may I have four or five, your

9    Honor?

10           THE COURT:  Three.

11           MR. LYNCH:  Your Honor, I did not bring the dispute to

12   the District Court.  My LCIA claims, there are 13 claims

13   relating to 13 clauses in the shareholders agreement.  There

14   are claims of, under English law, negotiated damages and *Rotham*

15   *Park* damages.  Your Honor, I did the transcript analysis.  Of

16   those 16 clauses that I'm seeking claims against, nine of them

17   were not mentioned once.  Four were mentioned once in passing

18   and the remaining three were discussed vis-à-vis the loan

19   agreements.

20           THE COURT:  Well, but you didn't participate in the

21   hearing, you didn't bring that up before Judge Drain.  You

22   didn't bring an adversary proceeding and seek to get the

23   principals in and hold an adversary proceeding in the

24   bankruptcy court.  You didn't do anything.  You were there.

25   You knew that Judge Drain had concluded that he had

I9L5kirA

1  jurisdiction and don't you think you kind of acted at your

2  peril by just standing aside saying I'm going to ignore this

3  proceeding?

4          MR. LYNCH:  No.

5          THE COURT:  Well, you did.  Guess what, you did.

6          MR. LYNCH:  Judge Drain had decided that he had

7  jurisdiction, therefore he had jurisdiction over the

8  bankruptcy.  My claims are not bankruptcy.  They have no effect

9  on the debtor or its estate.  The precedents are very clear.

10  The Supreme Court decided in *Celotex v. Edwards*, when it

11  discussed a different test of several circuits, whatever test

12  is used these cases made clear that bankruptcy courts have no

13  jurisdiction on proceedings that have no effect on that estate.

14  They have made no argument that my claims have any effect on

15  the estate because they don't.  And if the Court does not have

16  subject matter jurisdiction, *Hertz v. Friend* decided -- the

17  Supreme Court -- that courts have an independent obligation to

18  determine whether subject matter jurisdiction exists, such as

19  Judge Bernstein did in *Sun Edison*, even when no party

20  challenges it.

21          THE COURT:  Agreed.  And Judge Drain concluded that

22  subject matter jurisdiction existed.

23          MR. LYNCH:  For the bankruptcy, not my claims.  I

24  never submitted my claims in the Court.  I challenge the other

25  side to show us, in my pleadings, in the transcript, where did

I9L5kirA

1    I submit those claims?  In fact, I submitted my claims to the

2    LCIA before the confirmation hearing and that was expressly

3    known to the Court.  I did not consent.

4         And let me just add, your Honor, please, *Austin v.*

5    *Smith*, District of Columbia quoted in *Bell Helicopter*:  A

6    judgment remains void even after final judgment if the issuing

7    Court lacks subject matter jurisdiction, regardless of whether

8    there existed an arbitrable basis for jurisdiction.  And,

9    forgive me, I just found it recently thanks to Google Scholar,

10   tying to the Second Circuit with Judge tinny in Ruddies v.

11   Auburn Spark Plug, A void judgment can acquire no validity.

12        To briefly address the stemming issue.  It is a flawed

13   argument.  It conflates the issue of jurisdiction of a

14   bankruptcy court over particular matters such as a direct claim

15   with the general power of the courts granting a particular type

16   of relief such as exculpations and injunctions.  I am a layman.

17   This is my first exposure to bankruptcy court and it seems to

18   me that --

19        THE COURT:  It is very complicated.  You were better

20   off being represented by Jenner & Block.

21        MR. LYNCH:  Your Honor, Mr. Levin is a fantastic

22   lawyer and he is here with me in spirit and that's all it can

23   because I don't have the money for more than his spirit.

24        The petitioners have repeatedly threatened to crush me

25   and financially they have, but I prepared the case, I know the

I9L5kirA

1    case, I know the law, and I'm right.  And that's why I am here

2    today pro se, your Honor.  And, I apologize for any

3    inconvenience to the Court.

4              THE COURT:  No, it is no inconvenience to me.  I think

5    it is a tremendous inconvenience to you that you did not

6    continue to be represented by superb and superbly qualified

7    bankruptcy counsel because, frankly, this stuff is complicated.

8    I don't deal with it all the time and when I have to get into

9    it I have to learn it all over again.

10             MR. LYNCH:  I understand, your Honor, and I really

11   wish I had counsel with me.  I know I should have counsel with

12   me but they did financially crush me.  This is all I can do and

13   I am doing the best I can.

14             What I was simply going to say is that the way

15   bankruptcy professionals approached things is if it barks,

16   meows and moos it is a bankruptcy and you can put it into the

17   plan exculpations and releases.  Well, that's just not the

18   case.  I am not arguing that exculpations and releases are not

19   core matters of the bankruptcy court.  I'm arguing that not

20   every exculpation is legitimately so and that is the case here.

21             The laundry list of people who got a

22   get-out-of-jail-free card from these exculpations and releases

23   in my case is incredible.  There is no way I could bring them

24   into the U.S. Court.  They are not U.S. citizens, they're SPVs

25   in islands.  I could just imagine Judge Drain's reaction if I

I9L5kirA

1    said, your Honor, I'm suing them for a hundred million -- I'm

2    suing these third-parties for a hundred million dollars of

3    contract damages under *Rothman Park*.  Would you please hear

4    that case?  And I think he would throw it out because it has no

5    relevance to bankruptcy and it is not based on bankruptcy law

6    and did not affect the estate.

7            I think that's it, unless the Court has any questions

8    for me, your Honor.

9            THE COURT:  Thank you so much for coming, Mr. Lynch.

10           MR. LYNCH:  Oh.  May I have one minute?

11           THE COURT:  You may have one thing to say.

12           MR. LYNCH:  The one thing I did want to say, and it is

13   on a losing matter but I am saying it for the record -- who

14   knows, my children might read this some day -- in regards to

15   notice, it is well briefed and I am going to lose it --

16           THE COURT:  It is well briefed and you are going to

17   lose it.  That's right.

18           MR. LYNCH:  Well, I ask the Court to consider the

19   totality of the circumstances.  The January 27th decision

20   denying my motion for dismissal on bad faith was an incredible

21   shock to me.  I risked and actually lost 10 years of my work.

22   I lost my job, I lost my office, I lost my e-mail, I lost the

23   defense I had on many other cases around the world where as a

24   function of my position in the company my lawyers were paid

25   for.  This bankruptcy is the least of my worries.  I have

I9L5kirA

1    hundreds of millions of claims that are now being put against

2    me because I no longer have the shield of my share.  And in

3    those circumstances I essentially had 11 days to figure out

4    what to do because Judge Drain shortened the notice period.  I

5    had 11 days, sitting in Russia with no office, limited

6    resources, no e-mail, to try and figure out what to do.  I

7    actually think I made the right decision then.  I didn't have

8    the sophistication that I have for what it is today's

9    sophistication, to understand why I made the decision, but I

10   made the decision because Judge Drain had no subject matter

11   jurisdiction and I had important claims in the LCIA that I

12   wanted to preserve.  His stance today is the same.  He did not

13   have the authority, respectfully, to decide my LCIA claims.

14           Thank you, your Honor.

15           THE COURT:  Okay.  Anything else from you?

16           MR. McDERMOTT:  Nothing, your Honor.  Thank you.

17           THE COURT:  Okay.  Thank you very much.  And I do

18   apologize for how long it's taken for me to get to this.  I do.

19   Okay?  Thank you.

20           Thank you, all.  I'm not going to get up and leave, I

21   have to turn the computer off and things like that.  But you

22   may leave.

23                              o0o

24

25